**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- x
                       :

**REKOR SYSTEMS, INC.**              :

                       :  **CIVIL ACTION**

             **Plaintiff,**    :

                       :  **NO._____**

      **v.**                 :

                       :  **<u>COMPLAINT</u>**

**SUZANNE LOUGHLIN, HARRY RHULEN, and**  :
**JAMES SATTERFIELD**           :

             **Defendants.**   :

                       :

-------------------------------------------------------------------- x

Plaintiff Rekor Systems, Inc., by and through its attorneys, as and for this Complaint, states and alleges as follows:

## I.

## PRELIMINARY STATEMENT

1.      Plaintiff Rekor Systems, Inc., along with its affiliated subsidiaries ("Rekor"), is a multifaceted business that provides consulting and technical-support services to clients operating in the industries of telecommunications, defense, public safety, and others.  Rekor is a publicly-traded company on the Nasdaq stock exchange.

2.      In January 2017, Defendants Suzanne Loughlin and Harry Rhulen, childhood acquaintances of Rekor's Chief Executive Officer Robert Berman, together with Defendant James Satterfield, swindled Rekor into purchasing their businesses Firestorm Solutions LLC and Firestorm Franchising LLC (together "Firestorm") in exchange for cash payments, promissory notes, shares in Rekor, and options and warrants to purchase additional shares of Rekor common stock.

3.      The parties effectuated Rekor's purchase through a Membership Interest Purchase Agreement dated January 25, 2017 (the "Purchase Agreement").  The Purchase Agreement is attached to this Complaint at Exhibit A.

4.      Leading up to the Purchase Agreement, Defendants represented to Rekor that Firestorm was a competent and viable business specializing in crisis-management and emergency-response consulting, and capable of being franchised to local businesses.  But in reality these representations were false: the business was unproven and struggling to sign clients and franchisees.  Contrary to Defendants' representations, Firestorm did not have a proven franchise model, nor was it on the verge of being retained as crisis-management advisor to Beazley Insurance Company, a large insurer based in London.

5.      After the Purchase Agreement, Rekor continued to employ Defendants as executive employees to run Firestorm's day-to-day operations.  Specifically, Defendant Rhulen was hired to be President of KeyStone Solutions, Inc. (Rekor's predecessor). Defendant Loughlin was hired to be Chief Administrative Officer and General Counsel of KeyStone Solutions, Inc. And Defendant Satterfield was hired to be President of Firestorm.

6.       Defendants' employment lasted fewer than two years.  It was during these two years that Rekor began to learn of Defendants' fraud and their misrepresentations leading up to the Purchase Agreement.

7.      Firestorm suffered significant financial losses during Defendants' employment.

8.      In December 2018, Defendants resigned from Rekor and Firestorm to work for CrisisRisk Strategies LLC ("CrisisRisk")—a competing business they established—all the while keeping the cash payments, promissory notes, shares in Rekor, and stock warrants that they obtained from the Purchase Agreement.

9.     This case is about the fraud that Defendants perpetrated against Rekor. Defendants' fraudulent omissions and misrepresentations induced Rekor to enter into the Purchase Agreement.  Rekor through this Complaint seeks to rescind the Purchase Agreement and its related transactions, and requests the Court to order Defendants to return to Rekor the cash payments, promissory notes, shares in Rekor, and stock options that Defendants obtained from the Purchase Agreement.

## II.

## THE PARTIES, JURISDICTION, AND VENUE

10.     Rekor is a company that is incorporated under the laws of Delaware and maintains its headquarters at 7172 Columbia Gateway Driveway, Suite 400, Columbia, Maryland 21046.  Rekor is a citizen of Delaware and Maryland for purposes of determining federal diversity jurisdiction.

11.     Defendant Suzanne Loughlin is an individual who resides at 492 Old Sackett Lake Road, Rock Hill, New York 12775.  She is a citizen of New York for purposes of determining federal diversity jurisdiction.

12.     Defendant Harry Rhulen is an individual who resides at 560 Sundown Lane Evergreen, Colorado 80439.  He is a citizen of Colorado for purposes of determining federal diversity jurisdiction.

13.     Defendant James Satterfield is an individual who resides at 240 Wicklawn Way, Roswell, Georgia, 30076.  He is a citizen of Georgia for purposes of determining federal diversity jurisdiction.

14.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of attorney's fees, interest, and costs.

15.     The Court also has personal jurisdiction over this action because all Defendants consented in the Purchase Agreement to the personal jurisdiction of this Court "for the purpose of any Proceeding arising out of or relating to the [Purchase] Agreement [and its related transactions]."  Ex. A at ¶ 11.14.

16.     Venue in this Court is proper under 28 U.S.C. § 1391(b).

## III.

## FACTUAL ALLEGATIONS

**A.     Lead-up to the Purchase Agreement**

17.     Rekor's Chief Executive Officer, Robert Berman, has known Defendants Loughlin and Rhulen for over 50 years.  The three grew up together in the same neighborhoods of Monticello, New York.  Defendants Loughlin and Rhulen are siblings.

18.     In the summer of 2016, Defendants Loughlin and Rhulen approached Mr. Berman about selling their businesses Firestorm Solutions LLC and Firestorm Franchising LLC.

19.     Mr. Berman welcomed Defendants' approach, given the Rhulen family's reputation in Monticello for successfully creating specialized and sophisticated businesses.

20.     Defendants described Firestorm as a business that sells consulting services, programs, and resources in the areas of crisis management, crisis communications, emergency response, and business continuity.

21.     Defendants informed Mr. Berman that Firestorm developed a franchise model where local businesses operating in the ambit of crisis management and business continuity, such as a law firm or an insurance company, could purchase the right to operate a Firestorm franchise as a side business and offer crisis-management services under the Firestorm brand.

22.     Defendants said to Mr. Berman that both Firestorm's Jim Satterfield and Jim Squire, a long-time Firestorm employee operating from the company's offices in Roswell,

4

Georgia, were experts in franchising and more so that Jim Satterfield was a "genius" when it came to selling franchises.

23.     Defendants—particularly Defendant Satterfield—described Firestorm as a "great business" that utilized a successful franchise model and that had over a dozen highly specialized and sophisticated franchisees.

24.     Mr. Berman considered Defendants' description of Firestorm intriguing because its services sounded complementary to services being offered at that time by Rekor (then operating as KeyStone Solutions, Inc.).

25.     Mr. Berman and other Rekor executives were specifically intrigued by the idea of Firestorm's franchising business model because Rekor had been exploring franchising as a way to expand its existing offerings but had yet to implement the concept.

26.     Defendants also represented to Mr. Berman that Firestorm was on the verge of signing Beazley Insurance Company, a London-based global insurer with U.S. operations, as a major client.

27.     Defendants informed Mr. Berman that Beazley underwrites and re-insures hundreds of thousands of insurance policies for its customers.

28.     Defendants described how Beazley was prepared to pay Firestorm a standby fee of $10-$20 per policy from the premiums received by Beazley in exchange for retaining Firestorm as its crisis-management advisor in the event a coverable crisis occurred under any of these policies.

29.     Defendants said that the "Beazley business" was set to generate millions of dollars in recurring revenue for Firestorm and that the arrangement had limited cost to Firestorm, so it would be highly profitable.

30. Defendants also represented that other large insurance carriers, specifically including Church Mutual, were also working with Firestorm to market and underwrite an active shooter policy developed by Firestorm. Defendants told Mr. Berman that these insurance products were the product of years of development.

31. Defendant Rhulen used these representations of the Beazley business and business with other large insurance carriers as leverage to negotiate up the purchase price of Firestorm in the weeks leading up to the Purchase Agreement.

**B.     The Purchase Agreement**

32. By the end of 2016, these discussions between Mr. Berman and Defendants led Rekor (still operating as Keystone Solutions, Inc.) to purchase Firestorm from Defendants.

33. On January 25, 2017, Rekor and Defendants entered into the Purchase Agreement, under which Defendants sold 100% of their interests in Firestorm to Rekor, in exchange for the following:

     a.    Cash payments aggregating $500,000, with $250,000 payable to Defendant Satterfield; $125,000 payable to Defendant Loughlin; and $125,000 payable to Defendant Rhulen (the "Cash Payments").

     b.    Promissory notes aggregating $500,000, with $166,666.67 payable to Defendant Satterfield; $166,666.67 payable to Defendant Loughlin; and $166,666.66 payable to Defendant Rhulen (the "Promissory Notes").

     c.    Four hundred eighty-eight thousand and ninety-four (488,094) shares of Rekor's common stock, distributed as follows: 162,698 shares to Defendant Satterfield; 162,698 to Defendant Loughlin; and 162,698 to Defendant Rhulen (the "Common Stock").

     d.    Three warrants to purchase an aggregate of one hundred sixty-two thousand six hundred and ninety-nine (162,699) shares of Rekor common stock at a purchase price of $5.00 per share, distributed as follows: Warrant to Defendant Satterfield for 54,233 shares; Warrant to Defendant Loughlin for 54,233 shares; and Warrant to Defendant Rhulen for 54,233 shares (the "Five-Dollar Warrants").

    e.    Three warrants to purchase an aggregate of one hundred sixty-two thousand six hundred and ninety-nine (162,699) shares of Rekor common stock at a purchase price of $7.00 per share, distributed as follows: Warrant to Defendant Satterfield for 54,233 shares; Warrant to Defendant Loughlin for 54,233 shares; and Warrant to Defendant Rhulen for 54,233 shares (the "Seven-Dollar Warrants").

34.    This Complaint refers to the Five-Dollar Warrants and the Seven-Dollar Warrants together as the "Warrants."

35.    After KeyStone Solutions, Inc. merged with Brekford Traffic Safety, Inc. to form Novume Solutions, Inc. (another predecessor to Rekor), the aggregate number of Common Stock shares increased to 946,875 shares (315,625 shares per Defendant), the number of stock shares for each Defendant subject to the Warrants increased to 105,209 shares, and the exercise prices on both the Five Dollar Warrants and the Seven-Dollar Warrants decreased to $2.58 per share and $3.60 per share respectively.

36.    As part of the Purchase Agreement, Defendants entered into executive employment agreements with Rekor to continue to operate Firestorm (now owned by Rekor) in exchange for annual salaries and options to purchase additional Rekor stock.  Specifically, Defendant Rhulen was hired to be President of KeyStone Solutions, Inc. (Rekor's predecessor). Defendant Loughlin was hired to be Chief Administrative Officer and General Counsel of KeyStone Solutions, Inc.  And Defendant Satterfield was hired to be President of Firestorm.

## C.    Defendants' Material Misrepresentations

37.    Defendants made four material misrepresentations to induce Rekor into entering the Purchase Agreement.

### (i)    *Defendants concealed the Side Letters.*

38.    Before the close of the Purchase Agreement, Rekor requested and Defendants provided copies of franchise agreements that Firestorm had with its franchisees.

39.     On or about December 21, 2016, Defendants provided ten franchise agreements to Rekor, including agreements with the following franchisees: Resilience, LLC; Resiligence, Inc.; Sales & Marketing Associates, LLC; Crisis Averted, LLC; Your Safety Place, Inc.; MHP, Inc.; Novawood, Inc.; Eido & Cross Solutions, LLC; Hodgson Group, LLC; and Brauer Franchising, LLC.  An example copy of a franchise agreement (this one with Resiligence, Inc.) is attached to the Complaint at Exhibit B.

40.     Each franchise agreement required that the respective franchisee pay an initial franchise fee of $55,000 to Firestorm (the "Initial Franchise Fee").

41.     What Defendants did not provide to Rekor, however, were side letters that Firestorm had sent to its franchisees waiving the requirement that they pay the Initial Franchise Fee to participate in Firestorm's franchise program (the "Side Letters").

42.     An example Side Letter (this one dated October 20, 2015 and addressed to franchisee Resiligence, Inc.) states in part: "This letter will serve as recognition that Jim [Satterfield] has agreed to waive the Initial Franchise Fee…" The Side Letter is attached to the Complaint at Exhibit C.

43.     Each franchise agreement also required that the respective franchisee pay a minimum continuing royalty: "The Continuing Royalty shall be an amount equal to the greater of (i) $1,000 or (ii) 8% of the Gross Revenues…of the [franchisee's] Firestorm Business." (the "Minimum Continuing Royalty").  Ex. B at ¶ 5.2.

44.     Some Side Letters, Rekor later discovered, also waived the Minimum Continuing Royalty, including, as an example, one memorializing a franchise renewal with franchisee Novawood, Inc: "[T]his letter will confirm that Firestorm will waive the minimum Continuing Royalty in Paragraph 5.2 of $1,000 for the term of your Franchise Agreement."  A copy of this

Side Letter to Novawood is attached to the Complaint at Exhibit D. *See also* Ex. C ("This letter will serve as recognition that Jim [Satterfield] has agreed to waive…the Minimum Continuing Royalty…").

45.     Upon information and belief, Firestorm sent the Side Letters and waived the Initial Franchise Fee and the Minimum Continuing Royalty requirement for the vast majority of its franchises.

46.     Defendants hid the Side Letters from Rekor to keep Rekor from learning that the Firestorm franchisees were paying nothing of value to participate in the franchise program.

47.     By providing the franchise agreements but not the Side Letters, Defendants created the false impression in Rekor that Firestorm had a franchise model strong enough that businesses were willing to buy the right to participate in the franchise program, when in reality, Firestorm was giving that right away.

48.     The Side Letters show that Firestorm was setting up franchises without any requirement or expectation that it would receive any revenue from them.

49.     By failing to disclose the Side Letters to Rekor, Defendants deliberately acted to conceal the value and nature of Firestorm's franchise business from Rekor.

50.     Rekor reasonably relied on Defendants' deliberate omission and the false impression created by it in deciding to enter into the Purchase Agreement.

51.     Rekor learned of the Side Letters only after entering into the Purchase Agreement.

*(ii)     Defendants concealed that the majority of Firestorm Franchisees were abandoned at the time of the Purchase Agreement.*

52.     Defendants also did not disclose that seven of the ten franchisees identified to Rekor were abandoned before the Purchase Agreement was ever even executed.

53.     Each franchise agreement states: "If, after Franchisee commences paying the first Continuing Royalty under Section 5.2 of this Agreement, Franchisee either (i) has no Gross Revenues from the Firestorm Business within any 180-day period or (ii) has not generated any written sales proposals (with pricing that is consistent with Franchisee's customary pricing & Services) in any 90-day period, such inactivity shall be considered "Abandonment" of the Firestorm Business." Ex. B, at ¶ 1.1.5.

54.     Resiligence, Inc.; Sales & Marketing Associates, LLC; Your Safety Place, Inc.; MHP, Inc.; Novawood, Inc.; Crisis Averted, LLC; and Hodgson Group, LLC had not generated any Gross Revenue as defined in the Franchise Agreements in the 180 days leading up to the Purchase Agreement's execution date and had therefore abandoned those franchises under the terms of the Franchise Agreements (the "Franchise Abandonments").

55.     Defendants hid the Franchise Abandonments from Rekor to keep Rekor from learning that these franchises were effectively non-existent prior to the Purchase Agreement.

56.     By providing the franchise agreements but hiding the fact of the Franchise Abandonments, Defendants created the false impression in Rekor that Firestorm had a healthy set of at least ten franchisees participating in its franchise program, when in reality, the majority of these franchisees were inactive and had already abandoned the franchise program.

57.     By failing to disclose the Franchise Abandonments, Defendants deliberately acted to conceal the health, value, and continued viability of Firestorm's franchise business from Rekor.

58.     Rekor reasonably relied on Defendants' deliberate omission and the false impression created by it in deciding to enter into the Purchase Agreement.

59.     Rekor learned of the Franchise Abandonments only after entering into the
Purchase Agreement.

### (iii)     Defendants misrepresented Firestorm's relationship with Beazley Insurance Company.

60.     Between the spring of 2016 and January 25, 2017 (the execution date of the
Purchase Agreement), Defendants represented to Rekor that Firestorm was on the verge of
signing Beazley Insurance Company as a major client.

61.     Defendants informed Rekor that Beazley underwrites and re-insures hundreds of
thousands of insurance policies for its customers.

62.     Defendants represented to Rekor that Beazley agreed in principle to retain
Firestorm as crisis-management advisor in the event a coverable crisis ever did occur under these
policies.

63.     In exchange for Firestorm's retention, Defendants informed Rekor that Beazley
was set to pay Firestorm $10-$20 per policy.

64.     Leading up to the Purchase Agreement, Defendants said that the "Beazley
business" would create millions of dollars of recurring revenue for Firestorm.

65.     After consummating the Purchase Agreement, Rekor discovered that Firestorm
was nowhere close to being retained by Beazley as its crisis-management adviser, and that
Defendants had no reasonable basis for representing that Beazley would be a steady stream of
work and revenue for Firestorm.

66.     Defendants deliberately misrepresented to Rekor that Beazley was on the verge of
retaining Firestorm as a crisis-management advisor to induce Rekor into entering the Purchase
Agreement.

67.    Rekor reasonably relied on this misrepresentation in deciding to enter into the Purchase Agreement.

### (iv)    Defendants misrepresented Firestorm's Financials for Year 2016 Leading Up to the Purchase Agreement.

68.    In Section 3.4(a) of the Purchase Agreement, Defendants represented that year 2016 unaudited financial statements for Firestorm (the "Unaudited Statements") that they furnished before execution of the Purchase Agreement were "consistent with, the books and records of [Firestorm] and fairly present[] in all material respects the financial condition of [Firestorm] as of the dates thereof…" Ex. A at ¶ 3.4.

69.    After consummation of the Purchase Agreement, however, Rekor paid for an audit of Firestorm's 2016 financial statements, which yielded a set of audited statements for year 2016 (the "Audited Statements").

70.    These Audited Statements differed significantly from the Unaudited Statements that Defendants furnished before execution of the Purchase Agreement.

71.    The Unaudited Statements that Defendants provided to Rekor before execution of the Purchase Agreement showed net income values significantly higher for Firestorm, specifically Firestorm Solutions LLC, than they were in reality and as reflected in the Audited Statements.

72.    The Unaudited Statements for 2016 that Defendants provided to Rekor overstated Firestorm Solutions' net income by 87% compared to the Audited Statements.  This variance is material.

73.    The Unaudited Statements for 2016 that Defendants provided to Rekor overstated Firestorm Solutions and Firestorm Franchising's combined net income by 35.1% compared to the Audited Statements.  This variance is material.

74.     Defendants deliberately misrepresented to Rekor that the Unaudited Statements were "consistent with, the books and records of [Firestorm] and fairly present[] in all material respects the financial condition of [Firestorm] as of the dates thereof…" Ex. A at ¶ 3.4.

75.     Defendants made this misrepresentation to induce Rekor into believing that Firestorm was a financially healthier company than it was in reality.

76.     Defendants made this misrepresentation with the intent of inducing Rekor to enter into the Purchase Agreement.

77.     Rekor reasonably relied on this misrepresentation in deciding to enter into the Purchase Agreement.

**C.     Rekor Discovers Defendants' Fraud**

78.     After execution of the Purchase Agreement on January 25, 2017, Defendants did not make Firestorm a successful business venture for Rekor.

79.     Firestorm, as operated by Defendants, never signed Beazley Insurance Company, Church Mutual, or any critical mass of clients to make the business successful.

80.     Firestorm, as operated by Defendants, never signed a critical mass of franchisees to make the franchise program successful, and most of the franchisees that it did sign were businesses and individuals unsophisticated and unspecialized in crisis management.  The only "qualification" that most of the franchise owners had were that they were familiar or friends with Defendants.

81.     Firestorm continued to enter Side Letter agreements with franchisees waiving the Initial Franchise Fee and/or the Minimum Royalty Requirement.

82.     Defendants did not demonstrate competence, let alone expertise, in the field of crisis management, despite representations that they were such experts leading up to the Purchase Agreement.

83.     In June 2018, Defendant Rhulen misrepresented Firestorm's financial performance to Rekor's executive leadership, claiming that the business was "doing well" and had "unlimited potential," when in reality it was floundering.

84.     The Firestorm business suffered significant financial losses between January 2017 and December 2018.

85.     In December 2018, just before Defendants' resignation from Rekor, Defendants attended a Rekor management meeting in Chantilly, Virginia.

86.     At that meeting, Rekor's executive leadership confronted Defendants about their management of Firestorm and Firestorm's performance. In response, Defendants stated that nothing could be done to save the Firestorm business and that they had no solutions for improving Firestorm's prospects for the future.

87.     In December 2018, Defendants resigned from their positions with Rekor.

88.     In early January 2019, Defendants began to publicly operate CrisisRisk, their competing business.  On its website, CrisisRisk markets itself as a consulting service that works with customers to "identify emergency threats and vulnerabilities which put critical assets at risk—people, reputation, brand, key relationships, financials.  We develop strategies for mitigating those risks by preparing and supporting leadership teams to know when to get involved, make decisions, and communicate effectively."

89.     In March 2019, at the Disaster Recovery World conference in Orlando, Florida, Defendant Satterfield loitered near Rekor's Firestorm booth and engaged in repeated attempts to divert Firestorm customers and potential customers to CrisisRisk.  A representative from Markel Insurance, an established Firestorm customer, complained to Rekor that Defendant Satterfield attempted to pressure him into transferring Markel's business to CrisisRisk.

90.     Defendants have continued to keep the Cash Payments, the Promissory Notes, the Common Stock, and the Warrants.

## IV.

## CLAIMS

### As and for a First Cause of Action
### (Fraudulent Concealment)

91.     Rekor incorporates by reference the allegations set forth in paragraphs 1 through 90 above.

92.     Before consummation of the Purchase Agreement, Defendants furnished to Rekor ten franchise agreements representing that Firestorm had a healthy and proven franchise model.

93.     Defendants did not disclose to Rekor the Side Letters showing that Firestorm had waived the Initial Franchise Fee for its franchisees to participate in its franchise business.

94.     Defendants did not disclose to Rekor the Side Letters showing that Firestorm had waived the Minimum Continuing Royalty requirement set out in the franchise agreements.

95.     Defendants did not disclose to Rekor that seven of the ten franchise agreements had been effectively abandoned prior to the Purchase Agreement.

96.     These omissions coupled with Defendants' provision of the franchise agreements induced Rekor into believing a material false impression that Firestorm had a healthy, proven franchise business with franchisees willing to pay to participate in the program, when in reality, it did not.

97.     Defendants knew that this impression they created for Rekor was false.

98.     By providing the franchise agreements to Rekor, Defendants had a duty to disclose the Side Letters and the fact of the Franchise Abandonments to avoid misleading Rekor.

99.     Defendants knowingly and with the intent to induce Rekor into entering into the Purchase Agreement deliberately did not disclose the Side Letters to Rekor.

100.    Defendants knowingly and with the intent to induce Rekor into entering in the Purchase Agreement deliberately did not disclose the fact of the Franchise Abandonments to Rekor.

101.    Rekor reasonably relied upon Defendants' omissions and the material false impression created by them in deciding to enter into the Purchase Agreement.

102.    Rekor's reliance was justified as it had no way of learning Defendants' omissions through reasonable diligence prior to the Purchase Agreement.

103.    Rekor has been injured by Defendants' omissions and the material false impression created by them by being misled into entering into the Purchase Agreement whereby it paid Defendants valuable consideration in the form of the Cash Payments, the Promissory Notes, the Common Stock, and the Warrants.

104.    As a party fraudulently induced to enter into a contract and consummate the related transactions, Rekor is entitled to rescind that contract and the related transactions.

105.    Rekor is entitled to judgement against Defendants and relief: (a) declaring the Purchase Agreement and the transactions consummated pursuant thereto to be rescinded and void; (b) directing Defendants to return the Cash Payments to Rekor; (c) directing Defendants to return to Rekor the Common Stock; (d) declaring the Promissory Notes void, prohibiting Defendants from exercising any rights/options granted by the Promissory Notes, and directing Defendants to return any interest received on the Promissory Notes; (e) declaring the Warrants void and prohibiting Defendants from exercising any rights/options granted by the Warrants; (f) directing the parties to take all action necessary to be placed in the same position they were in

prior to the execution of the Purchase Agreement; (g) awarding Rekor punitive damages; and (h) awarding Rekor interest and costs, attorneys fees, and such other relief as this Court deems just and proper.

106.     In the alternative, Rekor is entitled judgment against Defendants and damages in an amount to be determined at trial, but no less than the aggregate value of the Cash Payments, the Common Stock, the Promissory Notes (including interest paid on the Promissory Notes), and the Warrants, together with interest, punitive damages, costs, attorneys fees, and such other relief as this Court deems just and proper.

107.     Rekor does not seek damages or any other relief relating to Defendants' conduct after January 25, 2017. This cause of action is based on conduct that Defendants engaged in at or before consummation of the Purchase Agreement.

**As and for a Second Cause of Action**
**(Fraudulent Misrepresentation)**

108.     Rekor incorporates by reference the allegations set forth in paragraphs 1 through 107 above.

109.     Defendants deliberately represented inaccurate net income values on Firestorm's 2016 Unaudited Statements to Rekor.

110.     The Unaudited Statements showed net income values significantly higher for Firestorm, specifically Firestorm Solutions, than they were in reality, as Rekor eventually discovered in the 2016 Audited Statements.

111.     Because the financial health and performance of Firestorm leading up to the Purchase Agreement was a key factor in Rekor's decision to enter into the Purchase Agreement, the inaccuracies in the 2016 Unaudited Statements were material.

112.    Defendants knew that the net income values on the Unaudited Statements were inaccurate and tended to show Firestorm performing better financially than it was in reality.

113.    Defendants knew that the net income values on the Unaudited Statements were false and misleading.

114.    Defendants submitted the Unaudited Statements to Rekor with the knowledge and intent that the false net income values would be relied upon by Rekor in entering into the Purchase Agreement.

115.    Rekor justifiably relied on the false net income values that Defendants reported on the 2016 Unaudited Statements and had no way of learning Defendants' misrepresentation through reasonable diligence prior to the Purchase Agreement.

116.    Rekor has been injured by Defendants' misrepresentation because it was misled and induced into entering into the Purchase Agreement whereby it paid Defendants valuable consideration in the form of the Cash Payments, the Promissory Notes, the Common Stock, and the Warrants.

117.    As a party fraudulently induced to enter into a contract and consummate the related transactions, Rekor is entitled to rescind that contract and the related transactions.

118.    Rekor is entitled to judgement against Defendants and relief: (a) declaring the Purchase Agreement and the transactions consummated pursuant thereto to be rescinded and void; (b) directing Defendants to return the Cash Payments to Rekor; (c) directing Defendants to return to Rekor the Common Stock; (d) declaring the Promissory Notes void, prohibiting Defendants from exercising any rights/options granted by the Promissory Notes, and directing Defendants to return any interest received on the Promissory Notes; (e) declaring the Warrants void and prohibiting Defendants from exercising any rights/options granted by the Warrants; (f)

directing the parties to take all action necessary to be placed in the same position they were in prior to the execution of the Purchase Agreement; (g) awarding Rekor punitive damages; and (h) awarding Rekor interest and costs, attorneys fees, and such other relief as this Court deems just and proper.

119.   In the alternative, Rekor is entitled judgment against Defendants and damages in an amount to be determined at trial, but no less than the aggregate value of the Cash Payments, the Common Stock, the Promissory Notes (including interest paid on the Promissory Notes), and the Warrants, together with interest, punitive damages, costs, attorneys fees, and such other relief as this Court deems just and proper.

120.   Rekor does not seek damages or any other relief relating to Defendants' conduct after January 25, 2017.  This cause of action is based on conduct that Defendants engaged in at or before consummation of the Purchase Agreement.

### As and for a Third Cause of Action
**(Fraudulent Misrepresentation)**

121.   Rekor incorporates by reference the allegations set forth in paragraphs 1 through 120 above.

122.   Defendants deliberately mispresented to Rekor Firestorm's business relationship with Beazley Insurance Company.

123.   Defendants represented to Rekor that Beazley agreed to retain Firestorm as its crisis-management advisor and that it would pay Firestorm $10-$20 per specialized insurance policy that it sold.

124.   Defendants represented to Rekor that the Beazley business promised to make Firestorm millions of dollars.

125.    In reality, Firestorm had no established business relationship or agreements in principle with Beazley.

126.    Because the prospect of the Beazley business was a key factor in Rekor's decision to enter into the Purchase Agreement, Defendants' misrepresentations concerning Firestorm's relationship with Beazley were material.

127.    Defendants knew that Firestorm had no agreements or established business relationship with Beazley.

128.    Defendants knew that their representations to Rekor concerning Firestorm's relationship with Beazley were misleading.

129.    Defendants communicated their false representations concerning Firestorm's relationship with Beazley with the knowledge and intent that they would be relied upon by Rekor in entering into the Purchase Agreement.

130.    Rekor justifiably relied on Defendants' false representations concerning Firestorm's relationship with Beazley.

131.    Rekor has been injured by Defendants' misrepresentations because it was misled and induced into entering into the Purchase Agreement whereby it paid Defendants valuable consideration in the form of the Cash Payments, the Promissory Notes, the Common Stock, and the Warrants.

132.    As a party fraudulently induced to enter into a contract and consummate the related transactions, Rekor is entitled to rescind that contract and the related transactions.

133.    Rekor is entitled to judgement against Defendants and relief: (a) declaring the Purchase Agreement and the transactions consummated pursuant thereto to be rescinded and void; (b) directing Defendants to return the Cash Payments to Rekor; (c) directing Defendants to

return to Rekor the Common Stock; (d) declaring the Promissory Notes void, prohibiting Defendants from exercising any rights/options granted by the Promissory Notes, and directing Defendants to return any interest received on the Promissory Notes; (e) declaring the Warrants void and prohibiting Defendants from exercising any rights/options granted by the Warrants; (f) directing the parties to take all action necessary to be placed in the same position they were in prior to the execution of the Purchase Agreement; (g) awarding Rekor punitive damages; and (h) awarding Rekor interest and costs, attorneys fees, and such other relief as this Court deems just and proper.

134.    In the alternative, Rekor is entitled judgment against Defendants and damages in an amount to be determined at trial, but no less than the aggregate value of the Cash Payments, the Common Stock, the Promissory Notes (including interest paid on the Promissory Notes), and the Warrants, together with interest, punitive damages, costs, attorneys fees, and such other relief as this Court deems just and proper.

135.    Rekor does not seek damages or any other relief relating to Defendants' conduct after January 25, 2017. This cause of action is based on conduct that Defendants engaged in at or before consummation of the Purchase Agreement.

<u>**As and for a Fourth Cause of Action**</u>
**(Negligent Misrepresentation)**

136.    Rekor incorporates by reference the allegations set forth in paragraphs 1 through 135 above.

137.    Leading up to the Purchase Agreement, Defendants held themselves out as having unique and specialized expertise in the fields of crisis-management and business continuity.

138.    Leading up to the Purchase Agreement, Defendants provided information to Rekor about Firestorm's franchise program for the sole purpose that it would be relied upon by Rekor in deciding to enter into the Purchase Agreement.

139.    Defendants had a duty as a result of a special relationship to give correct information to Rekor about Firestorm's franchise program.

140.    Defendants did not disclose to Rekor the Side Letters showing that Firestorm had waived the Initial Franchise Fee for its franchisees to participate in its franchise business.

141.    Defendants did not disclose to Rekor the Side Letters showing that Firestorm had waived the Minimum Continuing Royalty requirement set out in the franchise agreements.

142.    Defendants did not disclose to Rekor that seven of the ten franchise agreements had been effectively abandoned prior to the Purchase Agreement.

143.    These omissions coupled with Defendants' provision of the franchise agreements induced Rekor into believing a material false impression that Firestorm had a healthy, proven franchise business with franchisees willing to pay to participate in the program, when in reality, it did not.

144.    Defendants should have known to disclose the Side Letters to Rekor.

145.    Defendants should have known that the impression they created for Rekor  by failing to disclose the Side Letters was false.

146.    Defendants should have known to disclose the Franchise Abandonments to Rekor.

147.    Defendants should have known that the impression they created for Rekor by failing to disclose the Franchise Abandonments was false.

148.    Defendants knew that Rekor desired accurate information about Firestorm's franchise program for the serious purpose of deciding to enter into the Purchase Agreement and that Rekor would rely on that information in deciding to enter into the Purchase Agreement.

149.    Rekor reasonably relied to its detriment on Defendants' misrepresentations concerning Firestorm's franchise program in deciding to enter into the Purchase Agreement.

150.    As a party that relies on a negligent misrepresentation in deciding to enter into a contract, Rekor is entitled to rescind that contract and the related transactions.

151.    Rekor is entitled to judgement against Defendants and relief: (a) declaring the Purchase Agreement and the transactions consummated pursuant thereto to be rescinded and void; (b) directing Defendants to return the Cash Payments to Rekor; (c) directing Defendants to return to Rekor the Common Stock; (d) declaring the Promissory Notes void, prohibiting Defendants from exercising any rights/options granted by the Promissory Notes, and directing Defendants to return any interest received on the Promissory Notes; (e) declaring the Warrants void and prohibiting Defendants from exercising any rights/options granted by the Warrants; (f) directing the parties to take all action necessary to be placed in the same position they were in prior to the execution of the Purchase Agreement; (g) and awarding Rekor interest and costs, attorneys fees, and such other relief as this Court deems just and proper.

152.    In the alternative, Rekor is entitled judgment against Defendants and damages in an amount to be determined at trial, but no less than the aggregate value of the Cash Payments, the Common Stock, the Promissory Notes (including interest paid on the Promissory Notes), and the Warrants, together with interest, costs, attorneys fees, and such other relief as this Court deems just and proper.

153.    Rekor does not seek damages or any other relief relating to Defendants' conduct after January 25, 2017. This cause of action is based on conduct that Defendants engaged in at or before consummation of the Purchase Agreement.

## As and for a Fifth Cause of Action
### (Negligent Misrepresentation)

154.    Rekor incorporates by reference the allegations set forth in paragraphs 1 through 153 above.

155.    Leading up to the Purchase Agreement, Defendants held themselves out as having unique and specialized expertise in the fields of crisis-management and business continuity.

156.    Leading up to the Purchase Agreement, Defendants provided information to Rekor about Firestorm's financial performance and statements for the serious purpose that it would be relied upon by Rekor in deciding to enter into the Purchase Agreement.

157.    Defendants had a duty as a result of a special relationship to give correct information to Rekor about Firestorm's financial performance and statements.

158.    Defendants represented inaccurate net income values on its 2016 Unaudited Statements to Rekor.

159.    The Unaudited Statements showed net income values significantly higher for Firestorm, specifically Firestorm Solutions, than they were in reality, as Rekor eventually discovery in the Audited Statements.

160.    Defendants should have known that their representations concerning Firestorm's financial performance and the Unaudited Statements were false.

161.    Defendants knew that Rekor desired accurate information on Firestorm's Unaudited Statements for the serious purpose of deciding to enter into the Purchase Agreement and that Rekor would rely on that information in deciding to enter into the Purchase Agreement.

162.    Rekor reasonably relied to its detriment on Defendants' misrepresentations concerning Firestorm's financial performance and the Unaudited Statements in deciding to enter into the Purchase Agreement.

163.    As a party that relied on a negligent misrepresentation in deciding to enter into a contract, Rekor is entitled to rescind that contract and the related transactions.

164.    Rekor is entitled to judgement against Defendants and relief: (a) declaring the Purchase Agreement and the transactions consummated pursuant thereto to be rescinded and void; (b) directing Defendants to return the Cash Payments to Rekor; (c) directing Defendants to return to Rekor the Common Stock; (d) declaring the Promissory Notes void, prohibiting Defendants from exercising any rights/options granted by the Promissory Notes, and directing Defendants to return any interest received on the Promissory Notes; (e) declaring the Warrants void and prohibiting Defendants from exercising any rights/options granted by the Warrants; (f) directing the parties to take all action necessary to be placed in the same position they were in prior to the execution of the Purchase Agreement; (g) and awarding Rekor interest and costs, attorneys fees, and such other relief as this Court deems just and proper.

165.    In the alternative, Rekor is entitled judgment against Defendants and damages in an amount to be determined at trial, but no less than the aggregate value of the Cash Payments, the Common Stock, the Promissory Notes (including interest paid on the Promissory Notes), and the Warrants, together with interest, costs, attorneys fees, and such other relief as this Court deems just and proper.

166.    Rekor does not seek damages or any other relief relating to Defendants' conduct after January 25, 2017. This cause of action is based on conduct that Defendants engaged in at or before consummation of the Purchase Agreement.

## As and for a Sixth Cause of Action
### (Negligent Misrepresentation)

167.   Rekor incorporates by reference the allegations set forth in paragraphs 1 through 166 above.

168.   Leading up to the Purchase Agreement, Defendants held themselves out as having unique and specialized expertise in the fields of crisis-management and business continuity.

169.   Leading up to the Purchase Agreement, Defendants provided information to Rekor about Firestorm's business relationship with large insurance carriers for the serious purpose that it would be relied upon by Rekor in deciding to enter into the Purchase Agreement.

170.   Defendants had a duty as a result of a special relationship to give correct information to Rekor about Firestorm's business relationship with large insurance carriers.

171.   Defendants represented to Rekor that Beazley agreed to retain Firestorm as its crisis-management advisor and that it would pay Firestorm $10-$20 per specialized insurance policy that it sold.

172.   Defendants represented to Rekor that the Beazley business promised to make Firestorm millions of dollars.

173.   In reality, Firestorm had no established business relationship or agreements in principle with Beazley.

174.   Defendants should have known that their representations concerning Firestorm's Firestorm's relationship with Beazley were false.

175.   Defendants knew that Rekor desired accurate information about Firestorm's relationship with Beazley for the serious purpose of deciding to enter into the Purchase Agreement and that Rekor would rely on that information in deciding to enter into the Purchase Agreement.

176.     Rekor reasonably relied to its detriment on Defendants' misrepresentations concerning Firestorm's business relationship with Beazley in deciding to enter into the Purchase Agreement.

177.     As a party that relied on a negligent misrepresentation in deciding to enter into a contract, Rekor is entitled to rescind that contract and the related transactions.

178.     Rekor is entitled to judgement against Defendants and relief: (a) declaring the Purchase Agreement and the transactions consummated pursuant thereto to be rescinded and void; (b) directing Defendants to return the Cash Payments to Rekor; (c) directing Defendants to return to Rekor the Common Stock; (d) declaring the Promissory Notes void, prohibiting Defendants from exercising any rights/options granted by the Promissory Notes, and directing Defendants to return any interest received on the Promissory Notes; (e) declaring the Warrants void and prohibiting Defendants from exercising any rights/options granted by the Warrants; (f) directing the parties to take all action necessary to be placed in the same position they were in prior to the execution of the Purchase Agreement; (g) and awarding Rekor interest and costs, attorneys fees, and such other relief as this Court deems just and proper.

179.     In the alternative, Rekor is entitled judgment against Defendants and damages in an amount to be determined at trial, but no less than the aggregate value of the Cash Payments, the Common Stock, the Promissory Notes (including interest paid on the Promissory Notes), and the Warrants, together with interest,  costs, attorneys fees, and such other relief as this Court deems just and proper.

180.     Rekor does not seek damages or any other relief relating to Defendants' conduct after January 25, 2017. This cause of action is based on conduct that Defendants engaged in at or before consummation of the Purchase Agreement.

## V.

## REQUEST FOR RELIEF

181.    Rekor respectfully requests that the Court enter judgment in its favor and against

Defendants, granting the following relief:

   a.  declaring the Purchase Agreement and the transactions consummated pursuant
       thereto to be rescinded and void;

   b.  directing Defendants to return the Cash Payments to Rekor;

   c.  directing Defendants to return to Rekor the Common Stock;

   d.  directing Defendants to return all interest paid on the Promissory Notes;

   e.  declaring the Promissory Notes void and prohibiting Defendants from
       exercising any rights/options granted by the Promissory Notes;

   f.  declaring the Warrants void and prohibiting Defendants from exercising any
       rights/options granted by the Warrants;

   g.  directing the parties to take all action necessary to be placed in the same
       position they were in prior to the execution of the Purchase Agreement;

   h.  in the alternative, ordering Defendants to pay damages resulting from
       Defendants' conduct on or before January 25, 2017 at a value to be
       determined at trial, but no less than the aggregate value of the Cash Payments,
       the Common Stock, the Promissory Notes, and the Warrants;

   i.  awarding Rekor any actual, compensatory and punitive damages resulting
       from Defendants' conduct on or before January 25, 2017, in an amount that
       presently cannot be calculated;  and

   j.  awarding Rekor interest and costs, attorneys fees, and such other relief as this
       Court deems just and proper.

Dated: August 19, 2019
       New York, NY

                                    Respectfully submitted,

                                    **CROWELL & MORING**

By: _/s/    Sarah Gilbert_
Sarah Gilbert
Glen McGorty
Crowell & Moring LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
sgilbert@crowell.com
gmcgorty@crowell.com
212-895-4226


Jay P. DeSanto (*pro hac vice pending*)
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 2004-2595
jdesanto@crowell.com
202-624-2812

*Attorneys for Plaintiff Rekor Systems, Inc.*