# FIRESTORM FRANCHISING, LLC
## FRANCHISE AGREEMENT

# TABLE OF CONTENTS

**Section**                                                                                             Page

1.    GRANT .............................................................................................................................1

2.    CORPORATE, LIMITED LIABILITY COMPANY OR PARTNERSHIP
      FRANCHISEE ....................................................................................................................4

3.    TERM AND RENEWAL.....................................................................................................5

4.    DUTIES OF FIRESTORM ...................................................................................................6

5.    FEES AND COMPENSATION.............................................................................................7

6.    ONGOING DUTIES OF FRANCHISEE .............................................................................8

7.    OPENING OF FIRESTORM BUSINESS ...........................................................................10

8.    ORIENTATION AND TRAINING.......................................................................................11

9.    PROPRIETARY MARKS .....................................................................................................12

10.   MANUAL ..............................................................................................................................13

11.   CONFIDENTIAL INFORMATION.....................................................................................14

12.   ACCOUNTING AND RECORDS .......................................................................................15

13.   ADVERTISING AND PROMOTION ..................................................................................16

14.   INSURANCE..........................................................................................................................18

15.   TRANSFER OF INTEREST .................................................................................................19

16.   DEFAULT AND TERMINATION .......................................................................................23

17.   OBLIGATIONS UPON TERMINATION OR EXPIRATION .............................................25

18.   COVENANTS.........................................................................................................................27

19.   TAXES, PERMITS, AND INDEBTEDNESS.......................................................................29

20.   INDEPENDENT CONTRACTOR AND INDEMNIFICATION..........................................30

21.   APPROVALS AND WAIVERS............................................................................................31

22.   WARRANTIES OF FRANCHISEE ......................................................................................31

23.   NOTICES ...............................................................................................................................32

24.   ENTIRE AGREEMENT ........................................................................................................33

25.   SEVERABILITY AND CONSTRUCTION..........................................................................33

26.   ARBITRATION......................................................................................................................34

27.   APPLICABLE LAW...............................................................................................................35

28.   ACKNOWLEDGMENTS......................................................................................................36

**Exhibits**

EXHIBIT A - FRANCHISE TERRITORY
EXHIBIT B - OWNERS
EXHIBIT C - GUARANTY AND ASSUMPTION OF OBLIGATIONS
EXHIBIT D - PERSONAL COVENANTS
EXHIBIT E - STATE ADDENDUM

## FRANCHISE AGREEMENT

THIS AGREEMENT (this "**Agreement**"), made and entered into on $\qquad$ October 27
20 15 (the "**Effective Date**"), by and between Firestorm Franchising, LLC ("**Firestorm**") at its
principal place of business at 1000 Holcomb Woods Parkway, Suite 130, Roswell, Georgia 30076, and
Resiligence, Inc., a corporation having an address at 2088 Walsh Avenue, Suite C2, Santa Clara, California
95050 ("**Franchisee**").

### RECITALS:

A.     Through its time, skill, effort, and money, Firestorm has developed a distinctive system
that offers, through franchisees, critical decision support, planning and consulting to individuals, corporate
entities and government agencies (the "**System**"). The critical decision support, planning and consulting
offered under the System includes (i) support, planning and consulting related to continuity of operations;
crisis and communication management; and communicable illness, pandemic, safety, security, threat and
vulnerability analysis, and (ii) other related support, planning and consulting services approved by
Firestorm (collectively, "**Products & Services**");

B.     The distinguishing characteristics of the System include a brand with distinctive Products
& Services; high standards of customer service and quality advice, including administrative procedures for
providing superior customer service; standards and specifications; the Manual (defined below); training
programs; advertising and promotional programs; and support services; all of which may be changed,
improved, and further developed by Firestorm from time to time;

C.     The System is identified by trade names, service marks, trademarks, logos, emblems, and
indicia of origin, including the mark "Firestorm" (the "**Proprietary Marks**");

D.     Franchisee desires to contract with Firestorm to operate a business offering Products &
Services under the System and using the Proprietary Marks (the "**Firestorm Business**"), and to receive the
services provided by Firestorm in consideration for the covenants contained herein; and

E.     Franchisee understands and acknowledges the importance of the Firestorm Businesses
operating under the System ("**Firestorm Businesses**") complying with Firestorm's high standards of quality
of advice and customer service, to protect the value and integrity of the System and all the Firestorm
Businesses.

THEREFORE, Franchisee and Firestorm agree as follows:

1.     GRANT

1.1     Firestorm Business.

1.1.1     Firestorm and Franchisee agree upon the terms and conditions in this Agreement,
for Franchisee to establish and operate the Firestorm Business.

1.1.2     Franchisee must have a work space for the Firestorm Business ("**Work Space**").
The Work Space can be a home office or other office site that is available to Franchisee. The Work Space
must be a quiet, designated space to perform work for the Firestorm Business. During the term of this
Agreement, Franchisee shall continue to satisfy Firestorm's requirements for a Work Space. Clients and
prospective clients will not visit any Work Space unless the Work Space has been approved by Firestorm

for client visits. Franchisee is not required to have an Office for the Firestorm Business but Franchisee must have access to a specific off-site conference room at a business location where Franchisee can meet with clients and prospective clients. Franchisee may also visit with clients and prospective clients at their offices. If Franchisee elects to have an office (the "**Office**"), the location and office décor for any Office must be approved by Firestorm and meet Firestorm's specifications. The Work Space and any office must be located in the Franchise Territory (defined below). Franchisee agrees to not relocate any Office without prior written authorization by Firestorm. In connection with obtaining Firestorm's authorization for the location of an Office, Franchisee must provide to Firestorm any information Firestorm requests in considering the proposed location as an Office. Firestorm will authorize a location that meets with Firestorm's standards, requirements and criteria for an Office. Prior to Franchisee's commencement of operations of the Firestorm Business, Franchisee and Firestorm will document the location of the Work Space and/or Office.

      1.1.3    Subject to Franchisee's compliance with all of the terms and conditions of this Agreement, the provisions of Section 1.2.2 related to Unrestricted Franchisees (defined below) and the provisions of Section 1.3 related to National Account Program (defined below), Firestorm grants Franchisee the right during the term of this Agreement to operate the Firestorm Business within the franchise territory specified in Exhibit A (the "**Franchise Territory**"), including directly or indirectly soliciting prospective clients in the Franchise Territory to become Clients (defined below) of the Firestorm Business through purchasing Products & Services and providing Products & Services to Clients in the Franchise Territory. The Products & Services are further described in Section 6 and the Manual. For purposes of this Agreement, "**Client**" means a person or entity that acquires any Products & Services through Franchisee, Firestorm, Firestorm's affiliates, or a franchisee operating under the System. The Manual will specify the procedures and rules for determining the Firestorm Business that should service a Client or prospective client with multiple locations (including but not limited to National Account customers) and Firestorm will make all final determinations in accordance with the Servicing Conflict (defined below) procedures. In accordance with Sections 10 and 19 of this Agreement, all Clients shall be deemed Clients of Firestorm and not any individual Franchisee. Firestorm will maintain a list of Clients using information received from Firestorm Businesses operating under the System.

      1.1.4    Franchisee acknowledges that the System may be supplemented, improved, and otherwise modified from time to time by Firestorm; and Franchisee agrees to comply with all reasonable requirements of Firestorm in that regard.

      1.1.5    If, after Franchisee commences paying the first Continuing Royalty under Section 5.2 of this Agreement, Franchisee either (i) has no Gross Revenues from the Firestorm Business within any 180-day period or (ii) has not generated any written sales proposals (with pricing that is consistent with Franchisee's customary pricing for Products & Services) in any 90-day period, such inactivity shall be considered "**Abandonment**" of the Firestorm Business.

    1.2    Franchise Territory Exclusions.

      1.2.1    Except as expressly limited by this Section 1, Firestorm and its affiliates retain all rights with respect to Firestorm Businesses, the Proprietary Marks, the System, the Products & Services, the Clients, the sale of similar or dissimilar products and services, and any other activities Firestorm deems appropriate whenever and wherever Firestorm desires. Specifically, but without limitation, Firestorm and its affiliates reserve the following rights:

      1.2.1.1    To own and/or operate, and license others to operate, businesses that market and sell products and services other than the Products & Services within the Franchise Territory under a different brand name or mark;

1.2.1.2     To establish and operate, and grant rights to other System franchisees to establish and operate, Firestorm Businesses or similar businesses at locations outside the Franchise Territory, and on any terms and conditions Firestorm deems appropriate;

1.2.1.3     To own and/or operate, and license others to operate, businesses that offer critical decision support, planning and consulting services and products (identical to or similar to the Products & Services), using proprietary marks other than the Proprietary Marks or other systems, whether such businesses are similar to or different from the Firestorm Business, at any location;

1.2.1.4     To offer through any distribution channels Firestorm thinks best (including through online services, third-party marketers and other distribution methods) books, materials, software, toolkits and/or online training on any topics, including topics involving support, planning and consulting related to critical decision making; continuity of operations; crisis and communication management; communicable illness, pandemic, safety, security, threat and vulnerability analysis, and other topics;

1.2.1.5     To purchase or otherwise acquire the assets or controlling ownership of one or more businesses identical or similar to Firestorm Businesses (and/or franchise, license, and/or similar agreements for such businesses), some or all of which might be located anywhere;

1.2.1.6     To be acquired (regardless of the form of transaction) by a business identical or similar to Firestorm Businesses, even if the other business operates, franchises and/or licenses competitive businesses anywhere; and

1.2.1.7     The right to engage in any other business activities not expressly prohibited by this Agreement, anywhere.

1.2.2     Franchisee acknowledges and agrees that prior to December 31, 2012 Firestorm entered into certain franchise agreements with franchisees under the System which gave such franchisees the right to sell Products & Services to Client and prospective clients located anywhere in the United States ("**Unrestricted Franchisees**"). Franchisee will have no territorial exclusivity in the Franchise Territory with respect to activities of Unrestricted Franchisees. Therefore, Franchisee acknowledges and agrees that Unrestricted Franchisees (including such Unrestricted Franchisees' employees and persons associated with such Unrestricted Franchisees) now sell, and shall continue to have the right to sell, Products & Services, to Clients and prospective clients located in the Franchise Territory or close proximity to the Franchise Territory (including the Work Space and any Office), and such Unrestricted Franchisees shall be direct competitors of Franchisee.

1.2.3     Franchisee acknowledges and agrees that Firestorm and certain of Firestorm's affiliates and designees (including Firestorm's employees and other franchisees of Firestorm and persons associated with such franchisees) now sell, and shall continue to have the right to sell, Products & Services, to National Accounts located in the same or close proximity to the Franchise Territory (including the Work Space and any Office); and that Firestorm and such affiliates and designees shall be direct competitors of Franchisee.

1.2.4     Franchisee is not permitted to directly or indirectly sell, offer to sell, or provide any of the Products & Services to any Client in the Franchise Territory that is currently being serviced by Firestorm, Firestorm's employees or an Unrestricted Franchisee unless the Client is a National Account (defined below) that Firestorm has authorized Franchisee to service in accordance with Section 1.3 below. In the event of any dispute or conflict ("**Servicing Conflict**") between or among Franchisee, an Unrestricted Franchisee, another franchisee under the System, or Firestorm (or an affiliate of Firestorm) related to a

Client or prospective Client, the parties shall comply with Firestorm's procedures and rules in the Manual for resolving Servicing Conflicts and such Servicing Conflict shall be resolved by a final binding resolution by Firestorm, using Firestorm's reasonable business judgment, in accordance with the Manual.

      1.2.5    Firestorm expressly reserves any and all rights not explicitly granted to Franchisee by the terms and conditions of this Agreement.

      1.3    National Account Program. Franchisee shall participate in Firestorm's national account program ("**National Account Program**"). Franchisee acknowledges and agrees that Firestorm, at Firestorm's discretion, may change the terms and conditions of the National Account Program from time to time. Franchisee shall comply with the following terms and conditions related to the National Account Program:

      1.3.1    The term "**National Account**" means any customer that Firestorm designates as a national account. Except as provided below, and subject to other policies and procedures set forth in the Manual, Franchisee may not solicit, sell to, or service the National Account without Firestorm's prior written consent. Firestorm has the right to condition Firestorm's consent (although Firestorm is not obligated to grant Firestorm's consent) on Franchisee's agreement to comply with certain requirements and Firestorm has the right to withdraw Firestorm's consent for any or no reason as Firestorm deems appropriate. If Firestorm withdraws its consent to Franchisee's providing the Products & Services to one or more National Accounts, Franchisee must cease all solicitation, servicing and/or other activity (including providing the Products & Services) with respect to that National Account(s) immediately.

      1.3.2    Firestorm retains the right under all circumstances to provide any Products & Services to any National Account location, wherever operated, provided, however, Firestorm may offer Franchisee the responsibility under this Agreement to provide the Products & Services through Franchisee's Firestorm Business that Firestorm would like to provide to the National Account location(s) in the Franchise Territory subject to any existing National Accounts being serviced by Unrestricted Franchisees. If Firestorm offers Franchisee the opportunity to provide Products & Services to any National Account or National Account location in the Franchise Territory, Franchisee shall respond to such offer in accordance with the procedures and timeframe set forth in the Manual. If Franchisee fails to respond to Firestorm's offer related an opportunity to provide Products & Services to a National Account or a National Account location, or Franchisee fails to agree to or comply with the terms and conditions that Firestorm has established with the National Account, Franchisee shall be deemed to have forfeited the opportunity related to such National Account or National Account location.

      1.3.3    Notwithstanding anything in this Section 1.3, if any National Account wished not to be serviced by Franchisee's Firestorm Business (for any reason), Firestorm (and its affiliates) has the right, or may authorize other franchisees or third parties, to provide the Products & Services to the locations of the National Account. If Franchisee fails to accept the offer in the manner Firestorm specifies, Firestorm (and its affiliates) also has the right, or may authorize other franchisees or third parties, to provide the Products & Services to the locations of the National Account. Franchisee is not permitted to negotiate the cost for providing Products & Services to a National Account under any circumstances or conditions.

      1.3.4    If Franchisee defaults under this Agreement for any reason, Firestorm may cease to make the National Account Program available to Franchisee.

      1.3.5    Franchisee shall follow all additional terms, conditions, rules, regulations and procedures set forth in the Manual related to the National Account Program.

2.    CORPORATE, LIMITED LIABILITY COMPANY OR PARTNERSHIP FRANCHISEE

2.1     Franchisee must be a corporation, limited liability company or partnership. Each shareholder, member or partner of Franchisee (each, an "**Owner**" and collectively, "**Owners**"), and the interest of such person in Franchisee, shall be identified in Exhibit B and will execute a guaranty, in the form that Firestorm prescribes, undertaking to be personally bound, jointly and severally, by all the provisions of this Agreement and any ancillary agreements between Franchisee and Firestorm. Firestorm's current form of guaranty is attached as Exhibit C and such guaranty must be executed in connection with this Agreement. Franchisee shall immediately furnish Firestorm with an update to the information contained in Exhibit B upon any change, provided that nothing in this Section 2 shall waive or otherwise limit the terms of Section 15 regarding transfers. Additionally, Franchisee shall identify in Exhibit B, an Owner, who is reasonably acceptable to Firestorm, to serve as Franchisee's "**Managing Principal**." The Managing Principal is an Owner of Franchisee, who Franchisee empowers with the responsibility and decision-making authority regarding the Firestorm Business's operation and Franchisee's business, and Franchisee acknowledges and agrees that Firestorm shall have the right to rely upon the Managing Principal for such purposes. Additionally, Franchisee shall not remove or replace the Managing Principal identified in Exhibit B without the prior written approval of Firestorm.

2.2     If Franchisee is a corporation or limited liability company, Franchisee shall comply with the following requirements:

2.2.1     Copies of Franchisee's articles of incorporation, bylaws, articles of organization, operating agreement and/or other governing documents, and any amendments thereto, including the resolution of the Board of Directors or members authorizing entry into this Agreement, shall be promptly furnished to Firestorm, upon request of Firestorm.

2.2.2     Franchisee shall maintain stop-transfer instructions against the transfer on its records of any equity securities; and each stock certificate or issued securities of Franchisee shall have conspicuously endorsed upon its face a statement in a form satisfactory to Firestorm that it is held subject to, and that further assignment or transfer thereof is subject to, all restrictions imposed upon assignments by this Agreement; provided, however, that the requirements of this Section 2.2.3 shall not apply to a publicly-held corporation.

2.2.3     Franchisee shall submit to Firestorm, for prior written approval, any corporate or other legal name that Franchisee proposes to use.

2.3     If Franchisee or any successor to or assignee of Franchisee is a partnership, Franchisee shall comply with the following requirements:

2.3.1     Franchisee shall furnish Firestorm with a copy of its partnership agreement as well as such other documents as Firestorm may reasonably request, and any amendments thereto.

2.3.2     Franchisee shall submit to Firestorm, for prior written approval, any name of the partnership or other legal name that Franchisee proposes to use.

3.     TERM AND RENEWAL

3.1     This Agreement shall be in effect upon its execution by Firestorm and, except as otherwise provided herein, the term of this Agreement shall be 5 years from the Effective Date. Franchisee acknowledges that the rights granted under this Agreement are of limited duration, and do not convey any rights of ownership or goodwill whatsoever in the Proprietary Marks.

3.2     Franchisee may apply to operate a Firestorm Business for 3 additional consecutive terms of 5 years each if the following conditions are met prior to each renewal:

3.2.1     Franchisee gives Firestorm written notice of Franchisee's election to renew not less than 6 months nor more than 8 months prior to the end of the then-current term;

3.2.2     If Franchisee has an Office, the Office and premises of the Office shall meet reasonable professional standards and the requirements set forth in the Manual and Franchisee shall, at Franchisee's expense, make or provide for in a manner satisfactory to Firestorm, such renovation and modernization of the Office as Firestorm may reasonably require. If at renewal the location of the Office or building where the Office is located is determined by Firestorm to be (i) inappropriate or obsolete for a Firestorm Business, (ii) inconsistent with the professional standards and requirements set forth in the Manual; or (iii) inconsistent with the then-current image of the System, Firestorm may condition renewal on relocation of the Office within a period designated by Firestorm;

3.2.3     Franchisee agrees to not be in default of any provision of this Agreement, any other agreement between Franchisee and Firestorm or its affiliates, or any standards applicable to Franchisee as set forth in the Manual; and Franchisee agrees to have substantially complied with all the terms and conditions of such agreements and standards;

3.2.4     Except as otherwise allowed by Firestorm, Franchisee agrees to have satisfied all monetary obligations owed by Franchisee to Firestorm and its affiliates, and shall have timely met those obligations throughout the term of this Agreement;

3.2.5     Franchisee shall, at Firestorm's option, execute Firestorm's then-current form of the franchise agreement for such renewal terms as are provided by this Agreement, which shall supersede this Agreement and which may include terms that differ from the terms of this Agreement;

3.2.6     Franchisee shall execute a general release, in a form prescribed by Firestorm, of any and all claims against Firestorm and its affiliates, and their respective officers, directors, agents and employees;

3.2.7     On the 4th renewal, Franchisee shall pay to Firestorm a renewal fee in an amount of 50% of the then-current franchise fee (any renewal fee for the 3rd renewal will be specified in the franchise agreement Franchisee executes in connection with the 2nd renewal); and

3.2.8     Franchisee shall comply with the then-current qualification and training requirements of Firestorm (for owners, managers and employees) and pay any training fees associated with meeting such then-current qualifications and training requirements.

4.     DUTIES OF FIRESTORM

4.1     Firestorm shall provide to Franchisee, from time to time, as Firestorm deems appropriate, advice and written materials concerning techniques of managing, marketing and operating a Firestorm Business and offering the Products & Services. Firestorm will maintain a list of Clients and provide Franchisee with access to such list in order for Franchisee to comply with Section 1.2.1.

4.2     Prior to the opening the Firestorm Business, Firestorm shall provide to Franchisee an initial supply of templates, forms and books related to offering the Products & Services and/or commencing the operation of the Firestorm Business ("**Opening Supplies and Materials**").

4.3     As provided in Section 8 below, Firestorm will provide an initial training program ("**Firestorm Training**"). Firestorm is responsible for the cost of instruction for Firestorm Training and Franchisee is responsible for all travel, lodging and other training expenses in connection with Firestorm Training. During the term of this Agreement, Firestorm, at Firestorm's discretion, may provide required and optional training programs ("**Continuing Education Programs**") and Firestorm may charge a fee for Continuing Education Programs. Franchisee shall be responsible for such fees for Continuing Education Programs and all travel, lodging and other training expenses associated with such Continuing Education Programs.

4.4     Firestorm agrees to provide national advertising, as provided in Section 13 below. Firestorm may develop promotional programs and sales campaigns for Products & Services.

4.5     Firestorm will operate a national toll-free number for businesses seeking Products & Services offered by Firestorm Businesses operating under the System (the "**Central Phone**"). Firestorm will operate the Central Phone using its reasonable business judgment and Firestorm reserves the right to change or modify from time to time how the Central Phone operates. Firestorm does not owe any fiduciary obligation or other duty to Franchisee in connection with operating the Central Phone. Firestorm undertakes no obligation to ensure that the Central Phone benefits each Firestorm Business equally. If Franchisee is in default under this Agreement for any reason, Firestorm may cease to make the Central Phone available to Franchisee.

4.6     Firestorm agrees to provide Franchisee, on loan, one copy of Firestorm's Confidential Manual (the "**Manual**"), as more fully described in Section 10 hereof.

4.7     Firestorm may offer optional services to Franchisee for a fee, as described in the Manual. At Firestorm's option and at Franchisee's expense, Firestorm may offer to Franchisee analysis, report writing, plan development, training, test exercises, site inspection and analysis, marketing/sales support, presentation creation and other services for Clients ("**Optional Support Services**"). Firestorm will provide Franchisee a quote for any Optional Support Services prior to commencing such Optional Support Services and Franchisee shall pay Firestorm for such services in accordance with the terms of such quote. Firestorm and/or its affiliates may be the only supplier of Optional Support Services.

4.8     Firestorm may directly, or indirectly through Firestorm's affiliates or designated suppliers, provide merchandise using the Proprietary Marks ("**Logo Merchandise**"). Franchisee must pay Firestorm or Firestorm's affiliates or designated suppliers for Logo Merchandise.

4.9     Franchisee acknowledges and agrees that any duty or obligation imposed on Firestorm by this Agreement may be performed by a designee, employee, or agent of Firestorm, as Firestorm may direct.

5.     FEES AND COMPENSATION

5.1     In consideration of the franchise granted herein, Franchisee will pay to Firestorm an initial franchise fee of $55,000 (the "**Initial Franchise Fee**"), receipt of which is hereby acknowledged, contemporaneously with the execution of this Agreement. The Initial Franchise Fee is not refundable unless otherwise expressly provided in this Agreement. Among other reasons, Franchisee is paying the Initial Franchise Fee in consideration of administrative and other expenses incurred by Firestorm in entering into this Agreement.

5.2     After commencing operation of the Firestorm Business, Franchisee shall commence paying Firestorm a continuing monthly royalty fee (the "**Continuing Royalty**"). The Continuing Royalty shall be an amount equal to the greater of (i) $1,000 or (ii) 8% of the Gross Revenues (as defined in Section 5.4

below) of the Firestorm Business. However, for the first 180 days after Franchisee commences operating the Firestorm Business, the Continuing Royalty will be 8% of the Gross Revenues of the Firestorm Business with no minimum Continuing Royalty. Notwithstanding anything to the contrary, if Franchisee fails to commence operating the Firestorm Business prior to 270 days after the Effective Date, Franchisee must pay the minimum Continuing Royalty of $1,000 each month as provided in Section 5.2.2(i) commencing 270 days after the Effective Date through when Franchisee commences operating the Firestorm Business. The Continuing Royalty shall be payable on or before the 5th day of each month on the Gross Revenue of the preceding calendar month (or on such other basis as may be set forth in the Manual or otherwise agreed to in writing by Firestorm).

5.3     In accordance with Section 13 below, Franchisee shall make contributions to the Fund (defined below) payable on or before the 5th day of each month based on the Gross Revenue of the Firestorm Business.

5.4     Franchisee must pay Firestorm or its affiliate(s) within 10 days after demand: (i) all sales taxes, employment taxes, corporate taxes, trademark license taxes, and any like taxes imposed on, required to be collected by, or paid by Firestorm or its affiliate(s) on account of products or services Firestorm or its affiliate(s) furnish to Franchisee, through sale, lease, or otherwise, or on account of Firestorm's collection of any fee related to this Agreement; (ii) all franchise or like taxes, whether based on gross receipts, gross revenues, Royalties, Advertising Contributions, or otherwise, imposed on, required to be collected by, or paid by Firestorm or its affiliate(s); and (iii) all other amounts Firestorm or its affiliate(s) pay or must pay for Franchisee for any reason.

5.5     As used in this Agreement, "**Gross Revenue**" means all revenue from the invoicing of sales of all products and services (including the Products & Services) and all other income, whether for cash or on a charge, credit, barter or time basis, of every kind and nature related to, derived from or in connection with the Firestorm Business, regardless of collection in the case of credit. Gross Revenue shall not include any sales taxes or other taxes collected from customers by Franchisee, if the amount of the tax is added to the selling price and is charged to the customer, a specific record is made at the time of each sale of the amount of such tax, and the amount of such tax is paid to the appropriate taxing authority by Franchisee.

5.6     All payments and contributions due each month as provided under this Section 5 shall be paid in cash by the 5th day of each month, calculated on the Gross Revenue for the preceding calendar month in the manner specified by Firestorm from time to time. Concurrent with such payments, Franchisee shall submit to Firestorm any reports or statements required under Section 12 below. Franchisee agrees to pay Firestorm all payments and contributions due under this Agreement by telegraphic transfer, auto-draft arrangement, electronic funds transfer, or by other means Firestorm may specify from time to time, to a bank account or address designated by Firestorm, in accordance with procedures and processes specified by Firestorm in the Manual or otherwise. Franchisee shall comply with the payment and reporting procedures and processes specified by Firestorm in the Manual. Firestorm reserves the right to change the payment procedures and processes upon notice to Franchisee and Franchisee agrees to immediately comply with any new payment procedures or processes (including executing any new or additional forms which grant Firestorm the right to draft, transfer or debit Franchisee's account for payment of royalty fees, contributions to the Fund and other fees or contributions to be paid to Firestorm or required by Firestorm under this Agreement).

5.7     Any payment, contribution, statement, or report not actually received by Firestorm on or before the due date shall be overdue. If any payment or contribution is overdue, Franchisee shall pay Firestorm immediately upon demand, in addition to the overdue amount, interest on such amount from the date it was due until paid, at the rate of 18% per annum, or the maximum rate permitted by law, whichever is less. Entitlement to such interest shall be in addition to any other remedies Firestorm may have. If any

payment or contribution (i) submitted by check is returned or dishonored or (ii) submitted by draft, transfer or otherwise is returned or dishonored, Franchisee shall pay Firestorm immediately upon demand, in addition to the amount due, an amount to compensate Firestorm for any fees or charges that Firestorm incurs due to such returned or dishonored check, draft, or transfer.

5.8     Franchisee shall not delay, withhold or set-off any payments or contributions due hereunder against any monetary or other claim it may have against Firestorm.

## 6.     ONGOING DUTIES OF FRANCHISEE

6.1     Franchisee shares Firestorm's and the other Firestorm franchisees' commitment to high standards for providing quality Products & Services to increase the demand for Products & Services offered by all franchisees operating under the System, and to protect the reputation and goodwill of Firestorm and the Proprietary Marks. Consistent with this commitment, Franchisee agrees:

6.1.1     To maintain all required licenses and regulatory compliance standards consistent with the standards set forth in the Manual. In addition, Franchisee agrees to comply with this Agreement and with all federal, state, and local laws, rules, and regulations requirements.

6.1.2     To maintain a satisfactory performance standard, as more fully described in the Manual.

6.1.3     To maintain Client Satisfaction Standards of at least 95%, as more fully described in the Manual.

6.1.4     To maintain, at Franchisee's expense, an appropriate Work Space with the equipment necessary to maintain professional standards for the operation of the Firestorm Business as fully described in the Manual. Unless approved by Firestorm, Franchisee shall not purchase or install any signs with the Proprietary Marks at the Work Space or Office.

6.1.5     To offer, provide, and market the Products & Services to Franchisee's Clients and prospective clients.

6.2     If Franchisee has an Office, Franchisee agrees to use the premises of the Office to operate the Firestorm Business and any other activities for which Franchisee has obtained written consent from Firestorm, or for other uses which do not require consent or notice as required in the Manual; and shall refrain from using or permitting the use of the premises of the Office for any other purpose at any time without first obtaining written consent from Firestorm or providing notice to Firestorm as specified in the Manual, or unless the use is permitted without obtaining consent or providing notice as specified in the Manual.

6.3     As provided in the Manual, Franchisee agrees to promptly pay Firestorm all payment and contributions that are due to Firestorm and its affiliates.

6.4     As provided in the Manual, Franchisee agrees to promptly submit complete and accurate Client information, Franchisee shall preserve good customer relations; render competent, prompt, courteous, and knowledgeable service; and meet such minimum standards as Firestorm may establish from time to time in the Manual.

6.5     If Franchisee has an Office, Franchisee will not relocate the Office of the Firestorm Business without prior written approval from Firestorm.

6.6     Franchisee agrees to purchase a computer system that meets the specifications of Firestorm, as set forth in the Manual, including such software, peripheral devices and equipment as Firestorm may specify in the Manual, or otherwise in writing, as reasonably necessary for the efficient management and operation of the Firestorm Business and the transmission of data to and from Firestorm (the "**Computer System**"). Firestorm may require Franchisee to purchase the Computer System (or components of the Computer System) from Firestorm or Firestorm's affiliates or designated vendors. Firestorm may require the Computer System to be a network (which may include multiple central process units or a server). Firestorm may specify in the Manual or otherwise in writing the information that Franchisee shall collect and maintain on the Computer System installed at the Work Space and any Office, and Franchisee agrees to provide to Firestorm such information as Firestorm requests from the data so collected and maintained on the Computer System. Franchisee agrees to permit Firestorm to access (on site or electronically) the Computer System installed at the Work Space and any Office for the purpose of obtaining information related to the Firestorm Business from the Computer System. Franchisee agrees to acquire from Firestorm (or, if any, an approved vendor), a license or licenses to use software designated by Firestorm for the Firestorm Business, and to pay a fees in connection with such software. Firestorm may require Franchisee to establish and maintain internet and/or web access for the Computer System as specified in the Manual through service providers. At the request of Firestorm, Franchisee agrees to obtain such upgrades, or other modifications to the Computer System and software to conform to the specifications of Firestorm.

6.7     As required by Firestorm, Franchisee agrees to obtain all Opening Supplies and Materials and Logo Merchandise from (i) Firestorm, (ii) an affiliate of Firestorm, or (iii) Firestorm's designated supplier (if any).

6.8     Franchisee may only offer Products & Services approved by Firestorm in the Manual. If Franchisee desires to offer products or services, other than those already approved in the Manual, Franchisee agrees to submit to Firestorm a written request to approve the proposed products or services (and any supplier), together with such evidence of conformity with Firestorm's specifications and requirements for the System and Firestorm Businesses. Firestorm's representatives shall have the right to evaluate the proposed products or services. Firestorm agrees to, within 15 days after its receipt of such request, notify Franchisee in writing of its approval or disapproval of the proposed products or services (including any supplier). Firestorm reserves the right to (i) deny approval of any proposed products or services and/or supplier, (ii) limit the number of approved Products & Services and approved suppliers, and/or (iii) condition approval of unapproved products and services on Firestorm being the supplier of such products and services. Franchisee agrees to not offer for sale or sell any products or services until written approval by Firestorm of the proposed product or service or supplier is received. Firestorm may from time to time revoke its approval of particular Products & Services or suppliers if Firestorm determines, in its sole discretion, that the Products & Services or suppliers no longer meet the standards of Firestorm or the Products & Services can no longer be offered by Franchisee. Upon receipt of written notice of such revocation, Franchisee agrees to cease to offer and sell any disapproved Products & Services and/or cease to purchase from any disapproved supplier.

6.9     Franchisee agrees to ensure that all advertising and promotional materials (including any materials used for approved internet advertising and social media networking), signs, decorations, stationery, business forms, and other items bear the Proprietary Marks in the form, color, location, and manner prescribed by Firestorm. Franchisee will use best efforts to uphold the reputation and goodwill of Firestorm, and its affiliates.

6.10     Franchisee agrees to be solely responsible for all employment decisions and to comply with all state, federal, and local laws and functions of the Firestorm Business, including, without limitation, those related to hiring, firing, training, wage and hour requirements, compensation, promotion, record-keeping, supervision, and discipline of employees, paid or unpaid, full or part time. Franchisee's employees must be

competent, conscientious, and properly trained. Franchisee shall have all employees of Franchisee sign Firestorm's confidentiality agreement agreeing to maintain the confidentiality of Client and Firestorm information, however, under no circumstances will Firestorm control the forms or terms of employment agreements Franchisee uses with its employees or otherwise be responsible for Franchisee's employment practices.

6.11    Franchisee agrees to not implement any material change to the System without the express prior written consent of Firestorm. Franchisee agrees to notify Firestorm in writing of any material change to the System which Franchisee proposes to make, and shall provide to Firestorm such information as Firestorm requests regarding the proposed change. Franchisee acknowledges and agrees that Firestorm shall have the right to incorporate any proposed material change into the System and shall thereupon obtain all right, title, and interest therein without the obligation to compensate Franchisee. Franchisee will post all Client work product on the Firestorm document library site.

6.12    To determine whether Franchisee and the Firestorm Business are complying with this Agreement, the Manual and the System, Firestorm and Firestorm's designated agents or representatives may at all times and without prior notice to Franchisee: (1) inspect the Work Space and any Office; (2) observe and monitor the operation of the Firestorm Business for consecutive or intermittent periods Firestorm deems necessary; (3) interview the personnel and Clients of the Firestorm Business; and (4) inspect and copy any books, records, and agreements relating to the Firestorm Business' operation. Franchisee agrees to cooperate with Firestorm fully. If Firestorm exercises any of these rights, Firestorm will not interfere unreasonably with the operation of the Firestorm Business.

7.    OPENING OF FIRESTORM BUSINESS

7.1    Franchisee agrees to furnish and equip the Firestorm Business at Franchisee's own expense.

7.2    Franchisee may use any Office only for the operation of the Firestorm Business and such other authorized activities for which Franchisee has obtained written consent or notice from Firestorm or has provided notice to Firestorm as specified in the Manual.

7.3    Franchisee agrees to be responsible for obtaining, at Franchisee's expense, all appropriate permits, certificates, licenses, and training, which may be required by Firestorm, and other governmental and regulatory agencies.

7.4    Franchisee agrees to obtain Firestorm's written approval prior to opening the Firestorm Business, which approval shall not be unreasonably withheld, and shall open the Firestorm Business within 120 days after the Effective Date.

8.    ORIENTATION AND TRAINING

8.1    Before opening the Firestorm Business, (i) an Owner of a beneficial interest in Franchisee approved by Firestorm, and (ii) Franchisee's manager (or assistant manager if an Owner will be the manager) shall attend and complete to Firestorm's satisfaction Firestorm Training. The Initial Franchise Fee covers initial Firestorm Training for the two individuals discussed in the previous sentence. In addition to initial Firestorm Training, Firestorm may require any persons subsequently employed by Franchisee in the position of manager (or assistant manager if Franchisee or an Owner will be the manager) to attend and complete to Firestorm's satisfaction, Firestorm Training, for which training Firestorm may charge Franchisee a fee. Firestorm may require another Owner to complete Firestorm Training if the original Owner who completed the initial Firestorm Training is no longer involved actively in the Firestorm Business.

8.2     In addition to Firestorm Training provided for in Section 8.1, Firestorm may require sales representatives or any other person that comes in direct contact with Clients and prospective clients for the purpose of selling the Products & Services to have a specified level of training to be conducted, at Firestorm's option, by (i) Firestorm and/or (ii) a representative of Franchisee's that has completed Firestorm Training and has such other qualifications designated by Firestorm. Firestorm reserves the right to charge a training fee in connection with training conducted by Firestorm under this Section 8.3.

8.3     Firestorm may offer optional and mandatory additional training courses, seminars, and other training programs as Firestorm may develop from time to time ("**Additional Training**").  Firestorm may require Franchisee, Owners, and Franchisee's managers, assistant managers and other employees to attend Additional Training.  Franchisee may be required to pay a fee to Firestorm, or to trainers designated by Firestorm, for Additional Training.

8.4     All training programs shall be at such times and places as may be designated by Firestorm. Franchisee or its employees shall be responsible for any and all other expenses incurred by them in connection with Firestorm Training and Additional Training, including the costs of transportation, lodging, meals and wages.  Trainees will not receive compensation from Firestorm for work performed during Firestorm Training or Additional Training.

8.5     Firestorm may require Franchisee (or an Owner) and/or one or more of the managers of the Firestorm Business to attend conferences which may be offered by Firestorm from time to time.  Franchisee will be responsible for the travel and living expenses of such persons, and Firestorm may charge a reasonable fee sufficient to cover the costs and expenses of such conferences.

9.     PROPRIETARY MARKS

9.1     Firestorm represents with respect to the Proprietary Marks that Firestorm has the right to use, and to license others to use, the Proprietary Marks.

9.2     With respect to Franchisee's use of the Proprietary Marks:

9.2.1     Franchisee agrees to use only the Proprietary Marks designated by Firestorm, and shall use them only in the manner authorized and permitted by Firestorm;

9.2.2     Franchisee agrees to use the Proprietary Marks only (i) for the operation of the Firestorm Business, (ii) in connection with Products & Services approved in the Manual for use in connection with the Proprietary Marks, or (iii) in advertising approved by Firestorm for the Firestorm Business;

9.2.3     Unless otherwise authorized or required by Firestorm, Franchisee agrees to operate and advertise the Firestorm Business only under the Proprietary Marks, and shall use all Proprietary Marks without prefix or suffix in the manner required by Firestorm;

9.2.4     Franchisee may not use any of the Proprietary Marks in any part of any domain name or electronic address or any similar proprietary or common carrier electronic delivery system. Franchisee will not seek to register, or assert any claim of ownership or usage rights to, any domain name or electronic address incorporating any of the Proprietary Marks or any names confusingly similar to the Proprietary Marks.  Franchisee agrees, at the request of Firestorm, to take all necessary steps to assign to Firestorm all rights in or to such domain names and electronic addresses (and any registrations for the foregoing) that Franchisee may acquire;

9.2.5    Franchisee agrees to identify itself as the owner of the Firestorm Business in conjunction with any use of the Proprietary Marks in the manner required by Firestorm;

9.2.6    Franchisee's right to use the Proprietary Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of rights of Firestorm;

9.2.7    Franchisee agrees not to use the Proprietary Marks to incur any obligation or indebtedness on behalf of Firestorm;

9.2.8    Franchisee agrees to execute any documents deemed necessary by Firestorm to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability; and

9.2.9    Franchisee agrees to promptly notify Firestorm of any suspected unauthorized use of the Proprietary Marks, any challenge to the validity of the Proprietary Marks, or any challenge to Firestorm's and/or Firestorm's licensor's ownership of, Firestorm's right to use and to license others to use, or Franchisee's right to use, the Proprietary Marks. Franchisee acknowledges that Firestorm has the sole right to direct and control any administrative proceeding or litigation involving the Proprietary Marks, including any settlement thereof. Firestorm has the right, but not the obligation, to take action against uses by others that may constitute infringement of the Proprietary Marks. Through legal counsel chosen by Firestorm, Firestorm agrees to defend Franchisee against any third-party claim, suit, or demand arising out of Franchisee's use of the Proprietary Marks. If Firestorm, in its sole discretion, determines that Franchisee has not used the Proprietary Marks in accordance with this Agreement, the cost of such defense, including the cost of any judgment or settlement, shall be borne by Franchisee. Franchisee agrees to execute any and all documents and do such acts as may (including signing documents or doing such acts in connection with retaining legal counsel), in the opinion of Firestorm, be necessary or advisable to protect and maintain the interests of Firestorm and Franchisee in the Proprietary Marks.

9.3    Franchisee expressly understands and acknowledges that:

9.3.1    Firestorm and/or its affiliates (or licensor) are the owners of all right, title, and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them, and Firestorm has the right to use, and license others to use, the Proprietary Marks;

9.3.2    The Proprietary Marks are valid and serve to identify the System, the Products & Services, and those who are authorized to operate under the System;

9.3.3    During the term of this Agreement and after its expiration or termination, Franchisee agrees not to directly or indirectly contest the validity of, or Firestorm's ownership of, or right to use and license others to use, the Proprietary Marks;

9.3.4    Franchisee's use of the Proprietary Marks does not give Franchisee any ownership interest or other interest in or to the Proprietary Marks;

9.3.5    Any and all goodwill arising from Franchisee's use of the Proprietary Marks shall inure solely and exclusively to the benefit of Firestorm (and Firestorm's affiliates and licensor), and upon expiration or termination of this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System or the Proprietary Marks;

9.3.6    The license of the Proprietary Marks granted hereunder to Franchisee is nonexclusive, and Firestorm and its affiliates thus have and retain the rights, among others: (a) to use the

Proprietary Marks themselves in connection with selling products and services (including Products & Services that Franchisee will offer and sell); (b) to grant other licenses for the Proprietary Marks, including to licensees outside of the System; and (c) to develop and establish other systems using the Proprietary Marks, similar proprietary marks, or any other proprietary marks, and to grant licenses thereto without providing any rights therein to Franchisee; and

9.3.7   If Firestorm decides, at Firestorm's sole discretion, to change, add or discontinue use of any of the Proprietary Marks, or to introduce additional or substitute proprietary marks for use in identifying the System, the Firestorm Businesses operating under the System, and/or the Products & Services, Franchisee, upon a reasonable period of time after receipt of written notice from Firestorm, shall take such action, at Franchisee's sole expense, as is necessary to comply with such changes, addition, discontinuation, alteration or substitution.  Firestorm will not be liable to Franchisee for any expenses, losses (including loss of revenue or goodwill) or damages Franchisee may sustain as a result of any Proprietary Mark addition, modification, discontinuation or substitution.

## 10.   MANUAL

10.1   To promote the highest standards of operation under the System, Firestorm has prepared a Confidential Operations Manual (the "**Manual**") which includes manuals, bulletins, and other written policies and procedures setting forth the minimum standards regarding the Products & Services, quality of advice, client satisfaction, and compliance.  In addition, the Manual set forth standards regarding the use of Proprietary Marks, signage, communications, privacy principles, and confidentiality.

10.2   To comply with all applicable laws and regulations and to protect the reputation and goodwill of Firestorm and the System, Franchisee agrees to operate the Firestorm Business in accordance with the professional standards specified in the Manual, one copy of which Franchisee agrees to receive on loan from Firestorm for the term of this Agreement upon completion by Franchisee of Firestorm Training to Firestorm's satisfaction.  In lieu of, or in addition to, providing Franchisee with a paper copy of the Manual, Firestorm may provide Franchisee with electronic access to the Manual (or such updates to the Manual as Firestorm may determine).

10.3   Firestorm may from time to time revise or modify the contents of the Manual, and Franchisee expressly agrees to comply with each new or changed standard.

10.4   Franchisee agrees to treat the Manual, any other materials created for or approved for use in the operation of the Firestorm Business, and the information contained therein, as confidential, and shall use all reasonable efforts to maintain such information as secret and confidential.  Franchisee agrees to not download, copy, duplicate, record, or otherwise reproduce the foregoing materials, in whole or in part, or otherwise make the same available to any unauthorized person.  The Manual shall remain the sole property of Firestorm and shall be kept in a secure place at the Work Space or any Office.  Franchisee agrees to ensure that the Manual is kept current at all times.  In the event of any dispute as to the contents of the Manual, the terms of the most recently communicated Manual supersede all previous versions of the Manual.

## 11.   CONFIDENTIAL INFORMATION

11.1   Franchisee shall not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person or entity any confidential information, knowledge, or know-how concerning Firestorm and/or the marketing, management or operations of the Firestorm Business that may be communicated to Franchisee or of which Franchisee may be apprised by virtue of Franchisee's operation under the terms of this Agreement.  Franchisee shall divulge such confidential

information only to such of its employees as must have access to it in order to operate the Firestorm Business. For purposes of this Agreement, "confidential information" means: (i) any and all information, knowledge, or know-how relating to Firestorm and the System which may be communicated to Franchisee, whether communicated in writing, orally, electronically, by inspection, or by sample, exhibit, training, demonstration or other means; and (ii) the Manual, information and materials received by Franchisee from Firestorm; provided, however, it shall not include information which Franchisee can demonstrate came to its attention prior to disclosure thereof by Firestorm, or which, at or after the time of disclosure by Firestorm to Franchisee, had become or later becomes part of the public domain through publication or communication by others. Confidential information may include, but is not limited to, (a) information relating to the development and operation of the System; (b) proprietary information and trade secrets, including, without limitation, Client names, addresses and data, know-how concerning the methods of operation of the System and the business franchised hereunder and information regarding the Products & Services sold under the System and the development of Products & Services sold under the System which may be communicated to Franchisee or of which Franchisee may be apprised by virtue of Franchisee's operation under the terms of this Agreement; (c) advertising and marketing plans and materials for the System; (d) information concerning the marketing, management and operation of the Firestorm Business under the System; and (e) information concerning Firestorm. The foregoing list of confidential information is illustrative only and does not necessarily include all matters considered confidential by Firestorm.

11.2   At Firestorm's request, Franchisee agrees to require any personnel having access to any confidential information of Firestorm or information about Clients or potential clients to execute covenants that they will maintain the confidentiality of information they receive in connection with their employment by or association with Franchisee in the Firestorm Business. Such covenants shall be in a form satisfactory to Firestorm, including specific identification of Firestorm as a third-party beneficiary of such covenants with the independent right to enforce them.

## 12.   ACCOUNTING AND RECORDS

12.1   As specified in the Manual, Franchisee shall record on the Computer System (or on any other equipment or communication system specified by Firestorm in the Manual or otherwise in writing) (i) all Products & Services provided by the Firestorm Business, (ii) all Clients of the Firestorm Business, (iii) all prospective businesses or customers that Franchisee has solicited, contacted, or pitched to purchase Products & Services (including proposals, quotes and proposed contracts), (iv) all invoices related to Clients services by the Firestorm Business, (v) all financial information for the Firestorm Business required by Firestorm, and (vi) contracts and plans related to Clients. Franchisee agrees to, at Franchisee's expense, submit to Firestorm, in the form prescribed by Firestorm, such reports, forms, records, accounts, information, and data in the form and manner prescribed by Firestorm from time to time in the Manual or otherwise in writing.

12.1.1   All Gross Revenue, sales tax and charges collected on behalf of third parties shall be recorded by Franchisee in accordance with the procedures-prescribed in the Manual and on the Computer System.

12.1.2   Franchisee shall, at Franchisee's expense, submit to Firestorm in the form prescribed by Firestorm, the following reports, financial statements and other data:

12.1.2.1   No later than 5:00 pm on the 5th day of each Period, or such other time as may correspond to the required payment periods as set forth in Section 5.5, Franchisee shall submit to Firestorm a royalty report and Gross Revenue report for the prior month, and such other information as Firestorm specifies, all in the form prescribed by Firestorm;

12.1.2.2    No later than the 21st day of each month a profit and loss statement reflecting all Gross Revenue during the preceding calendar months and such other information as Firestorm may specify for the preceding calendar months. Franchisee shall prepare profit and loss statements on an accrual basis and in accordance with Generally Accepted Accounting Principles;

12.1.2.3    Within 90 days after the end of each fiscal year of Franchisee, financial statements compiled or reviewed by an independent certified public accountant, showing the results of operations, including the balance sheet, statement of income and retained earnings and statement of cash flow (and, for each, the supporting notes) relating to the Firestorm Business during the fiscal year. If Franchisee does not, in the ordinary course, obtain financial statements complied or reviewed by an independent certified accountant, then Franchisee may provide internally prepared financial statements which shall be certified as true and correct by Franchisee or Franchisee's principal executive officer or chief financial officer if Franchisee is a corporation, partnership or limited liability company. Firestorm shall have the right at any time to require audited annual statement to be provided to Firestorm, at Franchisee's expense;

12.1.2.4    Within 90 days after their filing for each year during the term of this Agreement, Franchisee's signed 1120 or 1120 S tax form as filed with the Internal Revenue Service (or any forms which take the place of those forms), and all other federal, state and local sales and use and income tax reports Franchisee is required to file; and

12.1.2.5    Other forms, statements, reports, records, information and data as Firestorm may reasonably designate.

12.1.3    Firestorm and its agents shall have the right at all reasonable times to examine and copy, at the expense of Firestorm, the books, records, accounts and/or business tax returns of Franchisee, but not the records and information of Franchisee's employees, which shall be controlled exclusively by Franchisee. Firestorm shall also have the right, at any time, to have an independent audit made of the books of Franchisee. If an audit should reveal that Gross Revenues or any payments or contributions have been understated in any statement or report to Firestorm, then Franchisee shall immediately pay to Firestorm the amount due based on the understatement upon demand, in addition to interest from the date such amount was due until paid, at the rate of 18% per annum, or the maximum rate permitted by law, whichever is less. If an audit discloses an understatement in any statement or report of 3% or more, Franchisee shall, in addition to repayment of monies owed with interest, reimburse Firestorm for any and all costs and expenses connected with the audit (including travel, lodging and wages expenses, and reasonable accounting and legal costs). The foregoing remedies shall be in addition to any other remedies Firestorm may have.

12.1.4    All data provided by Franchisee to Firestorm will be owned exclusively by Firestorm, and Firestorm shall have the right to use such data in any reasonable business related manner Firestorm deems appropriate without compensation to Franchisee, provided that Firestorm shall use reasonable efforts to avoid public dissemination of any confidential financial information in a manner that would identify Franchisee as the source of such information.

13.    ADVERTISING AND PROMOTION

13.1    Firestorm Advertising Fund

13.1.1    Recognizing the value of advertising and promotion to Firestorm and the Firestorm Business, and the importance of coordinated advertising and promotion programs to the furtherance of the goodwill and public image of the System, the parties agree as follows:

13.1.1.1     Firestorm has the right, but not the obligation, to establish the System's advertising fund (the "**Fund**"). On or before the 5th day of each month, Franchisee shall contribute to the Fund a percentage of the Gross Revenues of the Firestorm Business for the preceding calendar month. Franchisee's obligation to contribute to the Fund will not commence until the first full week of the sixth calendar month after the Effective Date. When Franchisee's obligation to contribute to the Fund commences, Franchisee shall contribute the greater of $25 or 1% of Gross Revenue of the Firestorm Business for the first six months after Franchisee's obligation to contribute to the Fund starts and, thereafter (and for the remainder of the term of this Agreement), Franchisee shall contribute the greater of $50 or 2% of Gross Revenue of the Firestorm Business.

13.1.1.2     If established, the Fund shall be maintained and administered by Firestorm as follows:

13.1.1.2.1     Firestorm agrees to direct all advertising programs conducted through the Fund, with sole discretion over the concepts, materials, and media used in such programs and the placement and allocation thereof. Franchisee agrees and acknowledges that the Fund is intended to maximize general public recognition, acceptance, and use of the System, Products & Services; and that Firestorm is not obligated, in administering the Fund, to make expenditures for Franchisee which are equivalent or proportionate to Franchisee's contribution, or to ensure that any particular franchisee under the System benefits directly or pro rata from expenditures by the Fund.

13.1.1.2.2     The Fund, all contributions thereto, and any earnings thereon, shall be used exclusively to meet the costs of preparing, directing, conducting, placing, and administering advertising, marketing, public relations, and/or promotional programs and materials, and any other activities which Firestorm believes will enhance the image of the System, Proprietary Marks and Products & Services, including, the costs of preparing and conducting media advertising campaigns; direct mail advertising; marketing surveys; establishing and operating the National Account Program; establishing and operating the Central Phone and Website; employing advertising and/or public relations agencies to assist therein; purchasing promotional items; conducting and administering in-office promotions; maintain social networking technology programs; and providing promotional and other marketing materials and services to the businesses operating under the System.

## 13.2    Franchisee Advertising

13.2.1    All advertising and promotion by Franchisee shall be in such media and of such type and format as Firestorm may approve, shall be conducted in a dignified manner, and shall conform to such standards and requirements as Firestorm may specify to conform to legal requirements and to protect the value of the Proprietary Marks. Franchisee agrees to not use any advertising or promotional plans or materials unless and until Franchisee has received written approval from Firestorm, pursuant to the procedures and terms set forth in this Section. Franchisee agrees to submit samples of all advertising and promotional plans and materials to Firestorm, for Firestorm's prior approval if such plans and materials have not been prepared or previously approved by Firestorm within the prior one-year period. Franchisee agrees to not use such plans or materials until they have been approved in writing by Firestorm. Firestorm or its affiliates may, in its sole discretion, establish and operate websites, social media accounts (such as Facebook, Twitter, Instagram, Pinterest, etc.), applications, keyword or adword purchasing programs, accounts with websites featuring gift certificates or discounted coupons (such as Groupon, Living Social, etc.), mobile applications, or other means of digital advertising on the Internet or any electronic communications network (collectively, "Digital Marketing") that are intended to promote the Proprietary Marks, your Firestorm Business, and the entire network of Firestorm Businesses. We will have the sole right to control all aspects of any Digital Marketing, including those related to your Firestorm franchise.

Unless we consent otherwise in writing, you may not, directly or indirectly, conduct or be involved in any Digital Marketing that use the Proprietary Marks or that relate to your Firestorm Business.

13.2.2  Firestorm may make available to Franchisee, at Franchisee's expense, pre-approved advertising and promotional plans and materials, including newspaper mats, merchandising materials, sales aids, special promotions, direct mail materials, speech/seminar invitations and similar advertising and promotional materials. Firestorm may derive revenue on making available such advertising and promotional materials to franchisees of Firestorm.

13.2.3  If Franchisee satisfies all legal requirements and other requirements in the Manual, Franchisee may obtain listings for the Firestorm Business in telephone directories. The content and appearance of any telephone listing shall conform to Firestorm's pre-approved format, to conform to regulatory requirements and to protect the value of the Proprietary Marks.

13.2.4  If Firestorm believes that any advertising or promotional materials may cause a conflict with protecting the value of the Proprietary Marks, Firestorm will initiate a process to review and/or coordinate the advertising or promotional materials and has final approval authority over the materials.

13.3  Firestorm may establish a website for or related to the System (the "**Website**"). After creating a Website, Firestorm shall have the right to designate a successor Website for the System. Subject to the terms of this Agreement, during the term of this Agreement, Firestorm will endeavor to make available to Franchisee a sub-page on the Website that will be located at a sub-domain of the Website to be specified by Firestorm (the "**Subpage**"). Franchisee will be permitted to upload content onto the Subpage solely to promote, and provide Clients and prospective clients with information related to, the Firestorm Business operated by Franchisee. Franchisee shall only upload content onto the Subpage in accordance with terms of this Agreement as well as any guidelines, directives or specifications (collectively, "**Subpage Standards**") in the Manual. Firestorm may require each Subpage to be in the format of Firestorm's template for Subpages. Franchisee understands and agrees that the Subpage may not contain content which references any other Firestorm Business other than the Firestorm Business operated by Franchisee. Franchisee will not upload, publish, display, or otherwise include or use any content on the Subpage without receiving the prior written approval of Firestorm. Accordingly, once the initial content of the Subpage is approved by Firestorm, Franchisee must submit any changes to such content to Firestorm for Firestorm's prior written approval.

13.3.1  Firestorm's review and approval of the Subpage content shall not be construed as Firestorm's approval, recommendation or endorsement of Franchisee or a representation or warranty by Firestorm that such content is accurate, complete, truthful or correct. Franchisee acknowledges and understands that the registration for the Website domain name is and shall be maintained exclusively in the name of Firestorm or its designee. Franchisee acknowledges Firestorm's or its designee's exclusive right, title and interest in and to the domain name for the Website and further acknowledges that nothing herein shall give it any right, title or interest in such domain name. Franchisee will not, at any time, challenge Firestorm's or its designee's ownership of the Website domain name, challenge the validity of the Website domain name, or impair any right, title or interest of Firestorm or its designee in the Website domain name. Franchisee will assist Firestorm in preserving and protecting Firestorm's or its designee's rights in and to the Website domain name.

13.3.2  Franchisee further acknowledges and agrees that Firestorm may, at any time in its sole discretion, cease to make the Subpage available to Franchisee or the public. Franchisee agrees that Firestorm shall have no liability for failing to make the Subpage available to Franchisee or the public. ADDITIONALLY, TO THE MAXIMUM EXTENT PERMITTED BY LAW, FIRESTORM HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES (WHETHER EXPRESS, IMPLIED OR STATUTORY)

RELATED TO THE AVAILABILITY AND PERFORMANCE OF THE WEBSITE AND THE SUBPAGE, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF NONINFRINGEMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. TO THE MAXIMUM EXTENT PERMITTED BY LAW, FIRESTORM SHALL NOT BE LIABLE FOR ANY DIRECT OR INDIRECT DAMAGES (INCLUDING, WITHOUT LIMITATION, ANY CONSEQUENTIAL, PUNITIVE OR INCIDENTAL DAMAGES OR DAMAGES FOR LOST PROFIT OR LOSS OF BUSINESS) RELATED TO THE USE, OPERATION, AVAILABILITY OR FAILURE OF THE WEBSITE OR SUBPAGE. Upon the termination or expiration of this Agreement for any reason or Franchisee's default under this Agreement for any reason, all right of Franchisee to upload content onto, or otherwise use, the Subpage shall immediately cease and Firestorm may cease to make the Subpage available to Franchisee.

14.     INSURANCE

14.1     Franchisee shall procure before any operations under this Agreement (and prior to opening any Office), and shall maintain in full force and effect at all times during the term of this Agreement, at Franchisee's expense, an insurance policy or policies protecting Franchisee, Firestorm, and Firestorm's affiliates against any demand or claim with respect to personal injury, death, negligence, or property damage, or any loss, liability, or expense whatsoever arising or occurring upon or in connection with the Firestorm Business, including, but not limited to, errors and omissions, comprehensive general liability insurance, property and casualty insurance, and statutory workers' compensation insurance. Such policy or policies shall reflect industry standards, shall be written by a responsible carrier or carriers acceptable to Firestorm, shall name Firestorm and its affiliates (including Firestorm Solutions, LLC and Firestorm Publishing, LLC) as additional insureds, and shall provide at least the types and minimum amounts of coverage as are specified in the Manual as modified by Firestorm from time to time.

14.2     Franchisee's obligation to obtain and maintain the policy or policies in the amounts specified in the Manual shall not be limited in any way by reason of any insurance which may be maintained by Firestorm, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in Section 20 of this Agreement.

14.3     Prior to the commencement of any operations under this Agreement, and thereafter on an annual basis, Franchisee shall deliver to Firestorm Certificates of Insurance evidencing the proper types and minimum amounts of coverage. Franchisee shall also maintain Certificates of Insurance evidencing the proper types and minimum amounts of coverage at the Work Space and any Office and furnish to Firestorm a copy. All Certificates of Insurance shall expressly provide that no less than 30 days' prior written notice shall be given to Firestorm in the event of material alteration to or cancellation of the coverages evidenced by such Certificates.

14.4     Should Franchisee, for any reason, fail to procure or maintain the insurance required by this Agreement, as such requirements may be revised by Firestorm in the Manual or otherwise in writing, Firestorm shall have the right and authority (but not the obligation) to procure such insurance and to charge same to Franchisee, which charges, together with a reasonable fee for the expenses of Firestorm in so acting, shall be payable by Franchisee immediately upon notice. The foregoing remedies shall be in addition to any other remedies Firestorm may have.

15.     TRANSFER OF INTEREST

15.1     Firestorm has the right to transfer or assign its rights or obligation under this Agreement to any person or entity and Firestorm interest will bind and inure to the benefit of any transferee, successor or assignee. After Firestorm's transfer or assignment of this Agreement to a person or entity who expressly

assumes the obligations under this Agreement, Firestorm will have no further obligation under this Agreement. Franchisee further agrees and affirms that Firestorm may sell itself, its assets, the Proprietary Marks and/or the System to a third-party; may go public, may engage in private placement of some or all of its securities; may merge, acquire other corporations or be acquired by another corporation; and/or may undertake a refinancing, recapitalization, leveraged buyout or other economic or financial restructuring. Franchisee further agrees and affirms that Firestorm has the right, now or in the future, to purchase, merge, acquire or affiliate with an existing competitive or noncompetitive franchise network, chain or any other business regardless of the location of that chain's or business' facilities, and to operate, franchise or license those businesses as Firestorm Businesses operating under the Proprietary Marks or any other marks following Firestorm's purchase, merger, acquisition or affiliation, regardless of the location of these facilities, which Franchisee acknowledges may be proximate to any Firestorm Business. With regard to any of the above sales, assignments and dispositions, Franchisee expressly and specifically waives any claims, demands or damages arising from or related to the loss of Firestorm's name, the Proprietary Marks (or any variation thereof) and the System and/or the loss of association with or identification of Firestorm under this Agreement.

15.2   Franchisee understands and acknowledges that Firestorm has granted this franchise in reliance on Franchisee's (or, if Franchisee is a corporation, partnership or limited liability company, its principals') business skill, financial capacity and personal character. Accordingly, neither Franchisee, nor any individual, partnership, corporation, limited liability company or other legal entity which directly or indirectly owns any interest in Franchisee or in the Firestorm Business shall sell, assign, transfer, convey, pledge, encumber, merge or give (collectively, "**transfer**") away any direct or indirect interest in Franchisee (including any direct or indirect interest in a corporate, partnership or limited liability company Franchisee), in the Firestorm Business, or in all or substantially all of the assets of the Firestorm Business or the business franchised hereunder, without the prior written consent of Firestorm.

15.3   Franchisee shall notify Firestorm in writing of any proposed transfer of any direct or indirect interest in this Agreement, in Franchisee, in the Firestorm Business, or in all or substantially all of the assets of the Firestorm Business at least **30** days before such transfer is proposed to take place. Firestorm shall review any proposed transfer to determine whether the proposed terms and transferee(s) meets Firestorm's standards. If a transfer, alone or together with other previous, simultaneous or proposed transfers, would have the effect of changing control of Franchisee, results in the assignment of the rights and obligations of Franchisee under this Agreement or transfers the ownership interest in the Firestorm Business or all or substantially all of the assets of the Firestorm Business or the business franchised hereunder, Firestorm may, in its sole discretion, require any or all of the following as conditions of its approval:

15.3.1   That all of Franchisee's accrued due monetary obligations and all other outstanding obligations to Firestorm, its affiliates and any approved suppliers of the System have been satisfied;

15.3.2   That Franchisee shall not be in default under any provision of this Agreement, any other agreement between Franchisee, and Firestorm, Firestorm's affiliates, any approved suppliers of the System or the lessor (or sublessor) for any Office;

15.3.3   That each transferor (and, if the transferor is other than an individual, the transferor and such owners of beneficial interest in the transferor as Firestorm may request) shall have executed a general release in a form satisfactory to Firestorm of any and all claims against Firestorm and its affiliates and their respective officers, directors, agents and employees;

15.3.4   Franchisee shall execute, for a term ending on the expiration date of this Agreement, the form of franchise agreement then being offered to new System franchisees, and such other

ancillary agreements required by Firestorm for the business franchised hereunder, which agreements shall supersede this Agreement and its ancillary documents in all respects, and the terms of which may differ from the terms of this Agreement, including, without limitation, a different royalty fee and advertising obligations, provided, however, that Franchisee shall not have to pay an initial franchise fee;

15.3.5   That the transferee demonstrate to Firestorm's satisfaction that the terms of the proposed transfer do not place an unreasonable financial or operational burden on the transferee, and that the transferee (or, if the transferee is other than an individual, such owners of beneficial interest in the transferee as Firestorm may request) meets the then-current educational, managerial and business standards of Firestorm (including a demonstration of competence with respect to the Products & Services, computer applications, verbal and written language skills, mathematical applications and ability to prepare a business plan); possesses a good moral character, business reputation and credit rating; has the aptitude and ability to operate the Firestorm Business (as may be evidenced by prior related business experience or otherwise) and absence of conflicting interests; and has adequate financial resources and capital to operate the Firestorm Business. If the transferee is already a System franchisee, transferee must also meet the current standards for new franchisees for Firestorm Businesses; have the ability to operate multiple Firestorm Businesses; have existing Firestorm Businesses that are proximate to the Firestorm Business that is being transferred; have a history of compliance with all franchise agreements and other agreements between such franchisee and Firestorm and its affiliates; and have a record of good customer service and compliance with System standards satisfactory to Firestorm;

15.3.6   If Franchisee has an Office and the Office does not meet Firestorm's standards for offices for Firestorm Businesses, that the transferee shall, at its expense and in a manner satisfactory to Firestorm, refurbish, renovate and/or redecorate the Office, and expend such funds as Firestorm requires in doing so, to conform to the image then in effect for new offices for Firestorm Businesses;

15.3.7   That Franchisee (and the guarantors) remain liable for all of the obligations to Firestorm in connection with the Firestorm Business which arose prior to the effective date of the transfer and execute any and all instruments reasonably requested by Firestorm to evidence such liability;

15.3.8   That the transferee (and, if the transferee is other than an individual, such owners of beneficial interest in the transferee as Firestorm may request), and the transferee's manager (if transferee or an owner of beneficial interest in transferee will not manage the Firestorm Business), at the transferee's expense, successfully complete any training programs then in effect for System franchisees and managers upon such terms and conditions, including payment to Firestorm for such training programs, as Firestorm may reasonably require;

15.3.9   That Franchisee pay a transfer fee in an amount of 20% of Franchisee's then-current initial franchise fee for Firestorm Business;

15.3.10 That Franchisee and the transferee satisfy all of the conditions for Firestorm's consent to the transfer and consummate the transfer within 30 days of the date on which the transferee completes the training requirements described in Section 15.3.8 hereof; and

15.3.11 That transferor(s), at the request of Firestorm, shall agree in writing to comply with the covenants set forth in Section 18 below.

15.4   For any transfer not included in Section 15.3, each transferee shall, in addition to the requirement of obtaining Firestorm's consent as provided in Section 15.2, be subject to the requirements of Sections 15.3.3 and 15.3.4 (with respect to execution of personal guarantees) above.

15.5    Neither Franchisee nor any Owner shall grant a security interest in, or otherwise encumber, any of the assets or securities of Franchisee, including the Firestorm Business unless Franchisee satisfies the requirements of Firestorm. Such requirements may include, without limitation, execution of an agreement by the secured party in which it acknowledges the creditor's obligations under this Section 15, and agrees that in the event of any default by Franchisee under any documents related to the security interest, Firestorm shall have the right and option (but not the obligation) to be substituted as obligor to the secured party and to cure any default of Franchisee, and, in the event Firestorm exercises such option, any acceleration of indebtedness due to Franchisee's default shall be void.

15.6    If any party holding any direct or indirect interest in this Agreement, in Franchisee, in the Firestorm Business or in all or substantially all of the assets of the Firestorm Business desires to accept any bona fide offer from a third party to purchase such interest, Franchisee shall notify Firestorm as provided in Section 15.3 hereof, and shall provide such information and documentation relating to the offer as Firestorm may require (e.g. term sheet, letter of intent, proposed asset purchase agreement). Firestorm shall have the right and option, exercisable within 30 days after receipt of the written transfer request and the required information and documentation related to the offer (including any information that Firestorm may reasonably request to supplement or clarify information provided to Firestorm with the written transfer request), to send written notice to the seller that Firestorm intends to purchase the seller's interest on the same terms and conditions offered by the third party. If Firestorm elects to purchase the seller's interest, closing on such purchase shall occur within 45 days from the date of notice to the seller of the election to purchase by Firestorm, or, if longer, on the same timetable as contained in the bona fide offer. If Firestorm elects not to purchase the seller's interest, any material change thereafter in the terms of the offer from the third party or by Franchisee, or a change in the identity of the third party shall constitute a new offer subject to the same rights of first refusal by Firestorm as in the case of the third party's initial offer. Failure of Firestorm to exercise the option afforded by this Section 15.6 shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this Section 15, with respect to a proposed transfer.

15.7    Upon the death or incapacity of any person with an interest in this Agreement, in Franchisee, in the Firestorm Business, or in all or substantially all of the assets of the Firestorm Business, the executor, administrator or personal representative of such person shall transfer such interest to a third party approved by Firestorm within 3 months after such death or incapacity. Such transfers, including transfers by devise or inheritance, shall be subject to the same conditions as any inter vivos transfer except no transfer fee will be required. In the case of transfer by devise or inheritance, if the heirs or beneficiaries of any such person are unable to meet the conditions in this Section 15, the executor, administrator or personal representative of the decedent shall transfer the decedent's interest to another party approved by Firestorm within a reasonable time, which disposition shall be subject to all the terms and conditions for transfers contained in this Agreement. If Franchisee does not comply with this Section 15.7, Firestorm may terminate this Agreement, pursuant to Section 16.4 hereof.

15.8    The consent of Firestorm to any transfer pursuant to this Section 15 shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be a waiver of the right of Firestorm to demand exact compliance with any of the terms of this Agreement by the transferor or transferee.

15.9    All materials required for any offering of securities or partnership interests in Franchisee by federal or state law shall be submitted to Firestorm by the offeror for review prior to filing with any government agency; and any materials to be used in any exempt offering shall be submitted to Firestorm for review prior to their use. No offering shall imply, by use of the Proprietary Marks or otherwise, that Firestorm is participating in an underwriting, issuance or offering of securities of either Franchisee or Franchisee's affiliates; and review by Firestorm of any offering shall be limited solely to the subject of the

relationship between Franchisee and Firestorm. At its option, Firestorm may require the offering materials to contain written statements or disclaimers prescribed by Firestorm including, but not limited to, any limitations stated above in this Section. Franchisee and the other participants in the offering must fully indemnify Firestorm in connection with the offering. For each proposed offering, Franchisee shall reimburse Firestorm for its actual costs and expenses associated with reviewing the proposed offering materials, including legal and accounting fees. Franchisee shall give Firestorm written notice at least 60 days prior to the date of commencement of any offering or other transaction covered by this Section 15.9. Any such offering shall be subject to prior written consent of Firestorm and right of first refusal as provided in Sections 15.2, 15.3, 15.4 and 15.6 hereof.

15.10 If Franchisee is a corporation, partnership or limited liability company: (1) an original shareholder, partner or member approved by Firestorm must at all times during the Term of this Agreement have a controlling interest in Franchisee; and (2) Franchisee shall require each shareholder, partner or member (as the case may be) holding an interest in Franchisee to execute a covenant with Firestorm agreeing not to transfer any interest in Franchisee in violation of the terms of this Agreement.

15.11 If Franchisee or any person holding any interest (direct or indirect) in Franchisee becomes a debtor in a proceeding under the U.S. Bankruptcy Code or any similar law in the U.S. or elsewhere, it is the parties' understanding and agreement that any transfer of the ownership of Franchisee, Franchisee's obligations and/or rights hereunder and/or any material assets of Franchisee, shall be subject to all of the terms of this Section 15.

15.12 Notwithstanding anything to the contrary in this Agreement, no transfer shall be made if the transferee, any of its affiliates, or the finding sources for either is a person or entity designated with whom Firestorm, or any of its affiliates, are prohibited by law from transacting business.

## 16. DEFAULT AND TERMINATION

16.1 Franchisee shall be in default under this Agreement, and all rights granted to Franchisee herein shall automatically terminate without notice to Franchisee, if Franchisee shall become insolvent or make a general assignment for the benefit of creditors; if a petition in bankruptcy is filed by Franchisee or such a petition is filed against and not opposed by Franchisee; if Franchisee is adjudicated a bankrupt or insolvent; if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for the Firestorm Business or assets is filed and consented to by Franchisee; if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; if proceedings for a composition with creditors under any state or federal law should be instituted by or against Franchisee; if a final judgment remains unsatisfied or of record for 30 days or longer (unless supersedeas bond is filed); if Franchisee is dissolved; if execution is levied against Franchisee's business or property; if suit to foreclose any lien or mortgage against any Office or equipment is instituted against Franchisee and not dismissed within 30 days; or if the real or personal property of the Firestorm Business shall be sold after levy thereupon by any sheriff, marshal, or constable.

16.2 Upon the occurrence of any of the following events of default, Firestorm may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon the provision of notice to Franchisee (in the manner provided under Section 23 hereof):

16.2.1 If Franchisee fails to obtain Firestorm's authorization for any Office as required by Section 1.1.2;

16.2.2 If Franchisee loses the right to occupy any Office, or acts or fails, to act, in any manner which is inconsistent with or contrary to its lease or sublease for any Office, or in any way jeopardizes its right to renewal of such lease or sublease;

16.2.3 If Franchisee or any of its Owners is charged with, pleads nolo contendere to, or is convicted of a felony, a crime involving moral turpitude or dishonesty, or any other crime or offense that Firestorm believes is reasonably likely to have an adverse effect on Firestorm, the System, the Proprietary Marks, the Products & Services, the goodwill associated therewith or the interest of Firestorm therein;

16.2.4 If Franchisee or any of its Owners is alleged to have violated Federal or state civil law or common law that Firestorm believes is reasonably likely to have an adverse effect on Firestorm, the System, the Proprietary Marks, the Products & Services, the goodwill associated therewith or the interest of Firestorm therein;

16.2.5 If Franchisee's action or inaction, at any time, results in the loss of the right to possession of any Office, or forfeiture of the right to do or transact business in the jurisdiction where any Office is located or any other area where Franchisee is required to transact business to service Clients of the Firestorm Business;

16.2.6 If Franchisee, any Owner or other party covered by Section 15 purports to transfer any rights or obligations under this Agreement, or any interest in Franchisee, the Firestorm Business or the assets of the Firestorm Business to any third party in a manner that is contrary to the terms of Section 15 hereof;

16.2.7 If Franchisee knowingly maintains false books, records or information on the Computer System, or knowingly submits any false statements or reports to Firestorm;

16.2.8 If, contrary to the terms of Sections 10 or 11 hereof, Franchisee discloses or divulges the contents of the Manual or other confidential information provided to Franchisee by Firestorm;

16.2.9 If Franchisee misuses or makes any unauthorized use of the Proprietary Marks or any other identifying characteristics of the System, or if Franchisee otherwise operates the Firestorm Business in a manner that materially impairs the reputation or goodwill associated with Firestorm, the System, Proprietary Marks, the Products & Services or the rights of Firestorm therein;

16.2.10 If Franchisee, after curing a default pursuant to Sections 16.3 or 16.4 hereof, commits the same default again, whether or not cured after notice;

16.2.11 If Franchisee breaches any material provision of this Agreement which breach is not susceptible to cure; or

16.2.12 If Franchisee is deemed to have Abandoned the Firestorm Business.

16.3    Upon the occurrence of any of the following events of default in this Section 16.3, Firestorm may, at its option, terminate this Agreement by giving written notice of termination (in the manner set forth under Section 23 hereof) stating the nature of the default to Franchisee at least 7 days prior to the effective date of termination; provided, however, that Franchisee may avoid termination by immediately initiating a remedy to cure such default, curing it to the satisfaction of Firestorm, and by promptly providing proof thereof to Firestorm within the 7-day period. If any such default is not cured within the specified time, or such longer period as applicable law may require, this Agreement shall

terminate without further notice to Franchisee, effective immediately upon the expiration of the 7-day period or such longer period as applicable law may require.

16.3.1 If Franchisee fails, refuses or neglects promptly to pay any monies owing to Firestorm or its affiliates when due;

16.3.2 If Franchisee refuses to permit Firestorm to inspect the Work Space or any Office, or the books, records or accounts of Franchisee and the Firestorm Business upon demand;

16.3.3 If Franchisee refuses to give Firestorm access to the Computer System or cuts off access to the Computer System (including access to certain portions of the Computer System);

16.3.4 If Franchisee fails to open the Firestorm Business in accordance with Section 7.4, or operate the Firestorm Business during such days and hours specified in the Manual;

16.3.5 If Franchisee fails, refuses or neglects promptly to submit Certificates of Insurance to Firestorm when due as required under Section 14;

16.3.6 If Franchisee fails to maintain or observe any of the standards and procedures prescribed by Firestorm in this Agreement, the Manual or otherwise in writing; or

16.3.7 If Franchisee or any of Franchisee's affiliates materially breaches any other agreement with Firestorm or Firestorm's affiliates.

16.4 Except as otherwise provided in Sections 16.1, 16.2 and 16.3 of this Agreement, upon any other default by Franchisee, Firestorm may terminate this Agreement by giving written notice of termination (in the manner set forth under Section 23 hereof) stating the nature of the default to Franchisee at least 30 days prior to the effective date of termination; provided, however, that Franchisee may avoid termination by immediately initiating a remedy to cure such default, curing it to the satisfaction of Firestorm, and by promptly providing proof thereof to Firestorm within the 30-day period. If any such default is not cured within the specified time, or such longer period as applicable law may require, this Agreement shall terminate without further notice to Franchisee, effective immediately upon the expiration of the 30-day period or such longer period as applicable law may require.

16.5 Franchisee acknowledges that upon Franchisee's failure to remedy any default specified in any written notice issued to Franchisee under Section 16.2 and/or Section 16.3, Firestorm also has the right to (i) cease providing any operational support or services, until, Franchisee complies to Firestorm's satisfaction with the written notice, (ii) suspend access and use of the Central Phone, Website, Subpage, and Manual; (iii) ceasing providing products to Franchisee; (iv) cease Franchisee's right to access the National Account Program (including the opportunity to service National Accounts); and (v) cease having Firestorm's affiliates and suppliers provide products, services and support to Franchisee. If Firestorm exercises Firestorm's right to suspend Franchisee's rights, Firestorm will only do so after Franchisee's cure period under the written notice of default has expired. Franchisee agrees that Firestorm's exercise of these rights will not constitute an actual or constructive termination of this Agreement nor will it constitute Firestorm's sole and exclusive remedy. If Firestorm exercises Firestorm's right not to terminate this Agreement but to implement such suspension and/or removal, Firestorm reserves the right at any time after the appropriate cure period under the written notice has lapsed, to, upon written notice to Franchisee, terminate this Agreement without giving Franchisee any additional corrective or cure period. During any period of suspension, all fees due under this Agreement shall continue to be payable by Franchisee. Additionally, if Franchisee is in default under this Agreement, Firestorm has the right to withhold or condition Firestorm's consent or approval if needed until Franchisee cures all defaults. Firestorm's election

of the suspension rights as provided above shall not be a waiver by Firestorm of any breach of this Agreement or any other term, covenant or condition of this Agreement.

17.    OBLIGATIONS UPON TERMINATION OR EXPIRATION

Upon termination or expiration of this Agreement, all rights granted hereunder to Franchisee shall forthwith terminate although Franchisee's duties under this Agreement shall continue as specified in this Section 17, and:

17.1    Franchisee agrees to immediately cease to operate the Firestorm Business, and Franchisee agrees to not thereafter, directly or indirectly, represent to the public or hold himself or herself out as a present or former franchisee of Firestorm.

17.2    Franchisee agrees to immediately and permanently cease to use, in any manner whatsoever, any confidential methods, procedures, computer files or templates, and techniques associated with the System; the Proprietary Marks; and distinctive forms, slogans, signs, symbols, and devices associated with the System. In particular, Franchisee agrees to cease to use, without limitation, (i) all Opening Supplies and Materials, and (ii) signs, advertising materials, displays, stationery, forms, products, and any other articles which display the Proprietary Marks.

17.3    Franchisee agrees to make such modifications or alterations to the Work Space and any Office immediately upon termination or expiration of this Agreement as may be necessary to distinguish the Work Space and any Office from that of the Firestorm Business under the System, and shall make such specific additional changes thereto as Firestorm may reasonably request for that purpose. In the event Franchisee fails or refuses to comply with the requirements of this Section 17, Franchisee agrees Firestorm has the right to enter upon the premises of the Work Space and any Office, without being guilty of trespass or any other tort, for the purpose of making or causing to be made such changes as may be required, at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.

17.4    Franchisee agrees to immediately cease using any telephone number used by Franchisee in the Firestorm Business.

17.5    Franchisee agrees, in the event it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit, copy, or colorable imitation of the Proprietary Marks, either in connection with such other business or the promotion thereof, which, in Firestorm's sole discretion, is likely to cause confusion, mistake, or deception, or which, in Firestorm's sole discretion, is likely to dilute Firestorm's rights in and to the Proprietary Marks. Franchisee further agrees not to utilize any designation of origin, description, or representation (including but not limited to reference to Firestorm, the System, or the Proprietary Marks) which, in Firestorm's sole discretion, suggests or represents a present or former association or connection with Firestorm, the System, or the Proprietary Marks.

17.6    Franchisee agrees to promptly pay all sums owing to Firestorm and its affiliates. In the event of termination for any default of Franchisee, such sums shall include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Firestorm as a result of the default.

17.7    Franchisee agrees to immediately deliver to Firestorm the Manual and all other original records, including most recent financial plans and recommendations, computer databases and files, correspondence, and instructions containing confidential information relating to the System (and any copies thereof, including electronic or computer generated copies, even if such copies were made in violation of this Agreement), all of which are acknowledged to be the property of Firestorm.

17.8    Franchisee agrees to immediately (i) discontinue use of any computer software developed for the System or Firestorm or licensed by Firestorm or Firestorm's affiliates, (ii) deliver to Firestorm all such computer software in Franchisee's possession or control and any copies made of such computer software, (iii) erase or destroy any of such computer software contained in the computers or data storage devices under the control of Franchisee, and (iv) remove such computer software from the Computer System and any other computer system, programs or software in Franchisee's possession or control that incorporates or used such computer software in whole or in part.

17.9    Franchisee hereby acknowledges that all telephone numbers, e-mail addresses, domain names (if and as permitted), and other means of communication used in connection with operation of the Firestorm Business (collectively, the "**Contact Vehicles**") constitute assets of the System; and upon termination or expiration of this Agreement, Franchisee shall assign to Firestorm or its designee, all Franchisee's right, title, and interest in and to the Contact Vehicles and shall notify the telephone company, all listing agencies, and any other party with which a Contact Vehicle is registered of the termination or expiration of Franchisee's right to use any Contact Vehicle, and shall authorize a transfer of same to, or at the written direction of, Firestorm.

17.10    Upon termination of this Agreement, or upon expiration of this Agreement without renewal, Firestorm shall have the right and option, but not the obligation, to purchase the equipment used in the operation of the Firestorm Business at a purchase price equal to its then-current book value determined using the straight-line method of depreciation. If Firestorm elects to exercise this option, Firestorm will deliver written notice to Franchisee of Firestorm's election within 30 days after the date of termination or expiration of this Agreement. Firestorm will have the right to inspect the equipment at any time during this 30-day period. If Firestorm elects to purchase the equipment, Firestorm will be entitled to, and Franchisee must provide, all customary warranties and representations relating to the equipment purchase including, but not limited to, representations and warranties as to the maintenance, function and condition of the equipment and Franchisee's good title to the equipment (including, but not limited to, that Franchisee owns the equipment free and clear of any liens and encumbrances).

17.11    Franchisee agrees to comply with the covenants contained in Section 18 of this Agreement.

## 18.    COVENANTS

18.1    Franchisee covenants that, during the term of this Agreement, except as otherwise approved in writing by Firestorm, an Owner or Franchisee's manager shall devote full time and best efforts to the daily management and operation of the Firestorm Business. The person who shall devote best efforts to the daily management and operation of the Firestorm Business must be present at the Work Space and/or working in the Firestorm Business for such minimum hours of each day that Firestorm shall specify in the Manual and also be directly responsible for (i) marketing the Firestorm Business; (ii) customer service and customer relations; (iii) complying with the operation standards and the Manual; and (iv) management of any staff. Franchisee acknowledges and agrees that the success of the Firestorm Business and the System is dependent upon the marketing, solicitation and sale of Products & Services under the System. To that end, Franchisee shall use best efforts to:  (1) maximize the sale of the Products & Services; (2) promote the Firestorm Business; and (3) implement recommendations from Firestorm.

18.2    Franchisee specifically acknowledges that, pursuant to this Agreement, Franchisee will receive additional substantive rights as a franchisee of Firestorm.  Franchisee also recognizes he or she will receive valuable specialized training and confidential information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques of Firestorm and the System. In recognition of and in consideration for these and other benefits, to protect Firestorm's confidential information, Firestorm's trade secrets, and the confidentiality of Firestorm's Client

information and Firestorm's goodwill, Franchisee agrees to the covenants in Section 18.3 and 18.4 below. "**Competing Business**" means a business which is engaged in marketing and providing products or services that are similar to the Products & Services offer by Firestorm Businesses to any person or business.

18.3    Franchisee covenants that during the term of this Agreement, Franchisee will not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or entity:

18.3.1    Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or customer to terminate an agreement with Firestorm, Firestorm's affiliates, or any franchisee under the System;

18.3.2    Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or customer to terminate, surrender, redeem, or cancel any action related to Products & Services acquired or ordered from or through Firestorm, Firestorm's affiliates, or any franchisee under the System;

18.3.3    Engage in, have a financial interest in (except as provided herein below) or be employed by any Competing Business; or

18.3.4    Employ, or retain as an independent contractor, any person who is at that time employed by Firestorm or by any other franchisee of Firestorm, or otherwise directly or indirectly induce such person to leave his or her employment, association or independent contractor relationship with Firestorm or a franchisee of Firestorm.

18.4    Franchisee covenants that (i) for one year after a transfer permitted under Section 15 of this Agreement; (ii) for one year after expiration of this Agreement; and (iii) one year after termination of this Agreement (regardless of the cause for termination), Franchisee agrees to not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or entity:

18.4.1    Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or customer to terminate an agreement with Firestorm, Firestorm's affiliates, or any franchisee under the System;

18.4.2    Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or customer to terminate, surrender, redeem, or cancel any action related to Products & Services acquired or ordered from or through Firestorm, Firestorm's affiliates, or any franchisee under the System;

18.4.3    Solicit any Clients that Franchisee contacted, serviced or learned about while operating under this Agreement to purchase products or services that are similar to the Products & Services offered by Firestorm Businesses;

18.4.4    Provide or offer to provide any products or services that are similar to the Products & Services offered by Firestorm Businesses to any Clients that Franchisee contacted, serviced or learned about while operating under this Agreement;

18.4.5    Engage in, have a financial interest in (except as provided herein below) or be employed by any Competing Business which is located within 20 miles of (a) the Work Site, (b) any Office, or (c) the Franchise Territory;

18.4.6  Employ, or retain as an independent contractor, any person who is at that time employed by Firestorm or by any other franchisee of Firestorm, or otherwise directly or indirectly induce such person to leave his or her employment, association or independent contractor relationship with Firestorm or a franchisee of Firestorm; or

18.4.7  Disparage Firestorm, its affiliates, employees, franchisees, and Products & Services.

18.5  The covenants in Sections 18.3 and 18.4 shall not prevent Franchisee from investing in or owning less than 1% of the shares or obligations of a Competing Business if such shares or obligations are listed or traded on any national securities exchange or in the over-the-counter market and such investments do no adversely affect the supervision, management or operation of the Firestorm Business. Franchisee understands and acknowledges that upon termination or expiration of this Agreement, Firestorm (or Firestorm's franchisees and affiliates) shall have the right to continue to actively offer all Products & Services to Clients the Firestorm Business serviced.

18.6  Franchisee understands and acknowledges that Firestorm shall have the right, in its sole discretion, to reduce the scope or restrictiveness of any covenant set forth in Section 18.3 and/or 18.4, or any portion thereof, without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice thereof; and Franchisee agrees that it shall comply forthwith with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Section 24 hereof. Franchisee agrees and understands that Firestorm's exercise of such discretion, as to the Franchisee who is the subject of this Agreement, or of any other Franchisee, shall not constitute a waiver of any of Firestorm's right to enforce this or any other agreements.

18.7  Franchisee expressly agrees that the existence of any claims it may have against Firestorm, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Firestorm of the covenants in this Section 18.

18.8  Franchisee shall obtain and furnish to Firestorm executed covenants similar in substance to those set forth in this Section 18 (including covenants applicable upon the termination of a person's relationship with Franchisee) and the provisions of Sections 11 and 17 of this Agreement (as modified to apply to an individual) from any or all of the following persons: (a) all managers and assistant managers of Franchisee and any other personnel employed by Franchisee who have received or will receive training from Firestorm; (b) all Owners, officers, directors and holders of a beneficial interest of 1% or more of the securities of Franchisee, and of any corporation or limited liability company directly or indirectly controlling, controlled by, or under common control with, Franchisee, if Franchisee is a corporation; and (c) the general partners and any limited partners (including the Owners and any corporation or limited liability company, and the officers, directors, and holders of a beneficial interest of 1% or more of the securities of any corporation or limited liability company which controls, directly or indirectly, any general or limited partner), if Franchisee is a partnership. Firestorm's current form of covenants related to (b) and (c) above are attached as Exhibit D and such covenants must be executed in connection with this Agreement. Every covenant required by this Section 18.8 shall be in a form approved by Firestorm, including specific identification of Firestorm as a third-party beneficiary of such covenants with the independent right to enforce them.

18.9  Nothing in this Agreement will prevent Franchisee from engaging in a competitive business consistent with the covenants in this Section 18. Nothing in this Agreement will prohibit Franchisee from soliciting and servicing any Clients that Franchisee contacted, serviced or learned about while operating under an agreement with Firestorm after the period provided for in Section 18.4, provided that Franchisee

makes no use directly or indirectly of any confidential or trade secret information, including but not limited to client files and lists obtained from Firestorm.

18.10 Franchisee acknowledges and agrees that the covenants and restrictions in this Section 18 are reasonable, appropriate and necessary to protect the System and the interest of the Firestorm, and do not cause undue hardship on Franchisee or any of the other individuals required by this Section 18 to comply with the covenants and restrictions.

## 19. TAXES, PERMITS, AND INDEBTEDNESS

19.1 Franchisee agrees to promptly pay when due all taxes levied or assessed, including, without limitation, unemployment and sales taxes, and all accounts and other indebtedness of every kind incurred by Franchisee in the operation of the Firestorm Business. Franchisee agrees to pay to Firestorm an amount equal to any sales tax, gross receipts tax, or similar tax (other than income tax) imposed on Firestorm with respect to any payments to Firestorm required under this Agreement, unless the tax is credited against income tax otherwise payable by Firestorm.

19.2 In the event of any bona fide dispute as to Franchisee's liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law, but in no event shall Franchisee permit a tax sale or seizure by levy or execution or similar writ or warrant, or attachment by a creditor, to occur against any Office of the Firestorm Business, or any improvements thereon.

19.3 Franchisee shall comply with all federal, state and local laws, rules and regulations, and shall timely obtain any and all permits, certificates or licenses necessary for the full and proper conduct of the Firestorm Business, including licenses to do business, fictitious name registrations, sales tax permits and qualifications to do business.

## 20. INDEPENDENT CONTRACTOR AND INDEMNIFICATION

20.1 This Agreement does not create a fiduciary duty on behalf of Firestorm to the Franchisee. Franchisee agrees to be an independent contractor, and nothing in this Agreement is intended to constitute Firestorm as an agent, legal representative, subsidiary, joint venturer, partner, employee, or servant of the Franchisee for any purpose whatsoever.

20.2 No act or assistance given by either party to the other pursuant to this Agreement shall be construed to alter the relationship. Franchisee shall be solely responsible for compliance with all federal, state and local laws, rules and regulations, and for Franchisee's policies, practices and decisions relating to the operation of the Firestorm Business.

20.3 During the term of this Agreement, Franchisee agrees to hold itself out to the public as an independent contractor operating the Firestorm Business. Franchisee agrees to take such action as may be necessary to do so, including, without limitation, exhibiting a notice of that fact in a conspicuous place at any Office, the content of which Firestorm reserves the right to specify. Nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty, or representation on Firestorm's behalf, or to incur any debt or other obligation in Firestorm's name; and Firestorm agrees to in no event assume liability for, or be deemed liable hereunder as a result of, any such action; nor shall Firestorm be liable by reason of any act or omission of Franchisee in Franchisee's operation of the Firestorm Business or for any claim or judgment arising therefrom against Franchisee or Firestorm.

20.4    Franchisee agrees to indemnify and hold harmless Firestorm and its affiliates, and their respective officers, directors, agents, employees, successors and assigns (the "**Indemnitees**"), against any and all causes of action, claims, demands, liabilities, losses, damages, actions, litigation or other expenses (including, but not limited to, interest, costs of investigation, settlement costs, and attorneys' fees) arising directly or indirectly from, as a result of, or in connection with (i) the establishment or operation of the Firestorm Business, (ii) Franchisee conduct under this Agreement, including those alleged to be caused by the Indemnitees' negligence, or (iii) Franchisee's noncompliance with any law, ordinance, rule, regulation, including any allegation that Firestorm or another Indemnitee is a joint employer or otherwise responsible for Franchisee's acts or omissions relating to Franchisee's employees. Franchisee agrees that with respect to any threatened or actual litigation, proceeding or dispute which could directly or indirectly affect any of the Indemnitees, the Indemnitees shall have the right, but not the obligation, to: (i) choose counsel, (ii) direct, manage and/or control the handling of the matter; and (iii) settle on behalf of the Indemnitees, and/or Franchisee, any claim against the Indemnitees in their sole discretion.    All vouchers, canceled checks, receipts, receipted bills or other evidence of payments for any such losses, liabilities, costs, damages, charges or expenses of whatsoever nature incurred by any Indemnitee shall be taken as prima facie evidence of Franchisee's obligation hereunder. Firestorm may require Franchisee to reimburse Firestorm for all expenses (including attorneys' fees) reasonably incurred by Firestorm to enforce the terms of this Agreement or any obligation owed by Franchisee to Firestorm under this Agreement or otherwise, including, without limitation, Franchisee's indemnification obligations.

20.5    Firestorm shall not, by virtue of any approvals, advice or services provided to Franchisee, assume responsibility or liability to Franchisee or any third parties to which Firestorm would not otherwise be subject.

## 21.    APPROVALS AND WAIVERS

21.1    Whenever this Agreement requires the prior approval or consent of Firestorm, Franchisee agrees to make a timely written request to Firestorm therefor, and such approval or consent must be obtained in writing from an officer of Firestorm. Failure by Firestorm to provide approval or consent in writing shall constitute a denial of the same.

21.2    Firestorm makes no warranties or guarantees upon which Franchisee may rely, and assumes no liability or obligation to Franchisee, by providing any waiver, approval, consent, or suggestion to Franchisee in connection with this Agreement, or by reason of any neglect, delay, or denial of any request therefor.

21.3    No failure of Firestorm to exercise any power reserved to it by this Agreement, or to insist upon strict compliance by Franchisee with any obligation or condition hereunder, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of Firestorm's right to demand exact compliance with any of the terms hereof. Waiver by Firestorm of any particular default of Franchisee shall not affect or impair Firestorm's rights with respect to any subsequent default of the same, similar, or different nature; nor shall any delay, forbearance, or omission of Firestorm to exercise any power or right arising out of any breach of default by Franchisee of any of the terms, provisions, or covenants hereof, affect or impair Firestorm's right to exercise the same, nor shall such constitute a waiver by Firestorm of any right hereunder, or the right to declare any subsequent breach or default and to terminate this Agreement prior to the expiration of its term. Subsequent acceptance by Firestorm of any payments or contributions due to it hereunder shall not be deemed to be a waiver by Firestorm of any preceding breach by Franchisee of any terms, covenants, or conditions of this Agreement.

22.    WARRANTIES OF FRANCHISEE

22.1    Firestorm entered into this Agreement in reliance upon the statements and information submitted to Firestorm by Franchisee in connection with this Agreement. Franchisee represents and warrants that all such statements and information submitted by Franchisee in connection with this Agreement are true, correct and complete in all material respects. Franchisee agrees to promptly advise Firestorm of any material changes in the information or statements submitted.

22.2    During the term of this Agreement Franchisee represents, warrants and covenants that it shall: (1) comply with all applicable data protection and privacy laws and regulations in each relevant jurisdiction (collectively, the "**Data Protection Laws**"); (2) comply with all of Firestorm's requirements regarding the Data Protection Laws as set forth in the Manual or otherwise; (3) refrain from putting Firestorm or Firestorm's affiliates in breach of any of the Data Protection Laws; (4) do and execute, or arrange to be done and executed, each act, document and thing necessary or desirable to keep Firestorm and Firestorm's affiliates in compliance with any of the Data Protection Laws; and (5) permit Firestorm and Firestorm's affiliates to use any data or other information each of them gathers concerning Franchisee and its affiliates in connection with the establishment and operation of Firestorm Businesses under the System by Firestorm and Firestorm's affiliates.

22.3    Franchisee represents and warrants to Firestorm that neither Franchisee (including, without limitation, any and all of its Owners, employees, officers, directors, shareholders, members, partners, other representatives and other holders of a direct or indirect ownership interest in Franchisee or the Firestorm Business), nor any of its affiliates or the funding sources for either (a) are a person or entity designated with whom Firestorm, or any of its affiliates, are prohibited by law from transacting business, (b) are, have been or will be listed on any Government Lists (as defined below), (c) are, have been or will be determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 133224 (Sept. 23, 2001), or any other similar prohibitions contained in the rules and regulations of OFAC (as defined below) or in any enabling legislation or other Presidential Executive Orders in respect thereof, (d) have been or will be indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any offenses under the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "**USA Patriot Act**"), (e) are, have been or will be under investigation by any Governmental Authority (as defined below) for alleged criminal activity, or (f) have or have had a reputation in the community for criminal or unethical behavior.  For purposes of this provision, the following definitions apply:

22.4    Government Lists means any of the following lists: (a) the "Specially Designated Nationals and Blocked Persons List" maintained by OFAC, (b) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC, or (c) any similar list maintained by the United States Department of State, the United States Department of Commerce or any other Governmental Authority or pursuant to any Executive Order of the President of the United States of America.

22.5    "**OFAC**" mean the Office of Foreign Assets Control, United States Department of the Treasury, or any other office, agency or department that succeeds to the duties of OFAC.

22.6    Governmental Authority means all federal, state, county, local, foreign or other governmental or regulatory agencies, authorities (including self-regulatory authorities), instrumentalities, commissions, boards or bodies.

22.7    The foregoing representation, warranty and certification shall continue in full force and effect during the term of this Agreement.

## 23.   NOTICES

Any and all notices required or permitted under this Agreement shall be in writing and shall be personally delivered, sent by facsimile transmission, mailed by certified mail, return receipt requested, or dispatched by overnight commercial courier service, to the respective parties at the following addresses, unless and until a different address has been designated by written notice to the other party:

> Notices to Firestorm:
> Firestorm Franchising, LLC
> 1000 Holcomb Woods Parkway
> Suite 130
> Roswell, Georgia 30076
> Facsimile No.:  770-643-1118
>
> Notices to Franchisee:
> Resiligence, Inc.
> 2088 Walsh Avenue
> Suite C2
> Santa Clara, California  95050

Notices shall be deemed to have been received as follows: by personal delivery-- at the time of delivery; by facsimile transmission (if the sender has confirmation of successful transmission)—at the time of delivery; by overnight delivery service -- on the next business day following the date on which the notice was given to the overnight delivery service; and certified mail -- three days after the date of mailing.

## 24.   ENTIRE AGREEMENT

This Agreement, the attachments hereto, and the documents referred to herein constitute the entire Agreement between Firestorm and Franchisee concerning the subject matter hereof, and supersede any prior agreements, no other representations having induced Franchisee to execute this Agreement. Except for those permitted to be made unilaterally by Firestorm hereunder, no amendment, change, or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing. Notwithstanding the foregoing, nothing in this Agreement shall disclaim or require Franchisee to waive reliance on any representation that Firestorm made in the most recent disclosure document (including its exhibits and amendments) that Firestorm delivered to Franchisee or its representative, subject to any agreed-upon changes to the contract terms and conditions described in that disclosure document and reflected in this Agreement (including any riders or addenda signed at the same time as this Agreement).

## 25.    SEVERABILITY AND CONSTRUCTION

25.1    If, for any reason, any section, part, term, provision, and/or covenant herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such shall not impair the operation of, or have any other effect upon, such other portions, sections, parts, terms, provisions, and/or covenants of this Agreement as may remain otherwise intelligible; and the latter shall continue to be given full force and effect and bind the parties hereto; and said invalid portions, sections, parts, terms, provisions, and/or covenants shall be deemed not to be a part of this Agreement.

25.2    Any provision or covenant in this Agreement which expressly or by its nature imposes obligations beyond the expiration, termination, or assignment of this Agreement (regardless of cause for termination) shall survive such expiration, termination, or assignment, including but not limited to Sections 11, 17, 18, 20, and 26.

25.3    Franchisee expressly agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision hereof, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof any portion or portions which a court, regulator, or agency having valid jurisdiction may hold to be unreasonable and unenforceable in an unappealed final decision to which Firestorm is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court, regulator, or agency order.

25.4    If the performance of any obligation by Firestorm under this Agreement is prevented, hindered, or delayed by reason of Force Majeure, which cannot be overcome by reasonable commercial measures, Firestorm shall be relieved of any such obligation during the period of such Force Majeure. In such event, Firestorm shall give Franchisee written notice of the Force Majeure occurrence and an estimate as to its duration. As used in this Agreement, the term "Force Majeure" shall include, but not be limited to, any act of God; acts of terrorism or war (declared or undeclared); riots or other social disturbances; strikes, lock-outs, or other industrial disturbances; failure or degradation of telecommunications or Internet services; fires, floods, earthquakes, or other natural occurrences; epidemics; and any other circumstance outside of Firestorm's control.

25.5    Firestorm shall have the right to operate, develop and change the System in any manner that is not specifically precluded by this Agreement. Whenever Firestorm has reserved in this Agreement a right to take or withhold an action, or are deemed to have a right and/or discretion to take or withhold an action, or to grant or decline to grant Franchisee a right to take or omit an action, except as otherwise expressly and specifically provided in this Agreement, Firestorm may make its decision or exercise its rights, on the basis of the information readily available to Firestorm, and its judgment of what is in its best interests and/or in the best interests of the System, at the time its decision is made, without regard to whether: (i) other reasonable or even arguably preferable alternative decisions could have been made by Firestorm; (ii) the decision or action of Firestorm will promote its financial or other individual interest; (iii) Firestorm's decision or the action it take applies differently to Franchisee and one or more other System franchisees or Firestorm company-owned operations; or (iv) Firestorm's decision or the exercise of its right or discretion is adverse to Franchisee's interests. In the absence of an applicable statute, Firestorm will have no liability to Franchisee for any such decision or action. Firestorm and Franchisee intend that the exercise of Firestorm's right or discretion will not be subject to limitation or review. If applicable law implies a covenant of good faith and fair dealing in this Agreement, Firestorm and Franchisee agree that such covenant shall not imply any rights or obligations that are inconsistent with a fair construction of the terms of this Agreement and that this Agreement grants Firestorm the right to make decisions, take actions and/or refrain from taking actions not inconsistent with Franchisee's rights and obligations hereunder.

25.6 All captions in this Agreement are intended solely for the convenience of the parties, and no caption shall be deemed to affect the meaning or construction of any provision hereof. The word "including" shall be construed to include the works "without limitation." The term "Franchisee" is applicable to one or more persons, a corporation, a limited liability company, or a partnership and its owners, as the case may be. If two or more persons are at any time Franchisee hereunder, whether as partners, joint venturers or otherwise, their obligations and liabilities to Firestorm should be joint and several. References to a "controlling" interest in an entity shall mean more than 50% of the equity or voting control of such entity.

26. ARBITRATION

26.1 Franchisee and Firestorm agree that all controversies, disputes, or claims between Firestorm and Firestorm's affiliates, and their respective equity holders, officers, directors, agents, and/or employees, and Franchisee (and/or Franchisee owners, guarantors, affiliates, and/or employees) arising out of or related to:

26.1.1 This Agreement or any other agreement between Franchisee and Firestorm;

26.1.2 Firestorm's relationship with Franchisee;

26.1.3 The scope and validity of this Agreement or any other agreement between Franchisee and Firestorm or any provision of such agreements (including, but not limited to, the validity and scope of the arbitration obligations under this Section 26, which the parties acknowledge is to be determined by an arbitrator and not a court); or

26.1.4 Any System standards;

must be submitted for binding arbitration, on demand of either party, to the American Arbitration Association. The arbitration proceedings will be conducted by one arbitrator and, except as this Section 26 otherwise provides, according to the then current commercial arbitration rules of the American Arbitration Association. All proceedings will be conducted at a suitable location chosen by the arbitrator in the Atlanta, Georgia metropolitan area. The arbitrator shall have no authority to select a different hearing locale. All matters relating to arbitration will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.). Judgment upon the arbitrator's award may be entered in any court of competent jurisdiction.

26.2 The arbitrator has the right to award or include in his or her award any relief which he or she deems proper including, but not limited to, money damages (with interest on unpaid amounts from the date due), specific performance, injunctive relief, and attorneys' fees and costs, provided that the arbitrator may not declare any Proprietary Mark generic or otherwise invalid or, except as expressly provided in Section 27.3 below, award any punitive or exemplary damages against either party (Franchisee and Firestorm hereby waiving to the fullest extent permitted by law, except as expressly provided in Section 27.3 below, any right to or claim for any punitive or exemplary damages against the other).

26.3 Franchisee and Firestorm agree to be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier. Franchisee and Firestorm further agree that, in any arbitration proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any claim which is not submitted or filed as required is forever barred. The arbitrator may not consider any settlement discussions or offers that might have been made by either Franchisee or Firestorm. Firestorm reserves the right, but has no obligation, to advance Franchisee's share of the costs of any arbitration proceeding in order for such

arbitration proceeding to take place and by doing so will not be deemed to have waived or relinquished Firestorm's right to seek the recovery of those costs in accordance with this Section 26.

26.4    Franchisee and Firestorm agree that arbitration will be conducted on an individual, not a class-wide, basis and that an arbitration proceeding between Firestorm and Firestorm's affiliates, and Firestorm's and their respective equity holders, officers, directors, agents, and/or employees, and Franchisee (and/or Franchisee's owners, guarantors, affiliates, and/or employees) may not be consolidated with any other arbitration proceeding between Firestorm and any other person. Notwithstanding the foregoing or anything to the contrary in this Section 26 or Section 25, if any court or arbitrator determines that all or any part of the preceding sentence is unenforceable with respect to a dispute that otherwise would be subject to arbitration under this Section 26, then the parties agree that this arbitration clause shall not apply to that dispute and that such dispute will be resolved in a judicial proceeding in accordance with this Agreement (excluding this Section 26).

26.5    Despite Franchisee's and Firestorm's agreement to arbitrate, Franchisee and Firestorm each have the right in a proper case to seek temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction; provided, however, that Franchisee and Firestorm must contemporaneously submit the dispute for arbitration on the merits as provided in this Section 26.

26.6    The provisions of this Section are intended to benefit and bind certain third party non-signatories and will continue in full force and effect subsequent to and notwithstanding this Agreement's expiration or termination.

## 27.    APPLICABLE LAW

27.1    ALL MATTERS RELATING TO ARBITRATION WILL BE GOVERNED BY THE FEDERAL ARBITRATION ACT (9 U.S.C. §§ 1 ET SEQ.). EXCEPT TO THE EXTENT GOVERNED BY THE FEDERAL ARBITRATION ACT, THE UNITED STATES TRADEMARK ACT OF 1946 (LANHAM ACT, 15 U.S.C. SECTIONS 1051 ET SEQ.), OR OTHER FEDERAL LAW, THIS AGREEMENT, THE FRANCHISE, AND ALL CLAIMS ARISING FROM THE RELATIONSHIP BETWEEN FRANCHISEE AND FIRESTORM WILL BE GOVERNED BY THE LAWS OF THE STATE OF GEORGIA, WITHOUT REGARD TO ITS CONFLICT OF LAWS RULES, EXCEPT (I) THE LAW OF THE STATE IN WHICH THE FRANCHISE TERRITORY IS LOCATED SHALL APPLY TO THE CONSTRUCTION AND ENFORCEMENT OF THE OBLIGATION SET FORTH IN SECTIONS 18.3, 18.4 AND 18.8 HEREOF, AND (II) THAT ANY GEORGIA LAW REGULATING THE SALE OF FRANCHISES OR GOVERNING THE RELATIONSHIP OF A FRANCHISOR AND ITS FRANCHISEE WILL NOT APPLY UNLESS ITS JURISDICTIONAL REQUIREMENTS ARE MET INDEPENDENTLY WITHOUT REFERENCE TO THIS SECTION.

27.2    SUBJECT TO SECTION 26 ABOVE AND THE PROVISIONS BELOW, FRANCHISEE AND FRANCHISEE'S OWNERS AGREE THAT ALL ACTIONS ARISING UNDER THIS AGREEMENT OR OTHERWISE AS A RESULT OF THE RELATIONSHIP BETWEEN FRANCHISEE AND FIRESTORM MUST BE COMMENCED IN THE STATE OR FEDERAL COURT OF GENERAL JURISDICTION IN ATLANTA, GEORGIA AND FRANCHISEE (AND EACH OWNER) IRREVOCABLY SUBMIT TO THE JURISDICTION OF THOSE COURTS AND WAIVE ANY OBJECTION FRANCHISEE (OR THE OWNERS) MIGHT HAVE TO EITHER THE JURISDICTION OF OR VENUE IN THOSE COURTS. NONETHELESS, FRANCHISEE AND FRANCHISEE'S OWNERS AGREE THAT FIRESTORM MAY ENFORCE THIS AGREEMENT AND ANY ARBITRATION ORDERS AND AWARDS IN THE COURTS OF THE STATE OR STATES IN WHICH FRANCHISEE IS DOMICILED OR THE FRANCHISE TERRITORY IS LOCATED.

27.3     EXCEPT FOR FRANCHISEE'S OBLIGATION TO INDEMNIFY FIRESTORM FOR THIRD PARTY CLAIMS UNDER SECTION 20, AND EXCEPT FOR PUNITIVE DAMAGES AVAILABLE TO EITHER PARTY UNDER FEDERAL LAW, FRANCHISEE (AND FRANCHISEE'S OWNERS) AND FIRESTORM WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE OR EXEMPLARY DAMAGES AGAINST THE OTHER AND AGREE THAT, IN THE EVENT OF A DISPUTE BETWEEN FRANCHISEE AND FIRESTORM, THE PARTY MAKING A CLAIM WILL BE LIMITED TO EQUITABLE RELIEF AND TO RECOVERY OF ANY ACTUAL DAMAGES IT SUSTAINS.  FRANCHISEE AND FIRESTORM IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER FRANCHISEE OR FIRESTORM.

27.4     EXCEPT FOR CLAIMS ARISING FROM FRANCHISEE'S NON-PAYMENT OR UNDERPAYMENT OF AMOUNTS FRANCHISEE OWES FIRESTORM, ANY AND ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR FIRESTORM'S RELATIONSHIP WITH FRANCHISEE WILL BE BARRED UNLESS A JUDICIAL OR ARBITRATION PROCEEDING IS COMMENCED WITHIN 18 MONTHS FROM THE DATE ON WHICH THE PARTY ASSERTING THE CLAIM KNEW OR SHOULD HAVE KNOWN OF THE FACTS GIVING RISE TO THE CLAIMS.

## 28.     ACKNOWLEDGMENTS

28.1     Franchisee acknowledges that it has conducted an independent investigation of the Firestorm Business, and recognizes that the business venture contemplated by this Agreement involves significant business risks and that its success will be largely dependent upon the ability of Franchisee as an independent businessperson. Firestorm expressly disclaims the making of, and Franchisee acknowledges that it has not received, any warranty or guarantee, express or implied, as to the potential volume, profits, or success of the business venture contemplated by this Agreement.

28.2     Franchisee acknowledges that it received a complete copy of this Agreement, the attachments hereto, and agreements relating thereto, if any, as well as a copy of Firestorm's current franchise disclosure document ("**FDD**"), at such time(s) as required by the applicable federal and state franchise laws and regulations.

28.3     Franchisee acknowledges that it has read and understood the FDD, this Agreement, the attachments hereto, and agreements relating thereto, if any, and that Firestorm has accorded Franchisee ample time and opportunity to consult with advisors of Franchisee's own choosing about the potential benefits and risks of entering into this Agreement. Franchisee acknowledges that it has no knowledge of any representations by Firestorm, or anyone purporting to act on Firestorm's behalf, that are contrary to the statements made in the FDD or contrary to the terms of this Agreement.

28.4     Franchisee acknowledges that (i) Firestorm informed Franchisee in the FDD that Firestorm has affiliates that may currently offer services to Franchisee, (ii) the purchase of the rights to operate a Firestorm Business does not give Franchisee any right to access the people, resources, services processes, intellectual capital, or any other asset owned by any current, past or future affiliate of Firestorm's (other than any assets licensed to Franchisee under this Agreement), (iii) in the future current affiliates of Firestorm may no longer be affiliated with Firestorm and there may be new affiliates of Firestorm; (iv) current, past or future affiliates of Firestorm may offer or cease to offer services to the System and franchisees under the System, (v) Firestorm does not control its affiliates and cannot compel its affiliates to provide or offer services to the System and franchisees under the System, and (vi) by virtue of executing this Agreement Franchisee is not obtaining any rights now or in the future to have any affiliation with any current, past or future affiliates of Firestorm.

28.5 At the time of execution of this Agreement, the parties contemplate that the Firestorm Business will be established in and operate in and from the state where the Franchise Territory is located ("Operating State"). Franchisee represents, at the time of execution of this Agreement, that if Franchisee provides Products & Services outside of the Operating State, Franchisee intends that any such Product & Services will be provided from the Work Space and/or any Office located in the Operating State. For purposes of determining the franchise laws that may be applicable to the Firestorm Business, Franchisee represents that the Firestorm Business will be deemed to be located only in the Operating State.

[Signatures Appear on Following Page]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement in duplicate effective on the Effective Date.

Resiligence, Inc.
Franchisee

By: _____
                    10/27/15

Name: Cyril Rayan
Title: President/CEO

Firestorm Franchising, LLC
Franchisor

By: _____

Name: James W. Satterfield
Title: President/CEO

**Exhibit A**
to
**Firestorm Franchising, LLC Franchise Agreement**

Franchise Territory: The zip codes in the attached list in Fresno, Merced, Sacramento, San Joaquin, and Stanislaus Counties, CA.

The Franchise Territory is the described zip codes and/or counties shown in this Exhibit A as they are known as of October 20, 2015. Notwithstanding the foregoing, Firestorm is not obligated to expand the Franchise Territory beyond the above description for any reason.

Initial: _____
Resiligence, Inc.

Initial: _____
Firestorm

Date: 10/27/15

Date: 10/20/15

Firestorm\FA\033115
EAST\96496747.3

# Central California Area by Zip

| County | Zip | Number of Businesses |
|---|---|---|
| Fresno | 93210 | 496 |
| Fresno | 93234 | 173 |
| Fresno | 93242 | 110 |
| Fresno | 93602 | 195 |
| Fresno | 93605 | 13 |
| Fresno | 93606 | 19 |
| Fresno | 93607 | 5 |
| Fresno | 93608 | 41 |
| Fresno | 93609 | 235 |
| Fresno | 93611 | 1116 |
| Fresno | 93612 | 2290 |
| Fresno | 93613 | 152 |
| Fresno | 93616 | 74 |
| Fresno | 93619 | 363 |
| Fresno | 93621 | 24 |
| Fresno | 93622 | 379 |
| Fresno | 93624 | 57 |
| Fresno | 93625 | 318 |
| Fresno | 93626 | 79 |
| Fresno | 93627 | 15 |
| Fresno | 93628 | 8 |
| Fresno | 93630 | 650 |
| Fresno | 93631 | 728 |
| Fresno | 93634 | 18 |
| Fresno | 93640 | 203 |
| Fresno | 93641 | 27 |
| Fresno | 93642 | 1 |
| Fresno | 93646 | 197 |
| Fresno | 93648 | 234 |
| Fresno | 93649 | 8 |
| Fresno | 93650 | 236 |
| Fresno | 93651 | 101 |
| Fresno | 93652 | 21 |
| Fresno | 93654 | 1000 |

| County | Zip | Number of Addresses |
|---|---|---|
| Fresno | 93656 | 208 |
| Fresno | 93657 | 998 |
| Fresno | 93660 | 107 |
| Fresno | 93662 | 1053 |
| Fresno | 93664 | 117 |
| Fresno | 93667 | 77 |
| Fresno | 93668 | 77 |
| Fresno | 93675 | 91 |
| Fresno | 93701 | 516 |
| Fresno | 93702 | 960 |
| Fresno | 93703 | 1191 |
| Fresno | 93704 | 1434 |
| Fresno | 93705 | 675 |
| Fresno | 93706 | 1457 |
| Fresno | 93707 | 16 |
| Fresno | 93708 | 8 |
| Fresno | 93709 | 12 |
| Fresno | 93710 | 2389 |
| Fresno | 93711 | 2854 |
| Fresno | 93712 | 5 |
| Fresno | 93714 | 5 |
| Fresno | 93715 | 15 |
| Fresno | 93716 | 3 |
| Fresno | 93717 | 6 |
| Fresno | 93718 | 7 |
| Fresno | 93720 | 2101 |
| Fresno | 93721 | 1609 |
| Fresno | 93722 | 2436 |
| Fresno | 93724 | 4 |
| Fresno | 93725 | 1036 |
| Fresno | 93726 | 1703 |
| Fresno | 93727 | 2724 |
| Fresno | 93728 | 812 |
| Fresno | 93729 | 138 |
| Fresno | 93740 | 32 |
| Fresno | 93741 | 1 |
| Fresno | 93744 | 38 |

| County | | |
|---|---|---|
| Fresno | 93745 | 59 |
| Fresno | 93747 | 71 |
| Fresno | 93750 | 2 |
| Fresno | 93755 | 81 |
| Fresno | 93761 | 1 |
| Fresno | 93765 | 1 |
| Fresno | 93771 | 6 |
| Fresno | 93772 | 7 |
| Fresno | 93773 | 7 |
| Fresno | 93774 | 4 |
| Fresno | 93775 | 13 |
| Fresno | 93776 | 14 |
| Fresno | 93777 | 11 |
| Fresno | 93778 | 13 |
| Fresno | 93779 | 17 |
| Fresno | 93780 | 1 |
| Fresno | 93786 | 1 |
| Fresno | 93790 | 13 |
| Fresno | 93791 | 12 |
| Fresno | 93792 | 8 |
| Fresno | 93793 | 13 |
| Fresno | 93794 | 35 |
| Fresno | 93888 | 3 |
| County Total | | 36894 |
| Merced | 93620 | 330 |
| Merced | 93635 | 1183 |
| Merced | 93661 | 5 |
| Merced | 93665 | 13 |
| Merced | 95301 | 940 |
| Merced | 95303 | 58 |
| Merced | 95312 | 21 |
| Merced | 95315 | 201 |
| Merced | 95317 | 45 |
| Merced | 95322 | 377 |
| Merced | 95324 | 377 |
| Merced | 95333 | 110 |

| County | Zip | Number of Businesses |
|---|---|---|
| Merced | 95334 | 333 |
| Merced | 95340 | 2567 |
| Merced | 95341 | 70 |
| Merced | 95344 | 69 |
| Merced | 95348 | 811 |
| Merced | 95365 | 75 |
| Merced | 95369 | 47 |
| Merced | 95374 | 80 |
| Merced | 95388 | 247 |
| County Total | | 7959 |
| | | |
| Sacramento | 94203 | 11 |
| Sacramento | 94209 | 9 |
| Sacramento | 94229 | 3 |
| Sacramento | 94232 | 5 |
| Sacramento | 94234 | 18 |
| Sacramento | 94236 | 16 |
| Sacramento | 94237 | 5 |
| Sacramento | 94240 | 1 |
| Sacramento | 94244 | 29 |
| Sacramento | 94245 | 1 |
| Sacramento | 94249 | 2 |
| Sacramento | 94250 | 6 |
| Sacramento | 94252 | 3 |
| Sacramento | 94271 | 4 |
| Sacramento | 94273 | 5 |
| Sacramento | 94274 | 5 |
| Sacramento | 94279 | 5 |
| Sacramento | 94280 | 8 |
| Sacramento | 94283 | 13 |
| Sacramento | 94290 | 1 |
| Sacramento | 94294 | 1 |
| Sacramento | 94295 | 6 |
| Sacramento | 94296 | 4 |
| Sacramento | 94298 | 5 |
| Sacramento | 94299 | 1 |
| Sacramento | 95608 | 2684 |

| County | | |
|--------|--------|--------|
| Sacramento | 95609 | 98 |
| Sacramento | 95610 | 2566 |
| Sacramento | 95611 | 92 |
| Sacramento | 95615 | 68 |
| Sacramento | 95621 | 948 |
| Sacramento | 95624 | 2094 |
| Sacramento | 95626 | 214 |
| Sacramento | 95628 | 2668 |
| Sacramento | 95630 | 3006 |
| Sacramento | 95632 | 887 |
| Sacramento | 95638 | 99 |
| Sacramento | 95639 | 13 |
| Sacramento | 95641 | 175 |
| Sacramento | 95652 | 187 |
| Sacramento | 95655 | 125 |
| Sacramento | 95660 | 1471 |
| Sacramento | 95662 | 1488 |
| Sacramento | 95670 | 2554 |
| Sacramento | 95671 | 8 |
| Sacramento | 95673 | 563 |
| Sacramento | 95680 | 10 |
| Sacramento | 95683 | 200 |
| Sacramento | 95690 | 263 |
| Sacramento | 95693 | 293 |
| Sacramento | 95741 | 92 |
| Sacramento | 95742 | 1667 |
| Sacramento | 95743 | 1 |
| Sacramento | 95757 | 106 |
| Sacramento | 95758 | 1515 |
| Sacramento | 95759 | 136 |
| Sacramento | 95763 | 125 |
| Sacramento | 95812 | 159 |
| Sacramento | 95813 | 21 |
| Sacramento | 95814 | 5548 |
| Sacramento | 95815 | 2395 |
| Sacramento | 95816 | 1903 |
| Sacramento | 95817 | 524 |

| County | Zip | Number of Subpoenas |
|---|---|---|
| Sacramento | 95818 | 995 |
| Sacramento | 95819 | 990 |
| Sacramento | 95820 | 1253 |
| Sacramento | 95821 | 2309 |
| Sacramento | 95822 | 1432 |
| Sacramento | 95823 | 2580 |
| Sacramento | 95824 | 796 |
| Sacramento | 95825 | 3728 |
| Sacramento | 95826 | 2004 |
| Sacramento | 95827 | 1688 |
| Sacramento | 95828 | 1816 |
| Sacramento | 95829 | 559 |
| Sacramento | 95830 | 22 |
| Sacramento | 95831 | 967 |
| Sacramento | 95832 | 142 |
| Sacramento | 95833 | 1058 |
| Sacramento | 95834 | 1042 |
| Sacramento | 95835 | 309 |
| Sacramento | 95836 | 7 |
| Sacramento | 95837 | 94 |
| Sacramento | 95838 | 967 |
| Sacramento | 95841 | 1607 |
| Sacramento | 95842 | 662 |
| Sacramento | 95843 | 676 |
| Sacramento | 95851 | 28 |
| Sacramento | 95852 | 39 |
| Sacramento | 95853 | 27 |
| Sacramento | 95860 | 71 |
| Sacramento | 95864 | 863 |
| Sacramento | 95865 | 55 |
| Sacramento | 95866 | 33 |
| Sacramento | 95867 | 1 |
| Sacramento | 95899 | 7 |
| County Total | | 65960 |
| | | |
| San Joaquin | 95201 | 148 |
| San Joaquin | 95202 | 1157 |

| County | | |
|---|---|---|
| San Joaquin | 95203 | 695 |
| San Joaquin | 95204 | 1100 |
| San Joaquin | 95205 | 1765 |
| San Joaquin | 95206 | 1260 |
| San Joaquin | 95207 | 2752 |
| San Joaquin | 95208 | 71 |
| San Joaquin | 95209 | 575 |
| San Joaquin | 95210 | 731 |
| San Joaquin | 95211 | 24 |
| San Joaquin | 95212 | 323 |
| San Joaquin | 95213 | 70 |
| San Joaquin | 95215 | 902 |
| San Joaquin | 95219 | 663 |
| San Joaquin | 95220 | 307 |
| San Joaquin | 95227 | 88 |
| San Joaquin | 95230 | 50 |
| San Joaquin | 95231 | 201 |
| San Joaquin | 95234 | 22 |
| San Joaquin | 95236 | 228 |
| San Joaquin | 95237 | 203 |
| San Joaquin | 95240 | 2643 |
| San Joaquin | 95241 | 185 |
| San Joaquin | 95242 | 911 |
| San Joaquin | 95253 | 33 |
| San Joaquin | 95258 | 136 |
| San Joaquin | 95267 | 83 |
| San Joaquin | 95269 | 71 |
| San Joaquin | 95290 | 1 |
| San Joaquin | 95296 | 9 |
| San Joaquin | 95304 | 946 |
| San Joaquin | 95320 | 596 |
| San Joaquin | 95330 | 339 |
| San Joaquin | 95336 | 1404 |
| San Joaquin | 95337 | 746 |
| San Joaquin | 95366 | 620 |
| San Joaquin | 95376 | 1837 |
| San Joaquin | 95377 | 452 |

| County | Zip | Number of Businesses |
|---|---|---|
| San Joaquin | 95378 | 130 |
| San Joaquin | 95385 | 41 |
| San Joaquin | 95391 | 28 |
| San Joaquin | 95686 | 46 |
| County Total | | 24592 |
| Stanislaus | 95307 | 1247 |
| Stanislaus | 95313 | 114 |
| Stanislaus | 95316 | 302 |
| Stanislaus | 95319 | 79 |
| Stanislaus | 95323 | 53 |
| Stanislaus | 95326 | 415 |
| Stanislaus | 95328 | 40 |
| Stanislaus | 95329 | 97 |
| Stanislaus | 95350 | 2722 |
| Stanislaus | 95351 | 1529 |
| Stanislaus | 95352 | 138 |
| Stanislaus | 95353 | 168 |
| Stanislaus | 95354 | 2157 |
| Stanislaus | 95355 | 1508 |
| Stanislaus | 95356 | 1488 |
| Stanislaus | 95357 | 521 |
| Stanislaus | 95358 | 1084 |
| Stanislaus | 95360 | 340 |
| Stanislaus | 95361 | 1583 |
| Stanislaus | 95363 | 586 |
| Stanislaus | 95367 | 514 |
| Stanislaus | 95368 | 346 |
| Stanislaus | 95380 | 2191 |
| Stanislaus | 95381 | 174 |
| Stanislaus | 95382 | 803 |
| Stanislaus | 95386 | 298 |
| Stanislaus | 95387 | 79 |
| Stanislaus | 95397 | 2 |
| County Total | | 20578 |
| Grand Total | | 155983 |

**Exhibit B**
to
**Firestorm Franchising, LLC Franchise Agreement**

Owners (as defined in Section 2.1) : All of Franchisee's (i) owners of record and all beneficial owners of any class of voting securities or securities convertible into voting securities: and/or (ii) general and limited partners.

| Name of Shareholder/Partner/Member | Address | Interest (%) (with description) |
|---|---|---|
| Cyril Rayan | 2088 Walsh Ave, Suite C2 Santa Clara, CA 95050 | 100% |
| | | |
| | | |
| | | |
| | | |
| | | |

Designated Owner: The following identifies Franchisee's Managing Principal (as defined in Section 2.1 of the Franchise Agreement):

| Name and Title | Address | Interest (%) (with description) |
|---|---|---|
| Cyril Rayan President/CEO | 2088 Walsh Ave. Suite C2 Santa Clara, CA 95050 | 100% |
| | | |

## Exhibit C
## to
## Firestorm Franchising, LLC Franchise Agreement

**THIS GUARANTY AND ASSUMPTION OF OBLIGATIONS** is given this  27th  day of \_\_\_\_October_____, 2015 (the "**Effective Date**")
By:

Cyril Rayan

In consideration of, and as an inducement to, the execution of that certain Franchise Agreement (the "**Agreement**"), dated as of the Effective Date, by FIRESTORM FRANCHISING, LLC, a Georgia limited liability company ("**Firestorm**"), each of the undersigned personally and unconditionally (a) guarantees to Firestorm and Firestorm's successors and assigns, for the term of the Agreement (including, but not limited to, extensions) and afterward as provided in the Agreement, that RESILIGENCE, INC.("**Franchisee**") will punctually pay and perform each and every undertaking, agreement, and covenant set forth in the Agreement (including, but not limited to, any amendments or modifications of the Agreement) and (b) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement (including, but not limited to, any amendments or modifications of the Agreement), both monetary obligations and obligations to take or refrain from taking specific actions or to engage or refrain from engaging in specific activities including, but not limited to, the non-competition, confidentiality, transfer, and arbitration requirements.

Each of the undersigned consents and agrees that: (1) his or her direct and immediate liability under this Guaranty will be joint and several, both with Franchisee and among other guarantors; (2) he or she will render any payment or performance required under the Agreement upon demand if Franchisee fails or refuses punctually to do so; (3) this liability will not be contingent or conditioned upon Firestorm's pursuit of any remedies against Franchisee or any other person; (4) this liability will not be diminished, relieved, or otherwise affected by any extension of time, credit, or other indulgence which Firestorm may from time to time grant to Franchisee or to any other person including, but not limited to, the acceptance of any partial payment or performance or the compromise or release of any claims (including, but not limited to, the release of other guarantors), none of which will in any way modify or amend this Guaranty, which will be continuing and irrevocable during the term of the Agreement (including, but not limited to, extensions), for so long as any performance is or might be owed under the Agreement by Franchisee or its owners, and for so long as Firestorm has any cause of action against Franchisee or its owners; and (5) this Guaranty will continue in full force and effect for (and as to) any extension or modification of the Agreement and despite the transfer of any interest in the Agreement or Franchisee, and each of the undersigned waives notice of any and all renewals, extensions, modifications, amendments, or transfers.

Each of the undersigned waives: (i) all rights to payments and claims for reimbursement or subrogation that any of the undersigned may have against Franchisee arising as a result of the undersigned's execution of and performance under this Guaranty, for the express purpose that none of the undersigned shall be deemed a "creditor" of Franchisee under any applicable bankruptcy law with respect to Franchisee's obligations to Firestorm; (ii) all rights to require Firestorm to proceed against Franchisee for any payment required under the Agreement, proceed against or exhaust any security from Franchisee, take any action to assist any of the undersigned in seeking reimbursement or subrogation in connection with this Guaranty or pursue, enforce or exhaust any remedy, including any legal or equitable relief, against Franchisee; (iii) any benefit of, any right to participate in, any security now or hereafter held by Firestorm; and (iv) acceptance and notice of acceptance by Firestorm of his, her or its undertakings under this Guaranty, all presentments, demands and notices of demand for payment of any indebtedness or non-performance of any obligations hereby guaranteed, protest, notices of dishonor, notices of default to any

party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed, and any other notices and legal or equitable defenses to which he, she or it may be entitled. Firestorm shall have no present or future duty or obligation to the undersigned under this Guaranty, and each of the undersigned waives any right to claim or assert any such duty or obligation, to discover or disclose to the undersigned any information, financial or otherwise, concerning Franchisee, any other guarantor, or any collateral securing any obligations of Franchisee to Firestorm. Without affecting the obligations of the undersigned under this Guaranty, Firestorm may, without notice to the undersigned, extend, modify, supplement, waive strict compliance with, or release all or any provisions of the Agreement or any indebtedness or obligation of Franchisee, or settle, adjust, release, or compromise any claims against Franchisee or any other guarantor, make advances for the purpose of performing any obligations of Franchisee under the Agreement, assign the Agreement or the right to receive any sum payable under the Agreement, and the undersigned each hereby jointly and severally waive notice of same. The undersigned expressly acknowledge that the obligations hereunder survive the expiration or termination of the Agreement.

If Firestorm is required to enforce this Guaranty in a judicial or arbitration proceeding, and prevails in such proceeding, Firestorm shall be entitled to reimbursement of its costs and expenses including, but not limited to, reasonable accountants', attorneys', attorneys' assistants', arbitrators', and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses, whether incurred prior to, in preparation for, or in contemplation of the filing of any such proceeding. If Firestorm is required to engage legal counsel in connection with any failure by the undersigned to comply with this Guaranty, the undersigned shall reimburse Firestorm for any of the above-listed costs and expenses Firestorm incurs.

Subject to the arbitration obligations in the Agreement, each of the undersigned agrees that all actions arising under this Guaranty or the Agreement, or otherwise as a result of the relationship between Firestorm and the undersigned, must be commenced in the state or federal court of general jurisdiction in Atlanta, Georgia, and each of the undersigned irrevocably submits to the jurisdiction of those courts and waives any objection he or she might have to either the jurisdiction of, or venue in, those courts. Nonetheless, each of the undersigned agrees that Firestorm may enforce this Guaranty and any arbitration orders and awards in the courts of the state or states in which he or she is domiciled.

IN WITNESS WHEREOF, each of the undersigned has affixed his or her signature as of the Effective Date.

Signature Of Guarantor

Percentage Of Ownership
In Franchisee

100%

**Exhibit D**
to
**Firestorm Franchising, LLC Franchise Agreement**

**Personal Covenants**

*To Be Signed By: (i) All Owners, officers, directors and holders of a beneficial interest of 1% or more of the securities of Franchisee, and of any corporation or limited liability company directly or indirectly controlling, controlled by, or under common control with, Franchisee, if Franchisee is a corporation; and (ii) the general partners and any limited partners (including the Owners and any corporation or limited liability company, and the officers, directors, and holders of a beneficial interest of 1% or more of the securities of any corporation or limited liability company which controls, directly or indirectly, any general or limited partner), if Franchisee is a partnership.*

Each undersigned ("you") agrees that:

1.      All capitalized terms used but not defined in these Personal Covenants shall have the meanings set forth in that certain Firestorm Franchise Agreement between Firestorm Franchising, LLC ("Company") and Resiligence, Inc. ("Franchisee") dated as of the 27th day of October of the year 20 15 (the "Franchise Agreement").

2.      You are an Owner of Franchisee, or you are a director, officer, or a general or limited partner of Franchisee; and as such, you expect to or will gain a direct personal benefit from the Franchise Agreement.

3.      As an inducement to Company to enter into the Franchise Agreement, and in consideration of the direct and personal benefits you will derive from the Franchise Agreement, you agree that: (i) you have read and understand all the provisions of Sections 11, 17, and 18 of the Franchise Agreement; (ii) you will be personally bound by all of the obligations and covenants of Franchisee contained in Sections 11, 17, and 18 as if such obligations and covenants were made and given personally by you directly to Company; and (iii) such obligations and covenants are fair and reasonable and will not deprive you of your livelihood.

4.      If any provision contained in Sections 11, 17, and 18 of the Franchise Agreement is held by a court of competent jurisdiction to be unenforceable as applied to you, then such unenforceable provision may be modified by such court to the extent necessary to render it enforceable, and if it cannot be so modified, it shall be severed and the remainder of Sections 11, 17, and 18 shall remain in full force and effect.

5.      These personal covenants shall be governed by the internal laws of the state where the Franchise Territory is located.

The undersigned hereby execute and deliver this instrument effective as of the date set forth beneath their signatures.

_____

Cyril Rayan

Date: ___ 10 / 27 / ___, 20 15

**Exhibit E**
to
**Firestorm Franchising, LLC Franchise Agreement**

**STATE ADDENDUM**

FIRESTORM FRANCHISING, LLC
ADDENDUM TO FRANCHISE AGREEMENT
(California)

The following Addendum modifies and supersedes Firestorm Franchising, LLC Franchise Agreement (the "Agreement") with respect to Firestorm franchises offered or sold to either a resident of the State of California or a non-resident who will be operating a Firestorm franchise in the State of California pursuant to the California Franchise Investment Law §§ 31000 through 31516, and the California Franchise Relations Act, California Business and Professions Code §§ 20000 through 20043, as follows:

1.      The first sentence of Section 5.1 of the Franchise Agreement is deleted in its entirety and replaced with the following:

In consideration of the franchise granted herein, when the Franchisee's Firestorm Business has opened for business, Franchisee shall pay to Firestorm an initial franchise fee of $55,000 ("Initial Franchise Fee"), which is non-refundable. The Firestorm Business shall be deemed to be open for business when Franchisee starts (i) receiving requests for any Products & Services or (ii) accepting, providing, performing or soliciting Products & Services.

2.      If any of the provisions of the Agreement concerning termination and non-renewal of a franchise are inconsistent with either the California Franchise Relations Act or with the federal bankruptcy law (11 U.S.C. §101, et seq.) (concerning termination of the Agreement on certain bankruptcy-related events), then such laws will apply.

3.      The Agreement requires that it be governed by Georgia law. This requirement may be unenforceable under California law.

4.      Franchisee must sign a general release if Franchisee renews or transfers Franchisee's franchise. California Corporations Code 31512 voids a waiver of Franchisee's rights under the Franchise Investment Law (California Corporations Code 31000 through 31516). Business and Professions Code 20010 voids a waiver of Franchisee's rights under the Franchise Relations Act (Business and Professions Code 20000 through 20043).

5.      Franchisee and Firestorm agree to be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier.

6.      The Agreement contains a covenant not to compete, which extends beyond the termination of the franchise. This provision may not be enforceable under California law.

7.      The Agreement requires binding arbitration. The arbitration will occur at a suitable location in the Atlanta, Georgia metropolitan area with the costs being borne equally by Firestorm and Franchisee. Prospective franchisees are encouraged to consult private legal counsel to determine the applicability of California and federal laws (such as Business and Professions Code Section 20040.5, Code of Civil Procedure Section 1281, and the Federal Arbitration Act) to any provisions of a franchise agreement restricting venue to a forum outside the State of California.

8.      To the extent this Addendum is inconsistent with any terms or conditions of the Agreement or the Exhibits or Schedules thereto, the terms of this Addendum shall govern.

Each of the undersigned hereby acknowledges having read, understood, and executed this

Addendum on __10__/__27__/__, 20 15__.

FRANCHISOR:                                        FRANCHISEE:

FIRESTORM FRANCHISING, LLC              RESILIGENCE, INC.

By:_____                 By:_____
James Satterfield                                  Cyril Rayan
President/CEO                                      President/CEO