IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
:
**REKOR SYSTEMS, INC.** :
: **CIVIL ACTION**
                    **Plaintiff,** :
: **NO. 1:19-cv-7767-VEC**
      v. :
: **AMENDED COMPLAINT**
**SUZANNE LOUGHLIN, HARRY RHULEN, and** :
**JAMES SATTERFIELD** :
                    **Defendants.** :
:
------------------------------------------------------------------ x

      Plaintiff Rekor Systems, Inc., by and through its attorneys, as and for this Amended Complaint, states and alleges as follows:

## I.

## PRELIMINARY STATEMENT

      1.     Plaintiff Rekor Systems, Inc., along with its affiliated subsidiaries ("Rekor"), is a multifaceted business that provides technology products and professional services for clients in the areas of government contracting, aerospace, public safety, security, transportation, financial services and logistics. Rekor is a publicly-traded company on the Nasdaq stock exchange.

      2.     In January 2017, Defendants Suzanne Loughlin and Harry Rhulen, childhood acquaintances of Rekor's Chief Executive Officer Robert Berman, together with Defendant James Satterfield, fraudulently induced Rekor into purchasing their businesses Firestorm Solutions LLC and Firestorm Franchising LLC (together "Firestorm") in exchange for cash payments, promissory notes, shares in Rekor, and options and warrants to purchase additional shares of Rekor common stock.

3.      The parties, along with a fourth seller, Lancer Financial Group, Inc. ("Lancer") effectuated Rekor's purchase through a Membership Interest Purchase Agreement dated January 25, 2017 (the "Purchase Agreement").  The Purchase Agreement is attached to this Amended Complaint at Exhibit A.

4.      Leading up to the Purchase Agreement, Defendants represented to Rekor that Firestorm was a competent and viable business specializing in crisis-management and emergency-response consulting, and capable of being effectively franchised.  But in reality these representations were misleading.  Contrary to Defendants' representations, Firestorm did not have a proven and sustainable franchise model, nor did it have a critical mass of franchisees willing to pay for the right to operate as Firestorm franchises. Instead, many Firestorm franchisees were paying nothing of value to participate in the franchise program.

5.      After the Purchase Agreement, Rekor employed Defendants as executive employees.  Defendant Rhulen was hired to be President of KeyStone Solutions, Inc. (Rekor's predecessor). Defendant Loughlin was hired to be Chief Administrative Officer and General Counsel of KeyStone Solutions, Inc.  Defendant Satterfield was hired to be President of Firestorm.  Defendant Satterfield was tasked with running Firestorm's day-to-day operations. Defendants Loughlin and Rhulen assisted in overseeing the management of Firestorm but also assisted in other aspects of Rekor's work more generally.

6.       Defendants' employment lasted fewer than two years.  It was during these two years that Rekor began to learn of Defendants' fraud and their misrepresentations leading up to the Purchase Agreement.

7.      Firestorm suffered financial losses during Defendants' employment.

8. In December 2018, Defendants resigned from Rekor—all the while keeping the cash payments, promissory notes, shares in Rekor, and stock warrants that they obtained from the Purchase Agreement.

9. This case is about the fraud that Defendants perpetrated against Rekor. Defendants' fraudulent misrepresentations and omissions induced Rekor to enter into the Purchase Agreement. Rekor through this action seeks to rescind the Purchase Agreement and requests the Court to order Defendants to return to Rekor the cash payments and to void the promissory notes, shares in Rekor, and stock warrants that Defendants obtained from the Purchase Agreement.

## II.

## THE PARTIES, JURISDICTION, AND VENUE

10. Rekor is a company that is incorporated under the laws of Delaware and maintains its headquarters at 7172 Columbia Gateway Driveway, Suite 400, Columbia, Maryland 21046. Rekor is a citizen of Delaware and Maryland for purposes of determining federal diversity jurisdiction.

11. Defendant Suzanne Loughlin is an individual who resides at 492 Old Sackett Lake Road, Rock Hill, New York 12775. She is a citizen of New York for purposes of determining federal diversity jurisdiction.

12. Defendant Harry Rhulen is an individual who resides at 560 Sundown Lane, Evergreen, Colorado 80439. He is a citizen of Colorado for purposes of determining federal diversity jurisdiction.

13. Defendant James Satterfield is an individual who resides at 240 Wicklawn Way, Roswell, Georgia 30076. He is a citizen of Georgia for purposes of determining federal diversity jurisdiction.

14.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of attorney's fees, interest, and costs.

15.     The Court also has personal jurisdiction over this action because all Defendants consented in the Purchase Agreement to the personal jurisdiction of this Court "for the purpose of any Proceeding arising out of or relating to the [Purchase] Agreement [and its related transactions]." Ex. A at ¶ 11.14.

16.     Venue in this Court is proper under 28 U.S.C. § 1391(b).

### III.

### FACTUAL ALLEGATIONS

**A.     Lead-up to the Purchase Agreement**

17.     Rekor's Chief Executive Officer, Robert Berman, has known Defendants Loughlin and Rhulen for over 50 years. The three grew up together in the same neighborhoods of Monticello, New York. Defendants Loughlin and Rhulen are siblings.

18.     In the summer of 2016, Defendants Loughlin and Rhulen described their businesses, Firestorm Solutions LLC and Firestorm Franchising LLC, to Mr. Berman, and throughout that summer, the three began to discuss the idea of Rekor purchasing these businesses.

19.     Defendants described Firestorm as a business that sells consulting services, programs, and resources in the areas of crisis management, crisis communications, emergency response, and business continuity.

20.     Defendants informed Mr. Berman that Firestorm developed a franchise model where businesses or certain skilled individuals specializing in professional services could

purchase the right to operate a Firestorm franchise and offer crisis-management services under the Firestorm brand.

21. Defendants said to Mr. Berman and others at Rekor that Firestorm's Jim Satterfield was a "marketing genius" when it came to selling franchises, and that Firestorm's Jim Squire, a long-time Firestorm employee operating from the company's offices in Roswell, Georgia, was a "foremost expert" in franchising.

22. Defendants—particularly Defendant Satterfield—described Firestorm as a "great business" that utilized a cleverly implemented franchise model.

23. Defendants represented that Firestorm had a critical mass of specialized and sophisticated franchisees. Defendants told Mr. Berman that the business was on the precipice of generating significant revenue.

24. Mr. Berman considered Defendants' description of Firestorm intriguing because its services sounded complementary to services being offered at that time by a subsidiary of Rekor (then operating as KeyStone Solutions, Inc.).

25. Mr. Berman and other Rekor executives were specifically intrigued by the idea of Firestorm's franchising business model because Rekor had been exploring franchising as a way to expand the existing offerings of one of its subsidiaries but had yet to implement the concept.

26. Defendants, particularly Defendant Rhulen, also represented to Mr. Berman that Firestorm was on the verge of entering into a major deal with Beazley Insurance Company, a London-based global insurer with U.S. operations.

27. Defendants informed Mr. Berman that Beazley underwrites and re-insures hundreds of thousands of insurance policies for its customers. Defendants described how Beazley was prepared to pay Firestorm a standby fee of $10-$20 per policy in exchange for

retaining Firestorm as its insureds' crisis-management advisor in the event a coverable crisis occurred under any of the policies.

28.   Defendants said that this Beazley deal was set to generate millions of dollars in recurring revenue for Firestorm and that the arrangement had limited cost to Firestorm, so it would be highly profitable.

29.   Defendants informed Mr. Berman that they were certain that the deal would get done, and that it was imminent.

30.   Defendants also represented that other large insurance carriers, specifically including Church Mutual, were also working with Firestorm to market and underwrite other specialty program based insurance policies developed by Firestorm.  Defendants told Mr. Berman that these insurance products were the product of years of development.

31.   Defendant Rhulen used these representations in the context of negotiating the Purchase Agreement.

**B.   The Purchase Agreement**

32.   By the end of 2016, these discussions between Mr. Berman and Defendants led Rekor (still operating as Keystone Solutions, Inc.) to the decision to purchase Firestorm from Defendants and Lancer.

33.   Defendants Loughlin, Rhulen, and Satterfield each owned 25% of Firestorm Solutions LLC, along with Lancer, which also owned 25%.  Firestorm Solutions LLC owned 49% of Firestorm Franchising, LLC, with Defendant Satterfield owning the other 51%.

34.   On January 25, 2017, Rekor on one side, and Defendants and Lancer on the other entered into the Purchase Agreement, under which Defendants sold 100% of their interests in Firestorm to Rekor, in exchange for the following:

6

      a.      Cash payments aggregating $500,000, with $250,000 payable to Defendant Satterfield; $125,000 payable to Defendant Loughlin; and $125,000 payable to Defendant Rhulen (the "Cash Payments").

      b.      Promissory notes aggregating $500,000, with $166,666.67 payable to Defendant Satterfield; $166,666.67 payable to Defendant Loughlin; and $166,666.66 payable to Defendant Rhulen (the "Promissory Notes").

      c.      Four hundred eighty-eight thousand and ninety-four (488,094) shares of Rekor's common stock, distributed as follows: 162,698 shares to Defendant Satterfield; 162,698 to Defendant Loughlin; and 162,698 to Defendant Rhulen (the "Common Stock").

      d.      Three warrants to purchase an aggregate of one hundred sixty-two thousand six hundred and ninety-nine (162,699) shares of Rekor common stock at a purchase price of $5.00 per share, distributed as follows: Warrant to Defendant Satterfield for 54,233 shares; Warrant to Defendant Loughlin for 54,233 shares; and Warrant to Defendant Rhulen for 54,233 shares (the "Five-Dollar Warrants").

      e.      Three warrants to purchase an aggregate of one hundred sixty-two thousand six hundred and ninety-nine (162,699) shares of Rekor common stock at a purchase price of $7.00 per share, distributed as follows: Warrant to Defendant Satterfield for 54,233 shares; Warrant to Defendant Loughlin for 54,233 shares; and Warrant to Defendant Rhulen for 54,233 shares (the "Seven-Dollar Warrants").

35.     This Amended Complaint refers to the Five-Dollar Warrants and the Seven-Dollar Warrants together as the "Warrants."

36.     Rekor purchased Lancer's 25% interest in Firestorm Solutions in exchange for a $500,000 promissory note.

37.     After KeyStone Solutions, Inc. merged with Brekford Traffic Safety, Inc. to form Novume Solutions, Inc. (another predecessor to Rekor), the aggregate number of Common Stock shares increased to 946,875 shares (315,625 shares per Defendant), the number of stock shares for each Defendant subject to the Warrants increased to 105,209 shares of the Five-Dollar Warrants and 105,209 shares of the Seven-Dollar Warrants, and the exercise prices on both the

Five-Dollar Warrants and the Seven-Dollar Warrants decreased to $2.58 per share and $3.60 per share respectively.

38.     On or about January 25, 2017, Defendants also entered into five-year executive employment agreements with Rekor.  Defendant Rhulen was hired to be President of KeyStone Solutions, Inc. (Rekor's predecessor). Defendant Loughlin was hired to be Chief Administrative Officer and General Counsel of KeyStone Solutions, Inc.  Defendant Satterfield was hired to be President of Firestorm.

39.     Rekor in this action is not seeking any damages, claims, or relief under or arising from Defendants' employment agreements with Rekor.

40.     Rekor in this action is not seeking the return of any consideration that it paid to Lancer, Defendants' silent business partner, in exchange for its interest in Firestorm, including the $500,000 promissory note.  Rekor furthermore is not seeking any damages from Lancer. Lancer's rights will not be materially affected by any grant of judgment and relief in favor of Rekor.

**C.     Defendants' Material Misrepresentations and Omissions Regarding the Franchise Business**

41.     Defendants intentionally failed to disclose material information regarding Firestorm's franchise business to induce Rekor into entering the Purchase Agreement.

42.     Before the close of the Purchase Agreement, Defendants represented that Firestorm had a critical mass of viable franchisees that had paid to participate in Firestorm's franchising program. In mid-2016, Defendant Rhulen told Mr. Berman at Mr. Berman's residence in Washington, D.C. that Firestorm had signed up a group of franchisees who had paid an initial franchise fee of approximately $50,000.   Later in 2016, both Defendant Rhulen and Defendant Satterfield reaffirmed the approximately $50,000 initial fee for franchisees during

8

conference calls with Mr. Berman. The franchise business also was discussed in detail at multiple in-person meetings between Defendants and other personnel at Rekor leading up to the Purchase Agreement.

43. Defendants' representations regarding Firestorm's franchising business were misleading.

44. First, Defendants did not disclose to Rekor that the majority of Firestorm franchisees had not paid any initial fee to join the franchise program. Firestorm's franchise agreements required that a franchisee pay an initiation fee of $55,000, but Firestorm and Defendants had actually waived that fee for a large number of their franchisees. These waivers were memorialized in side letters ("Side Letters"), which, upon information and belief, Defendants deliberately hid from Rekor, and which Rekor discovered only after consummation of the Purchase Agreement.

45. An example Side Letter (this one dated October 20, 2015 and addressed to franchisee Resiligence, Inc.) states in part: "This letter will serve as recognition that Jim [Satterfield] has agreed to waive the Initial Franchise Fee…" The Side Letter is attached to the Amended Complaint at Exhibit B.

46. Second, Defendants did not disclose to Rekor that many franchisees were not subject to any requirement to pay Firestorm a minimum amount of royalties. After the consummation of the Purchase Agreement, Rekor discovered that some Side Letters waived the minimum royalty provision in the franchise agreements.

47. An example of one such Side Letter to franchisee Novawood, Inc., dated October 16, 2015 and attached at Exhibit C states: "[T]his letter will confirm that Firestorm will waive the minimum Continuing Royalty in Paragraph 5.2 of $1,000 for the term of your Franchise

Agreement..." *See also* Exhibit B ("This letter will serve as recognition that Jim [Satterfield] has agreed to waive…the Minimum Continuing Royalty…"). The Side Letters show that Firestorm, upon information and belief, was setting up franchises without any requirement or expectation that it would receive any revenue from them. Rekor learned of this fact only after entering into the Purchase Agreement.

48. Defendants knew their representation to Rekor that Firestorm had a critical mass of franchisees willing to pay to participate in the franchise program was false.

49. Before the close of the Purchase Agreement, Defendants provided to Rekor copies of franchise agreements that Firestorm had with its franchisees, as well as other financial documents related to Firestorm's franchise business, but it did not provide the Side Letters.

50. On or about December 21, 2016, Defendants provided ten franchise agreements to Rekor, including agreements with the following franchisees: Resilience, LLC; Resiligence, Inc.; Sales & Marketing Associates, LLC; Crisis Averted, LLC; Your Safety Place, Inc.; MHP, Inc.; Novawood, Inc.; Eido & Cross Solutions, LLC; Hodgson Group, LLC; and Brauer Franchising, LLC. An example copy of a franchise agreement (this one with Resiligence, Inc.) is attached to the Amended Complaint at Exhibit D.

51. Defendants did not provide the Side Letters to Rekor prior to the close of the Purchase Agreement. Upon information and belief, Defendants deliberately did not disclose the Side Letters to Rekor to keep Rekor from learning that many Firestorm franchisees were paying nothing of value to participate in the franchise program.

52. Defendants' misrepresentations and deliberate omissions created a false impression in Rekor about the health and viability of the Firestorm franchise business.

53. Rekor would not have entered the Purchase Agreement had it known that Defendants were establishing franchises without any requirement or expectation of receiving revenue from those franchisees.

54. Rekor's reliance on Defendants' misrepresentations and deliberate omissions concerning the franchise business in deciding to enter into the Purchase Agreement was justified because the Side Letters were exclusively within Defendants' knowledge.

**D.     Defendants' Pattern of Misleading Statements Regarding the Firestorm Business**

55. Defendants made a number of other misleading statements regarding the financial health and existing prospects for growth of the Firestorm business in the months leading up to the Purchase Agreement.

(i)     *Firestorm's relationship with Beazley Insurance Company*

56. Between the spring of 2016 and January 25, 2017 (the execution date of the Purchase Agreement), Defendants, particularly Defendant Rhulen, represented to Rekor that Firestorm was on the verge of entering into a major deal with client Beazley Insurance Company.

57. Defendants informed Rekor that Beazley underwrites and re-insures hundreds of thousands of insurance policies for its customers. As part of the deal, Defendants described how Beazley was prepared to pay Firestorm a standby fee of $10-20 per policy in exchange for retaining Firestorm as its insureds' crisis-management advisor in the event a coverable crisis occurred under any of the policies.

58. Leading up to the Purchase Agreement, Defendants said that this Beazley deal would create millions of dollars of recurring revenue for Firestorm.

59. Defendants informed Mr. Berman that they were certain that the deal would get done, and that it was imminent.

60. After execution of the Purchase Agreement, however, this deal described by Defendants was never realized.

### (ii) *Firestorm's 2016 Unaudited Financials*

61. In Section 3.4(a) of the Purchase Agreement, Defendants represented that year 2016 unaudited financial statements for Firestorm (the "Unaudited Statements") that they furnished before execution of the Purchase Agreement were "consistent with, the books and records of [Firestorm] and fairly present[] in all material respects the financial condition of [Firestorm] as of the dates thereof…" Ex. A at ¶ 3.4.

62. Rekor commenced an audit of Firestorm's 2016 financial statements in December 2016 in anticipation of a merger transaction that would require Rekor to provide consolidated financials for 2016. Rekor received audited statements for year 2016 on June 9, 2017 (the "Audited Statements").

63. These Audited Statements differed significantly from the Unaudited Statements that Defendants furnished before execution of the Purchase Agreement.

64. The Unaudited Statements that Defendants provided to Rekor before execution of the Purchase Agreement showed revenue values significantly higher for Firestorm than they were in reality and as reflected in the Audited Statements.

65. The Unaudited Statements for 2016 that Defendants provided to Rekor overstated Firestorm's revenue by more than 15% compared to the Audited Statements.

66. This overstatement of Firestorm's revenue in the Unaudited Statements for 2016, in combination with understatements of Firestorm's cost of sales, as compared to the Audited Statements, created an inaccurate picture of Firestorm's gross profit and the misleading appearance of significant year-over-year revenue growth for Firestorm leading up to the Purchase Agreement.

67. Defendants' pattern of misleading statements gave Rekor the false impression that Firestorm had a viable business model that was on the precipice of generating significant revenue.

**E.   Rekor Learns of Defendants' Fraud**

68. After execution of the Purchase Agreement on January 25, 2017, Firestorm did not prove to be a successful business venture for Rekor.

69. Firestorm, as operated by Defendant Satterfield and overseen by Defendants Loughlin and Rhulen, was never able to operate successfully.  Firestorm continued to fail to enforce the requirements set forth in the franchise agreements with its existing franchisees, and Firestorm continued to enter Side Letter agreements with new franchisees waiving the initial franchise fee and/or the minimum royalty requirement set out in the franchise agreements.

70. In June 2018, Defendant Rhulen misrepresented Firestorm's financial performance to Rekor's executive leadership, claiming that the business was "doing well" and had "unlimited potential," when in reality it was floundering.

71. The Firestorm business suffered significant financial losses between January 2017 and December 2018.

72. In December 2018, just before Defendants' resignation from Rekor, Defendants attended a Rekor management meeting in Chantilly, Virginia.

73. At that meeting, Rekor's executive leadership confronted Defendants about their management of Firestorm and Firestorm's performance. In response, Defendants stated that nothing could be done to save the Firestorm business and that they had no solutions for improving Firestorm's prospects for the future.

74. In December 2018, Defendants resigned from their positions with Rekor.

75. Defendants have continued to keep the Cash Payments, the Promissory Notes, the Common Stock, and the Warrants.

## IV.

## CLAIMS

### As and for a First Cause of Action
### (Fraudulent Omission)

76. Rekor incorporates by reference the allegations set forth in paragraphs 1 through 75 above.

77. Prior to the consummation of the Purchase Agreements, Defendants made a number of misleading statements to Rekor regarding the Firestorm business.

78. Defendants represented to Rekor that Firestorm had a critical mass of viable franchisees that had paid to participate in Firestorm's franchising program. In mid-2016, Defendant Rhulen told Mr. Berman at Mr. Berman's residence in Washington, D.C. that Firestorm had signed up a group of franchisees who had paid an initial franchise fee of approximately $50,000. Later in 2016, both Defendant Rhulen and Defendant Satterfield reaffirmed the approximately $50,000 initial fee for franchisees during conference calls with Mr. Berman.

79. These representations were misleading.

80. Because Defendants made this and other misleading statements to Rekor about the Firestorm business, Defendants had a duty to disclose material facts relating to the Firestorm business.

81. In particular, because Defendants made misleading representations to Rekor regarding the franchise business, Defendants had a duty to disclose material facts relating to the franchise business.

82. Defendants did not disclose that Firestorm entered into Side Letters with franchisees that waived the initial fee and/or the minimum royalty requirements set out in the franchise agreements.

83. Defendants provided the franchise agreements but, upon information and belief, deliberately did not disclose the Side Letters to Rekor to keep Rekor from learning that the Firestorm franchisees were paying nothing of value to participate in the franchise program. Defendants knowingly and with the intent to induce Rekor into entering into the Purchase Agreement deliberately did not disclose the Side Letters to Rekor.

84. Defendants' misrepresentations and deliberate omissions induced Rekor into believing that Firestorm had a healthy, proven franchise business with franchisees willing to pay to participate in the program, when in reality, it did not.

85. Rekor relied upon Defendants' misrepresentations and omissions in deciding to enter into the Purchase Agreement.

86. Rekor's reliance was justified because the Side Letters were exclusively within Defendants' knowledge.

87. Rekor has been injured by Defendants' misrepresentations and omissions by being misled into entering into the Purchase Agreement whereby it paid Defendants valuable consideration in the form of the Cash Payments, the Promissory Notes, the Common Stock, and the Warrants.

88. As a party fraudulently induced to enter into a contract, Rekor is entitled to rescind that contract.

89. Rekor is entitled to judgement against Defendants and relief: (a) declaring the Purchase Agreement rescinded and void; (b) directing Defendants to return the Cash Payments to

Rekor; (c) directing Defendants to return to Rekor the Common Stock; (d) declaring the Promissory Notes void, prohibiting Defendants from exercising any rights/options granted by the Promissory Notes, and directing Defendants to return any interest received on the Promissory Notes; (e) declaring the Warrants void and prohibiting Defendants from exercising any rights/options granted by the Warrants; (f) directing the parties to take all action necessary to be placed in the same position they were in prior to the execution of the Purchase Agreement; (g) awarding Rekor punitive damages; and (h) awarding Rekor interest and costs, attorneys fees, and such other relief as this Court deems just and proper.

90. In the alternative, should the Court ultimately determine that the rescissionary relief in paragraph 89 is not available, Rekor is entitled to judgment against Defendants and damages. The value of Firestorm that Rekor received by way of the Purchase Agreement is far less than the aggregate value of the Cash Payments, the Common Stock, the Promissory Notes, and the Warrants that Rekor paid Defendants in exchange for their interests in Firestorm. As a form of relief alternative to the rescissionary relief in paragraph 89, Rekor is entitled to damages in an amount to be determined at trial, but no less than the difference between the aggregate value of the Cash Payments, the Common Stock, the Promissory Notes, and the Warrants, and the value of Firestorm at the time of the Purchase Agreement.

91. Rekor does not seek damages or any other relief relating to Defendants' conduct after January 25, 2017. This cause of action is based on conduct that Defendants engaged in at or before consummation of the Purchase Agreement.

## V.

## **REQUEST FOR RELIEF**

92. Rekor respectfully requests that the Court enter judgment in its favor and against Defendants, granting the following relief:

a. declaring the Purchase Agreement rescinded and void;

b. directing Defendants to return the Cash Payments to Rekor;

c. directing Defendants to return to Rekor the Common Stock;

d. directing Defendants to return all interest paid on the Promissory Notes;

e. declaring the Promissory Notes void and prohibiting Defendants from exercising any rights/options granted by the Promissory Notes;

f. declaring the Warrants void and prohibiting Defendants from exercising any rights/options granted by the Warrants;

g. directing the parties to take all action necessary to be placed in the same position they were in prior to the execution of the Purchase Agreement;

h. in the alternative, ordering Defendants to pay damages resulting from Defendants' conduct on or before January 25, 2017 at a value to be determined at trial;

i. awarding Rekor any actual, compensatory and punitive damages resulting from Defendants' conduct on or before January 25, 2017, in an amount that presently cannot be calculated; and

j. awarding Rekor interest and costs, attorneys fees, and such other relief as this Court deems just and proper.

Dated: October 9, 2019
New York, NY

Respectfully submitted,

**CROWELL & MORING**

By: */s/ Sarah Gilbert*
Sarah Gilbert
Glen McGorty
Crowell & Moring LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
sgilbert@crowell.com
gmcgorty@crowell.com
212-895-4226

*Attorneys for Plaintiff Rekor Systems, Inc.*