UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

Rekor Systems, Inc.                                    No. 19-cv-7767(VEC)
                        Plaintiff,

v.

                                              **ANSWER WITH AFFIRMATIVE**
                                              **DEFENSES AND COUNTERCLAIMS**

Suzanne Loughlin, Harry Rhulen and
James Satterfield

                        Defendants            **TRIAL BY JURY DEMANDED**

            And

CrisisRisk Strategies, LLC

                  Additional Plaintiff
                   On Counterclaims

v.

Robert A. Berman, Eyal Hen,
James K. McCarthy, Paul A. de Bary,
Glenn Goord, Christine Harada, David
Hanlon, Richard Nathan, Steven
D. Croxton, Firestorm Solutions, LLC,
and Firestorm Franchising, LLC

                  Additional Defendants
                   On Counterclaims
-----------------------------------------------------X

Defendants Suzanne Loughlin ("Suzy Loughlin"), Harry Rhulen ("Harry Rhulen") and James

Satterfield ("Jim Satterfield") (collectively, "Defendants") and Additional Plaintiff On

Counterclaims CrisisRisk Strategies, LLC ("CrisisRisk"), by and through their attorneys, allege

in response to the amended complaint filed October 9, 2019 (the "Amended Complaint") in this

action (the "Action") as follows:

1.   Deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 1 of the Amended Complaint, except admit that plaintiff Rekor Systems, Inc. ("Rekor") is a publicly traded company.

2.   Deny the truth of the allegations of paragraph 2 of the Amended Complaint, except admit that Suzy Loughlin and Harry Rhulen were childhood acquaintances of Rekor CEO, Robert Berman ("Berman"), and further admit that, in 2017, Rekor purchased Defendants' interests in Firestorm Solutions, LLC. ("Firestorm Solutions") and Firestorm Franchising, LLC ("Firestorm Franchising") (from time to time herein, Firestorm Solutions and Firestorm Franchising are referred to jointly as "Firestorm") and respectfully refer the Court to the documents that reflect that transaction for the terms and conditions thereof.

3.   Deny the truth of the allegations of paragraph 3 of the Amended Complaint, except admit that, as of January 25, 2017, Defendants, Rekor, Lancer Financial Group, Inc. ("Lancer"), and others, entered into a certain Membership Interest Purchase Agreement (the "Purchase Agreement"), a copy of which, upon information and belief, is attached to the Amended Complaint as Exhibit A, and respectfully refer the Court to that instrument for the terms and conditions thereof.

4.   Deny the truth of the allegations of paragraph 4 of the Amended Complaint, except admit that, on various occasions prior to January 25, 2017, Defendants discussed Firestorm's business with various representatives of Rekor.

5.   Deny the truth of the allegations of paragraph 5 of the Amended Complaint, except admit that, in accordance with certain employment agreements that were exhibits to the Purchase Agreement and referred to therein, Harry Rhulen was employed as President of Rekor, Suzy

Loughlin was employed as General Counsel and Chief Administrative Officer of Rekor, and Jim Satterfield was employed as President and Chief Executive Officer of Firestorm Solutions and as President and Chief Executive Officer of Firestorm Franchising.

6.   Deny the truth of the allegations of paragraph 6 of the Amended Complaint, except admit that Defendants ceased to be employees of Rekor and Firestorm as of December 28, 2018.

7.   In response to paragraph 7 of the Amended Complaint, admit, upon information and belief, that, if GAAP accounting principles were applied, Firestorm suffered financial losses as of calendar year end 2017 and 2018.

8.   Admit the truth of the allegations of paragraph 8 of the Amended Complaint.

9.    In response to paragraph 9 of the Amended Complaint, state that this paragraph appears to set forth conclusions of law, or opinions, or both, as to which no response is necessary, and, to the extent that this paragraph is deemed to set forth allegations of fact, they are denied.

10.   Deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 10 of the Amended Complaint.

11.   Admit the truth of the allegations of paragraph 11 of the Amended Complaint, except deny that the word "Lake" is in Ms. Loughlin's street name.

12.   Admit the truth of the allegations of paragraph 12 of the Amended Complaint.

13.   Deny the truth of the allegations of paragraph 13 of the Amended Complaint, except admit that Jim Satterfield is a citizen of Georgia.

14.   In response to paragraph 14 of the Amended Complaint, state that this paragraph appears to set forth conclusions of law as to which no response is necessary, and, to the extent that this paragraph sets forth allegations of fact, it is denied.

15.   In response to paragraph 15 of the Amended Complaint, state that this paragraph appears to set forth conclusions of law as to which no response is necessary, except admit that article 11.14 of the Purchase Agreement is entitled "Consent of Jurisdiction" and respectfully refer the Court thereto for the contents thereof, and, to the extent that this paragraph sets forth further allegations of fact, it is denied.

16.   In response to paragraph 16 of the Amended Complaint, state that this paragraph appears to set forth a conclusion of law as to which no response is needed, and, to the extent that this paragraph sets forth allegations of fact, it is denied.

17.   Deny the truth of the allegations of paragraph 17 of the Amended Complaint, except admit that Suzy Loughlin and Harry Rhulen are siblings, and that they have known Robert Berman for more than 50 years.

18.   Deny the truth of the allegations of paragraph 18 of the Amended Complaint, except admit that in the Autumn of 2016, Robert Berman approached Suzy Loughlin and Harry Rhulen with the general proposal that Rekor might purchase Firestorm and that thereafter there were discussions with respect to this topic.

19.   Deny the truth of the allegations of paragraph 19 of the Amended Complaint, except admit that, as part of the discussions that followed Robert Berman's purchase proposal, Harry Rhulen and Suzy Loughlin described and discussed Firestorm's business activities.

20.   Deny the truth of the allegations of paragraph 20 of the Amended Complaint, except admit that Firestorm had developed a franchise model as part of its business strategy and respectfully refers the Court to Firestorm Franchising's publicly available franchise disclosure documents for the statements therein. (A copy of Firestorm Franchising's April 2016 Franchise

Disclosure Document, which was filed and was publicly available nationwide, is annexed hereto as Exhibit 1.)

21.  Deny the truth of the allegations of paragraph 21 of the Amended Complaint, except deny having knowledge or information sufficient to form a belief as to the accuracy of the quotations set forth therein, and state that Jim Squire was an employee of Firestorm Franchising.

22.  Deny the truth of the allegations of paragraph 22 of the Amended Complaint, except admit that Firestorm had developed a franchise model as part of its business model, and deny having knowledge or information sufficient to form a belief as to the accuracy of the quotation set forth therein.

23.  Deny the truth of the allegations of paragraph 23 of the Amended Complaint.

24.  Deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 24 of the Amended Complaint.

25.  Deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 25 of the Amended Complaint.

26.  Deny the truth of the allegations of paragraph 26 of the Amended Complaint, except admit that, prior to January 25, 2017, Harry Rhulen discussed Firestorm's business relationship with Beazley Insurance Company ("Beazley") with Robert Berman.

27.  Deny the truth of the allegations of paragraph 27 of the Amended Complaint, except admit a then executive of Beazley, named Libby Benet, discussed with Harry Rhulen an embedded workplace violence program (the "Embedded Workplace Violence Program"), which, in 2018, Beazley decided not go forward with after Ms. Benet had left that company.

28.  Deny the truth of the allegations of paragraph 28 of the Amended Complaint.

29.  Deny the truth of the allegations of paragraph 29 of the Amended Complaint.

30.  Deny the truth of the allegations of paragraph 30 of the Amended Complaint, except admit that Harry Rhulen told Robert Berman that Firestorm worked with large insurance carriers, including Church Mutual, and that Firestorm's Crisis Coach policy took years to develop.

31.  Deny the truth of the allegations of paragraph 31 of the Amended Complaint.

32.  Deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 32 of the Amended Complaint, except admit that Rekor decided to to proceed with the acquisition of the ownership interests in Firestorm (the "Acquisition Process.")

33.  Admit the truth of the allegations of paragraph 33 of the Amended Complaint.

34.  Deny the truth of the allegations of paragraph 34 of the Amended Complaint, except admit that as of January 25, 2017, Defendants, Lancer, Rekor, and others, entered into the Purchase Agreement, and respectfully refer the Court to that instrument for the terms and conditions thereof.

35.  In response to paragraph 35 of the Amended Complaint, state that this paragraph appears to provide interpretive guidance as to which no response is necessary, and, to the extent that this paragraph sets forth allegations of fact, it is denied.

36.  Deny the truth of the allegations of paragraph 36 of the Amended Complaint, except admit that the Purchase Agreement provided, among other things, for the issuance of a $500,000 promissory note to Lancer and respectfully refer the Court to the Purchase Agreement for the terms and conditions thereof.

37.  Deny the truth of the allegations of paragraph 37 of the Amended Complaint, except admit that there was a merger agreement between Keystone Solutions, Inc. and Brekford Traffic Safety, Inc., that the number of shares subject to the warrants issued to Defendants

increased, that the exercise price on the warrants issued to Defendants decreased, and respectfully refer the Court to the instruments that reflect these events for the terms and conditions thereof.

38.   Deny the truth of the allegations of paragraph 38 of the Amended Complaint, except admit that the Defendants and Rekor entered into employment agreements as of January 25, 2017, and respectfully refer the Court to those instruments for the terms and conditions thereof.

39.   In response to paragraph 39 of the Amended Complaint, state that this paragraph appears to state a conclusion of law as to which no response is necessary, and, to the extent that this paragraph sets forth allegations of fact, it is denied.

40.   In response to paragraph 40 of the Amended Complaint, state that this paragraph appears to state conclusions of law as to which no response is necessary, and, to the extent that this paragraph sets forth allegations of fact, it is denied.

41.   Deny the truth of the allegations of paragraph 41 of the Amended Complaint.

42.   Deny the truth of the allegations of paragraph 42 of the Amended Complaint, except admit that Harry Rhulen told Robert Berman, prior to January 25, 2017, that Firestorm had developed a franchise model as part of its business strategy and that Firestorm Franchising had entered into agreements with various franchisees.

43.   Deny the truth of the allegations of paragraph 43 of the Amended Complaint.

44.   Deny the truth of the allegations of paragraph 44 of the Amended Complaint, except admit that Firestorm Franchising entered into various agreements and understandings with its franchisees.

45.   Deny the truth of the allegations of paragraph 45 of the amended Complaint, except admit that Exhibit B to the Amended Complaint appears to be an unsigned version or draft

of a letter of Firestorm, and respectfully refer the Court to that instrument for its contents.

46.  Deny the truth of the allegations of paragraph 46 of the Amended Complaint, except deny having knowledge or information sufficient to form a belief as to when and what "Rekor discovered".

47.  Deny the truth of the allegations of paragraph 47 of the Amended Complaint, except admit that Firestorm Franchising entered into various agreements and understandings with its franchisees and that Exhibit C to the Amended Complaint appears to be an unsigned version or draft of a letter of Firestorm, and deny having knowledge or information sufficient to form a belief as to when and what "Rekor learned."

48.  Deny the truth of the allegations of paragraph 48 of the Amended Complaint.

49.  Deny the truth of the allegations of paragraph 49 of the Amended Complaint, except admit that various materials, including the documents described as "Side Letters" in paragraph 49, were provided to Rekor by Firestorm during the Acquisition Process.

50.  Deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 50 of the Amended Complaint, except admit that various franchise agreements were provided to Rekor during the Acquisition Process and that Exhibit D to the Amended Complaint appears to be a copy of a Firestorm Franchising franchise agreement.

51.  Deny the truth of the allegations of paragraph 51 of the Amended Complaint.

52.  Deny the truth of the allegations of paragraph 52 of the Amended Complaint.

53.  Deny the truth of the allegations of paragraph 53 of the Amended Complaint.

54.  Deny the truth of the allegations of paragraph 54 of the Amended Complaint.

55.  Deny the truth of the allegations of paragraph 55 of the Amended Complaint.

56.  Deny the truth of the allegations of paragraph 56 of the Amended Complaint.

57.  Deny the truth of the allegations of paragraph 57 of the Amended Complaint, except admit that the nature and scope of Beazley's insurance business is public information and was the subject of discussion between Rekor and Firestorm prior to January 25, 2017.

58.  Deny the truth of the allegations of paragraph 58 of the Amended Complaint.

59.  Deny the truth of the allegations of paragraph 59 of the Amended Complaint.

60.  Deny the truth of the allegations of paragraph 60 of the Amended Complaint.

61.  Deny the truth of the allegations of paragraph 61 of the Amended Complaint, and respectfully refer the Court to Section 3.4 (a) of the Purchase Agreement for the contents thereof.

62.  Deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 62 of the Amended Complaint, except admit, upon information and belief, that Rekor commenced an audit of Firestorm in the late Autumn of 2016 and that such audit was to apply GAAP accounting principles.

63.  Deny the truth of the allegations of paragraph 63 of the Amended Complaint, and respectfully refer the Court to those documents described in paragraph 63 as the Audited Statements (the "Audited Statements") and the Unaudited Statements (the "Unaudited Statements") for the contents thereof.

64.  Deny the truth of the allegations of paragraph 64 of the Amended Complaint, and respectfully refer the Court to the Audited Statements and the Unaudited Statements for the contents thereof.

65.  Deny the truth of the allegations of paragraph 65 of the Amended Complaint, and respectfully refer the Court to the Audited Statements and the Unaudited Statements for the contents thereof.

66.   Deny the truth of the allegations of paragraph 66 of the Amended Complaint.

67.   Deny the truth of the allegations of paragraph 67 of the Amended Complaint.

68.   Deny the truth of the allegations of paragraph 68 of the Amended Complaint.

69.   Deny the truth of the allegations of paragraph 69 of the Amended Complaint, except admit that, after January 25, 2017, Firestorm Franchising entered into agreements and understandings with franchisees.

70.   Deny the truth of the allegations of paragraph 70 of the Amended Complaint.

71.   Deny the truth of the allegations of paragraph 71 of the Amended Complaint, except admit, upon information and belief, that if GAAP accounting principles were applied, Firestorm would show losses at calendar year end 2017 and 2018.

72.   Admit the truth of allegations of paragraph 72 of the Amended Complaint.

73.   Deny the truth of the allegations of paragraph 73 of the Amended Complaint.

74.   Admit the truth of the allegations of paragraph 74 of the Amended Complaint.

75.   Admit the truth of the allegations of paragraph 75 of the Amended Complaint.

76.   In response to paragraph 76 of the Amended Complaint, repeat and reallege the allegations of paragraphs 1 – 75 of this Answer as if set forth at length herein.

77.   Deny the truth of the allegations of paragraph 77 of the Amended Complaint.

78.   Deny the truth of the allegations of paragraph 78 of the Amended Complaint, except admit that Harry Rhulen told Robert Berman, prior to January 25, 2017, that Firestorm had developed a franchise model as part of its business strategy and that Firestorm Franchising had entered into agreements with various franchisees.

79.   Deny the truth of the allegations of paragraph 79 of the Amended Complaint.

80.   Deny the truth of the allegations of paragraph 80 of the Amended Complaint.

81.  Deny the truth of the allegations of paragraph 81 of the Amended Complaint.

82.  Deny the truth of the allegations of paragraph 82 of the Amended Complaint.

83.  Deny the truth of the allegations of paragraph 83 of the Amended Complaint.

84.  Deny the truth of the allegations of paragraph 84 of the Amended Complaint.

85.  Deny the truth of the allegations of paragraph 85 of the Amended Complaint.

86.  Deny the truth of the allegations of paragraph 86 of the Amended Complaint.

87.  Deny the truth of the allegations of paragraph 87 of the Amended Complaint.

88.  Deny the truth of the allegations of paragraph 88 of the Amended Complaint.

89.  Deny the truth of the allegations of paragraph 89 of the Amended Complaint.

90.  Deny the truth of the allegations of paragraph 90 of the Amended Complaint.

91.  In response to paragraph 91 of the Amended Complaint, state that this

paragraph appears to set forth a conclusion of law as to which no response is needed, and, to the

extent that this paragraph sets forth allegations of fact, it is denied.

92.  Deny the truth of the allegations of paragraph 92 of the Amended Complaint.

**First Affirmative Defense**

93.  The Amended Complaint fails to state a claim upon which relief can be granted.

**Second Affirmative Defense**

94.  The Amended Complaint fails to set forth a simple, concise, and direct statement

of the claim as required by Fed. R. Civ. P. 8 (d).

**Third Affirmative Defense**

95.  The Amended Complaint fails to plead fraud with the particularity required by Fed. R.

Civ. P. 9 (b).

**Fourth Affirmative Defense**

96.   The Amended Complaint is barred by the doctrines of estoppel, laches, ratification,

waiver, and unclean hands.

**Fifth Affirmative Defense**

97.   The Amended Complaint is barred due to a failure to join a required party.

## PARTIES TO THE COUNTERCLAIMS

98.   Defendant Suzy Loughlin is a citizen of the State of New York.

99.   Defendant Harry Rhulen is a citizen of the State of Colorado.

100.   Defendant Jim Satterfield is a citizen of the State of Georgia.

101.   Counterclaim-plaintiff CrisisRisk is a New York Limited Liability Company

with its principal place of business in the State of New York.

102.   CrisisRisk is owned by the Defendants.

103.   Upon information and belief, plaintiff-counterclaim defendant Rekor

Systems, Inc. ("Rekor") is a Delaware Corporation with its principal place of business

in the State of Maryland. (Rekor has changed its name several times during the past three

years. Rekor as used herein refers to the plaintiff under its current name and under all previous
names.)

104.   Upon information and belief, counterclaim defendant Robert A. Berman

("Berman") is the CEO of Rekor, a member of the Board of Directors of Rekor (the "Board"),

and a citizen of Washington, D.C.

105.   Upon information and belief, counterclaim defendant Eyal Hen ("Hen") is

the Chief Financial Officer of Rekor and a citizen of the State of Maryland.

106.   Upon information and belief, counterclaim defendant James K. McCarthy

("McCarthy") is Chair of the Board of Rekor and a citizen of the Commonwealth of Virginia.

12

107.    Upon information and belief, counterclaim defendant Paul A. de Bary ("de Bary") is a member of the Board of Rekor and a citizen of the State of Connecticut.

108.    Upon information and belief, counterclaim defendant Glenn Goord ("Goord") is a member of the Board of Rekor and a citizen of the State of Florida.

109.    Upon information and belief, counterclaim defendant Christine Harada ("Harada") is a member of the Board of Rekor and a citizen of the State of California.

110.    Upon information and belief, counterclaim defendant David Hanlon ("Hanlon") is a member of the Board of Rekor and a citizen of the State of Nevada.

111.    Upon information and belief, counterclaim defendant Richard Nathan ("Nathan") is a member of the Board of Rekor and a citizen of the Commonwealth of Virginia.

112.    Upon information and belief. counterclaim defendant Steven D. Croxton ("Croxton") is a member of the Board of Rekor and a citizen of the State of Louisiana.

113.    Upon information and belief, counterclaim defendant Firestorm Solutions, LLC ("Firestorm Solutions") is a Delaware limited liability company, and a sub-subsidiary of Rekor, with its principal place of business in the State of Maryland.

114.    Upon information and belief, counterclaim defendant Firestorm Franchising, LLC ("Firestorm Franchising") is a Georgia limited liability company, and a sub-subsidiary of Rekor, with its principal place of business in the State of Maryland. (Firestorm Solutions and Firestorm Franchising are referred to jointly herein as "Firestorm.")

### JURISDICTION

115.    The Court has subject matter jurisdiction over the counterclaims under 28 U.S.C. § 1332 and 28 U.S.C. § 1367.

### FACTS COMMON TO ALL AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

116.    In 2016, Defendants, together with Lancer Financial, Inc. ("Lancer") were the owners of Firestorm.

117.    Prior to January 25, 2017, Suzy Loughlin, Harry Rhulen, Jim Satterfield, and Lancer each owned 25% of Firestorm Solutions.

118.    Prior to January 25, 2017, Suzy Loughlin, Harry Rhulen, and Jim Satterfield were the only officers of Firestorm Solutions.

119.    Prior to January 25, 2017, Jim Satterfield owned 51% of Firestorm Franchising and Firestorm Solutions owned 49% of Firestorm Franchising.

120.    Prior to January 25, 2017, Jim Satterfield was the only officer of Firestorm Franchising, and served as President and CEO thereof.

121.    From time to time prior to January 25, 2017, Jim Satterfield exercised his business judgment as President and CEO of Firestorm Franchising, and, in the context thereof, waived the initial franchise fee that certain franchisees otherwise would have been required to pay to Firestorm Franchising.

122.    From time to time prior to January 25, 2017, Jim Satterfield exercised his business judgment as President and CEO of Firestorm Franchising and, in the context thereof, waived the flat fee term of the minimum level of the continuing royalty that certain franchisees otherwise would have been required to pay to Firestorm Franchising while leaving the percentage term of the minimum level of the continuing royalty in place.

123.    From time to time after January 25, 2017, Jim Satterfield exercised his business judgment as President and CEO of Firestorm Franchising, and, in the context thereof, waived the initial franchise fee that certain franchisees otherwise would have been required to pay to Firestorm Franchising.

124.    From time to time after January 25, 2017, Jim Satterfield exercised his business judgment as President and CEO of Firestorm Franchising and, in the context thereof, waived the flat fee term of the minimum level of the continuing royalty that certain franchisees otherwise would have been required to pay to Firestorm Franchising while leaving the percentage term of the minimum level of the continuing royalty in place.

125.    In 2016, Robert Berman, CEO of Rekor, approached the Defendants and proposed that Rekor (then named Keystone Solutions, Inc. ("Keystone)) acquire Firestorm (the "Acquisition").

126.    On November 16, 2016, Rekor and Firestorm executed a letter of intent that set forth certain aspects of the then proposed Acquisition.

127.    The terms and conditions of the Acquisition were set forth in the Purchase Agreement.

128.    At the beginning of the Acquisition Process, Harry Rhulen advised Robert Berman, in an e-mail dated October 2, 2016, that Rekor's purchase of Firestone could not be sustained based purely on the business value of Firestorm:

> As much as I would like to do a deal with Firestorm, I don't know what one would look like. A purchase would have to be based on brand value and intellectual property, not a financial measure.
> …If you are only raising 10-30mm, it is not reasonable to allocate much capital to Firestorm. …
> …I am very concerned that your investors see prudent behavior. I am not sure buying Firestorm will be seen that way unless the deal smells right. (A copy of Mr. Rhulen's October 2, 2016 e-mail is annexed hereto as Exhibit 2.)

129.    During the course of the Acquisition Process, Robert Berman advised various persons that, from Rekor's perspective, the acquisition of Firestorm was not focused on the acquisition of a business per se, but rather the acquisition of Firestorm's managerial talent, that is, the Defendants.

130.    Among the managerial experiences of Defendants that were of interest to Berman

and to Rekor, were the experiences of Harry Rhulen and Suzy Loughlin in the

operation of a public company.

131.    In order to have the Defendants begin to work for Rekor before the closing of the

Acquisition, Rekor and Firestorm entered into a Professional Services Agreement, dated

November 2016, (the "PSA") whereby the Defendants provided services to Rekor with respect

to Rekor as it then existed and with respect to the company that Rekor would become

after the acquisition of Firestorm. (A copy of the PSA is annexed hereto as Exhibit 3.)

132.    Under the PSA, Harry Rhulen and Suzy Loughlin worked virtually full-time for Rekor

in the de facto roles that they would be appointed to formally after the Acquisition, that is,

Harry Rhulen acted as President of Rekor and Suzy Loughlin acted as General Counsel

and Chief Administrative Officer of Rekor.

133.    Under the PSA, Harry Rhulen, among other things, provided services to Rekor

concerning the transaction (the "Brekford Transaction') whereby Rekor merged with Brekford Corp

("Brekford.")

134.    As a result of the Brekford Transaction, Rekor became a public company, and was renamed, at

that time, Novume Solutions, Inc. ("Novume")

135.    Novume was the successor to Keystone.

136.    Novume has since been renamed as Rekor.

137.    Under the PSA, Suzy Loughlin, among other things, provided services to Rekor

with respect to the operation of the Rekor Board of Directors. (Annexed hereto as Exhibit 4

is a draft December 28, 2016 agenda for a Board meeting that shows some of the activities

undertaken by Harry Rhulen and Suzy Loughlin for Rekor.) (Due to confidentiality agreements and concerns, the names of certain actual and prospective clients and business partners of Rekor and Firestorm have been redacted from Exhibits 4, 13, 14, 15, and 16. Defendants will provide the Court with unredacted copies of these exhibits, or otherwise reveal these persons' names, in accordance with an appropriate order.)

138.    The billing rate for Defendants' services under the PSA was $375 / hour.

139.    The value of the services that Harry Rhulen and Suzy Loughlin provided to Rekor under the PSA was more than $250,000.

140.    Firestorm never billed Rekor for the work done under the PSA.

141.    The value of the work done for Rekor under the PSA was subsumed into the Acquisition.

142.    From November 2016 until the execution of the Purchase Agreement, Rekor engaged in a due diligence process with respect to the acquisition of Firestorm.

143.    On November 16, 2016, a meeting concerning the Acquisition was held at the offices of Rekor's attorneys, Crowell & Moring LLP ("Crowell.") (The agenda for the November 16, 2016 meeting is attached hereto as Exhibit 5.)

144.    Among the matters discussed at the November 26, 2016 meeting was the due diligence process that Rekor was going to undertake as part of the Acquisition Process.

145.    At the November 16, 2016 meeting were representatives of Crowell, Rekor, Rekor's accountants, CohnReznick LLP ("CohnReznick"), and Firestorm.

146.    In December 2016, Suzy Loughlin introduced members of the CohnReznick audit team to various persons at Firestorm. (Annexed hereto as Exhibit 6 is a December 1, 2016 e-mail from Suzy Loughlin to Firestorm personnel introducing CohnReznick.).

147.    In December 2016, as part of Rekor's due diligence process, representatives of CohnReznick and Rekor began to make plans to visit the offices of Firestorm, at which Firestorm maintained its files. (Annexed hereto as Exhibit 7 is a December 3, 2016 email from Riaz Latifullah of Rekor concerning his joining with CohnReznick on the due diligence visit to the Firestorm offices.)

148.    No one from CohnReznick or Rekor came to the Firestorm offices as part of the due diligence process.

149.    As part of the due diligence process, Firestorm provided Rekor, or its agents, with contact information for all the then current Firestorm franchisees.

150.    Upon information and belief, no one from Rekor or CohnReznick contacted any of the Firestorm Franchisees.

151.    As part of the due diligence process, CohnReznick was granted continuous electronic access to Firestorm's QuickBooks financial record keeping system. (Annexed hereto as Exhibit 8 are copies of emails dated December 7, 2016 and December 8, 2016, between Jim Satterfield and John Chan of CohnReznick discussing CohnReznick's electronic access to Firestorm's QuickBooks files.)

152.    Rekor decided to proceed with the closing of the Acquisition on January 25, 2017 even although CohnReznick had not concluded the audit of Firestorm as of that date.

153.    During the course of the Acquisition Process, Robert Berman advised Harry Rhulen that Firestorm should provide Rekor with financial statements based upon Firestorm's QuickBooks financial record keeping program:

> Harry, I assume that both Firestorm and Firestorm Franchising use some
> internal accounting system i.e.; quick books etc. We need the P&L and
> Balance Sheets for 2014 &, 2015 as well as 2016 year to date. … Don't

worry about what it looks like, just send it to me first. (A copy of Mr. Berman's e-mail dated November 23, 2016 is annexed hereto as Exhibit 9.)

154.    During the course of the Acquisition Process, Robert Berman and Riaz Latifullah of Rekor personally were actively involved in managing Firestorm's financial accounts, including how much cash from Firestorm's 2016 earnings should be left in Firestorm's accounts at year end. (Copies of Mr. Rhulen's e-mails to Mr. Latifullah, dated November 23, 2016 and December 26, 2016, are annexed hereto as Exhibit 10.)

155.    During the Acquisition Process, Firestorm provided to Rekor unaudited year end 2016 financial statements, which were created using Firestorm's QuickBooks system.

156.    Firestorm's 2016 Unaudited Statements were made exhibits to the Purchase Agreement and are referenced at paragraph 61 of the Amended Complaint.

157.    On January 25, 2017, the Purchase Agreement was entered into and the Acquisition Process closed.

158.    On January 25, 2017, Defendants and Rekor entered into the employment agreements referenced in the Purchase Agreement. As a result of those agreements, Harry Rhulen became President of Rekor, Suzy Loughlin became General Counsel and Chief Administrative Officer of Rekor, and Jim Satterfield became President and Chief Executive Officer of Firestorm Solutions and President and Chief Executive Officer of Firestorm Franchising.

159.    While he acted as President of Rekor, Harry Rhulen was involved in certain strategic activities of Rekor, including, but not limited to, the Brekford transaction, Rekor's acquisition of

the Global companies in October 2017, and the drafting of Rekor's form S-1, which was filed with the SEC in November 2017.

160.    Mr. Rhulen was also in discussions with Ms. Benet of Beazley concerning the proposed Embedded Workplace Violence Program until Ms. Benet left Beazley in 2018 and Beazley decided not to continue to go forward with that program. (Annexed hereto as Exhibit 11 and 12, respectively, are copies of a June 11, 2017 email from Robert Berman to Harry Rhulen concerning Mr. Rhulen's discussions with Beazley in this regard, and Beazley's March 2018 brochure concerning the Embedded Workplace Violence Program.)

161.    In September 2017, Robert Berman, CEO of Rekor, assumed direct supervisory authority over Jim Satterfield, who was President and CEO of both Firestorm Solutions and Firestorm Franchising.

162.    In or about March 2017, CohnReznick resigned as accountants and auditors for Rekor.

163.    In or about April 2017, BD & Company, LLP were hired as accountants and auditors for Rekor.

164.    Upon information and belief, on June 9, 2017, BD & Company, delivered to Rekor audited financial statements for Firestorm for 2016, which are the Audited Statements referred to in paragraph 62 of the Amended Complaint.

165.    The Audited Statements make no finding or report that Firestorm's Unaudited Statements were erroneous or misleading.

166.    Rekor incorporated the Audited Statements into a Prospectus filed by Rekor with the SEC on August 4, 2017 (the "Prospectus").

167.    The Prospectus makes no statement or disclosure that the Unaudited Statements were erroneous or misleading or that the Acquisition of Firestorm was induced by any fraud, or any false or misleading statements.

168.    In June 2017, as a result of the Brekford Transaction, Rekor became a public Company and was renamed Novume at that time.

169.    Prior to June 2017, Riaz Latifullah had acted as Chief Financial Officer of Rekor.

170.    In June 2017, Carl Kumpf became Chief Financial Officer of Rekor.

171.    In March 2018, Carl Kumpf resigned as Chief Financial Officer of Rekor.

172.    As a result of Carl Kumpf's resignation, the Board commenced an investigation into Rekor CEO, Robert Berman (the "Kumpf Investigation").

173.    Upon information and belief, the Board has sealed the results of the Kumpf Investigation. (Defendants believe that the minutes of the Board, and of its Governance Committee, will reveal how the Board treated the results of the Kumpf Investigation.)

174.    Upon information and belief, at about the same time as the Kumpf Investigation, Riaz Latifullah complained to the Board about the conduct of Robert Berman.

175.    Upon information and belief, as a result of Mr. Latifullah's complaint, the Board commenced an investigation of Robert Berman (the "Latifullah Investigation").

176.    Upon information and belief, the Board has sealed the results of the Latifullah Investigation. (Defendants believe that the minutes of the Board, and of its Governance Committee, will reveal the fact of and how the Board treated the results of the Latifullah Investigation.)

177.    In July 2018, the four Presidents of the then four operating divisions of Rekor

complained about the conduct of Robert Berman.

178.     Upon information and belief, as a result of the complaints by the Presidents, the Board commenced an investigation of Robert Berman (the "Presidents' Investigation".)

179.     Upon information and belief, the Board has sealed the results of the Presidents' Investigation. (Defendants believe that the minutes of the Board, and of its Governance Committee, will reveal the fact of and how the Board treated the results of the Presidents' Investigation.)

180.     In June 2018, Harry Rhulen made a whistle blower complaint to the Board concerning Robert Berman.

181.     As a result of Harry Rhulen's whistle blower complaint, the Board commenced an investigation of Robert Berman (the "Rhulen Investigation").

182.     Upon information and belief, in September 2018, the Board sealed the results of the Rhulen Investigation. (Defendants believe that the minutes of the Board, and of its Governance Committee will reveal how the Board treated the results of the Rhulen Investigation.)

183.     In September 2018, Harry Rhulen was demoted from President of Rekor to Executive Vice President of Rekor.

184.     After Harry Rhulen was demoted to the position of Executive Vice President of Rekor, Harry Rhulen advised Robert Berman that it was his belief that, although he had been demoted, as an officer of Rekor, he still had a fiduciary duty to Rekor and the shareholders of Rekor.

185.     In October 2018, Harry Rhulen was demoted from Executive Vice President of Rekor to Executive Vice President of Firestorm Solutions, which was a sub-subsidiary of Rekor.

186.    Defendants resigned all their positions with Rekor, and any and all of its subsidiaries, effective December 28, 2018.

187.    In December 2018, Defendants and Firestorm entered into a New Agreement whereby Defendants and Firestorm would jointly pursue business opportunities and share the revenues therefrom. (Annexed hereto as Exhibit 13 are e-mails between Harry Rhulen and Jason Russell, then President of Firestorm, dated December 20, 2018 and December 21, 2018, by which the New Agreement was agreed to.)

188.    Beginning in January 2019, and continuing thereafter, Defendants and Firestorm performed under the New Agreement and jointly pursued various business opportunities.

189.    In January 2019, Defendants established CrisisRisk in order to, among other things, serve as a vehicle for Defendants' business under the New Agreement.

190.    In April 2019, Harry Rhulen sent a report to Rekor that set forth the business that had been engaged in under the New Agreement during the first quarter of 2019. (A copy of Harry Rhulen's April 2019 report is attached hereto as Exhibit 14.)

191.    In March 2019, CrisisRisk transmitted to Firestorm the share of revenue then due under the New Agreement. (A copy of the documents confirming CrisisRisk's payment to Firestorm are annexed hereto as Exhibit 15.)

192.    CrisisRisk is holding in its bank accounts additional moneys due Firestorm and Rekor under the New Agreement.

193.    In July 2019, Harry Rhulen sent a report to Rekor that set forth the business that had been engaged in under the New Agreement during the second quarter of 2019.

194.    In October 2019, Harry Rhulen sent a report to Rekor that set forth the business that had been engaged in under the New Agreement during the third quarter of 2019.

195.    In or about December 2018, separate and apart from the New Agreement, Firestorm and the Defendants entered into several agreements whereby Suzy Loughlin and Jim Satterfield would perform services for clients of Firestorm for which Firestorm would pay the Defendants.

196.    Firestorm's interest in obtaining these personal services was brought up by Firestorm's President, Jason Russell, in the same emails in which the New Agreement had been agreed to, that is, Exhibit 13.

197.    During the Winter of 2019, Suzy Loughlin and Jim Satterfield, acting under and through CrisisRisk, performed services as requested by Firestorm.

198.    From time to time during the Winter of 2019, CrisisRisk sent invoices to Firestorm for the services provided by Suzy Loughlin and Jim Satterfield. (Copies of CrisisRisk's invoices to Firestorm, dated January 20, 2019, February 12, 2019, and February 15, 2019, (the "Invoices") are annexed hereto as Exhibit 16.)

199.    Upon information and belief, as of the date of this answer, all agreements between Firestorm Franchising and its franchisees have been terminated or have otherwise been ended.

200.    Upon information and belief, as of the date of this answer, neither Firestorm nor Firestorm Franchising has any employees.

**First Counterclaim**
**(Breach of Employment Agreement)**

201.    Defendants repeat and reallege the allegations set forth in paragraphs 1-200 hereof.

202.    Pursuant to the Purchase Agreement, Harry Rhulen entered into an employment agreement with Keystone as of January 25, 2017 (the, "Employment Agreement".)

203.    Pursuant to the Employment Agreement, Harry Rhulen was hired to be the President of Keystone.

24

204.    After the merger of Keystone and Brekford, and the naming of the combined entity as Novume, Harry Rhulen continued as President of Novume.

205.    Harry Rhulen fully performed all of his obligations pursuant to the Employment Agreement.

206.    In the Autumn of 2018, Rekor decided to retaliate against Harry Rhulen for his whistleblower complaint in which Harry Rhulen raised issues concerning the conduct of Rekor's CEO, Robert Berman.

207.    In September 2018, Harry Rhulen was demoted from President of Rekor to Executive Vice President of Rekor.

208.    After Harry Rhulen was demoted to the position of Executive Vice President of Rekor, Harry Rhulen advised Robert Berman that it was his belief that, although he had been demoted, as an officer of Rekor, he still had a fiduciary duty to Rekor and the shareholders of Rekor.

209.    In October, 2018, Rekor made Harry Rhulen an Executive Vice President of Firestorm Solutions, a sub-subsidiary of Rekor, of which Jim Satterfield was President.

210.    Upon information and belief, Rekor removed Harry Rhulen as the President of Rekor, a public company, and reassigned him to Firestorm Solutions, a sub-subsidiary, in order to try to block Harry Rhulen from acting in accordance with his then fiduciary duty to the shareholders and other stakeholders of Rekor.

211.    Rekor breached the Employment Agreement by removing Harry Rhulen as President of Rekor and making him an Executive Vice President of Firestorm Solutions.

212.    As a result of the foregoing, Harry Rhulen has been damaged in amount to be determined at trial, but not less than $825,000.

213.    As a result of the foregoing, Harry Rhulen is entitled to a judgment in an amount to be determined at trial, but not less than $825,000.00, together with interest thereon.

**Second Counterclaim**
**(Breach of the Warrants)**

214.    Defendants repeat and reallege the allegations set forth in paragraphs 1-213 hereof.

215.    Pursuant to the Purchase Agreement, two different sets of warrants for Rekor stock were issued to Suzy Loughlin, Harry Rhulen, and Jim Satterfield.

216.    The two sets of warrants were generally referred to by their exercise price, that is, the $5.00 warrants and the $7.00 warrants. (The $5.00 warrants and the $7.00 warrants are referred to jointly herein as the "Warrants.")

217.    As part of the Brekford Transaction, the number of shares that were subject to the Warrants increased and the exercise price for the Warrants decreased.

218.    On June 25, 2019, Claud s.V. Eley ("Eley"), a partner at Crowell & Moring, who is held out as the Outside General Counsel for Rekor, sent a letter to the Defendants (the "June 25th Letter") in which he stated that, for the reasons set forth therein, it was Rekor's position that the Purchase Agreement and the transactions consummated thereunder, were subject to rescission.

219.    On July 25, 2019, Jim Satterfield attempted to exercise his Warrants.

220.    Rekor refused to honor Jim Satterfield's attempt to exercise his Warrants.

221.    On July 22, 2019, Suzy Loughlin attempted to transfer her Warrants.

222.    Rekor refused to honor Suzy Loughlin's attempt to transfer her Warrants.

223.    On August 5, 2019, Mr. Eley sent a letter to Jonathan P. Arfa, Esq., who was an attorney for the Defendants (the "August 5th Letter".)

224.    In the August 5th Letter, Mr. Eley stated that Rekor's "position" "was clearly stated" in the June 25th Letter, that the Purchase Agreement "and the transactions contemplated thereby,

including the issuance of the warrants, are subject to rescission." Mr. Eley concluded "Therefore, please be advised that Rekor will not honor the requests from Ms. Loughlin and Mr. Satterfield."

225.    At paragraph 181 of the complaint in this Action, filed on August 19, 2019 (the "Complaint"), Rekor sought a declaration that the Warrants are void.

226.    At paragraph 92 of the Amended Complaint, Rekor seeks a declaration that the Warrants are void.

227.    As a result of the foregoing, Rekor has repudiated its obligations to Suzy Loughlin and Jim Satterfield pursuant to the Warrants issued to them.

228.    As a result of the foregoing, Rekor has breached its obligations to Suzy Loughlin and Jim Satterfield pursuant to the Warrants.

229.    As a result of the foregoing, Suzy Loughlin and Jim Satterfield have been damaged.

230.    As a result of the foregoing, Suzy Loughlin and Jim Satterfield are each entitled to a judgment in an amount to be determined at trial to be the difference in value between the listed market price of Rekor stock on July 25, 2019 and the price at which Suzy Loughlin and Jim Satterfield could have exercised her or his Warrants on that date, but not less than $485,000.00 each, together with interest thereon.

**Third Counterclaim**
**(Anticipatory Breach of Warrants)**

231.    Defendants repeat and reallege the allegations of paragraphs 1-230 hereof.

232.    Pursuant to the Purchase Agreement, Warrants were issued to Harry Rhulen.

233.    As a result of the June 25th Letter, the August 5th Letter, the allegations in the Complaint, and the allegations of the Amended Complaint, Rekor has repudiated it obligations to Harry Rhulen pursuant to the Warrants issued to him.

27

234.    As a result of the foregoing, Rekor has breached its obligations to Harry Rhulen pursuant to the Warrants issued to him.

235.    As a result of the foregoing, Harry Rhulen has been damaged.

236.    As a result of the foregoing, Harry Rhulen is entitled to judgment in an amount to be determined at trial to be the difference in value between the listed price of Rekor stock on July 25, 2019 and the price at which he could have exercised his Warrants on that date, but not less than $485,000.00, together with interest thereon.

**Fourth Counterclaim**
**(Breach of Fiduciary Duty)**

237.    Defendants repeat and reallege the allegations of paragraphs 1-236 hereof.

238.    As members of the Rekor Board, counterclaim defendants Berman, McCarthy, de Bary, Goord, Harada, Hanlon, Nathan, and Croxton owed a fiduciary duty to Defendants as a result of their status as shareholders and warrant holders of Rekor.

239.    Rekor's refusal to honor Ms. Loughlin's and Mr. Satterfield's attempts to exercise their Warrants and Rekor's repudiation of its obligations pursuant to all of the Warrants directly injured the Defendants and improperly favored the interests of counterclaim defendant Robert Berman, who owns the largest single percentage of Rekor stock, by preventing the active dilution of his ownership percentage by Defendants' exercise of their Warrants.

240.    As a result of the foregoing, counterclaim defendants Berman, McCarthy, de Bary, Goord, Harada, Hanlon, Nathan, and Croxton breached their fiduciary duties to Defendants.

241.    As a result of the foregoing, Defendants have been damaged.

242.    As a result of the foregoing, Defendants are entitled to a judgment against counterclaim defendants Berman, McCarthy, de Bary, Goord, Harada, Hanlon, Nathan, and Croxton, jointly and severally, in an amount to be determined at trial, but not less than the difference in value

between the listed market price for Rekor stock as of July 25, 2019 and the price at which Defendants could have exercised their Warrants on that date, and not less than $1,455,000.00, together with interest thereon.

**Fifth Counterclaim**
**(Anticipatory Breach of Promissory Notes)**

243.    Defendants repeat and reallege the allegations of paragraphs 1-242 hereof.

244.    Pursuant to the Purchase Agreement, promissory notes in the amount of $166,666.67 were issued by Rekor to Suzy Loughlin and Jim Satterfield and a promissory note in the amount of $166,666.66 was issued by Rekor to Harry Rhulen (collectively, the "Notes".)

245.    The Notes were to mature on January 25, 2022.

246.    The Notes provided that accrued interest was to be paid on a monthly basis by Rekor to the Note holders.

247.    From March 2017 until July 2019, Rekor paid interest on the Notes monthly to the Defendants.

248.    Rekor has not paid any interest on the Notes to Defendants since July 2019.

249.    At paragraph 191 of the Complaint, Rekor sought a declaration that the Notes are void.

250.    At paragraph 92 of the Amended Complaint, Rekor seeks a declaration that the Notes are void.

251.    As a result of the June 25th Letter, the August 5th Letter, the allegations of the Complaint, and the allegations of the Amended Complaint, Rekor has repudiated it obligations to Suzy Loughlin, Harry Rhulen, and Jim Satterfield pursuant to the Notes.

252.    As a result of the foregoing, Rekor has breached the Notes.

253.    As a result of the foregoing, the Defendants have been damaged.

254.    As a result of the foregoing, Suzy Loughlin, Harry Rhulen, and Jim Satterfield each are

entitled to a judgment in the face amount of the Notes, but not less than $166,666.66 each,

together with interest thereon from June 25, 2019.

**Sixth Counterclaim**
**(Libel)**

255.    Defendants repeat and reallege the allegations of paragraphs 1-254 hereof.

256.    On August 14, 2019, Rekor filed a Form 10-Q with the Securities and Exchange

Commission (the "10-Q").

257.    The 10-Q is publicly available on the Rekor website.

258.    The 10-Q contains the following statement:

> On June 25, 2019, the we sent a letter to three former executives of the
> Company and Firestorm (the Firestorm Principals). The letter described the
> Company's position that, because the Firestorm Principals fraudulently
> induced the execution of the Membership Interest Purchase Agreement
> pursuant to which Firestorm was acquired by the Company, the entire
> Membership Interest Purchase Agreement and the transactions contemplated
> thereby, including the issuance of the warrants, are subject to rescission.

259.    The foregoing statement is of and concerning the Defendants.

260.    At the time of the 10-Q, the Defendants were former officers of Rekor and

Firestorm, and, prior to the Acquisition, the Defendants had been the majority owners of

Firestorm and the only officers of Firestorm.

261.    Rekor defined Harry Rhulen, Suzanne Loughlin, and James Satterfield as the "Firestorm

Principals" in its Form 10-K, filed with the SEC on April 11, 2019.

262.    The statement in the 10-Q that the Defendants "fraudulently induced the execution of the

Membership Interest Purchase Agreement" is false.

263.     The statement in the 10-Q that the Defendants "fraudulently induced the execution of the Membership Interest Purchase Agreement" disparages the Defendants in their business or profession and is defamatory per se.

264.     The statement in the 10-Q was published negligently, or with malicious intent to smear the Defendants in order to pressure the Defendants to acquiesce to Rekor's determination to repudiate its obligations to the Defendants pursuant to the Warrants and the Notes.

265.     As a result of the foregoing, the Defendants have been injured.

266.     Counterclaim defendants Berman and Hen signed the 10-Q.

267.     Upon information and belief, counterclaim defendants Berman, McCarthy, de Bary, Goord, Harada, Hanlon, Nathan, and Croxton reviewed and approved the 10-Q before it was filed with the SEC. (Defendants believe that the minutes of the Rekor Board, and of its Audit Committee, will show the Board's review and approval of the 10-Q.)

268.     Defendants seek the award of only nominal actual damages on this counterclaim.

269.     Defendants seek punitive damages in an amount equal to the difference in value between the listed market price of Rekor stock on July 25, 2019 and the price at which the Defendants could have exercised their Warrants on that date.

270.     Defendants seek a judgment against Rekor and counterclaim defendants Berman, Hen, McCarthy, de Bary, Goord, Harada, Hanlon, Nathan, and Croxton, jointly and severally, for an amount to be determined at trial, but not less than $1,455,000.00, together with interest thereon.

**Seventh Counterclaim**
**(Indemnification By Firestorm Solutions)**

271.     Defendants repeat and reallege the allegations of paragraphs 1-270 hereof.

272.     The Purchase Agreement provides at Article 11.13 that it is to be governed by the Law of New York regardless of conflict of law principles.

273.    Pursuant to the terms of the Purchase Agreement, as of January 25, 2017, Suzy Loughlin and Harry Rhulen entered into employment agreements with Rekor and Jim Satterfield entered into an employment agreement with Firestorm Solutions and Firestorm Franchising (collectively, the "Employment Agreements.")

274.    The Employment Agreements provide that they are to be governed by the Law of New York without regard to conflicts of law principles.

275.    As set forth in the Purchase Agreement, the affairs of Firestorm Solutions were governed by an operating agreement, dated as of January 14, 2008 (the "FS Operating Agreement").

276.    Defendants, as officers of Firestorm Solutions, fully and faithfully satisfied their obligations to Firestorm Solutions under the FS Operating Agreement and otherwise.

277.    Paragraph 12 of the FS Operating Agreement provides, among other things, that the officers of Firestorm Solutions shall be indemnified  with respect to "any and all losses, claims, damages, judgments, liabilities, obligations, penalties, settlements, and reasonable expenses (including legal fees" "arising from any and all claims, demands, actions, suits, or proceedings."

278.    Rekor alleges at paragraphs 41, 44, and 51 of the Amended Complaint that the Defendants "intentionally failed to disclose material information regarding Firestorm's franchise business" to Rekor' and "deliberately hid" and "did not disclose" certain Firestorm documents to Rekor.

279.    Pursuant to Article 1.4(b) of the Purchase Agreement, as part of the Acquisition Process, Firestorm Solutions and Firestorm Franchising were to deliver certain Estimated Closing Balance Sheets to Rekor.

280.     Pursuant to Article 3.4 (a) of the Purchase Agreement, the Estimated Closing Balance Sheets, which had been provided, were referenced in the Purchase Agreement.

281.     Paragraphs 65 and 66 of the Amended Complaint allege that the statements referenced in Article 3.4(a) "overstated Firestorm's revenue" and were "misleading."

282.     By a letter dated September 24, 2019, from Robert C. Boneberg, Esq. to Mr. Eley, the Defendants demanded that Rekor, Firestorm Solutions, and Firestorm Holdings, LLC ("Firestorm Holdings") indemnify Defendants in the Action pursuant to paragraph 12 of the FS Operating Agreement.

283.     By a letter dated October 15, 2019, Sarah M. Gilbert, Esq, a partner at Moring, (the "Gilbert Letter") rejected Defendants' demand for indemnification pursuant to the FS Operating Agreement and stated that Firestorm Solutions would not indemnify Defendants.

284.     As a result of the foregoing, Firestorm Solutions has breached its obligations to the Defendants pursuant to the FS Operating Agreement.

285.     As a result of the foregoing, Defendants have been damaged;

286.     As a result of the foregoing, Defendants are entitled to a judgment for damages in an amount to be determined at trial, together with interest thereon.

### Eighth Counterclaim
### (Declaratory Judgment Against Firestorm Solutions)

287.     Defendants repeat and reallege the allegations of paragraphs 1-286 hereof.

288.     As a result of the foregoing, Defendants are entitled to declaratory judgment that Firestorm Solutions is required to indemnify them in the Action pursuant to the terms of the FS Operating Agreement.

289.     Defendants have no adequate remedy at law.

**Ninth Counterclaim**
**(Specific Performance Against Firestorm Solutions)**

290.    Defendants repeat and reallege the allegations of paragraphs 1-289 hereof.

291.    As a result of the foregoing, Defendants are entitled to specific performance compelling Firestorm Solutions to indemnify them in the Action pursuant to the terms of the FS Operating Agreement.

292.    Defendants have no adequate remedy at law.

**Tenth Counterclaim**
**(Indemnification By Firestorm Franchising)**

293.    Defendants repeat and reallege the allegations of paragraphs 1-292 hereof.

294.    As set forth in the Purchase Agreement, the affairs of Firestorm Franchising were governed by an operating agreement, dated as of January 24, 2017 (the "FF Operating Agreement").

295.    Jim Satterfield, as an officer and member of Firestorm Franchising, fully and faithfully satisfied his obligations to Firestorm Franchising under the FF Operating Agreement and otherwise.

296.    Paragraph 16 of the FF Operating Agreement provides, among other things, that members and officers of Firestorm Franchising may be indemnified and held harmless if they are a party to a civil action because of their participation in or with Firestorm Franchising.

297.    Paragraph 16 (b) further provides that "expenses (including attorney's fees)" incurred by the officer "shall be paid in advance."

298.    By a letter dated September 30, 2019, from Robert C. Boneberg, Esq. to Mr. Eley, Mr. Satterfield demanded that Rekor, Firestorm Franchising, and Firestorm Holdings indemnify Mr. Satterfield in the Action pursuant to paragraph 16 of the FF Operating Agreement, including the payment of his expenses in advance.

299.    By the Gilbert Letter, Firestorm Franchising rejected Mr. Satterfield's demand for indemnification pursuant to the FS Operating Agreement, stated that Firestorm Franchising would not indemnify Mr. Satterfield, and stated that Firestorm Franchising refused to pay Mr. Satterfield's expenses in the Action in advance.

300.    As a result of the foregoing, Firestorm Franchising has breached its obligations to Mr. Satterfield pursuant to the FS Operating Agreement.

301.    As a result of the foregoing, Mr. Satterfield has been damaged.

302.    As a result of the foregoing, Mr. Satterfield is entitled to judgment for damages in an amount to be determined at trial, together with interest thereon.

## Eleventh Counterclaim
### (Declaratory Judgment Against Firestorm Franchising)

303.    Defendants repeat and reallege the allegations of paragraph 1-302 hereof.

304.    As a result of the foregoing, Jim Satterfield is entitled to declaratory judgment that Firestorm Franchising is required to indemnify him in the Action pursuant to the terms of the FF Operating Agreement.

305.    Mr. Satterfield has no adequate remedy at law.

## Twelfth Counterclaim
### (Specific Performance Against Firestorm Franchising

306.    Defendants repeat and reallege the allegations of paragraphs 1-304 hereof.

307. As a result of the foregoing, Jim Satterfield is entitled to specific performance compelling Firestorm Franchising to indemnify him in the Action pursuant to the terms of the FF Operating Agreement.

308. Mr. Satterfield has no adequate remedy at law.

### Thirteenth Counterclaim
### (Indemnification By Rekor)

309. Defendants repeat and reallege the allegations of paragraphs 1-308 hereof.

310. Firestorm Solutions and Firestorm Franchising were predecessor corporations of Rekor.

311. Rekor has enacted amended and restated bylaws, adopted on April 26, 2019 (the "Rekor Bylaws").

312. Defendants fully and faithfully satisfied their obligations to Firestorm Franchising and Firestorm Franchising under their respective operating agreements and otherwise prior to the Acquisition and, after the Acquisition, fully and faithfully satisfied their respective obligations to Rekor, Firestorm Solutions, and Firestorm Franchising in their respective roles as officers thereof and otherwise.

313. Article VI.1 of the Rekor Bylaws provides, among other things, that officers of Rekor shall be indemnified against "all expense liability and loss (including attorneys' fees…") by reason of the fact that the person seeking indemnification is or was an officer of Rekor.

314. Article 6.1 also states that an officer of Rekor includes an officer of a predecessor company of Rekor.

315. Article 6.3 of the Rekor Bylaws further provides that expenses incurred in defending an action for which indemnification is required shall be paid in advance upon

receipt of an undertaking by the indemnified party to repay the advanced expenses if such person is ultimately determined not to be entitled to indemnification.

316.   By a letter dated October 2, 2019, from Robert C. Boneberg, Esq. to Mr. Eley, Defendants demanded that Rekor indemnify them in the Action pursuant to Article 6 of the Rekor Bylaws, and that Rekor pay Defendants' expenses in advance pursuant to Article 6.3.

317.   By a letter dated October 4, 2019, from Robert C. Boneberg, Esq. to Mr. Eley, each of the Defendants provided to Rekor the undertaking contemplated by Article 6.3 of the Rekor Bylaws.

318.   By the Gilbert Letter, Rekor rejected Defendants' demand for indemnification pursuant to the Rekor Bylaws, stated that Rekor would not indemnify Defendants, and stated that Rekor refused to pay any of Defendants' expenses in connection with the Action in advance.

319.   As a result of the foregoing, Rekor has breached its obligations to the Defendants pursuant to the Rekor Bylaws.

320.   As a result of the foregoing, Defendants have been damaged.

321.   As a result of the foregoing, Defendants are entitled to judgment for damages in an amount to be determined at trial, together with interest thereon.

**Fourteenth Counterclaim**
**(Declaratory Judgment Against Rekor)**

322.   Defendants repeat and reallege the allegations of paragraph 1-321 hereof.

323.   As a result of the foregoing, Defendants are entitled to declaratory judgment that Rekor is required to indemnify them in the Action pursuant to the terms of the Rekor Bylaws.

324.   Defendants have no adequate remedy at law.

## Fifteenth Counterclaim
### (Specific Performance Against Rekor)

325.   Defendants repeat and reallege the allegations of paragraphs 1-324 hereof.

326.   As a result of the foregoing, Defendants are entitled to specific performance compelling Rekor to indemnify them in the Action pursuant to the terms of the Rekor Bylaws.

327.   Defendants have no adequate remedy at law.

## Sixteenth Counterclaim
### (Indemnification under the Purchase Agreement)

328.   Defendants repeat and reallege the allegations of paragraphs 1-327 hereof.

329.   Article VIII.2 (c) (ii) of the Purchase Agreement provides that Rekor will indemnify the Defendants against any losses, including attorney's fees, that they might suffer as a result of any nonfulfillment or breach by Rekor of any covenant, agreement, or obligation to Defendants under the Purchase Agreement.

330.   Defendants fully satisfied their obligations under the Purchase Agreement.

331.   Rekor has breached its obligations under the Purchase Agreement by refusing to honor the Warrants and by repudiating the Warrants and the Notes.

332.   By a letter dated October 3, 2019, from Robert C. Boneberg, Esq. to Mr. Eley, Defendants demanded that Rekor indemnify the Defendants pursuant to Article VIII of the Purchase Agreement.

333.   By the Gilbert Letter, Rekor rejected Defendants' demand for indemnification pursuant to the Purchase Agreement and stated that Rekor would not indemnify the Defendants.

334.   As a result of the foregoing, Rekor has breached its obligations to Defendants pursuant to the Purchase Agreement.

335.   As a result of the foregoing, Defendants have been damaged.

336.   As a result of the foregoing, Defendants are entitled to judgment for damages in an

amount to be determined at trial, together with interest thereon.

**Seventeenth Counterclaim**
**(Declaratory Judgment Under the Purchase Agreement)**

337.   Defendants repeat and reallege the allegations of paragraph 1-336 hereof.

338.   As a result of the foregoing, Defendants are entitled to declaratory judgment that Rekor is

required to indemnify them pursuant to the terms of the Purchase Agreement.

339.   Defendants have no adequate remedy at law.

**Eighteenth Counterclaim**
**(Specific Performance Under the Purchase Agreement)**

340.   Defendants repeat and reallege the allegations of paragraphs 1-339 hereof.

341.   As a result of the foregoing, Defendants are entitled to specific performance compelling

Rekor to indemnify them pursuant to the terms of the Purchase Agreement.

342.   Defendants have no adequate remedy at law.

**Nineteenth Counterclaim**
**(Breach of Contract)**

343.   Defendants repeat and reallege the allegations of paragraphs 1-342 hereof.

344.   CrisisRisk, Suzy Loughlin, and Jim Satterfield have performed all their obligations

pursuant to the agreements with Firestorm Solutions to provided services to certain clients of

Firestorm Solutions as reflected in the Invoices attached hereto as Exhibit 16.

345.   Firestorm Solutions has breached the agreements by failing to pay the Invoices.

346.   As a result of the foregoing, CrisisRisk has been damaged.

347.   As a result of the foregoing, CrisisRisk is entitled to a judgment in the amount of its

Invoices, together with interest thereon from the date thereof.

**WHEREAS**, Defendants and CrisisRisk demand judgment as follows:

1. Dismissing the Amended Complaint;

2. On the first counterclaim, awarding Harry Rhulen damages in an amount to be determined at trial, but not less than $825,000.00, together with interest thereon;

3. On the second counterclaim, awarding Suzy Loughlin and Jim Satterfield, individually, damages in an amount to be determined at trial to the difference in value between the listed market price of Rekor stock on July 25, 2019 and the exercise price of their Warrants as of that date, but not less than $485,000.00 each, together with interest thereon;

4. On the third counterclaim, awarding Harry Rhulen damages in an amount to be determined at trial to be the difference in value between the listed market price of Rekor stock on July 25, 2019 and the exercise price of his Warrants as of that date, but not less than $485,000.00, together with interest thereon;

5. On the fourth counterclaim, awarding Defendants damages in an amount to be determined at trial, but not less than $1,455,000.00, together with interest thereon;

6. On the fifth counterclaim, awarding Defendants, individually, judgment in the face value of their Notes, but not less than $166,666.66 each, together with interest thereon from June 25, 2019;

7. On the sixth counterclaim, awarding Defendants nominal damages, together with punitive damages in an amount to be determined at trial to be the difference in value between the listed market price of Rekor stock on July 25, 2019 and the exercise price of their Warrants as of that date, but not less than $1,455,000.00, together with interest thereon;

8. On the seventh counterclaim, awarding Defendants damages in an amount to be determined at trial, together with interest thereon;

9. On the eighth counterclaim, awarding Defendants declaratory judgment that Firestorm Solutions is required to indemnify them in the Action pursuant to the terms of the FS Operating Agreement;

10. On the ninth counterclaim, awarding Defendants specific performance compelling Firestorm Solutions to indemnify them in the Action pursuant to the terms of the FS Operating Agreement;

11. On the tenth counterclaim, awarding Jim Satterfield damages in an amount to be determined at trial, together with interest thereon;

12. On the eleventh counterclaim, awarding Jim Satterfield declaratory judgment that Firestorm Franchising is required to indemnify him in the Action pursuant to the terms of the FF Operating Agreement;

13. On the twelfth counterclaim, awarding Jim Satterfield specific performance compelling Firestorm Franchising to indemnify him in the Action pursuant to the terms of the FF Operating Agreement;

14. On the thirteenth counterclaim, awarding Defendants damages in an amount to be determined at trial, together with interest thereon;

15. On the fourteenth counterclaim, awarding Defendants declaratory judgment that Rekor is required to indemnify them in the Action pursuant to the terms of the Rekor Bylaws;

16. On the fifteenth counterclaim, awarding Defendants specific performance compelling Rekor to indemnify them in the Action pursuant to the terms of the Rekor Bylaws;

17. On the sixteenth counterclaim, awarding Defendants damages in an amount to be determined at trial, together with interest thereon;

18. On the seventeenth counterclaim, awarding Defendants declaratory judgment that Rekor is required to indemnify them pursuant to the terms of the Purchase Agreement;

19. On the eighteenth counterclaim, awarding Defendants specific performance compelling Rekor to indemnify them pursuant to the terms of the Purchase Agreement;

20. On the nineteenth counterclaim, awarding CrisisRisk damages in the amount of its Invoices, together with interest thereon from the date thereof;

21.  Awarding Defendants the costs and expenses of this Action, including
attorney's fees, and such other and further relief as may be just and proper.

Dated: November 1, 2019

Respectfully submitted,

John J. D. McFerrin-Clancy, Esq
17 State Street, 40th Floor
New York, NY 10004
646.771.7377
jmc@mcferrin-clancy.com

And

Robert C. Boneberg, Esq.
43 Madison Avenue
Maplewood, NJ 07040
bonebergesquire@gmail.com
973.886.6576

*Attorneys for Defendants
And Additional Plaintiff on
Counterclaims*