UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
Rekor Systems, Inc.                                             No. 19-cv-7767 (LJL)
                Plaintiff,

      v.

Suzanne Loughlin, Harry Rhulen and
James Satterfield,
                Defendants
        And

CrisisRisk Strategies, LLC

                Additional Plaintiff
                On Counterclaims

      v.

Robert A. Berman, Eyal Hen,
James K. McCarthy, Paul A. de Bary,
Glenn Goord, Christine Harada, David
Hanlon, Richard Nathan, Steven
D. Croxton, Firestorm Solutions, LLC,
and Firestorm Franchising, LLC

                Additional Defendants
                On Counterclaims

-----------------------------------------------------X

# Defendants' Memorandum of Law In Support of Their Motion For Judgment on the Pleadings

**TABLE OF CONTENTS**

**PRELIMINARY STATEMENT** ................................................................. 1

**FACTS** ..................................................................................................... 2

**ARGUMENT** ........................................................................................... 9

**Rekor Fails to State a Claim for Recission, Which Also Fails Because of the Impossibility of REsotring the Parties to the Status Quo and Because of Rekor's Delay in Seeking Rescission** ................................................................................... 9

    **A.  Rekor's Unpleaded Claim For Partial Rescission Fails** ................................. 10

    **B.  Rekor Has an Adequate Remedy at Law** ....................................................... 11

    **C.  It Is Impossible to Restore the Parties to the Status Quo** .............................. 11

    **D.  Rekor's 2nd Amended Complaint Shows That Rekor Failed to Seek Rescission Promptly** ................................................................................................... 13

        **CONCLUSION** ................................................................................... 16

**TABLE OF AUTHORITIES**

**Cases**

*Banque Arabe Et Internationale D'Investissement v. Maryland National Bank*, 850 F. Supp. 1199

  (S.D.N.Y., 1994) ................................................................................................................ 10

*Frymer v. Bell*, 99 A.D.2d 91, 472 N.Y.S.2d 622 (1st Dep't 1984) ................................................. 2

*L-7 Designs, Inc v. Old Navy LLC*, 647 F.3d 419 (2d Cir., 2011). .................................................. 9

 *Paulsen v Stifel, Nicolaus & Company, Inc., 2019 WL 2415213 (S.D.N.Y. 2019)* ........................ 9

*Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 330 N.Y.S.2d 33 (1972) .................. 9, 11

*Syncora Guarantee Inc. v. EMC Mortgage Corporation*, 874 F. Supp. 2d 328 (S.D.N.Y., 2012)…9

*Tudor v. Riposanu*, 93 A.D.2d 718, 461 N.Y.S.2d 6 (1st Dep't 1983) ............................................ 2

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC, 127 F. Supp. 3d 156 (S.D.N.Y. 2015)* .... 9

**Rules**

Fed. R. Civ. P. 8 (d) (1) .................................................................................................................... 3

Fed.R.Civ.P.9(b) .............................................................................................................................. 3

## PRELIMINARY STATEMENT

Defendants Suzanne Loughlin ("Suzy Loughlin"), Harry Rhulen ("Harry Rhulen"), and James Satterfield ("Jim Satterfield") (collectively, "Defendants") respectfully submit this motion pursuant to Fed. R. Civ. P. 12 (c) for judgment on the pleadings dismissing so much of plaintiff's ("Rekor") second amended complaint, filed January 30, 2020, (the "2nd Amended Complaint") as asserts a claim for rescission. Rekor's rescission claim fails to satisfy any of the three necessary elements of a rescission claim, namely, that Rekor lacks an adequate remedy at law, that it is possible to restore the parties to the status quo, and that Rekor promptly sought rescission. Rekor's failure to satisfy any one of these elements would be ground for dismissal of the rescission claim. Rekor's 2nd Amended Complaint is a paradigm of frivolous pleading, it satisfies none of the elements of rescission. Accordingly, Rekor's rescission claim should be dismissed. (The 2nd Amended Complaint, Defendants' Answer with Affirmative Defenses and Counterclaims (the "Answer"), and the Answer to Counterclaims With Affirmative Defenses ("Answer to Counterclaims") are annexed, respectively, as Exhibits 1, 2, and 3 to the accompanying declaration of Robert C. Boneberg.)

Rekor's first cause of action for fraud is based on alleged misrepresentations that occurred prior to January 25, 2017 at which time Rekor acquired two companies of which the Defendants were the majority owners, and all the Defendants became employees of Rekor or a sub-subsidiary thereof. Now, Rekor, desperate to avoid paying Defendants the balance of the purchase price for their companies, is claiming that "fraud" occurred some 30 months before it commenced this action and asks the Court to rescind the Membership Interest Purchase Agreement (the "Purchase Agreement"), which governed the acquisition. (The Purchase Agreement is attached as Exhibit 1 to the 2nd Amended Complaint.)

Rekor's original complaint was 181 paragraphs of frivolous allegations spread over six causes of action. After vigorous editing, Rekor filed an amended complaint, which had 92 paragraphs of, at best, meritless allegations and a single cause of action for fraud.

Rekor now has new counsel who have filed the 2nd Amended Complaint, which continues the ill-begotten fraud claim, and adds new causes of action grounded in Defendants' allegedly wrongful deletion of e-mails.[1] Whatever broom Rekor's new counsel applied to the prior complaint, they have failed to sweep away the debris that constitutes the rescission claim. Rekor's demand for rescission fails and should be dismissed.

### FACTS

Prior to January 25, 2017, the Defendants, together with an entity named Lancer Financial Group, Inc. ("Lancer") owned, in equal 25% shares, an entity called Firestorm Solutions, LLC ("Firestorm Solutions").[2] Firestorm Solutions owned 49% and Jim Satterfield owned 51% of an entity called Firestorm Franchising LLC ("Firestorm Franchising"). (2nd Amended Complaint ¶ 42) (From time to time herein, Firestorm Solutions and Firestorm Franchising are referred to jointly as "Firestorm".)

In the Autumn of 2016, the Defendants and Rekor began to discuss a transaction whereby, in essence, the Defendants and Lancer would sell Firestorm to Rekor, and all the Defendants would become employees of Rekor. The acquisition closed on January 25, 2017 with the execution of the Purchase Agreement.

---

[1] The focus on rescission in this motion does not lessen Defendants' belief that each and every one of Rekor's claims is meritless. Defendants expect that, at the appropriate time and in the appropriate context, all of Rekor's claims will be dismissed, and Defendants will receive judgment on all their counterclaims.

[2] Rekor has not joined Lancer to this action, although it is black-letter law that all parties to an agreement as to which rescission is sought must be made parties to the action. *Frymer v. Bell*, 99 A.D.2d 91, 472 N.Y.S.2d 622 (1st Dep't, 1984); *Tudor v. Riposanu*, 93 A.D.2d 718, 461 N.Y.S.2d 6 (1st Dep't 1983). Rekor's suggestion that Rekor itself has determined Lancer's interests is nonsense. 2nd Amended Complaint ¶ 55.

Rekor alleges that the Defendants deceived Rekor thereby inducing Rekor to enter into the Purchase Agreement. (2nd Amended Complaint ¶ 2). The facts show that, during the time that they were purportedly defrauding Rekor, and thereafter, the Defendants were ignoring their own best interests and working for the betterment of Rekor.

In an action that is the opposite of fraud, when discussions began, Harry Rhulen sent an email to Rekor CEO Robert Berman telling him that the acquisition of Firestorm could not be justified on "a financial measure." Mr. Rhulen suggested that Firestorm's value lay in its brand and intellectual property. (Answer ¶ 255, Exhibit 2, Rhulen E-mail, Oct. 2, 2016).

Further, rather than concealing anything, Defendants provided documents to Rekor that confirmed, as Mr. Rhulen had said, that Firestorm had minimal value under a financial analysis. Thus, Firestorm Franchising and Firestorm Solutions provided their 2015 and 2016 Profit & Loss Statements at the closing of the acquisition. These documents are attached to the 2nd Amended Complaint. (2nd Amended Complaint, Exhibit 1, Purchase Agreement, pp. 75, 83, 88, 90) These Profit & Loss Statements showed that, in 2015 and 2016, the two years immediately before the closing, both Firestorm companies had negative net income. When the two companies' finances are combined, Firestorm's net income was approximately -$98,000 in 2015 and -$31,000 in 2016.

During the same time that Rekor claims that the Defendants were defrauding Rekor, Harry Rhulen and Suzy Loughlin were hired to work for Rekor pursuant to an agreement between Rekor and Firestorm Solutions (the "PSA"). They worked for Rekor, in essence, in the same positions that they were to be appointed to upon the closing, that is, Harry Rhulen acted as President of Rekor, and Suzy Loughlin acted as Rekor's General Counsel and Chief Administrative Officer. During the weeks leading up to the closing, the value of their work under

the PSA exceeded $250,000. Instead of defrauding Rekor, the entire value of their work was contributed to Rekor and subsumed in the closing. (Answer ¶¶ 258-270)

Rekor's fraud theory culminates in its first "cause of action" denominated as "Fraudulent Omission." (2nd Amended Complaint ¶¶ 153-171) Rekor tries to support that claim by alleging that, at the same time that the Defendants were working to make Rekor successful, they were hiding documents from Rekor, that is, documents that concern Firestorm Franchising's relationship with certain of its franchisees. Rekor alleges that the Defendants concealed certain fee abatement confirmations (the "Abatement Confirmations"), which Rekor calls "Side Letters," that reflected fee abatements that Jim Satterfield, the President and CEO of Firestorm Franchising, granted to some franchisees. (2nd Amended Complaint ¶¶ 60-71, 159, 160)

The Abatement Confirmations reflected two different types of fee abatements that reduced two different types of revenue that Firestorm Franchising could receive from certain franchisees. (2nd Amended Complaint ¶¶ 63-66). The first type of revenue was a franchise fee that was paid on the initiation of the relationship. The second type of revenue that may have been affected by an abatement was the flat fee $1000.00 minimum monthly royalty. (The 8% percentage monthly royalty, which might have resulted in revenue that was higher or lower than the $1000.00 flat fee minimum, was unchanged by any fee abatement granted by Jim Satterfield.) (Answer ¶¶ 249-250).

In allegations that undercut its own fraud theory, Rekor alleges that, after the acquisition on January 25, 2017, Jim Satterfield continued to grant fee abatements to franchisees that reduced their various fees and royalties. (2nd Amended Complaint ¶ 109, Answer ¶¶ 251-252). It makes no sense whatsoever for Jim Satterfield to have tried to defraud Rekor by concealing the fee abatements that he granted to some franchisees prior to the acquisition, yet to continue to

grant fee abatements after the acquisition. The only plausible conclusion is that the fee abatements were not part of some fraud, but rather a reflection of one element of Jim Satterfield's broader business strategy.

Another fatal flaw in this part of Rekor's theory is that the Defendants made no effort whatsoever to conceal the reduction in revenue arising from the fee abatements and, in fact, made public disclosures in this regard.[3]

Firestorm Franchising annually filed a publicly available Franchise Disclosure Document. (The March 2016 Firestorm Franchise Disclosure Document (the "Firestorm FDD") is attached to the Answer as Exhibit 1) In Item 5, at page 5, of the Firestorm FDD, Firestorm disclosed to the entire world that "[d]uring our last fiscal year, the initial franchise fee ranged from $0 to $55,000...." Rekor cannot plausibly accuse the Defendants of fraudulently concealing that Firestorm Franchising sometimes abated the initial franchise fee, while, at the same time, the Defendants were disclosing that fact to the public at large.

As to the $1,000 flat fee minimum monthly royalty per franchisee, Rekor alleges that, in 2016, the Defendants disclosed that Firestorm Franchising had ten franchisees. (2nd Amended Complaint ¶ 79). Therefore, according to simple arithmetic, in 2016, Firestorm Franchising should have been receiving royalties in the minimum total amounts of $10,000 per month and $120,000 per year. During the due diligence period, Rekor's auditors had continuous electronic access to Firestorm Franchising's financial books and records. (Answer ¶ 280). It would have been obvious at a glance that Firestorm Franchising was not receiving royalties in the minimum

---

[3] This is not to ignore the specific disclosures that the Defendants made to Rekor during the due diligence period or the fact that Rekor elected to close the transaction without waiting for the completion of its audit of Firestorm. Further, during the due diligence period, neither Rekor nor its auditors came to the Firestorm offices to look at any franchise related documents and neither Rekor nor its auditors contacted any franchisee. (Answer ¶¶ 276 -281).

amount of $10,000 per month. Further, Firestorm Franchising confirmed at the closing in its unaudited year end 2016 Profit and Loss Statement that it had not received $120,000 in minimum royalties, but only $62,757.60. (2nd Amended Complaint, Exhibit 1, Purchase Agreement, p. 90). Rekor's own 2nd Amended Complaint confirms that the financial effect of the royalty abatements was open and available to Rekor by merely looking at the documents attached to the Purchase Agreement.

Rekor's inability to establish a strong inference of an intent to defraud is confirmed when the payment terms of the acquisition are examined. (2nd Amended Complaint ¶ 43, Purchase Agreement, Article 1.4). Defendants were to receive payment in four parts: cash at closing, shares of Rekor, warrants for Rekor stock, and promissory notes that matured five years after the closing. Except for the cash payment, the great majority of the consideration to be paid to Defendants required Rekor to be successful before any value accrued to the Defendants. (As to the cash payment, the $250,000 paid to Suzy Loughlin and Harry Rhulen was roughly equal to the fees due under the PSA for their pre-closing work for Rekor, which was foregone as part of the acquisition.)

At closing, Defendants received shares of Rekor, then named Keystone, which was then a private company. These shares had no market value unless and until Rekor became a public company. Harry Rhulen, in particular, worked to make Rekor a public company by way of a reverse triangular merger both during the due diligence period and after he was formally appointed to be President of Rekor. (Answer ¶¶ 262, 263, 266, 288).

The warrants issued to Defendants as part of the purchase price were also worthless unless two things happened: (1) Rekor became a public company and (2) the market price for Rekor stock was higher than the exercise price for the warrants.

6

Lastly, the promissory notes issued to Defendants, did not mature for five years. (2nd Amended Complaint, Exhibit 1, Purchase Agreement pp. 144-148) Thus, Rekor needed to be viable for five years after the closing for Defendants to be paid on these notes.

Rekor alleges that the Defendants defrauded Rekor to Rekor's detriment. But, at the same time, the Defendants went to work for Rekor and delayed reaping the great majority of the fruits of their alleged fraud until Rekor overcame the effects of the fraud and became a successful public company. In other words, the Court is asked to accept that the Defendants, having successfully defrauded Rekor, went to work for Rekor to help make Rekor a success. Rekor's theory of the case in this regard collapses short of the line of plausibility and fails to establish a strong inference of fraudulent intent.

Even Defendants' acts after they left Rekor give rise to a strong inference not of fraud, but of the opposite, namely, that the Defendants were still working to make Rekor successful and were going so far as to send money to Rekor that was derived from joint business ventures.

In December 2018, the Defendants left Rekor. At that time, the Defendants, who were continuing to try to help Rekor, entered into a new agreement (the "New Agreement") with Firestorm, which still is owned by Rekor. Pursuant to the New Agreement, the Defendants and Firestorm agreed to work jointly on possible business ventures and to share revenue arising therefrom. At this same time, Defendants established counterclaim-plaintiff CrisisRisk Strategies, LLC ("CrisisRisk") through which the Defendants, among other things, performed their obligations under the New Agreement. (Answer, ¶¶ 320-322).

In further activities that are wholly inconsistent with Rekor's fraud theory, the Defendants have been performing under the New Agreement, sending Rekor quarterly reports of the business being conducted, and sharing revenue with Rekor. (Answer ¶¶ 323-328).

In another December 2018 agreement that runs counter to Rekor's fraud claim, in response to a request by Firestorm, Jim Satterfield and Suzy Loughlin agreed to provide consulting services directly to certain Firestorm clients. Not surprisingly, Firestorm refuses to pay them for their services. (Answer ¶¶ 329-331).

During the late Spring or early Summer of 2019, Rekor made the decision to stop all of Firestorm's business operations. In its August 14, 2019 Form 10-Q, Rekor disclosed that it had terminated all of Firestorm's agreements with all of the Firestorm Franchisees. During this same period of time, Jason Russell, who had succeeded Jim Satterfield as President of Firestorm, left Rekor. At the same time that Mr. Russell left Rekor, according to the August 14, 2019 10-Q, Rekor sold Secure Education Consultants, the business that Mr. Russell had been a principal of and which Rekor had acquired when Mr. Russell came to Rekor.[4] As discussed herein, Rekor's 2019 SEC filings confirm the demise of Firestorm.

Also in the Summer of 2019, Defendants Loughlin and Satterfield attempted to exercise or otherwise use the warrants delivered to them at the closing. Rekor refused to honor the warrants and claimed that it had been defrauded years before when it purchased Firestorm. (Answer ¶¶ 361-369).

Rekor commenced this action in August 2019.

---

[4] Rekor did not disclose that Mr. Russell, the President of Firestorm, a Rekor operating division, had left the company. Mr. Russell is held out as the Founder / CEO of Secure Education Consultants on its website www.secureed.com.

8

# ARGUMENT

## Rekor Fails to State a Claim for Rescission, Which Also Fails Because of the Impossibility of Restoring the Parties to the Status Quo and Because of Rekor's Delay in Seeking Rescission

A motion under Rule 12 (c) is decided pursuant to the same standard as a motion to dismiss under Rule 12 (b) (6). *L-7 Designs, Inc v. Old Navy LLC*, 647 F.3d 419, 429 (2d Cir., 2011).[5] On a motion under Rule 12 (c), the Court may consider the pleadings, any attachments thereto, and any matter as to which the Court can take judicial notice. *L-7 Designs, supra,* 647 F.3d at 422. Documents publicly filed with the SEC are among those as to which a Court can take judicial notice. *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC,* 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) ("Pursuant to [Federal] Rule [of Evidence] 201, courts have considered newspaper articles, documents publicly filed with the SEC or FINRA...." (Citations omitted)), *Paulsen v Stifel, Nicolaus & Company, Inc.,* 2019 WL 2415213*3 (S.D.N.Y. 2019) ("Courts in this Circuit have routinely taken notice of public disclosure documents filed with the SEC that are proffered as part of motion to dismiss." (Citations omitted))

Rescission is an "extraordinary remedy." *Syncora Guarantee Inc. v. EMC Mortgage Corporation*, 874 F. Supp. 2d 328, 340 (S.D.N.Y., 2012) Rescission "is to be invoked only when there is lacking a complete and adequate remedy at law and where the status quo may be substantially restored...." *Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 13, 330 N.Y.S.2d 33, 43 (1972) (Citations omitted) (Rescission of transaction for acquisition of business denied where damages appeared adequate and restoration of the status quo was impracticable because the assimilation of the acquired company was complete). Further, a party seeking

---

[5] Paragraph 11.13 of the Purchase Agreement provides that it is to be governed by New York law.

rescission must to so promptly upon the discovery of the fraud. *Banque Arabe Et Internationale D'Investissement v. Maryland National Bank*, 850 F. Supp. 1199, 1211 (S.D.N.Y., 1994) ("Promptness is an element of a *prima facie* rescission action and the burden of proof is on plaintiff.")  A plaintiff cannot avoid the promptness requirement by claiming that it did not have complete knowledge of the fraud. "A party must assert his right to rescind after having had notice of the fraud and the opportunity to investigate." *Banque, supra*, 850 F. Supp. at 1211.

Rekor fails to even allege that it lacks an adequate remedy at law or that it has sought rescission promptly. Rekor does not bother to suggest how the Court might restore the status quo given that Firestorm was absorbed into the Rekor business structure more than three years ago and Rekor now has terminated all Firestorm Franchises and ended all Firestorm business operations. Simply put, Rekor's rescission claim fails under every standard analysis and for additional reasons as well.

A.      **Rekor's Unpleaded Claim For Partial Rescission Fails**

At paragraphs 168-169, and 202, of the 2nd Amended Complaint, Rekor asserts that it is entitled to rescission and that it seeks to rescind the Purchase Agreement and to have the warrants and promissory notes issued to Defendants declared void.  Rekor fails to allege how the rescission of the Purchase Agreement will affect the other agreements between Rekor and the Defendants under the Purchase Agreement, that is, the employment agreement with each Defendant and the confidentiality agreements, called "Proprietary Rights Agreements," provided for in the employment agreements. (2nd Amended Complaint, Exhibit 1, Purchase Agreement, pp. 122-143).

Rekor, without revealing all the facts and circumstances to the Court, is asking the Court to rescind select elements of the acquisition while leaving other elements intact. Rekor fails to

10

allege any basis for this partial rescission.  Rekor fails to allege how the Court can restore the parties to the status quo while keeping the Defendants bound to Rekor by certain contracts that Rekor chooses to omit from its 2nd Amended Complaint. In short, Rekor's rescission claim, which *sub silentio* seeks to retain pieces of the bargain for Rekor's benefit, cannot be sustained. On this basis alone, Rekor's claim for rescission should be dismissed.

### B.      Rekor Has an Adequate Remedy at Law

Rekor has not bothered to allege that it lacks an adequate remedy at law. To the contrary, Rekor suggests that it has an adequate remedy at law at paragraph 170 of the 2nd Amended Complaint when it puts forth an award of damages as alternative relief. Moreover, at page F-8 of Rekor's Form S-1, filed with the SEC on November 28, 2017, Rekor discloses the total consideration for the acquisition of Firestorm as $2,611,393. (Boneberg Dec., Exhibit 4) If Rekor can set forth the dollar value of the acquisition, then, assuming that it prevails on its fraud claim, Rekor can be fully compensated by an award of damages. On this ground also, Rekor's rescission claim should be dismissed.

### C.      It Is Impossible to Restore the Parties to the Status Quo

Rekor has not suggested how the parties can be restored to the status quo, when, as in *Rudman, supra,* Firestorm has been assimilated into Rekor. In addition to the fact that Rekor wants to keep the employment agreements and Proprietary Rights Agreements in place, there are several circumstances that singly and together establish the impossibility of restoring the status quo of January 2017:

(1) Defendants spent two years working at the highest levels of Rekor.  Rekor benefitted by Defendants' work on the Brekford merger, by which Rekor became a public company, and Rekor's subsequent first public offering of securities, and numerous other business activities too

11

numerous to set forth herein. Does restoring the status quo mean that Rekor intends to unwind these transactions or does rescission, in Rekor's world, means that Rekor keeps the value of Defendants' efforts over two years while stripping everything of value from Defendants?

(2) Rekor asks that Defendants be compelled to return common stock to Rekor. But, to the extent that the Defendants have sold any Rekor stock over the past 38 months, how are they to return that stock to Rekor? Or, are Defendants to be forced to pay Rekor the value of such stock, which shows that Rekor has an adequate remedy at law and is not entitled to rescission?

(3) And perhaps most significantly, Rekor has gutted the Firestorm business operations, thus making restoration impossible. Rekor's demolition of Firestorm is confirmed by Rekor's SEC filings.

(a) Thus, at page 11 in Rekor's Form 10-Q, filed on May 14, 2019, Rekor, using the present tense, states that Firestorm "provides services related to crisis management…." With respect to two of Firestorm's operating division, Rekor states that the "BC Management division is an executive search firm" and the "Secured Education division is comprised of an expert team of highly trained former U.S. Secret Service Agents…." (Boneberg Dec., Exhibit 5)

(b) But, all had changed by the time that Rekor filed its Form 10-Q on August 14, 2019. (Boneberg Dec., Exhibit 6) At page 17, Rekor described Firestorm in the past tense stating that Firestorm "provided" services related to crisis management. Also on page 17, Rekor disclosed that it had terminated all Firestorm Franchising franchise agreements[6], that Secure Education had been sold and that Rekor had discontinued the operations of BC Management.  At page 38 of the same 10-Q, Rekor disclosed that Firestorm's 2nd quarter revenue, which had been $660,000 in 2018, had decreased to $275,000 in 2019.

_____

[6] In its Form 10-K, filed on March 30, 2020, Rekor disclosed that it was in litigation with several former Firestorm franchisees.

(c) The demise of Firestorm is confirmed in Rekor's Form 10-Q, filed on November 15, 2019. (Boneberg Dec., Exhibit 7) At page 45 thereof, Rekor discloses that Firestorm's 3rd quarter revenue had dropped from \$1,104,000 in 2018 to \$49,000 in 2019.[7]

(d) In the Answer to Counterclaims, Rekor admits that Firestorm has no employees and that its last employee was terminated in November 2019. (Answer ¶¶ 341, 342, Answer to Counterclaims ¶¶ 138, 139, Boneberg Dec. Exhibits 2 and 3)

Does restoration of the *status quo* mean that Rekor gets millions of dollars in value while Defendants get a blank sheet of letterhead, which is all that remains of the once viable Firestorm? Restoration of the parties to the January 2017 status quo is impossible, and, on this basis also, rescission should be denied.

### D. Rekor's 2nd Amended Complaint Shows That Rekor Failed to Seek Rescission Promptly

The 2nd Amended Complaint itself shows that Rekor failed to seek rescission promptly when it learned of alleged wrong-doing by Defendants.

Thus, Rekor alleges in the section of the 2nd Amended Complaint titled "Defendants' Pattern of Misleading Statements Regarding the Firestorm Business" that Defendants provided misleading information to Rekor when the Defendants provided certain unaudited financial statements at the closing. (2nd Amended Complaint ¶¶ 98-105). But, Rekor admits that it received audited financial statements ("Audited Financials") in June 2017 (2nd Amended Complaint ¶ 99) (The Audited Financials are part of the Rekor Prospectus, filed with the SEC on August 4, 2017.) (Boneberg Dec., Exhibit 8) Rekor admits that the Audited Financials revealed the allegedly misleading financial information that Rekor complains of. (2nd Amended Complaint ¶¶ 102-104)

---

[7] Ironically, it seems likely that some part of Firestorm's continuing revenue, as meager as it may be, is attributable to the revenue sharing aspects of the New Agreement under which the Defendants are continuing to perform in good faith.

Thus, Rekor had documentary evidence of this alleged wrong-doing in June 2017, and Rekor did nothing and failed to seek rescission.

Rekor also alleges, as discussed above, that Defendants concealed certain fee abatements granted by Jim Satterfield with some franchisees that waived the flat fee $1000.00 monthly royalty. The unaudited 2016 Firestorm Franchising Profit & Loss Statement shows annual total royalties received of $62,757.60, which is far less than the $120,000 that should have been received but for the fee abatements. (2nd Amended Complaint Exhibit 1, Purchase Agreement, p. 89). Therefore, Rekor had knowledge of this alleged fraud no later than the closing on January 25, 2017. Further, the June 2017 Audited Financials confirmed that the franchise royalties received in 2016 were $62,758.00, far below the $120,000 pro forma estimate. And, armed with this information, Rekor did nothing.

In addition, Rekor should be charged with having notice no later than the January 25, 2017 closing date that Firestorm Franchising had waived the franchise fee in some circumstances as this fact was publicly disclosed in the March 2016 Franchise Disclosure Document. (Answer, Exhibit 1, Item 5, Page 5). And, again, Rekor did nothing.

Further, as discussed above, Rekor alleges that it was deceived with respect to the "never realized" Beazley deal, which the Defendants allegedly represented that they were "certain that the deal would close imminently." (2nd Amended Complaint ¶¶ 96-97). But, also in June 2017, Rekor's CEO, Robert Berman, sent Harry Rhulen an e-mail in which Mr. Berman told Mr. Rhulen: "I am sure that it's not lost on what this [the Beazley deal] would mean to our IPO … if you are successful with [Beazley]…. [G]ood luck in your meetings with them this week." (Answer ¶ 290, Exhibit 11). Mr. Berman's June 2017 email wishing Mr. Rhulen "good luck" confirms that as of that date Rekor knew that the Beazley deal was neither "certain" nor likely to

close "imminently." And Rekor did nothing in all of 2017 and all of 2018 when the alleged Beazley deal failed to materialize.

In sum, by no later than June 2017, Rekor had knowledge of every one of the allegedly fraudulent circumstances of which it now complains. Yet, Rekor did nothing with respect to its rescission claim.

Further, Harry Rhulen was removed as President of Rekor in October 2018. (See Rekor Form 8-K, filed with the SEC on October 12, 2018.) (Boneberg Dec., Exhibit 9) All the Defendants resigned from each of their Rekor positions in December 2018. (2nd Amended Complaint ¶ 8). Rekor, however, delayed starting this lawsuit until August 2019, by which time, among other things, Rekor had terminated all Firestorm Franchising franchises. (See Rekor 10-Q filed August 14, 2019.)

Although Rekor did not disclose the existence of or basis for its fraud claims for months and years, that is, until August 2019, as Mr. Berman's June 2017 e-mail suggests, Rekor was doing something – raising money. In fact, Mr. Berman's IPO did occur in 2018 and Rekor entered in to loan and credit agreements with various lenders in 2017 and 2018. (See Rekor's August 14, 2019, Form 10-Q, pp. 19, 20, 22 .)  Rekor's non-disclosure of the existence of its alleged fraud claims until August 2019 suggests that Rekor might have been engaged in one of two schemes: (1) Rekor suppressed disclosure of the fraud claims in order to more easily obtain money from potential shareholders and lenders, or (2) Rekor knew that the fraud claims had no factual or legal basis and only concocted them in 2019 in order to disrupt the Defendants' receipt of the balance of the Firestorm purchase price.

Regardless of what Rekor may have been up to, Rekor had actual knowledge of the bulk of its alleged fraud claims no later than June 2017 and had much time and many circumstances

thereafter to investigate the alleged additional wrong-doing by the Defendants, if Rekor had chosen to do so. Nevertheless, Rekor waited until August 2019 before it commenced this action. Rekor did not act promptly in seeking rescission and, therefore, on this basis also, Rekor's claim for rescission should be dismissed.

## CONCLUSION

Rekor's rescission claim fails because Rekor has an adequate remedy at law, because it is impossible to restore the parties to status quo, and because Rekor failed to seek rescission with promptness. Accordingly, Defendants' motion for judgment on the pleadings dismissing Rekor's rescission claim should be granted in its entirety.

Dated: April 26, 2020
    New York, New York

Respectfully submitted,

John J. D. McFerrin-Clancy, Esq.
17 State Street, 40th Floor
New York, NY 10004
jmc@mcferrin-clancy.com
646.771.7377

And

Robert C. Boneberg, Esq.
43 Madison Avenue
Maplewood, NJ 07040
bonebergesquire@gmail.com
973.886.6576

*Attorneys For Defendants and Additional Plaintiff on Counterclaims*

16