UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 03/14/2022

------------------------------------------------------------------------X
:
REKOR SYSTEMS, INC.,                                                     :
:
Plaintiff,            :
:                    19-cv-7767 (LJL)
-v-                                     :
:                    OPINION AND ORDER
SUZANNE LOUGHLIN, et al,                                                 :
:
Defendants.           :
:
------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendants Suzanne Loughlin ("Loughlin"), Harry Rhulen ("Rhulen"), and James

Satterfield ("Satterfield" and, with Loughlin and Rhulen, "Defendants") and additional

counterclaim plaintiff CrisisRisk Strategies, LLC ("CrisisRisk") move, pursuant to Federal Rule

of Civil Procedure 56, for an order granting them partial summary judgment against plaintiff

Rekor Systems, Inc. ("Plaintiff" or "Rekor"): (1) dismissing Plaintiff's first cause of action

against all Defendants (or, in the alternative, dismissing it against Loughlin and Rhulen or to the

extent it seeks rescission); (2) dismissing Plaintiff's third, fourth, and fifth causes of action (or, in

the alternative, dismissing those causes of action against Satterfield and Loughlin, as well as

dismissing the second cause of action against Loughlin); (3) granting summary judgment for

Defendants on their second, third, and fifth counterclaims; (4) granting summary judgment for

CrisisRisk on the nineteenth counterclaim; and (5) granting summary judgment for Satterfield on

the twentieth counterclaim.[1]  Dkt. No. 111.

---

[1] Plaintiff's complaint contains two claims titled "Fourth Cause of Action."  Dkt. No. 64 at 37,
39.  For convenience, the Court will refer to the second of these claims—the claim for trespass to
chattels—as the fifth cause of action.

For the following reasons, the motion for partial summary judgment is granted in part and denied in part.

## BACKGROUND

The following facts are undisputed for purposes of this motion except where otherwise indicated.

This case arises out of the sale of a business owned by Loughlin, Rhulen, and Satterfield to Rekor on January 25, 2017.  Dkt. No. 118 ¶ 34; Dkt. No. 137 ¶ 34.  Loughlin, Rhulen, and Satterfield were each 25% owners of Firestorm Solutions, LLC ("FSLLC").[2]  Dkt. No. 118 ¶ 1; Dkt. No. 137 ¶ 1.  FSLLC also owned 49% of Firestorm Franchising, LLC ("FFLLC" and, together with FSLLC, "Firestorm"), and Satterfield owned the remaining 51% of FFLLC.  Dkt. No. 118 ¶ 3; Dkt. No. 137 ¶ 3.  Prior to the sale of Firestorm, each of the Defendants was an officer of FSLLC.  Dkt. No. 118 ¶ 46; Dkt. No. 137 ¶ 46.  Satterfield was also the Chief Executive Officer ("CEO") and President of FFLLC.  Dkt. No. 118 ¶ 47; Dkt. No. 137 ¶ 47.  The parties dispute the number of employees Firestorm had.  Defendants state that Firestorm had nine employees; Plaintiff contends that Firestorm had five employees.  Dkt. No. 118 ¶ 50; Dkt. No. 137 ¶ 50.

FSLLC was in the business of providing business continuity planning and crisis response services to its customers, and FFLLC operated a group of franchises that marketed and serviced crisis planning services to customers.  Dkt. No. 112 ("Satterfield Decl.") ¶¶ 5–7; Dkt. No. 137 at 32 ("Additional Material Facts") ¶ 25.[3]  In the course of its business, FFLLC entered into franchise agreements.  FSLLC used FFLLC's franchise system as its sales force; frequently,

---

[2] Non-party Lancer Financial Group, Inc. was also a 25% owner of FSLLC.  *Id.* ¶ 2.
[3] Plaintiff's Response to the Rule 56.1 Statement included additional material facts in separately numbered paragraphs starting on page 32 of docket entry 137.

FSLLC provided crisis planning services to customers engaged by franchises of FFLLC. Satterfield Decl. ¶¶ 5–7; Additional Material Facts ¶ 25.

Rekor is a multifaceted business that is publicly traded on the Nasdaq Stock Exchange and provides technology products and professional services for clients in the areas of government contracting, aerospace, public safety, security, transportation, financial services, and logistics.  Dkt. No. 64 ¶ 1.  At all relevant times, Rekor's CEO was Robert Berman ("Berman").  Dkt. No. 118 ¶ 5; Dkt. No. 137 ¶ 5.  Plaintiff submits that Berman has known Loughlin and Rhulen since childhood.  Additional Material Facts ¶ 1.

On January 25, 2017, Rekor purchased Firestorm pursuant to the Purchase Agreement, and FSLLC and FFLLC became sub-subsidiaries of Rekor.  Dkt. No. 118 ¶ 36; Dkt. No. 137 ¶ 36.  In exchange, Loughlin, Rhulen, and Satterfield received cash, shares in Rekor common stock, warrants to purchase Rekor common stock ("Warrants"), and promissory notes ("Promissory Notes").  Dkt. No. 118 ¶ 43; Dkt. No. 137 ¶ 43.  In addition, pursuant to the Purchase Agreement, Loughlin and Rhulen resigned all positions at FSLLC and became officers of Rekor.  Dkt. No. 118 ¶¶ 37–39; Dkt. No. 137 ¶¶ 37–39.  Rhulen became the President of Rekor, and Loughlin became the General Counsel and Chief Administrative Officer of Rekor.  Dkt. No. 118 ¶¶ 38–39; Dkt. No. 137 ¶¶ 38–39.  Satterfield, by contrast, maintained his positions at Firestorm and continued as the President and CEO of FSLLC and FFLLC.  Dkt. No. 118 ¶¶ 40–41; Dkt. No. 137 ¶¶ 40–41.

The parties dispute the circumstances and due diligence surrounding Rekor's acquisition of Firestorm and the representations made regarding the franchising agreements that FFLLC had entered into with various entities.  According to Defendants, in September 2016, Berman proposed to Loughlin that the predecessor entity to Rekor acquire Firestorm.  Dkt. No. 118 ¶ 9.

Plaintiff, on the other hand, submits that Berman and Defendants Rhulen and Loughlin mutually arrived at the acquisition decision.  Dkt. No. 137 ¶ 9; *see also* Additional Material Facts ¶¶ 11–16.  According to Plaintiff, Berman spoke to Loughlin in early 2016 because he was interested in exploring the possibility of launching a franchise business, knew that Loughlin and Rhulen were equity members of a franchise business, and sought to learn the risks and opportunities in the industry generally.  Additional Material Facts ¶ 7.  Plaintiff submits that Loughlin encouraged Berman to speak to Rhulen, who was knowledgeable about the business, and Rhulen indicated to Berman that, given the transactional costs associated with launching a franchise business, Plaintiff might be better served by acquiring an existing franchise business.  *Id.* ¶¶ 8, 11.  From Plaintiff's perspective, Rhulen advised Berman that he believed there were meaningful synergies that could be achieved between Rekor and Firestorm and, over the next several months, Berman, Rhulen, and Loughlin met and discussed possible opportunities for the two companies to collaborate in some manner, including the possibility of a business combination.  *Id.* ¶¶ 12–16.  Defendants offer evidence that Rhulen emailed Berman in October 2016 and stated that the purchase price of Firestorm could not be based on a financial measure.  Dkt. No. 118 ¶ 10; Dkt. No. 114 ("Rhulen Decl.") ¶ 9.

Regarding the franchising agreements, FFLLC began entering into franchise agreements beginning in 2009.  Dkt. No. 118 ¶ 65; Dkt. No. 137 ¶ 65.  According to the FFLLC Franchise Agreement, the franchisee was required to pay to FFLLC an initial franchise fee of $55,000 and a continuing monthly royalty fee of an amount equal to the greater of $1,000 or 8% of the gross revenues.  Dkt. No. 111-6 § 5.  The parties also agree that, prior to the acquisition and continuing afterward, Satterfield granted waivers through side letters ("Side Letters") to certain franchisees with respect to the franchise fee and the minimum continuing royalty that would have been due

4

to FFLLC under the franchising agreements.  Dkt. No. 118 ¶¶ 69–71, 74; Dkt. No. 137 ¶¶ 69–71,

74.  Defendants submit that neither Rhulen nor Loughlin ever participated in the decision to

grant any such waiver, Dkt. No. 118 ¶ 72; Plaintiff states that it is unable to determine the

veracity of this statement without further discovery, Dkt. No. 137 ¶ 72.  *See also* Dkt. No. 118

¶ 49; Dkt. No. 137 ¶ 49 (parties dispute whether Loughlin and Rhulen had duties or

responsibilities with respect to FFLLC).

Plaintiff submits that Defendants neither expressly nor implicitly stated or suggested that

there were any waivers from the franchise fee and royalty requirements and that, while the

franchise agreements, which contained the initial franchise fee and monthly royalty fee

requirements, were provided to it before the acquisition, the Side Letters, which waived certain

of those fees, were not.  Additional Material Facts ¶¶ 19–21, 28, 46–50, 55–57, 67–68; *see also*

*id.* ¶¶ 90–96.  Plaintiff also submits that the existence of the waivers was material and would

have influenced the decision to acquire Firestorm.  *Id.* ¶¶ 22–24.  According to Plaintiff, after the

acquisition, Defendants continued to represent or fail to correct their representation that the

franchisees were obligated to pay an initial franchise fee and a continuing minimum monthly

royalty.  *Id.* ¶¶ 51–52.  Regarding the franchise agreements, Defendants point to evidence that

FFLLC publicly filed Franchise Disclosure Documents ("FDDs") with various state governments

and that the FDDs contained the standard form franchise agreement used by FFLLC.  Dkt. No.

118 ¶¶ 66–68.  The then-current FDD, which was filed in March 2016, disclosed that, during the

last fiscal year, the initial franchise fee ranged from $0 to $55,000.  Satterfield Decl. ¶¶ 8, 11; *id.*,

Ex. 1 at 5.  In response, Plaintiff notes that the FDDs did not identify the specific franchisees that

received waivers.  Additional Material Facts ¶¶ 77–78.  Defendants further discuss evidence

showing that, at a December 2016 board meeting, Plaintiff's predecessor approved the 2017

budget for Firestorm, including FFLLC, which showed revenues less than the aggregate of the minimum monthly fee times the number of franchises.  Dkt. No. 118 ¶ 32; Satterfield Decl. ¶¶ 34–36.  Plaintiff responds that the Firestorm budget did not state that Firestorm had waived any initial franchise fees or minimum monthly royalties and that the board approved the consolidated budget and did not separately approve Firestorm's individual subsidiary budget. Dkt. No. 137 ¶ 32; Additional Material Facts ¶¶ 81–82.  Plaintiff avers that, in 2019, Rekor finally learned that the Side Letters existed.  Additional Material Facts ¶ 97.

Plaintiff also submits that, at the meetings to discuss the possible acquisition, Rhulen and Loughlin informed Berman that Firestorm was on the cusp of consummating a valuable transaction with a British insurance company, Beazley PLC ("Beazley"), wherein Beazley would pay Firestorm a standby fee of $10 to $20 per policy in exchange for retaining Firestorm as its insureds' crisis-management advisor in the event of a coverable crisis.  *Id.* ¶¶ 17–18, 35–36, 53. According to Plaintiff, the purported deal with Beazley was ultimately never consummated.  *Id.* ¶¶ 37, 54.

On December 14, 2018, before Rekor learned of the Side Letters, each of the Defendants submitted a letter of resignation, resigning from his or her respective positions at Rekor or Firestorm, effective as of December 28, 2018.  Dkt. No. 118 ¶ 79; Dkt. No. 137 ¶ 79; Additional Material Facts ¶ 102.  Defendants formed a new company called CrisisRisk and entered into an agreement whereby they would inform Plaintiff of any potential customers covered by Defendants' non-compete agreements with Rekor and Firestorm who contacted them about potential services and would give Firestorm the option to take the engagement or allow CrisisRisk to take the engagement with the understanding that CrisisRisk would share 20% of the

revenue with Firestorm.  Dkt. No. 118 ¶¶ 89–90; Dkt. No. 137 ¶¶ 89–90; Additional Material Facts ¶ 147.

In addition, in December 2018, Satterfield and Loughlin agreed with Firestorm that they would provide services to Firestorm's customers at Firestorm's request and direction and at an agreed upon rate of pay.  Dkt. No. 118 ¶ 94; Dkt. No. 137 ¶ 94.  On or about January 20, 2019, CrisisRisk sent an invoice to Firestorm for work done by Satterfield.  Dkt. No. 118 ¶ 97; Dkt. No. 137 ¶ 97; *see also* Dkt. No. 119 ("Russell Decl."), Ex. 4 (invoice).  Firestorm has not paid the services portion of that invoice.  Dkt. No. 118 ¶ 99; Dkt. No. 137 ¶ 99; *see also* Satterfield Decl. ¶ 43 (stating that the unpaid portion of the invoice amounts to $7,500).  Similarly, on or about February 12, 2019, CrisisRisk sent an invoice to Firestorm for work done by Loughlin. Dkt. No. 118 ¶ 104; Dkt. No. 137 ¶ 104; *see also* Russell Decl., Ex. 6 (invoice for $2,224). Firestorm did not pay this invoice.  Dkt. No. 118 ¶ 106; Dkt. No. 137 ¶ 106; Satterfield Decl. ¶ 44 (stating that no portion of this invoice has been paid).  On February 18, 2019, CrisisRisk sent an invoice to Firestorm for work performed by Loughlin, and Firestorm did not pay the invoice.  Dkt. No. 118 ¶¶ 109, 111; Dkt. No. 137 ¶¶ 109, 111; *see also* Russell Decl., Ex. 5 (invoice for $15,776.60); Dkt. No. 120 ("Lynn Satterfield Decl.") ¶ 5 (stating that no payment has been received for this invoice).  In sum, the amount due on the three invoices totals $25,500.60.

According to Defendants, in January 2019, a finance officer of Rekor asked Satterfield to box and ship papers at the Firestorm office in Georgia to the Rekor headquarters at an agreed rate of $75 per hour.  Satterfield Decl. ¶¶ 47–48.  Rekor subsequently accepted an invoice of $1,537.50 for these services but has failed to pay the amount due.  *Id.* ¶ 48; Lynn Satterfield Decl. ¶ 4.

Until July 2019, Rekor paid monthly interest on Defendants' Promissory Notes; Rekor ceased interest payments in August 2019.  Dkt. No. 118 ¶¶ 115–116; Dkt. No. 137 ¶¶ 115–116. By November 2019, Firestorm's last employee was terminated.  Dkt. No. 118 ¶ 52; Dkt. No. 137 ¶ 52.  Neither FSLLC nor FFLLC has any employees anymore.  Dkt. No. 118 ¶ 53; Dkt. No. 137 ¶ 53.  On March 23, 2021, all of the Defendants attempted to exercise their Warrants.  Dkt. No. 118 ¶ 112; Dkt. No. 137 ¶ 112.  Rekor did not honor the Defendants' attempt to exercise their Warrants.  Dkt. No. 118 ¶ 113; Dkt. No. 137 ¶ 113.

## PROCEDURAL HISTORY

Plaintiff instituted this action by complaint filed on August 19, 2019.  Dkt. No. 1.  On January 30, 2020, Plaintiff filed its second amended complaint ("Complaint"), which is the operative complaint in this matter.  Dkt. No. 64.  The Complaint alleges five causes of action, including causes of action for (1) fraudulent omission (first cause of action); (2) breach of fiduciary duty for Defendants' destruction of corporate property—i.e., emails from their corporate email accounts (second cause of action); (3) violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.*, for Defendants' unauthorized access to their corporate email accounts on company servers and destruction of company emails (third cause of action); (4) conversion for Defendants' destruction of emails and data in their corporate email accounts (fourth cause of action); and (5) trespass to chattels for the same conduct with respect to the data contained in corporate and business email accounts (fifth cause of action).  *Id.* ¶¶ 153–201.

Regarding the first cause of action for fraudulent omission, Plaintiff alleges that, before the Firestorm acquisition closed, Defendants falsely represented to Plaintiff that it had recruited a group of franchisees who had paid an initial franchise fee of $50,000 and had a continuing minimum monthly royalty obligation of $1,000 per month.  *Id.* ¶ 155.  Plaintiff alleges that

Defendants provided the franchise agreements but failed to disclose or provide to Plaintiff the Side Letters pursuant to which Firestorm waived the initial franchise fee and/or minimum monthly royalty rate set forth in the franchise agreements. *Id.* ¶¶ 159–160. Plaintiff also alleges that, in the months before executing the Purchase Agreement for the acquisition of Firestorm, Defendants—and "particularly Defendant Rhulen"—repeatedly represented to Rekor that Firestorm would imminently be executing a major deal with Beazley that would create millions of dollars of recurring revenue for Firestorm but which was never realized. *Id.* ¶¶ 93, 95, 97. As relief, Plaintiff seeks either rescission or damages. *Id.* ¶¶ 168–170. In its remaining claims, Plaintiff alleges that each of the Defendants destroyed emails belonging to Rekor in the time between when they tendered their resignation letters and when those resignations became effective. *Id.* ¶¶ 172–201.

Defendants answered on February 28, 2020. Dkt. No. 71. Along with the answer, Defendants and CrisisRisk[4], as additional counterclaim plaintiff, filed twenty counterclaims against Plaintiff, FSLLC, FFLLC, and nine individuals. *Id*. Defendants later voluntarily dismissed the counterclaims against the individuals named as additional counterclaim defendants.[5] Dkt. No. 73. The counterclaims at issue on this motion are the second, third, fifth, nineteenth, and twentieth counterclaims. The second counterclaim alleges that Rekor breached its obligations to Loughlin and Satterfield by failing to honor the Warrants granted to the two of them in connection with the purchase of Firestorm, Dkt. No. 71 ¶¶ 356–375, and the third

---

[4] For ease of reference, the Court adopts the parties' convention of using the term "Defendants" to also include CrisisRisk when used in reference to the counterclaims.

[5] Loughlin, Rhulen, and Satterfield later sued one of those individuals, Glenn Goord, for breach of fiduciary duty and libel. *See Loughlin v. Goord*, 2021 WL 3932616, at *3 (S.D.N.Y. Sept. 1, 2021), *reconsideration denied*, 2021 WL 4523504 (S.D.N.Y. Sept. 30, 2021). The action was initially filed in state court but was removed to federal court. *See id.* at *3. This Court heard the case and granted the motion to dismiss the complaint with prejudice. *See id.* at *16.

counterclaim alleges that Rekor repudiated its obligations to Rhulen pursuant to the Warrants issued to him, *id.* ¶¶ 376–381.  The fifth counterclaim alleges that Rekor failed to honor the Promissory Notes issued to Defendants in connection with the Firestorm transaction.  *Id.* ¶¶ 389–400.  The nineteenth counterclaim for breach of contract on behalf of CrisisRisk alleges that FSLLC improperly failed to pay CrisisRisk invoices for services performed by it, Loughlin, and Satterfield.  *Id.* ¶¶ 493–497.  The twentieth counterclaim alleges that Rekor breached the agreement it entered into with Satterfield in January 2019 by failing to pay him pursuant to an invoice he issued in February 2019.  *Id.* ¶¶ 498–506.

On November 23, 2020, the Court denied Defendants' motion for judgment on the pleadings to dismiss the complaint against them to the extent it asserted a claim for rescission. *Rekor Sys., Inc. v. Loughlin*, 2020 WL 6898271 (S.D.N.Y. Nov. 23, 2020); *see also* Dkt. No. 104.  The Court concluded: (1) Plaintiff could plead rescission and damages in the alternative; (2) whether restoration of the status quo was possible so as to permit rescission "require[d] further factual development"; and (3) the question whether Plaintiff had promptly sought rescission was "highly fact-intensive" and could not be determined from the pleadings.  *Rekor Sys.*, 2020 WL 6898271, at *5–6.

On April 27, 2021, Defendants and CrisisRisk filed their motion for partial summary judgment.  Dkt. No. 111.  Defendants move for an order dismissing the first cause of action for fraudulent omission, the third cause of action for violations of the CFAA, the fourth cause of action for conversion, and the fifth cause of action for trespass to chattels.  Dkt. No. 127 at 1. They also seek the dismissal of the second cause of action for breach of fiduciary duty against Loughlin.  *Id.*  Defendants also move for an order granting them judgment on the second, third, and fifth counterclaims related to Rekor's failure to honor the Warrants.  *Id.*  Additional

counterclaim plaintiff CrisisRisk moves for summary judgment on the nineteenth counterclaim for breach of contract for FSLLC's failure to pay the CrisisRisk invoices. *Id.* Finally, Satterfield moves for summary judgment on the twentieth counterclaim for Rekor's failure to pay an invoice. *Id.*

By letter filed on April 28, 2021, Plaintiff objected to the motion and asked the Court for an order either holding the motion in abeyance or ordering it withdrawn until the conclusion of discovery. Dkt. No. 124. Plaintiff pointed out that the motion was filed well before the end of fact discovery and before a single document had been produced or a witness deposed, including the ten declarants who submitted declarations in support of the motion. *Id.* The letter documented a history of alleged delay by Defendants with respect to discovery. *Id.* The Court held a hearing on April 30, 2021 at which it advised Defendants that, if it concluded that there were fact issues that needed to be explored in discovery pursuant to Federal Rule of Civil Procedure 56(d), it would exercise the authority to deny the motion for summary judgment. The Court inquired whether, in that event, Defendants would file a new motion for summary judgment at the conclusion of discovery. On May 3, 2021, Defendants and additional counterclaim plaintiff CrisisRisk informed the Court that, were the Court to deny the motion for partial summary judgment pursuant to Rule 56(d), Defendants would not file another motion for summary judgment in the action. Dkt. No. 128. Based on that representation, the Court permitted briefing to proceed and ordered that Plaintiff respond to the motion by June 21, 2021, and Defendants reply by July 9, 2021. Dkt. No. 129. Plaintiff filed its memorandum of opposition as required on June 21, 2021, Dkt. No. 136, and Defendants filed their reply memorandum in further support of the motion on July 9, 2021, Dkt. No. 148. Discovery in this case is scheduled to be completed by April 8, 2022. Dkt. No. 213.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

"[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)). Nor may the non-moving party "rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The non-moving party must also demonstrate more than "some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).[6]

The fact that Defendants' motion was made before documents were exchanged or a deposition taken is not alone dispositive.  Under Rule 56(b), "[u]nless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of discovery."  Fed. R. Civ. P. 56(b).  "The rule protects against premature motions for summary judgment both by requiring the party asserting that a fact is not genuinely disputed to 'cit[e] to particular parts of materials in the record' supporting that proposition, Fed. R. Civ. P. 56(c)(1), and by permitting the non-movant—if unable to either show that the materials cited do not establish the purported fact or to point to contrary facts demonstrating a genuine issue—to 'show[] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition,' Fed. R. Civ. P. 56(d)."  *Chachkes v. David*, 2021 WL 101130, at *5 (S.D.N.Y. Jan. 12, 2021) (alterations in original).

---

[6] The Southern District's Local Civil Rule 56.1 sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented. Any party moving for summary judgment must "annex[] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  L.R. 56.1(a).  Local Rule 56.1(b), in turn, requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  L.R. 56.1(b).  All statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible."  L.R. 56.1(d).  "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  L.R. 56.1(c).

**DISCUSSION**

Defendants move for partial summary judgment seeking the dismissal of the first, third, fourth, and fifth causes of action as to all Defendants and the second cause of action as to Loughlin.  Defendants also seek summary judgment on the second, third, and fifth counterclaims for Defendants, the nineteenth counterclaim for CrisisRisk, and the twentieth counterclaim for Satterfield.  The Court discusses each cause of action in turn.

I.      **Plaintiff's First Cause of Action for Fraudulent Omission**

Defendants move for summary judgment on Plaintiff's first cause of action for fraudulent omission on the theories that the undisputed evidence precludes a finding of reasonable reliance, that Rhulen and Loughlin did not know of the fraudulently omitted information, and that the remedy of rescission is not available.  Dkt. No. 127 at 13–21.

Under New York law, "[t]o establish fraud, a plaintiff must prove a misrepresentation or a material omission of a fact which was known to be false by the defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance, and injury."  *Curtis-Shanley v. Bank of America*, 970 N.Y.S.2d 830, 832 (2d Dep't 2013); *see also Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) ("The elements of fraud under New York law are: [1] a material misrepresentation or a material omission of a fact which was false and known to be false by defendant, [2] made for the purpose of inducing the other party to rely upon it, [3] justifiable reliance of the other party on the material misrepresentation or material omission, and [4] injury." (internal quotation marks omitted)).

Defendants argue that Plaintiff cannot show reasonable reliance as a matter of law because: Rekor was led by sophisticated businesspeople and represented by sophisticated legal counsel; it failed to conduct minimal due diligence; it was provided information that was contrary to its claimed understanding of Defendants' arrangements with its franchisees; and it

14

created and adopted budget projections before the Firestorm closing, relying on revenue information that Defendants claim revealed the information that was allegedly concealed from it. Dkt. No. 127 at 13.  Regarding due diligence, Defendants note that Plaintiff failed to speak to the Firestorm officer in charge of the franchise program and that the then-current FDD disclosed that, during the past fiscal year, Firestorm's franchise fee ranged from $0 to $55,000.  *Id.* at 15. They also point out that Rhulen told Berman that the acquisition of Firestorm could not be justified as "a financial measure," that Firestorm's profit and loss statements showed that in 2015 and 2016 the two companies had negative net income, *id.* at 16, and that the Firestorm budget for 2017 provided to Berman in December 2016 projected revenue from franchise fees of either $3,000 to $4,000 a month—a figure Defendants contend is inconsistent with the claimed understanding that Firestorm was receiving at least $1,000 a month in franchise revenue from each of ten franchisees, *id.* at 16–17.

Reliance paradigmatically raises issues of fact.  *See Guobadia v. Irowa*, 103 F. Supp. 3d 325, 339 (E.D.N.Y. 2015) ("[I]n litigating a common law fraud claim under New York law, a 'determination of reasonable reliance [is] often a question of fact.'" (alteration in original) (quoting *Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, 820 F. Supp. 2d 541, 547 (S.D.N.Y. 2011))); *N. Shipping Funds I, L.L.C. v. Icon Cap. Corp.*, 998 F. Supp. 2d 301, 321 (S.D.N.Y. 2014) ("[R]easonable reliance is often a question of fact for the jury rather than a question of law for the court." (quoting *STMicroelectronics, N.V. v. Credit Suisse Securities (USA) LLC*, 648 F.3d 68, 81 (2d Cir. 2011))).

There are genuine issues of material fact here that preclude summary judgment in favor of Defendants.  Evidence that Berman is sophisticated and that Rekor was represented by counsel is relevant to the issue of reasonable reliance, but it is not dispositive of it.  *See Crigger*

*v. Fahnestock & Co.*, 443 F.3d 230, 235 (2d Cir. 2006) ("In assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 195 (2d Cir. 2003))); *Childers v. New York & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 310 (S.D.N.Y. 2014) ("While 'a sophisticated plaintiff cannot establish . . . justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it,' this rule does not alter the general rule that 'the inquiry [into the reasonableness of reliance] is fact-specific' and 'the entire context' is to be considered." (alteration in original) (quoting *Universe Antiques, Inc. v. Vareika*, 826 F. Supp. 2d 595, 609 (S.D.N.Y. 2011))).  Even sophisticated businesspeople can be victims of fraud.  Here, according to Plaintiff's version of the facts, the role of counsel was to negotiate the deal documents including a representation from Defendants that all material contracts attached to a schedule were complete.  Dkt. No. 143 ("Berman Decl.") ¶ 65.  And even if Berman were sophisticated, that would not give Defendants license to tell him one thing and then conceal from him facts peculiarly in Defendants' possession that would demonstrate something to the contrary.  *See Dexia SA/NV v. Bear, Stearns & Co.*, 929 F. Supp. 2d 231, 243 (S.D.N.Y. 2013) ("[E]ven a sophisticated party may rely on the representations of another where the facts misrepresented were peculiarly within the Defendants' knowledge." (internal quotation marks omitted)); *4Connections LLC v. Optical Commc'ns Grp., Inc.*, 618 F. Supp. 2d 178, 185 (E.D.N.Y. 2009) ("Even sophisticated businessmen, however, may justifiably rely on a representation unless the information it has access to would have alerted them to the untruthfulness of the representations.").  Nor was Plaintiff required as a matter of law to speak to the Firestorm officer

in charge of the franchise program on pain that, if it did not, Defendants could lie or fraudulently omit facts regarding the franchise arrangements.  Due diligence can take a variety of forms and still be reasonable.  Berman had his Chief Financial Officer Riaz Latifullah ("Latifullah") consider the wisdom of the acquisition and meet and speak with Defendants, including Satterfield, and heard as a result of that diligence the same story—that each franchisee paid a $55,000 initial franchise fee and a minimum monthly royalty of either $1,000 or 8% of gross revenues.  Berman Decl. ¶ 55.  Latifullah collected copies of the franchise agreements that were provided by Satterfield's wife; he was not given the Side Letters.  Dkt. No. 145 ("Latifullah Decl.") ¶¶ 20–21.  Rekor asked that all of Firestorm's material contracts be uploaded into the parties' shared folder data room; Satterfield stated in an email that "all the Franchisee agreements [have been uploaded] to the document site."  Additional Material Facts ¶ 65.  Berman himself reviewed Firestorm's contracts in the data room and did not see the Side Letters.  Berman Decl. ¶ 68.  According to Latifullah, none of the documents in the due diligence shared folder identified any specific franchisees as being exempt from the initial franchise fees or minimum monthly royalties.  Latifullah Decl. ¶ 24.  Whether these facts demonstrate reasonable reliance or whether, to the contrary, such reliance is lacking is a question for the jury.

As to Rhulen's statement to Berman, the FDD disclosure, and the profit and loss statements and budget, Plaintiff has offered declarations and admissible evidence that raises genuine issues of fact.  Berman has declared that both Rhulen and Loughlin told him that the franchisees each paid an initial franchise fee and had minimum monthly obligations of the greater of $1,000 per month or 8% of gross revenues, adding that the franchisees usually did not pay more than $1,000 per month.  Berman Decl. ¶¶ 19, 30, 40.  Rekor's then-CFO Latifullah has declared to the same effect.  Latifullah Decl. ¶¶ 12–13.  Next, Berman has explained the

statement from Rhulen to him about Firestorm's historic financial performance—both he and Rhulen agreed "that Firestorm could not be solely valued on its historic, rather meagre financial performance.  [Rhulen] stated that its true value rested in future prospects, its valuable intellectual property ('IP'), and its human capital."  Berman Decl. ¶ 57.  So understood, Rhulen's statement would not necessarily have alerted Berman to the existence of the Side Letters.  The point was forward-looking—that Rekor should value Firestorm not on what it had earned but on what it could earn.  Moreover, the profit and loss statements did not reveal whether the losses stemmed from incurred expenses or issues with properly booking franchise fees as opposed to outright waivers of initial franchise fee payments or minimum monthly royalty payments by Side Letters with certain franchisees.  *Id.* ¶ 71.  Thus, they would not necessarily have put Rekor on alert that the franchisees had been relieved of any legal obligation to make such payments.  Similarly, according to Plaintiff's version of events, the budget materials did not state that Firestorm had waived any initial franchise fees or minimum monthly royalties; the budget was presented at the Rekor board meeting only as part of a consolidated budget where the discussion was on topline revenue, expenses, and net income and not of Firestorm's budget.  Latifullah Decl. ¶¶ 29–30.  Further, Berman has explained that the initial franchise fee disclosures were important and material to him not because they reflected the discounted present value of the Firestorm enterprise but because they indicated how attractive the Firestorm product was. Berman Decl. ¶ 44.  On that understanding, they would not have given Berman reason to believe that Rhulen and Loughlin had lied to him or that, in addition to the franchise agreements that were placed in the data room, there also were undisclosed Side Letters that changed the terms of those agreements.

Plaintiff has also pointed to other evidence to show that it exercised due diligence.  It insisted that the Purchase Agreement include a warrant/representation that all material contracts had been provided.  *Id.* ¶ 59.  On its part, Rekor would not provide Defendant a reciprocal due diligence warrant/representation.  *Id.* ¶¶ 59, 66.  It hired Rhulen and Loughlin even before the transaction closed and expected them to protect Rekor's interests, including in connection with finalizing the Firestorm acquisition.  *Id.* ¶ 76.

The Court also cannot grant Rhulen or Loughlin summary judgment on the claims that they did not know of the Side Letters.  The primary evidence upon which Defendants rely comes from Rhulen and Loughlin themselves in the form of their declarations.[7]  Dkt. No. 127 at 18–19 (citing Rhulen and Loughlin declarations).  But Rhulen and Loughlin are interested parties, and, at the time of the motion for summary judgment, they had not been subject to deposition nor had Plaintiff had the opportunity to take any other discovery to challenge their assertions.  *See* Dkt. No. 140 ("Glatter Decl.") ¶ 18 (stating that Rekor requires discovery "to test the credibility of these representations" and that the discovery sought includes "conducting a review of Defendants' production for all relevant documents," "questioning the Defendants under oath," and "third-party discovery of Firestorm employees, customers, franchisees, and others").  The Court therefore denies summary judgment under Rule 56(d).  *See Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings Inc.*, 33 F. Supp. 3d 455, 491 (S.D.N.Y. 2014) ("Pursuant to Rule 56(d),

---

[7] Defendants also cite to the declarations of Satterfield and Jim Squire ("Squire"), an officer of FFLLC.  But Satterfield does not support that Rhulen and Loughlin were unaware of the Side Letters.  He merely states that Loughlin and Rhulen did not have "anything to do with" a waiver of the minimum royalty, Satterfield Decl. ¶ 15, and that he did not seek approval or consent for any fee waiver from Loughlin or Rhulen, *id.* ¶ 10.  Nor does Squire establish Rhulen and Loughlin's lack of knowledge.  He merely states that, to his knowledge, Satterfield alone made the decision whether a particular waiver would be granted and that Squire never communicated with Rhulen or Loughlin regarding a waiver, received instructions from them regarding waivers, or sent them the Side Letters.  Dkt. No. 122 ¶ 6.

Fed. R. Civ. P., where a party opposing summary judgment shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; [or] (2) allow time to . . . take discovery.  That declaration must detail, among other things, what facts are sought and how these facts are reasonably expected to create a genuine issue of material fact." (internal quotation marks omitted)), *aff'd sub nom. Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85 (2d Cir. 2017).

Moreover, even leaving aside the fact that Plaintiff has not had the opportunity to test Defendants' self-serving statements by deposition, fact issues would remain.  Each of Rhulen and Loughlin were indirect owners of at least 12% of FFLLC's membership interests by virtue of their 25% interest in FSLLC, Berman Decl. ¶ 53, and thus had both the opportunity to know about FSLLC's business and, through the consideration they received in the Firestorm transaction, a motive not to reveal the weaknesses of that business.  *See, e.g.*, *Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 155 (S.D.N.Y. 2004) ("Scienter may be proved through circumstantial evidence by establishing facts showing a motive for committing fraud and a clear opportunity to do so." (emphasis omitted)); *Negrete v. Citibank, N.A.*, 237 F. Supp. 3d 112, 123–24 (S.D.N.Y. 2017) ("To establish th[e] requisite inference [of fraudulent intent], a plaintiff must plead facts that: (i) demonstrate the defendant's motive and opportunity to commit or assist in the fraud, or (ii) constitute strong circumstantial evidence of the defendant's conscious misbehavior or recklessness." (internal quotation marks omitted)), *aff'd*, 759 F. App'x 42 (2d Cir. 2019).  Moreover, in meetings, both Rhulen and Loughlin touted their involvement with all aspects of the business and repeatedly explained that FFLLC served as FSLLC's *de facto* sales force.  Berman Decl. ¶¶ 52–53.  In conversations about the business, neither ever suggested that

they lacked adequate knowledge or information about FFLLC or FSLLC's management or operations.  *Id.* ¶ 42; Latifullah Decl. ¶ 11.

Defendants argue that they are entitled to summary judgment on Rekor's claim for rescission because the status quo may not be substantially restored, Rekor failed to seek rescission promptly upon discovery of the fraud, and Rekor has an adequate remedy of law because it is seeking damages in the alternative.  Dkt. No. 127 at 19.  They argue that Rekor cannot be restored to its prior status because there is no feasible process for erasing the contributions Rhulen and Loughlin made to the company and Firestorm cannot be restored to its status quo because the company no longer has employees, an office, or business, and because all franchises have been cancelled.  *Id.* at 20.

In response, Plaintiff relies upon the declaration of Donald May ("May"), Ph.D., a former professor at the Massachusetts Institute of Technology.  Dkt. No. 136 at 33.  May opines that the bulk of Firestorm's equity value of $2.6 million at the time of purchase was reflected in intellectual property held by FSLLC and that Firestorm's current intrinsic value is equal to or higher than its value at the time of purchase.  Dkt. No. 138.  Defendants reply that the value of a literal or electronic box of intellectual property is not equivalent to the existence of FSLLC and FFLLC as living thriving businesses.  Dkt. No. 148 at 12.  This dispute requires factual development.

For the reasons given, the Court denies Defendants' motion for partial summary judgment as to the first cause of action.

## II.   Plaintiff's Third, Fourth, and Fifth Causes of Action Related to Defendants' Alleged Destruction of Emails

Defendants argue that they are entitled to summary judgment on Plaintiffs' three claims relating to the alleged destruction of emails: the third cause of action alleging a violation of the

CFAA, the fourth cause of action for conversion, and the fifth cause of action for trespass to chattels.  Dkt. No. 127 at 22–27.  Although Defendants dispute that they destroyed emails, they argue that the claims would be deficient even if they had done so because: (1) the CFAA does not apply to acts undertaken by employees; (2) there is no evidence that Defendants ever misappropriated the emails (because they were merely transferred to company laptops); (3) Rekor never demanded return of the emails (and thus a claim for conversion does not lie); (4) Plaintiff suffered no harm and incurred no recoverable damages as a result of the alleged removal of emails; and (5) the emails belonged to Firestorm and not to Rekor and thus Rekor itself has no claim.  *Id.*  The Court first identifies those material facts that are undisputed and those that are disputed and then analyzes each claim independently.

## A.    The Material Facts

The undisputed facts are as follows.  At all relevant times, Rhulen, Loughlin, and Satterfield each had a Firestorm email address at which they received and sent emails.  Dkt. No. 118 ¶ 55; Dkt. No. 137 ¶ 55.  Those email accounts were maintained independently from any email accounts at Rekor.  Dkt. No. 118 ¶ 56; Dkt. No. 137 ¶ 56.  After the Firestorm acquisition closed on January 25, 2017, Loughlin and Rhulen had Rekor email addresses at which they sent and received emails.[8]  Dkt. No. 118 ¶ 57; Dkt. No. 137 ¶ 57.  Satterfield never had a Rekor email address.[9]  Dkt. No. 118 ¶ 58; Dkt. No. 137 ¶ 58.  As noted previously, on December 14, 2018, each of the three Defendants resigned from their positions at Rekor or Firestorm, effective

---

[8] The Rekor email addresses had the domain name of either @keystonewins.com or @novume.com; Keystone and Novume were predecessors to Rekor.  Dkt. No. 137 ¶ 57.

[9] Defendants assert that Firestorm maintained a computer server in the Firestorm office in Georgia on to which the emails of various Firestorm employees was backed up.  Dkt. No. 118 ¶ 59.  Plaintiff asserts it cannot determine the veracity of this statement without further discovery.  Dkt. No. 137 ¶ 59.  Rekor does not have possession, custody, or control of the Firestorm server and contends it is not able to determine its existence or location without further discovery.  *Id.* ¶ 62.

December 28, 2018.  Dkt. No. 118 ¶¶ 78–79; Dkt. No. 137 ¶¶ 78–79.  After December 28, 2018, however, Loughlin continued to have access to her Rekor email account with the express permission of Berman, and she continued to perform services on behalf of Rekor and Firestorm after her resignation.  Dkt. No. 118 ¶¶ 84, 87; Dkt. No. 137 ¶¶ 84, 87.

According to Plaintiff, in June 2019, Rekor realized that numerous emails likely were missing from Defendants' Firestorm email accounts, Additional Material Facts ¶ 116, and, through counsel, sent a letter to Defendants stating that Plaintiff had found evidence that their Firestorm email accounts were purged at or about the time their employment with Firestorm had ended, *id.* ¶ 141; Latifullah Decl. ¶ 64; *id.*, Ex. V.  In particular, Loughlin's Firestorm email account was missing sent emails for November 2014, August 2015, April and May 2016, May 2018, and August through November 2018 (i.e. the last four months before her departure from the company).  Additional Material Facts ¶ 117.  Rhulen's Firestorm email account had no emails in his inbox from before December 24, 2018 (four days before he left the company) other than two calendar invites from September 2017, and his account had no sent emails other than one accepted calendar invite from December 28, 2018, the day he left the company.  *Id.* ¶ 118. Satterfield had no emails in his inbox on his Firestorm email account from before December 5, 2018, and no sent emails from before January 5, 2019.  *Id.* ¶ 119.  When Satterfield returned his laptop, a Firestorm employee informed Rekor employees that he would wipe the laptop and prepare it for another user.  *Id.* ¶ 144.  Satterfield's laptop was redeployed to a Rekor employee. *Id.*  In May 2020, Plaintiff's discovery vendor Ricoh USA, Inc. ("Ricoh") performed a forensic examination of the laptop but was unable to recover any of Satterfield's data.  *Id.* ¶ 145.  Ricoh invoiced Plaintiff the $6,095 cost for its services.  *Id.* ¶ 146.

Defendants deny that they misappropriated or destroyed Rekor or Firestorm emails. Regarding Satterfield's Firestorm emails, Satterfield has declared that he followed a practice of transferring all of his emails to his company laptop where he kept them in folders for the projects he was working on. Satterfield Decl. ¶¶ 49–52. He states that, upon his departure, all of his emails were both on his company laptop and backed up on the Firestorm server, which was located in Georgia. *Id.* ¶¶ 53–54. Loughlin states that, after she resigned from Rekor, she was given permission from Berman to continue to use her Rekor email account. Loughlin Decl. ¶ 30. There came a time when she was asked to return her laptop to Rekor, but, at her request and after she began to volunteer her services for Rekor, she was allowed to retain the laptop. *Id.* ¶ 31. Loughlin states that she did not engage in a mass deletion of emails or use her company laptop or manage her emails any differently after December 14, 2018 than before. *Id.* ¶ 32. She states that she had many thousands of work-related emails on her company laptop prior to December 14, 2018, and those emails remain on her laptop today. *Id.* Loughlin moved some emails into folders on her laptop in accordance with her ordinary email management practices. *Id.* Rhulen too denies that he mass deleted emails or that he managed his emails any differently after December 14, 2018 than he did before. Rhulen Decl. ¶ 36. Like Loughlin, Rhulen had thousands of work-related emails on his company laptop, and he may have moved some emails into folders on his company laptop. *Id.* All three Defendants swear that Plaintiff never requested a return of the emails. Satterfield Decl. ¶ 57; Loughlin Decl. ¶ 33; Rhulen Decl. ¶ 36.

Plaintiff does not offer facts to dispute these assertions, but it points out that it has not had the opportunity to depose Defendants and thus cannot "precisely determine exactly when the Defendants accessed their data, including after their resignation." Glatter Decl. ¶ 20. Plaintiff also states that "discovery is necessary to identify specifically what emails Defendants deleted or

destroyed, when Defendants did so, and why they did so." *Id.*  It asserts that by the time Rekor

realized that numerous emails were likely missing from the Firestorm accounts, Microsoft 365

audit logs showing activity on Firestorm email accounts from before March 2019 were no longer

available, that Defendants never informed Rekor that they were transferring emails from their

email accounts to company laptops or that the emails were available on a company server,

company laptop, or other location accessible to Rekor or Firestorm, and that, after Defendants'

departure, Rekor did not have remote access to their laptops.  Additional Material Facts ¶¶ 120,

122–125, 127–129, 131–134.  It further asserts that it was not informed by Satterfield that there

was a computer server in the Georgia office, that Firestorm employees did not inform it of the

server, and it did not knowingly or intentionally abandon the server.  *Id.* ¶¶ 136–140.

> **B.      Third, Fourth, and Fifth Causes of Action Dismissed as to Satterfield**

Defendant Satterfield moves for summary judgment on Plaintiff's CFAA, conversion,

and trespass-to-chattels claims against him on the grounds that he was only an employee of

Firestorm and that the emails he allegedly accessed were the property of Firestorm and not of

Rekor.  Dkt. No. 127 at 3, 25–26.  He thus argues that Rekor does not have a direct claim against

him for any of those torts.  *Id.*  Plaintiff does not defend against those arguments by Satterfield

and instead states that it is prepared to dismiss those claims against him.  Dkt. No. 136 at 35.  In

light of Plaintiff's abandonment of those claims against Satterfield, the Court dismisses the third,

fourth, and fifth causes of action as to Satterfield.  *See Triodetic Inc. v. Statute of Liberty IV,*

*LLC*, 582 F. App'x 39, 40 (2d Cir. 2014) (summary order) ("[P]laintiff never raised these

arguments in its opposition to defendants' motion for summary judgment.  Accordingly, these

arguments were waived."); *Avillan v. Donahoe*, 2015 WL 728169, at *7 (S.D.N.Y. Feb. 19,

2015) ("Where a party fails to raise an 'argument in his opposition to summary judgment,' that

'argument has been waived.'" (quoting *Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004))).

### C.     CFAA

The CFAA makes it illegal for an individual to "intentionally access[] a computer without authorization or [to] exceed[] authorized access, and thereby obtain[]: . . . (C) information from any protected computer."  18 U.S.C. § 1030(a)(2)(C).  The statute provides a private civil cause of action in favor of "[a]ny person who suffers damage or loss by reason of a violation of this section . . . against the violator" so long as the conduct involves one of a number of factors, 18 U.S.C. § 1030(g), including as is relevant here that the offense involved "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value," *id.* § 1030(c)(4)(A)(i)(I).[10]  Put another way, "[t]o state a claim for loss in excess of $5,000, Plaintiff must plead that Defendant: (1) accessed a 'protected computer'; (2) 'without any authorization or exceeding its authorized access'; and (3) caused 'loss' in excess of $5,000."  *Better Holdco, Inc. v. Beeline Loans, Inc.*, 2021 WL 3173736, at *3 (S.D.N.Y. July 26, 2021) (quoting *LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 511 (S.D.N.Y. 2015)).  "The scope of civil actions permitted under [the CFAA] . . . has always been limited."  *Hancock v. County of Rensselaer*, 882 F.3d 58, 63 (2d Cir. 2018).

The statute defines "exceeds authorized access" to mean "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accessor is not entitled so to obtain or alter."  18 U.S.C. § 1030(e)(6).  "[A]n individual 'exceeds authorized access' when he accesses a computer with authorization but then obtains information located in particular areas of the computer—such as files, folders, or databases—that are off limits to him."  *Van Buren v. United States*, 141 S. Ct. 1648, 1662 (2021).  By contrast, under the CFAA, individuals do not exceed authorized access when they "have improper motives for

---

[10] For this type of violation, civil damages are limited to economic damages.  *See* 18 U.S.C. § 1030(g).

obtaining information that is otherwise available to them." *Id.* at 1652.  Courts have held that the CFAA "does not apply to a 'so-called faithless or disloyal employee'—that is, an employee who has been granted access to an employer's computer and misuses that access, either by violating the terms of use or by breaching a duty of loyalty to the employer." *Chefs Diet Acquisition Corp. v. Lean Chefs, LLC*, 2016 WL 5416498, at *6 (S.D.N.Y. Sept. 28, 2016) (citing *Advance Watch Co. v. Pennington*, 2014 WL 5364107, at *1, *3–4 (S.D.N.Y. Oct. 22, 2014)).

The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  18 U.S.C. § 1030(e)(11); *see also Garland-Sash v. Lewis*, 2011 WL 6188712, at *4 (S.D.N.Y. Dec. 6, 2011) ("'[L]oss' under the CFAA means 'any remedial costs of investigating the computer for damage, remedying the damage and any costs incurred because the computer cannot function while or until repairs are made.'" (quoting *Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 474 (S.D.N.Y. 2004)), *aff'd*, 166 F. App'x 559 (2d Cir. 2006).  "Thus, for example, a covered loss likely would include costs stemming from efforts to identify, diagnose, or address damage to the protected device or from an interruption of service, and the costs involved in investigating the damage to the computer system." *Better Holdco*, 2021 WL 3173736, at *4 (internal quotation marks and citations omitted).  "Damage" is defined as "any impairment to the integrity or availability of data, a program, a system, or information."  18 U.S.C. § 1030(e)(8). Further, in *Van Buren*, the Supreme Court noted that "[t]he statutory definitions of 'damage' and 'loss' . . . focus on technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data." *Van Buren*, 141 S. Ct. at 1660.  Both

before and after the Supreme Court's decision in *Van Buren*, "courts in this District [have] interpreted the CFAA to require 'loss' related to damage or impairment of the target computer itself." *El Omari v. Buchanan*, 2021 WL 5889341, at *14 (S.D.N.Y. Dec. 10, 2021).

Defendants are entitled to summary judgment on Plaintiff's CFAA claim. Plaintiff fails to identify any facts that it either has or could obtain from discovery to support that the Defendants either accessed their email accounts "without authorization" or exceeded "authorized access, and thereby obtain[ed] . . . information from any protected computer." 18 U.S.C. § 1030(a)(2), (a)(2)(C). To the contrary, Plaintiff's theory is that, in the two weeks after Defendants gave notice and while they were still employees, Defendants violated company policy and destroyed company documents by accessing the email accounts and deleting the emails.[11] *See* Dkt. No. 64 ¶ 131 (alleging that, "at some point before their resignations became effective," Loughlin and Rhulen accessed their corporate email accounts and deleted a mass quantity of their email accounts); *id.* ¶ 185 ("*Before their resignations became effective*, Defendants intentionally accessed their corporate email accounts on company servers without authorization or beyond their authorized access in order to view and destroy their company

---

[11] Plaintiff argues that it is premature to grant summary judgment on the CFAA claim because it has not had the opportunity to depose Defendants on when precisely they accessed their computers. Dkt. No. 136 at 34. In particular, Plaintiff's Rule 56(d) declaration states that "Plaintiff cannot, absent further discovery, precisely determine exactly when the Defendants accessed their data, *including after their resignation*." Glatter Decl. ¶ 20 (emphasis added). But, as discussed, the Complaint repeatedly alleged that Defendants accessed their email accounts *before* their resignations became effective. And "[a] court is free to reject a non-movant's Rule 56(d) request if it is based 'only on speculation as to what potentially could be discovered.'" *Better Angels Soc'y, Inc. v. Inst. for Am. Values, Inc.*, 419 F. Supp. 3d 765, 779–80 (S.D.N.Y. 2019) (quoting *In re Dana Corp.*, 574 F.3d 129, 149 (2d Cir. 2009)). "Rule 56(d) is meant to shield a party against the entry of summary judgment where it has not had an adequate opportunity to defend—a party cannot weaponize Rule 56(d) to fish for evidence in the hopes of finding out whether it has a claim." *All Am. Tel. Co., Inc. v. A T & T Corp.*, 328 F. Supp. 3d 342, 358 (S.D.N.Y. 2018).

emails, thereby severely impairing the integrity and availability of data on those servers." (emphasis added)).  But that theory, if supported by evidence, might establish a violation of company policy; it would not establish that Defendants "obtain[ed] information located in particular areas of the computer—such as files, folders, or databases—that are off limits to [them]."  *Van Buren*, 141 S. Ct. at 1662; *see also JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 523 (S.D.N.Y. 2013) ("When an employee who has been granted access to an employer's computer misuses that access, either by violating the terms of use or by breaching a duty of loyalty to the employer, the employee does not 'exceed authorized access' or act 'without authorization.'"); *Advance Watch*, 2014 WL 5364107, at *4.

Loughlin and Rhulen are entitled to summary judgment on the third cause of action under the CFAA.

### D.   Conversion

Defendants argue that they are entitled to summary judgment on Plaintiff's claim of conversion for three reasons: (1) they did not engage in mass deletion of emails but simply moved emails to folders on their company laptops; (2) they did not exercise ownership rights over the emails or attempt to exclude Rekor from exercising its rights in the emails; and (3) Rekor never demanded the return of the emails, which were initially lawfully possessed by Defendants.  Dkt. No. 127 at 23–24.

"A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession."  *Colavito v. New York Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006).  Its key elements are "(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights."  *Id.* (citations omitted); *see also Pappas v. Tzolis*, 982 N.E.2d 576, 580 (N.Y.

2012).  "Under the law of New York, an electronic record stored on a computer is subject to a claim of conversion."  *Kim v. Lee*, 2021 WL 6052122, at *12 (S.D.N.Y. Dec. 20, 2021) (citing *Thyroff v. Nationwide Mutual Ins. Co.*, 864 N.E.2d 1272, 1277–78 (N.Y. 2007)); *see also People v. Alynikov*, 104 N.E.3d 687, 698 (N.Y. 2018) ("*Thyroff* is best read . . . as treating the allegedly converted information as intangible property." (emphasis omitted)).  Such a claim lies when the defendant exercises rights of ownership over goods belonging to another to the exclusion of the rights of the owner.  *See Capricorn Mgmt. Sys., Inc. v. Gov. Emps. Ins. Co.*, 2019 WL 5694256, at * 19 (E.D.N.Y. July 22, 2019) (holding that defendants must have exercised unauthorized dominion to the exclusion of plaintiff's rights as an owner in order for a conversion claim to lie); *Fischkoff v. Iovance Biotherapeutics, Inc.*, 339 F. Supp. 3d 408, 414–16 (S.D.N.Y. 2018) (holding that there was no conversion where plaintiff was not denied use of original files); *Ctr. for Rheumatology, LLP v. Shapiro*, 118 N.Y.S.3d 380 (N.Y. Sup. Ct. 2019).[12]

Defendants are not entitled to judgment on the claims against Loughlin and Rhulen.  The argument that Loughlin and Rhulen did not engage in mass deletion of emails because the emails were moved to their laptops is premature and not an appropriate basis for summary judgment based on the filings before the Court.  Plaintiff has offered evidence that would support that there was a large deletion of emails or removal of emails from the accounts and, although Defendants have explained the gaps in the emails, Plaintiffs have not had the opportunity to test that explanation through depositions and other discovery.  In addition, although the only allegedly

---

[12] Although there are at least "scattered decisions that suggest that copying of data may constitute conversion," *Fischkoff*, 339 F. Supp. 3d at 415 (citing *Clark St. Wine & Spirits v. Emporos Sys. Corp.*, 754 F. Supp. 2d 474, 484 (E.D.N.Y. 2010); *Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F. Supp. 2d 609, 618 (S.D.N.Y. 2003); and *New York Racing Ass'n v. Nassau Regional Off-Track Betting Corp.*, 909 N.Y.S.2d 866 (N.Y. Sup. Ct. 2010)), the Court adheres to the majority rule absent more definitive guidance from the New York Court of Appeals.

missing emails were from their Firestorm accounts, Plaintiff has proffered evidence that by virtue of their employment agreements with Rekor, both Loughlin and Rhulen agreed that "[a]ll documents, records, data . . . whether or not pertaining to Confidential Information . . . , which . . . are produced by the Executive in connection with the Executive's employment will be and remain the sole property of [Rekor]."  Additional Material Facts ¶¶ 99–100.  Such evidence is sufficient at this stage to raise a triable issue regarding whether the emails generated after Loughlin and Rhulen ceased to be employees of Firestorm constituted property of Rekor.

Finally, although there is no evidence that Plaintiff demanded the return of the emails, the law in New York is that "[i]f possession of the property is originally lawful, a conversion occurs when the defendant refuses to return the property after a demand *or sooner disposes of the property*."  *White v. City of Mount Vernon*, 633 N.Y.S.2d 369, 370 (2d Dep't 1995) (emphasis added); *see also Polanco v. NCO Portfolio Mgmt., Inc.*, 132 F. Supp. 3d 567, 588 (S.D.N.Y. 2015) (quoting *Leveraged Leasing Admin. Corp. v. PacifiCorp. Cap., Inc.*, 87 F.3d 44, 49–50 (2d Cir. 1996)) (same); *Pac. M. Int'l Corp. v. Raman Int'l Gems, Ltd.*, 888 F. Supp. 2d 385, 396 (S.D.N.Y. 2012) (same); *Regions Bank v. Wieder & Mastroianni, P.C.*, 526 F. Supp. 2d 411, 414 (S.D.N.Y. 2007) ("When a defendant's possession of the property was initially lawful, there is no conversion unless the defendant refuses the owner's demand to return the property or wrongfully transfers or disposes of it before a demand is made."), *aff'd*, 268 F. App'x 17 (2d Cir. 2008).  Further, under New York law, "[r]eturning property to the rightful owner does not absolve defendants of all liability from the alleged conversion, and a claim will exist even when the deprivation is partial or temporary."  *Fischkoff*, 339 F. Supp. 3d at 414.  Plaintiff is entitled to depose Defendants on whether they disposed of Plaintiff's property before Plaintiff had the

opportunity to demand its return, whether they disposed of it in a wrongful way, or whether there was a partial deprivation.

Summary judgment is denied on the conversion claim as to Loughlin and Rhulen.

### E.    Trespass to Chattels

"The tort of trespass to chattel consists of intentionally disposing another of the chattel or using or intermeddling with a chattel in another's possession." *Hecht v. Components Int'l, Inc.*, 867 N.Y.S.2d 889, 898 (N.Y. Sup. Ct. 2008) (citing Restatement (Second) of Torts § 217).  "To prevail on a claim of trespass to chattels, plaintiffs must prove the following four elements: (1) defendants acted with intent, (2) to physically interfere with (3) plaintiffs' lawful possession, and (4) harm resulted." *Spa World Corp. v. Lipschik*, 2010 WL 11632681, at *13 (E.D.N.Y. Sept. 9, 2010) (quoting *Biosafe-One, Inc. v. Hawks*, 639 F. Supp. 2d 358, 368 (S.D.N.Y. 2009)).  A defendant is liable if it dispossesses the plaintiff of the chattel, including taking the chattel from the possession of another without the other person's consent or destroying the chattel while it is in the other person's possession.  *See Hecht*, 867 N.Y.S.2d at 898–99; Restatement (Second) of Torts §§ 218, 221.  "Deleting emails destroys computer information and may constitute dispossession of the information if the deletion is without the consent of the possessor of the computer."  *Hecht*, 867 N.Y.S.2d at 899.

For largely the same factual issues identified with respect to Plaintiff's conversion claim, defendants Loughlin and Rhulen are not entitled to summary judgment on the claim for trespass against chattels.[13]   !

---

[13] Loughlin also moves for summary judgment on the second cause of action for breach of fiduciary duty with respect to the alleged destruction of company property.  *See* Dkt. No. 127 at 28–29.  Plaintiff responds that "[u]ntil discovery is completed, it is premature to credit Defendants' assertions." Dkt. No. 136 at 35 n.19; *see also* Glatter Decl. ¶ 20.  The Court agrees that there remain issues of fact regarding the timing and scope of Loughlin's fiduciary duties to Rekor and whether her conduct with respect to the treatment of the emails amounts to a breach of

**III.    Defendants' Second, Third, and Fifth Counterclaims**

Defendants move for summary judgment on their second, third, and fifth counterclaims charging Plaintiff with breaches and anticipatory breaches of the Warrants and the Promissory Notes.  The second counterclaim alleges that Rekor has breached its obligations to Loughlin and Satterfield by failing to honor the Warrants granted to the two of them in connection with the purchase of Firestorm, Dkt. No. 71 ¶¶ 356–375, and the third counterclaim alleges that Rekor has repudiated its obligations to Rhulen pursuant to the Warrants issued to him, *id.* ¶¶ 376–381.  The fifth counterclaim alleges that Rekor has failed to honor the Promissory Notes issued to Defendants in connection with the Firestorm transaction.  *Id.* ¶¶ 389–400.

Defendants argue that there is no disputed fact that Rekor failed to honor the Warrants and the Promissory Notes and that if the Court dismisses Rekor's fraud claim or rules it cannot seek rescission, Rekor's last defense to its obligations under those instruments disappears.  Dkt. No. 127 at 29–31.  Plaintiff responds that the argument is premature because Defendants' counterclaims with respect to the Warrants and Promissory Notes will rise or fall with Plaintiff's fraud claim; if the fraud claim is successful and Plaintiff is entitled to rescission, it will follow that Defendants are not entitled to exercise the Warrants or to be paid on the Promissory Notes.  Dkt. No. 136 at 36.

The Court has denied Defendants' motion for summary judgment as to the fraud claim, including as to the remedy of rescission.  Accordingly, because these counterclaims rely on the disposition of Plaintiff's fraud claim, the Court also denies the motion for summary judgment on the second, third, and fifth counterclaims.

---

those duties.  Loughlin is denied summary judgment on the second cause of action.

## IV.     Defendants' Nineteenth and Twentieth Counterclaims

Defendants move for summary judgment for CrisisRisk on the nineteenth counterclaim and for Satterfield on the twentieth counterclaim.  The nineteenth counterclaim alleges a claim of breach of contract on behalf of CrisisRisk alleging that FSLLC has improperly failed to pay CrisisRisk invoices for services performed by it, Loughlin, and Satterfield.  Dkt. No. 71 ¶¶ 493–497.  The twentieth counterclaim alleges that Rekor breached the agreement it entered into with Satterfield in January 2019 by failing to pay him pursuant to an invoice he issued.  *Id.* ¶¶ 498–506.

In its memorandum in opposition, Plaintiff does not identify any disputed issues of fact that Rekor owes the requested sums to CrisisRisk (on the nineteenth counterclaim) and to Satterfield (on the twentieth counterclaim).  Dkt. No. 136 at 36–37.  Rather Plaintiff argues that summary judgment is premature until the Court has had the opportunity to determine whether the doctrines of recoupment and setoff, which are asserted as an affirmative defense, bar any recovery from Plaintiff.  *Id.* (citing to Plaintiff's third affirmative defense in its answer to the counterclaims, Dkt. No. 74).  Defendant Satterfield and additional counterclaim plaintiff CrisisRisk respond that the invoices arose pursuant to new agreements with Firestorm and Rekor that were entered into after Defendants left their employment and that recoupment and setoff do not apply to work was performed by a separate legal entity or after Defendants left the employ of Rekor.  Dkt. No. 148 at 18–19.

"Under New York law, '[r]ecoupment means a deduction from a money claim through a process whereby cross demands arising out of the same transaction are allowed to compensate one another and the balance only to be recovered. . . . [The doctrine] does not allow one transaction to be offset against another, but only permits a transaction which is made the subject of suit by a plaintiff to be examined in all its aspects, and judgment to be rendered that does

justice in view of the one transaction as a whole.'"  *Westinghouse Credit Corp. v. D'Urso*, 278

F.3d 138, 146 (2d Cir. 2002) (first alteration in original) (quoting *N.Y. State Elec. & Gas Corp. v.*

*McMahon*, 129 F.3d 93, 96 (2d Cir. 1997)).  Though recoupment applies to cross demands

arising out of the same transaction, the doctrine does not apply to obligations arising from a

"single integrated transaction" if the obligations derive from "discrete and independent units."

*Id.*

 By contrast, "[t]he right of setoff . . . allows entities that owe each other money to apply

their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B

owes A."  *Id.* at 149 (quoting *Malinowski v. N.Y. State Dep't of Labor*, 156 F.3d 131, 133 (2d

Cir. 1998)).  "In setoff, the debts may arise from different transactions."  *Id.*  The setoff doctrine

applies, however, only when the debts "are due to and from the same persons in the same

capacity."  *Id.*; *see also Sistem Muhendislik Insaat Sanayi Ve Ticaret, A.S. v. Kyrgyz Republic*,

2019 WL 8437454, at *3 (S.D.N.Y. Oct. 1, 2019) ("In setoff, the debts may arise from different

transactions.  The debts, however, must be mutual, meaning they are due to and from the same

persons in the same capacity." (internal quotation marks and citations omitted)), *report and*

*recommendation adopted*, 2020 WL 898215 (S.D.N.Y. Feb. 25, 2020); *Thai Lao Lignite*

*(Thailand) Co. v. Gov't of the Lao People's Democratic Republic*, 2016 WL 958640, at *2

(S.D.N.Y. Mar. 8, 2016) (same).

 The doctrine of recoupment does not apply here, and Plaintiff cannot forestall summary

judgment on the basis of it.  Plaintiff's obligations to CrisisRisk and to Satterfield on the post-

employment invoices do not arise from Rekor's acquisition of Firestorm.  They instead involve

entirely discrete and separate arrangements.

Nor does the doctrine of setoff bar recovery by CrisisRisk.  CrisisRisk was not a party to the Purchase Agreement pursuant to which Rhulen, Loughlin, and Satterfield sold their interests in Firestorm to Rekor in exchange for consideration including the Warrants and Promissory Notes.  CrisisRisk did not even exist at the time of the Purchase Agreement.  There is no reason it should be denied payment on the money it indisputably is owed by Rekor, even assuming that Rhulen, Loughlin, or Satterfield personally may owe Rekor money for damages or that Rekor may be entitled to rescission.  Summary judgment therefore is granted to CrisisRisk on the nineteenth counterclaim in the undisputed amount of $25,500.60.

A different result applies to Satterfield with respect to the twentieth counterclaim.  There are disputed facts regarding whether Satterfield owes Rekor money in damages on Rekor's fraud theory.  Construing the evidence in favor of the non-moving party Rekor, the monies it is owed by Satterfield (if the fraud damages claim prevails) would be set off against what Rekor owes Satterfield.  Accordingly, summary judgment is denied on the twentieth counterclaim.

## CONCLUSION

The motion for partial summary judgment is GRANTED IN PART and DENIED IN PART.  The third, fourth, and fifth causes of action are dismissed as to Satterfield.  Loughlin and Rhulen are granted summary judgment as to the third cause of action for violations of the CFAA, and CrisisRisk is granted summary judgment on the nineteenth counterclaim.  Summary judgment is denied as the first cause of action for fraudulent omission; the second cause of action for breach of fiduciary duty as to Loughlin; the fourth cause of action for conversion; the fifth cause of action for trespass to chattels; the second, third, and fifth counterclaims for breaches and anticipatory breaches of the Warrants and Promissory Notes; and the twentieth counterclaim for breach of contract as to Satterfield.

The Clerk of Court is respectfully directed to close Dkt. No. 111.

SO ORDERED.

Dated: March 14, 2022
     New York, New York

_____
LEWIS J. LIMAN
United States District Judge