UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _07/29/2022_

------------------------------------------------------------------------X
                             :

REKOR SYSTEMS, INC.,
                             :

              Plaintiff,       :

                             :         19-cv-7767 (LJL)

      -v-                    :

                             :       OPINION AND ORDER

SUZANNE LOUGHLIN, et al.,     :

                             :

             Defendants.     :

                             :
------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Plaintiff Rekor Systems, Inc. ("Plaintiff" or "Rekor") moves, pursuant to Federal Rule of Civil Procedure 56, for an order: (1) granting summary judgment in its favor as to liability on its second, fourth, and fifth claims; and (2) dismissing the first, fourth, and sixth counterclaims of defendants Suzanne Loughlin ("Loughlin"), Harry Rhulen ("Rhulen"), and James Satterfield ("Satterfield") (collectively "Defendants").[1]  Dkt. No. 243.

      For the following reasons, the motion for partial summary judgment is granted in part and denied in part.

## BACKGROUND

      The following facts are undisputed for purposes of this motion except where otherwise indicated.  The Court recounts only those facts relevant to the disposition of this motion.

      Rekor, together with its predecessors Keystone Solutions, Inc. ("Keystone") and Novume Solutions, Inc. ("Novume"), is a company that owns several subsidiaries.  Dkt. No. 247 ¶ 1; Dkt.

---

[1] Plaintiff's complaint contains two claims titled "Fourth Cause of Action."  Dkt. No. 64 at 37, 39.  The Court will refer to the second of these claims—the claim for trespass to chattels—as the fifth claim.

No. 295-8 ¶ 1.  For ease of reference and in accordance with the parties' usage, the Court will refer to Rekor and its predecessors as "Rekor" throughout this Opinion and Order unless reference to a specific predecessor is relevant.  On January 25, 2017, Rekor purchased Firestorm Solutions, LLC ("FSLLC") and Firestorm Franchising, LLC ("FFLLC") (collectively "Firestorm").  Dkt. No. 247 ¶ 2; Dkt. No. 295-8 ¶ 2.  That same day, Keystone entered into employment agreements with Rhulen and Loughlin, and Firestorm entered into an employment agreement with Satterfield.  Dkt. No. 247 ¶ 3; Dkt. No. 295-8 ¶ 3; *see also* Dkt. No. 245 ("Latifullah Decl."), Exs. B, C, D.

## I.     Rhulen's Employment

Section 1(b) of Rhulen's employment agreement provided: "The Executive's initial title shall be President of KeyStone Solutions, Inc.  The Executive's position and assignments are subject to change.  The Executive hereby accepts such employment by the Company upon the terms and conditions hereinafter set forth."  Latifullah Decl., Ex. B § 1(b).  The "Executive" was defined to be Rhulen, and the "Company" was defined to be Keystone.  Section 3 of the agreement, titled "Duties," provided in part: "The Executive shall be employed as an executive of the Company, and shall have such duties as are assigned or delegated to him by the Company. The Executive shall devote substantially all his working time and attention to the business of the Company and shall cooperate in the advancement of the best interests of the Company."  *Id.* § 3.

Rhulen's employment agreement had a five-year term unless otherwise terminated pursuant to Section 7 of the agreement.  *Id.* § 20.  Section 7 of the employment agreement provided in part that "[e]ither the Executive or the Company may terminate the employment relationship at any time."  *Id.* § 7.  Rhulen's compensation under the employment agreement included a salary and options.  *Id.* § 2.  More specifically, "[f]or performance of all services rendered under this Agreement, the Company shall pay the Executive a base salary at an

2

annualized rate of $275,000." *Id.* § 2(a).  And "[t]he Executive shall be granted an option to purchase 80,000 shares of the Company's common stock at an exercise price of $3.00 per share (the 'Option')," and "the Option shares shall vest in successive equal monthly installments starting on the one-year anniversary of the Effective Date and continuing over the 24-month period thereafter, provided that the Executive continues in Service with the Company through each vesting event." *Id.* § 2(b).

After Rhulen had served as President of Keystone for over a year and three months, Rekor assigned Rhulen to help oversee Firestorm.  Dkt. No. 247 ¶ 6; Dkt. No. 295-8 ¶ 6.  Rhulen testified that Rekor's CEO "felt that things were not going as he would have hoped at Firestorm" and "asked me to get involved, to see if I could figure out what was going on and straighten it out."  Dkt. No. 247 ¶ 9; Dkt. No. 295-8 ¶ 9.  A few months later, Rekor's governance committee changed Rhulen's title from President of Novume to Executive Vice President of Novume.  Dkt. No. 247 ¶¶ 10–11; Dkt. No. 295-8 ¶¶ 10–11.  On October 11, 2018, an email announced that Rhulen's title had been changed to "EVP" and stated that Rhulen was asked by the CEO "to focus his efforts on Firestorm" and that Rhulen's "responsibilities rest solely with helping Firestone's growth."  Dkt. No. 246 ("Newman Decl."), Ex. D.  The following day, Rhulen sent an email stating that he had changed his signature block to reflect his change in position.  *Id.*, Ex. E.  Rhulen's signature block listed his title as "EVP - Firestorm" followed by "Novume Solutions, Inc." in the line below.  *Id.*

Defendants, however, assert that, after Rhulen's title was changed to Executive Vice President of Novume, Rhulen's title was changed once again.  Dkt. No. 295-9 ¶ 12.  According to Defendants, on October 12, 2018, Rekor, a publicly traded corporation, filed a Form 8-K with the Securities and Exchange Commission ("SEC") in which Rekor announced that, on October

11, 2018, Rhulen changed positions from President of Novume to Executive Vice President of *Firestorm*—not Novume. *Id.*; *see also* Dkt. No. 293 ("Rhulen Decl."), Ex. 13 at 2. Defendants state that Rhulen did not consent to this change and that he was unaware of the change until he learned of the Form 8-K. Dkt. No. 295-9 ¶ 12. Thereafter, Rhulen's email signature block listed his title as "EVP & Founder" above the Firestorm logo and no longer referenced Novume. *Id.* ¶ 14.

Defendants also assert that Rhulen suffered damage as a result of "being wrongfully terminated as President of Rekor." Rhulen Decl. ¶ 29. Rhulen declares that, after he was demoted, he was "an outcast" at Rekor, and when, in December 2018, the CEO of Rekor suggested that Rhulen resign if he wanted, Rhulen resigned his position as EVP of Firestorm. *Id.* Rhulen declares that he suffered two types of damage. *Id.* First, according to Rhulen, his options were affected. Over the course of twenty-four months starting in January 2018, *id.* ¶ 2, Rhulen was to receive certain options vesting in equal monthly installments, and, "absent [his] termination or death, [he] had 10 years to exercise the options," *id.* ¶ 30. "Although [Rhulen] received 9 months of vested options, from January 2018-September 2018, [he] did not receive [his] 10 years to exercise those options." *Id.* Furthermore, he did not receive his last fifteen months of options, starting in October 2018. *Id.* ¶ 31. Second, Rhulen also declared that he was damaged "by the loss of 37 months of salary." *Id.*

## II. Emails

Section 9 of Rhulen's employment agreements provides:

Documents, Records, etc. All documents, records, data, apparatus, equipment and other physical property, whether or not pertaining to Confidential Information (as defined in the Proprietary Rights Agreement), which are furnished to the Executive by the Company or are produced by the Executive in connection with the Executive's employment will be and remain the sole property of the Employer. The Executive will return to the Company all such materials and property as and when requested by the Employer. In any event, the Executive will return all such

materials and property immediately upon termination of the Executive's employment for any reason.

Latifullah Decl., Ex. B § 9; Dkt. No. 247 ¶ 15; Dkt. No. 295-8 ¶ 15.  The "Company" is defined as Keystone.  Dkt. No. 247 ¶ 18; Dkt. No. 295-8 ¶ 18.  The same language is contained in Section 9 of Loughlin's employment agreement with Keystone.  Latifullah Decl., Ex. C § 9; Dkt. No. 247 ¶ 16; Dkt. No. 295-8 ¶ 16.  A similar clause can be found in Section 9 of Satterfield's employment agreement with Firestorm.  Latifullah Decl., Ex. D § 9; Dkt. No. 247 ¶ 17; Dkt. No. 295-8 ¶ 17.

The Proprietary Rights Agreement ("PRA"), signed by each of Defendants on January 25, 2017, provides in Section 2:

> Protected Information.  . . . Upon the termination of your affiliation with the Company Group for any reason or for no reason, or if the Company Group otherwise requests, (i) you will return to the Company Group all tangible Confidential Information and copies thereof (regardless of how such Confidential Information or copies are maintained) and (ii) you will deliver to the Company Group any property of the Company Group which may be in your possession, including products, materials, memoranda, notes, records, reports, or other documents, photocopies or electronic versions of the same.  The terms of this Section 2 are in addition to, and not in lieu of, any statutory or other contractual or legal obligation that you may have relating to the protection of the Company Group's Confidential Information.  The terms of this Section 2 will survive indefinitely any termination of your affiliation with the Company Group for any reason or for no reason.

Latifullah Decl., Exs. E–G § 2; Dkt. No. 247 ¶ 20; Dkt. No. 295-8 ¶¶ 20, 67.  The PRA defines the "Company Group" as "KeyStone Solutions, Inc. . . . or any present or future parent, subsidiary, or affiliate thereof that was part of the Company Group during your employ."  Dkt. No. 247 ¶ 21; Dkt. No. 295-8 ¶ 21.

According to Plaintiff, Plaintiff provided Defendants laptops, which they used for company business.  Dkt. No. 247 ¶ 22.  Defendants, however, dispute who provided the laptops and assert that Keystone provided laptops to Loughlin and Rhulen for company business while

Firestorm provided Satterfield a laptop, which he used for Firestorm's business.  Dkt. No. 295-8 ¶ 22.

On December 28, 2018, Defendants resigned their positions.  According to Defendants, in December 2018, Defendants and Firestorm entered into an agreement (the "New Agreement") whereby Defendants would provide services to certain persons and entities, and 20% of Defendants' revenue for such services would be provided to Firestorm.  Dkt. No. 295-8 ¶ 68.

In June 2019, Rekor employees discovered unexplained significant gaps in the files kept in Defendants' email accounts on the company email servers.  Dkt. No. 247 ¶ 23; Dkt. No. 295-8 ¶ 23.  Defendants admit that they moved emails to folders on their laptops.  Dkt. No. 247 ¶ 24; Dkt. No. 295-8 ¶ 24.  Firestorm employee William Baker ("Baker"), who was in charge of Firestorm's information technology, also confirmed that Satterfield kept copies of his emails on his laptop.  Dkt. No. 247 ¶¶ 25–26; Dkt. No. 295-8 ¶¶ 25–26.  Loughlin testified that, if she were to move a copy of an email from her inbox to a folder on her company laptop, that email would no longer be visible in her inbox if one were to access that inbox through the Rekor or Firestorm email system.  Dkt. No. 247 ¶ 27; Dkt. No. 295-8 ¶ 27.  However, according to Loughlin, for years before Firestorm was acquired by Rekor, she managed her emails by moving emails to her computer hard drive.  Dkt. No. 290 ("Loughlin Decl.") ¶ 7.

Defendants also admit that they did not return all documents upon their departures and that they still have some in their possession: Rhulen and Loughlin possess documents that relate to the business activities of Rekor and Firestorm, and Satterfield possesses some documents that relate to the business affairs of Firestorm.  Dkt. No. 247 ¶ 31; Dkt. No. 295-8 ¶ 31.  In addition, Rhulen admits that he still possesses thousands of work-related emails on his laptop, and

Loughlin admits that she still possesses thousands of emails related to her work at Rekor on her laptop.  Dkt. No. 247 ¶ 33; Dkt. No. 295-8 ¶ 33.

Defendants shared and used Firestorm materials in connection with their new company, CrisisRisk Strategies, LLC ("CrisisRisk").  Dkt. No. 247 ¶ 34; Dkt. No. 295-8 ¶ 34.  Jason Russell ("Russell"), who became President of Firestorm after Satterfield's departure, testified that CrisisRisk and Defendants should not have used Firestorm materials because this intellectual property did not belong to them.  Dkt. No. 247 ¶ 35; Dkt. No. 295-8 ¶ 35.  Defendants, however, assert that they understood that they could make use of previously existing Firestorm materials for the on-going provision of services to Firestorm customers.  Dkt. No. 295-8 ¶ 35.

On June 25, 2019, Rekor's counsel sent a letter to Defendants regarding potential claims against them; the letter stated in part:

> Your respective Firestorm e-mail accounts were purged at or about the time that your employment with Firestorm ended.  It is neither Firestorm's nor Rekor's policy to purge e-mail accounts when employees or officers resign from employment.  This indicates to us that you intentionally emptied your e-mail accounts for several improper purposes, which may include the destruction of information concerning customer leads, business opportunities and/or your efforts to establish CrisisRisk's operations and divert business from Firestorm and Rekor.

Dkt. No. 247 ¶ 54; Dkt. No. 295-8 ¶ 54.  Upon receiving this letter, Defendants did not return documents in their possession.  Dkt. No. 247 ¶ 55; Dkt. No. 295-8 ¶ 55.

In addition to these facts, there are many disputed facts with respect to the emails; however, because those disputed facts are not material to the Court's disposition of the motion, the Court does not further recount them.

## III.   Warrants

On August 14, 2019, Rekor filed a Form 10-Q with the SEC, which stated in part:

On June 25, 2019, the Company sent a letter to three former executives of the Company and Firestorm (the Firestorm Principals).  The letter described the Company's position that, because the Firestorm Principals fraudulently induced the

execution of the Membership Interest Purchase Agreement pursuant to which Firestorm was acquired by the Company, the entire Membership Interest Purchase Agreement and the transactions contemplated thereby, including the issuance of the warrants, are subject to rescission.

Dkt. No. 247 ¶ 58; Dkt. No. 295-8 ¶ 58.

In a separate action, Loughlin, Rhulen, and Satterfield sued Glenn Goord ("Goord"), a director of Rekor, for breach of fiduciary duty and libel. *See Loughlin v. Goord*, 558 F. Supp. 3d 126, 135 (S.D.N.Y.), *reconsideration denied*, 2021 WL 4523504 (S.D.N.Y. Sept. 30, 2021). They alleged that, after Rhulen made a whistleblower complaint to the Rekor board concerning the Executive Chairman, CEO, and controlling shareholder Robert Berman, Goord participated in a retaliation campaign against them, leading Goord to breach his fiduciary duty and to commit libel against them. *Id.* at 135. As to their libel claim, they alleged that the August 14, 2019 Form 10-Q statement referred to them when it mentioned the "Firestorm Principles"; that the statement that they had "fraudulently induced" the agreement was false and was made with actual malice in furtherance of the retaliation campaign against them; and that the statement disparaged them in their business or profession and was defamatory per se. *Id.* at 138. They alleged that Goord reviewed and approved the August 14, 2019 Form 10-Q at a 2019 board meeting. *Id.* at 137.

Goord moved to dismiss the complaint against him, and the Court dismissed the complaint with prejudice. *Id.* at 138, 155. As to libel, the Court held that the allegations failed to state a claim upon which relief can be granted because the 10-Q statement was protected by a qualified privilege. *Id.* at 155. After discussing why the 10-Q statement was neither a protected statement of opinion nor protected by the litigation privilege, the pre-litigation privilege, or the privilege for statements made during the preliminary or investigative stages of a judicial or quasi-judicial proceeding, the Court held that the 10-Q statement was subject at least to a

qualified privilege concerning common interest and legal duty. *Id.* at 146–53. A qualified privilege, however, may be overcome by the plaintiffs by a showing of either actual malice (i.e., knowledge of the statement's falsity or reckless disregard as to whether it was false) or common law malice (i.e., spite or ill will). *Id.* at 154. A showing of common law malice will defeat the privilege "only if it is the one and only cause for the publication." *Id.* (quoting *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 98 (2d Cir. 2000)). The Court held that there was no showing of actual malice because there were no allegations that Goord knew or recklessly failed to know that the statement was false at the time it was made. *Id.* at 154. The Court further held that, "even if Goord harbored personal animosity against [Loughlin, Rhulen, and Satterfield] as part of Berman's retaliation campaign, the ill will was not the 'one and only' reason for the statement's publication" because the statement "also provided the basis upon which the Company thought the warrants were subject to rescission, a topic of critical importance to shareholders as to which Rekor had a duty to report." *Id.* at 155. Thus, the allegations were insufficient to overcome the qualified privilege. *Id.*

## PROCEDURAL HISTORY

The procedural history of this case is recounted in the Court's previous summary judgment opinion at Dkt. No. 214. The Court will summarize in brief the procedural history most relevant to the instant motion.

Plaintiff's operative complaint brings five causes of action against Defendants. Dkt. No. 64. Plaintiff's second, fourth, and fifth claims are at issue on this motion and relate to Defendants' treatment of certain emails. The second claim for breach of fiduciary duty alleges that Defendants destroyed corporate property—i.e., emails from their corporate email accounts. Plaintiff's fourth claim for conversion and the fifth claim for trespass to chattels also allege that Defendants destroyed emails and data in their corporate email accounts.

Defendants answered and, along with additional counterclaim plaintiff CrisisRisk, filed twenty counterclaims against Plaintiff, FSLLC, FFLLC, and nine individuals. Dkt. No. 71. Defendants later voluntarily dismissed the counterclaims against the individual counterclaim defendants. Dkt. No. 73. The first, fourth, and sixth counterclaims are at issue on this motion. The first counterclaim alleges that Rekor breached Rhulen's employment agreement by removing him as President of Rekor and making him an Executive Vice President of Firestorm. Dkt. No. 71 ¶¶ 343–355. The fourth counterclaim for breach of fiduciary duty alleges that Rekor owed a fiduciary duty to Defendants in their status as shareholders and warrant holders of Rekor and that Rekor breached this fiduciary duty by refusing to honor Loughlin and Satterfield's attempts to exercise their warrants. *Id.* ¶¶ 382–388. The sixth counterclaim for libel alleges that the statement in Rekor's 10-Q filed with the SEC defamed Defendants. *Id.* ¶¶ 401–418.

Defendants and CrisisRisk filed their motion for partial summary judgment on April 27, 2021, before the end of discovery. Dkt. No. 111. On March 14, 2022, the Court granted in part and denied in part Defendants' motion for partial summary judgment.[2] Dkt. No. 214.

On April 29, 2022, Plaintiff filed its motion for partial summary judgment. Dkt. No. 243. Defendants filed their memorandum in opposition on June 6, 2022. Dkt. No. 291. Plaintiff replied on June 20, 2022. Dkt. No. 306.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is

---

[2] The Court's previous summary judgment opinion dismissed the third, fourth, and fifth claims as to Satterfield; granted summary judgment to Loughlin and Rhulen on the third claim; granted summary judgment to CrisisRisk on the nineteenth counterclaim; and denied summary judgment on the first claim, the second claim as to Loughlin, the fourth claim, the fifth claim, and the second, third, fifth, and twentieth counterclaims. Dkt. No. 214 at 36.

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

"[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)). Nor may the non-moving party "rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The non-moving party must also demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on

conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).[3]

The fact that Defendants' motion was made before documents were exchanged or a deposition taken is not dispositive.  Under Rule 56(b), "[u]nless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of discovery."  Fed. R. Civ. P. 56(b).  "The rule protects against premature motions for summary judgment both by requiring the party asserting that a fact is not genuinely disputed to 'cit[e] to particular parts of materials in the record' supporting that proposition, Fed. R. Civ. P. 56(c)(1), and by permitting the non-movant—if unable to either show that the materials cited do not establish the purported fact or to point to contrary facts demonstrating a genuine issue—to 'show[] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition,' Fed. R. Civ. P. 56(d)."  *Chachkes v. David*, 2021 WL 101130, at *5 (S.D.N.Y. Jan. 12, 2021) (alterations in original).

---

[3] The Southern District's Local Civil Rule 56.1 sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented. Any party moving for summary judgment must "annex[] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  L.R. 56.1(a).  Local Rule 56.1(b), in turn, requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  L.R. 56.1(b).  All statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible."  L.R. 56.1(d).  "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  L.R. 56.1(c).

**DISCUSSION**

The Court addresses Defendants' first counterclaim for breach of Rhulen's employment agreement before turning to Plaintiff's email-related common law claims (second, fourth, and fifth claims).  The Court then addresses Defendants' sixth counterclaim for libel.[4]

## I.    Breach of Contract (Defendants' First Counterclaim)

Defendants' first counterclaim alleges that Plaintiff breached Rhulen's employment agreement by changing his role from President of Rekor to Executive Vice President of Firestorm.  Dkt. No. 71 ¶ 353.  Plaintiff argues that the Court should dismiss this counterclaim for two reasons: (1) it fails because the contract expressly permitted this change; and (2) it fails because Rhulen presents no evidence that he suffered any damages due to his change in role.  Dkt. No. 244 at 11.  Defendants respond that Plaintiff breached the agreement by demoting Rhulen from President of Rekor to an officer of a subsidiary company—i.e., Executive Vice President of Firestorm.  Dkt. No. 291 at 21–22.  Defendants also contend that Rhulen was damaged by not receiving certain options pursuant to his employment agreement, by not being given ten years to exercise them, and by not receiving the remainder of his salary under his five-year employment agreement.  *Id.* at 22.

Under New York law, a breach of contract claim requires proof of: "(1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach."  *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004); *see also Lamda Sols. Corp. v. HSBC Bank USA, N.A.*, 2021 WL 5772290, at *4 (S.D.N.Y. Dec. 6, 2021) ("Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by

---

[4] Plaintiff moves to dismiss the fourth counterclaim, which alleges that Rekor breached a fiduciary duty when it refused to honor Defendants' warrants.  *See* Dkt. No. 243; Dkt. No. 244 at 1, 21.  Defendants stipulate to the dismissal of this counterclaim.  Dkt. No. 291 at 3.  Accordingly, the fourth counterclaim is dismissed.

the plaintiff, (3) breach by the defendant, and (4) damages." (quoting *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011))).  "One who violates his contract with another is liable for all the direct and proximate damages which result from the violation."  *Nat'l Mkt. Share*, 392 F.3d at 525 (quoting *Wakeman v. Wheeler & Wilson Mfg. Co.*, 4 N.E. 264 (N.Y. 1886)).  "Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages."  *Id.* (emphasis in original).  "Damages for breach of contract must be 'such only as actually follow or may follow from the breach of the contract.'"  *Id.* (quoting *Wakeman*, 4 N.E. 264).  In addition, "damages may be so remote as not to be directly traceable to the breach, or they may be the result of *other intervening causes*, and then they cannot be allowed."  *Id.* (emphasis in original) (internal quotation marks omitted).

Plaintiff is not entitled to summary judgment on this counterclaim because there are disputed issues of material fact as to both breach and damages.

As to breach, there are disputed facts regarding how Rhulen came to be Executive Vice President of Firestorm.  According to Plaintiff, Rhulen demoted himself as evidenced by the fact that he changed the title in his email signature to "EVP - Firestorm."  Defendants, on the other hand, assert that Rhulen was demoted by Plaintiff as evidenced by the SEC Form 8-K filing, which announced that Rhulen had changed positions from being President of Novume to Executive Vice President of Firestorm and by Rhulen's lack of consent and knowledge of this change prior to seeing the Form 8-K.  The Court cannot determine whether there was a breach of Rhulen's employment agreement without resolving who was responsible for Rhulen's change in position.

Plaintiff argues that there was no breach because Rhulen's employment agreement expressly permitted this change in position. But this argument fails. Granted, the employment agreement provides that Rhulen's "initial title" shall be President of Keystone and that his "position and assignments are subject to change." Latifullah Decl., Ex. B § 1(b). However, the agreement also provides that Rhulen "shall be employed as an executive of the Company," *id.* § 3, where "Company" is defined in the agreement to be Keystone. A reasonable jury could find that when Rhulen became an executive of Firestorm, a subsidiary of Plaintiff, he no longer was employed as an executive of Keystone. Plaintiff has provided no argument for why being an executive of a subsidiary company is equivalent to being employed as an executive of the parent company. *See Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, at *11 (Del. Ch. July 14, 2008) ("It is only the exceptional case where a court will disregard the corporate form . . . ." (quoting *Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1305 (D. Del. 1990))).

In addition, assuming there was a breach, there is a disputed issue of fact concerning damages: whether Rhulen was denied the options provided by his employment agreement as a result of his change of position in October 2018. Although Rhulen received options through September 2018, he declares that he did not receive options beginning in October 2018—the same month in which his position changed. There is thus a disputed issue of fact regarding whether the denial of options directly and proximately resulted from Rhulen's change in position, assuming that change in position constitutes a breach.

Plaintiff contends that Rhulen has failed to present evidence that he suffered any damages due to his change in role. Plaintiff is correct—but only as to the other types of damages that Rhulen asserts he suffered and not as to the denial of options starting in October 2018. As to the other categories of damage, Defendants have failed to establish damages resulting from the

purported breach of Rhulen's employment agreement.  If the Court views the facts in the light most favorable to Defendants (the non-moving party), Rhulen suffered from two other categories of damages: (1) he was not given ten years to exercise the options he received under his employment agreement; and (2) he lost thirty-seven months of salary.  Rhulen Decl. ¶¶ 29–31.  These two categories of damages, however, flow from Rhulen's decision to resign and terminate his employment agreement with Rekor.  Defendants have not pointed to evidence that ties these damages to Rhulen's change in position, and, based on the record before the Court on this motion, no reasonable factfinder could trace these damages to Rhulen's change in title or position.  In other words, there is no evidence showing that, once Rhulen became Executive Vice President of Firestorm, he was deprived of either the time to exercise his options or his salary.  Instead, the damages of which Rhulen complains flow directly from an intervening cause—Rhulen's decision to resign—rather than from Rhulen's change in position.  In fact, Defendants themselves indirectly concede this point as to salary when they argue that "Rhulen is entitled to 37 months of lost salary, *from the date of his resignation from Firestorm*, to the last day of his five-year Employment Agreement."  Dkt. No. 291 at 22 (emphasis added).  Defendants do not measure damages from the date on which Rhulen's position was changed to Executive Vice President of Firestorm in October 2018; rather, the damages flow from the date of Rhulen's resignation several weeks later.  As to the options, Rhulen declared that, "absent [his] termination or death, [he] had 10 years to exercise the options."  Rhulen Decl. ¶ 30.  By resigning, however, Rhulen terminated his employment agreement and affected the ten years he had to exercise the options.  There is no evidence that he was deprived of time to exercise his options upon his change in position.

Regardless, because disputed issues of material fact remain, the Court denies summary judgment in Plaintiff's favor on the first counterclaim for breach of contract.

## II.     Email Claims (Plaintiff's Second, Fourth, and Fifth Claims)

Plaintiff seeks summary judgment as to liability on: its second claim for breach of fiduciary duty against all Defendants; its fourth claim for conversion against Loughlin and Rhulen; and its fifth claim for trespass to chattels against Loughlin and Rhulen. Dkt. No. 244 at 13. The Court discusses each of the three claims in turn.

### A.     Breach of Fiduciary Duty (Plaintiff's Second Claim)

Plaintiff's second claim alleges that Defendants breached their fiduciary duties to Rekor by transferring company files from company servers for their own benefit. Plaintiff argues that Loughlin and Rhulen owed fiduciary duties of care and loyalty to Rekor and that Satterfield, as an officer of Rekor's wholly owned subsidiary Firestorm, owed a fiduciary duty of loyalty to both Rekor and Firestorm. Dkt. No. 244 at 14–15. Plaintiff argues that Defendants breached their fiduciary duties by removing company property—i.e., company emails—from company servers, by failing to return that property, and by using such property for their own benefit in connection with CrisisRisk. *Id.* at 15–16. Defendants oppose summary judgment because they claim that there exist disputed issues of material fact. Dkt. No. 291 at 15–18. Contrary to Plaintiff's version of the facts, Defendants assert that they moved copies of emails in accordance with Firestorm policies; that Rekor itself may have been responsible for the destruction of emails claimed to be missing; and that they used CrisisRisk as a means to perform the New Agreement with Firestorm. *Id.*

The parties do not dispute that Delaware law governs this claim.[5] "Under Delaware law, the elements of a claim for breach of fiduciary duty include (i) the existence of a fiduciary duty and (ii) a breach of that duty." *Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 607 (S.D.N.Y. 2011) (first citing *York Linings v. Roach*, 1999 WL 608850, at *2 (Del. Ch. July 28, 1999); and then citing *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002), *aff'd*, 806 A.2d 164 (Del. 2002)). Officers and directors owe fiduciary duties of care and loyalty to the corporations they serve. *See Gantler v. Stephens*, 965 A.2d 695, 708–09 (Del. 2009) (holding that "officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty, and that the fiduciary duties of officers are the same as those of directors"). And "in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interest of the parent and its shareholders." *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988).

"A breach of fiduciary duty occurs when a fiduciary commits an unfair, fraudulent, or wrongful act, including misappropriation of trade secrets, misuse of confidential information, solicitation of employer's customers before cessation of employment, conspiracy to bring about mass resignation of an employer's key employees, or usurpation of the employer's business opportunity." *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 602 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010). "A fiduciary breaches its duty of loyalty by 'improperly using confidential information . . . to advance [its] own personal interests and not

---

[5] Delaware law applies to Plaintiff's breach of fiduciary duty claim because Plaintiff is a Delaware corporation and because "New York applies the internal affairs doctrine to claims for breach of fiduciary duty and, thus, applies the law of the state of incorporation to such claims." *Kravitz v. Binda*, 2020 WL 927534, at *13 (S.D.N.Y. Jan. 21, 2020) (quoting *Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 607 (S.D.N.Y. 2011)), *report and recommendation adopted sub nom. Kravitz as Tr. of Creditor Tr. of Advance Watch Co., Ltd. v. Binda*, 2020 WL 917212 (S.D.N.Y. Feb. 26, 2020).

those of' its beneficiary." *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 858 (Del. Ch. 2022) (alteration in original) (quoting *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1061–62 (Del. Ch.), *judgment entered*, (Del. Ch. 2004), and *aff'd*, 872 A.2d 559 (Del. 2005)); *see also Beard Rsch.*, 8 A.3d at 603.  "The misuse of confidential information is inherently a breach of fiduciary duty." *Metro Storage*, 275 A.3d at 858 (internal quotation marks omitted).

Before turning to the arguments on summary judgment on this claim, the Court first addresses the threshold question of whether Plaintiff has standing to pursue a claim for breach of fiduciary duty against Satterfield for his actions as President and CEO of Firestorm, a wholly owned subsidiary of Plaintiff.[6]  *See* Latifullah Decl., Ex. D.  The Court here concludes that Plaintiff cannot bring a direct claim for breach of fiduciary duty against Satterfield, an executive of Firestorm.

The Delaware Court of Chancery opinion in *Case Financial, Inc. v. Alden*, 2009 WL 2581873 (Del. Ch. Aug. 21, 2009), is instructive.  There, the plaintiff Case Financial brought a breach of fiduciary duty claim against defendant Eric Alden ("Alden"), who was the former CEO of both Case Financial and a wholly owned subsidiary of Case Financial.  *See id.* at *1–2, *6. The issue was whether Case Financial had standing to pursue the claim against Alden where some of the wrongful conduct allegedly occurred at the subsidiary.  *Id.* at *1.  In other words, the court had to determine whether the claim could be prosecuted directly or whether it should have been pleaded derivatively.  *Id.* at *5; *see also id.* ("The Delaware Supreme Court articulated the test for determining whether a claim is derivative or direct as follows: 'Who suffered the alleged harm—the corporation or the suing stockholder individual—and who would receive the benefit

---

[6] The record before the Court on this motion indicates that the Firestorm entities may in fact be sub-subsidiaries of Plaintiff rather than subsidiaries, but this distinction does not significantly affect the substance of the Court's analysis.

of the recovery or other remedy?'" (quoting *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004))).  As for the subsidiary, Alden owed duties to it by virtue of his position at the subsidiary, and, therefore, the court concluded that, "*as a shareholder of [the subsidiary]*, Case Financial may have had standing to bring suit derivatively on behalf of [the subsidiary] to seek remedy for breaches of those duties owed to [the subsidiary]." *Id.* at *6.  But Case Financial did not attempt to assert any derivative claim on behalf of the subsidiary or to amend the pleadings to add the subsidiary as a nominal party.  *Id.*  The court continued, "[s]imilarly, Case Financial might have standing to sue on its own behalf *as a shareholder* of [the subsidiary] to redress a breach by Alden of a duty owed directly to the shareholders." *Id.* The court, however, ultimately did "not find that Case Financial can sue directly on the basis that Case Financial, as a shareholder of [the subsidiary], can make out a direct claim against Alden, as a director or officer of [the subsidiary]." *Id.* at *7.  Rather, "independent of Case Financial's status as a shareholder of [the subsidiary], Alden owed duties directly to Case Financial as a director and officer"; therefore, "Case Financial has standing to sue Alden directly for those breaches of fiduciary duty he owes directly to Case Financial arising out of his position at Case Financial." *Id.*

Here, unlike in *Case Financial*, Plaintiff does not articulate any harm it suffered directly as a result of Satterfield's alleged breach of duty.  The emails that Satterfield allegedly failed to return belonged to Firestorm and, if Plaintiff's account is to be credited, were due to be returned to Firestorm.  Satterfield was obliged not to use the emails contrary to the interests of Firestorm. The alleged harm thus was suffered by Firestorm, and any recovery on that harm is owed to Firestorm.  Plaintiff might have been able to bring a claim for that harm, but, to do so, it would have brought the claim derivatively and on behalf of Firestorm.  It cannot bring the claim

20

directly for itself; that choice belongs not to it but to a separate corporation.  Plaintiff might

argue that the Delaware Supreme Court held in *Anadarko Petroleum* that, "in a parent and

wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage

the affairs of the subsidiary in the best interests of the parent and its shareholders."  545 A.2d at

1174.  However, that language does not help it.  As the *Case Financial* court pointed out, "this

quotation [from *Anadarko Petroleum*] does not definitively answer whether the parent could

bring suit directly for an injury it sustained derivatively through a subsidiary's direct injury."

*Case Financial*, 2009 WL 2581873, at *7 n.41.  According to the court, "[t]he opinion could be

read instead to indicate that the directors of a subsidiary, like directors at every corporation,

ordinarily should be managing the corporation above all else to maximize shareholder value and

that in a wholly-owned subsidiary context, the shareholders of the parent might have standing to

sue the subsidiary double derivatively."  *Id.*  But, again, here, Plaintiff has not sued Satterfield in

any derivative capacity.  The Court thus dismisses Plaintiff's claim as to Satterfield.

As to Loughlin and Rhulen, Plaintiff is not entitled to summary judgment on this claim

because there are disputed issues of material fact.  As to the first element—existence of a

fiduciary duty—Defendants do not dispute that they owed fiduciary duties to Rekor.  However,

as to the second element—breach—there are disputed facts.  For example, while Plaintiff

contends that Defendants improperly used the company emails for their own benefit in

connection with CrisisRisk, Defendants have put forth evidence suggesting that they understood

that they could use previously existing Firestorm materials for the on-going provision of services

to Firestorm customers, that they used company materials in connection with their continued

affiliation with Firestorm under the New Agreement, that two Firestorm officers have sworn that

they had no interest in any of the old emails, and that Plaintiff never demanded that the emails be

returned.  *See, e.g.*, Rhulen Decl. ¶¶ 32, 35; Dkt. No. 294 ("Satterfield Decl.") ¶¶ 14, 17–18;

Loughlin Decl. ¶¶ 16–17; Dkt. No. 288-3 ¶ 10; Dkt. No. 287-1 ¶ 7.  In addition, Plaintiff relies

on case law holding that misusing confidential information can constitute a breach of fiduciary

duty, but on this motion, Plaintiff has not shown that the emails at issue contained confidential

information.

In sum, this claim is dismissed as to Satterfield, and Plaintiff is denied summary

judgment on this claim as to Loughlin and Rhulen.

### B.    Conversion (Plaintiff's Fourth Claim)

Plaintiff's fourth claim alleges that Loughlin and Rhulen are liable for conversion

because they destroyed Rekor's files without authorization.[7]  In contending that summary

judgment is warranted, Plaintiff argues that Loughlin and Rhulen acted without authorization

because their employment agreements required them to return the data upon leaving their

employment and because they removed the data without Rekor's knowledge; that they exercised

dominion over Rekor's property by removing the emails; and that they have failed to return the

emails despite the requirements of their employment agreements and PRAs to return them.  Dkt.

No. 244 at 17–18.  In the alternative, Plaintiff argues that it is not required to demand the return

of the property to show conversion.  *Id.* at 18–19.  Defendants, on the other hand, argue that

demand is a necessary element of the conversion claim and that Plaintiff has failed to make that

demand.  Dkt. No. 291 at 18–20.

"A conversion takes place when someone, intentionally and without authority, assumes

or exercises control over personal property belonging to someone else, interfering with that

person's right of possession."  *Colavito v. New York Organ Donor Network, Inc.*, 860 N.E.2d

---

[7] The Court dismissed this claim as to Satterfield in its previous summary judgment opinion.
Dkt. No. 214 at 25.

713, 717 (N.Y. 2006).  Its key elements are "(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights."  *Id.* (citations omitted); *see also Pappas v. Tzolis*, 982 N.E.2d 576, 580 (N.Y. 2012).  "Under the law of New York, an electronic record stored on a computer is subject to a claim of conversion."  *Kim v. Lee*, 2021 WL 6052122, at *12 (S.D.N.Y. Dec. 20, 2021) (citing *Thyroff v. Nationwide Mutual Ins. Co.*, 864 N.E.2d 1272, 1277–78 (N.Y. 2007)); *see also People v. Alynikov*, 104 N.E.3d 687, 698 (N.Y. 2018) ("*Thyroff* is best read . . . as treating the allegedly converted information as intangible property." (emphasis omitted)).  Such a claim lies when the defendant exercises rights of ownership over goods belonging to another to the exclusion of the rights of the owner.  *See Capricorn Mgmt. Sys., Inc. v. Gov. Emps. Ins. Co.*, 2019 WL 5694256, at * 19 (E.D.N.Y. July 22, 2019) (holding that defendants must have exercised unauthorized dominion to the exclusion of plaintiff's rights as an owner in order for a conversion claim to lie); *Fischkoff v. Iovance Biotherapeutics, Inc.*, 339 F. Supp. 3d 408, 414–16 (S.D.N.Y. 2018) (holding that there was no conversion where plaintiff was not denied use of original files); *Ctr. for Rheumatology, LLP v. Shapiro*, 118 N.Y.S.3d 380 (N.Y. Sup. Ct. 2019).[8]

"If possession of the property is originally lawful, a conversion occurs when the defendant refuses to return the property after a demand or sooner disposes of the property." *Polanco v. NCO Portfolio Mgmt., Inc.*, 132 F. Supp. 3d 567, 589 (S.D.N.Y. 2015) (quoting *Leveraged Leasing Admin. Corp. v. PacifiCorp Cap., Inc.*, 87 F.3d 44, 49–50 (2d Cir. 1996)).

---

[8] Although there are at least "scattered decisions that suggest that copying of data may constitute conversion," *Fischkoff*, 339 F. Supp. 3d at 415 (citing *Clark St. Wine & Spirits v. Emporos Sys. Corp.*, 754 F. Supp. 2d 474, 484 (E.D.N.Y. 2010); *Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F. Supp. 2d 609, 618 (S.D.N.Y. 2003); and *New York Racing Ass'n v. Nassau Regional Off-Track Betting Corp.*, 909 N.Y.S.2d 866 (N.Y. Sup. Ct. 2010)), the Court adheres to the majority rule absent more definitive guidance from the New York Court of Appeals.

"The reason for this rule is simply that one in lawful possession shall not have such possession changed into an unlawful one until he be informed of the defect of his title and have an opportunity to deliver the property to the true owner." *Id.* (quoting *Leveraged Leasing Admin.*, 87 F.3d at 50). "Such demand must apprise the defendant of the nature of the property at issue and give that defendant a reasonable opportunity to identify the property." *TechnoMarine SA v. Jacob Time, Inc.*, 905 F. Supp. 2d 482, 496 (S.D.N.Y. 2012) (citing *Branch v. Latham*, 174 N.Y.S. 295 (1st Dep't 1919)). "In analyzing the demand-and-refusal rule, New York Courts have noted that '[a] demand need not use the specific word "demand" so long as it clearly conveys the exclusive claim of ownership . . . . By the same reasoning, a refusal need not use the specific word "refuse" so long as it clearly conveys an intent to interfere with the demander's possession or use of his property.'" *Polanco*, 132 F. Supp. 3d at 589 (quoting *Feld v. Feld*, 720 N.Y.S.2d 35, 37 (1st Dep't 2001)). However, "where the defendant holds the property unlawfully—where, for example, he stole the property—no demand and refusal are necessary to render the defendant liable." *Id.* (internal quotation marks omitted) (quoting *Leveraged Leasing Admin.*, 87 F.3d at 50).

Plaintiff is not entitled to summary judgment on its claim for conversion because the undisputed facts do not establish that Defendants refused to return the emails after a demand or sooner disposed of the property.[9]

Plaintiff argues that the employment agreements and PRAs signed by Loughlin and Rhulen at the commencement of their employment by Plaintiff constituted a demand or, alternatively, that it was not required to demand the return of the property. Dkt. No. 244 at 18–

---

[9] Plaintiff does not argue that Loughlin and Rhulen have disposed of the property; in fact, Plaintiff contends that they continue to hold these materials. *See, e.g.*, Dkt. No. 306 at 7.

19.  Those arguments are unavailing.  For a claim of conversion, a demand is required when possession of the property was originally lawful.  *See Polanco*, 132 F. Supp. 3d at 588.  Where the original possession was not lawful, such as where the defendant "stole the property," *id.*, or where "circumstances show that the defendant knows it has no right to the goods," *Friedman v. Wahrsager*, 848 F. Supp. 2d 278, 296 (E.D.N.Y. 2012) (quoting *State v. Seventh Regiment Fund*, 774 N.E.2d 702 (N.Y. 2002)), demand is not required.  There is authority that "[w]here, 'prior to the institution of [an action for conversion], defendant had full information relating to her own defect in title and the identity of the true owner,' the rule requiring demand and refusal in order to bring such an action does not apply."  *Id.* at 296–97 (second alteration in original) (quoting *Employers' Fire Ins. Co. v. Cotten*, 156 N.E. 629, 630 (N.Y. 1927)).  This exception, however, applies only where the person in possession was "clearly informed" that the "title was wholly defective."  *Cotten*, 156 N.E. at 630; *see also id.* (discussing how the "defendant had been notified in the most explicit manner" about the defect in title).  Here, Plaintiff does not dispute that Loughlin and Rhulen originally possessed the emails lawfully, and the undisputed record on this motion does not show that, prior to this action, Loughlin and Rhulen clearly knew they had no right at all to possess the emails.  Under these circumstances, demand is required to establish a claim of conversion.  The cases relied upon by Plaintiff do not change the Court's disposition of the issue.[10]

---

[10] Plaintiff relies on *Sullivan & Cromwell LLP v. Charney*, 841 N.Y.S.2d 222 (N.Y. Sup. Ct. 2007), for the proposition that no demand was necessary, *see* Dkt. No. 244 at 19, but the quoted portion of this case merely states that demand is not necessary when the initial possession was without right.  Here, Plaintiff does not dispute that Loughlin and Rhulen originally possessed the emails lawfully; thus, *Sullivan & Cromwell* is inapposite.  Plaintiff also relies on *Fung-Schwartz v. Cerner Corp.*, 2018 WL 4386087 (S.D.N.Y. Sept. 13, 2018), *see* Dkt. No. 306 at 8, but that case only addressed in passing the issue for which Plaintiffs cite it, and the Court is not persuaded by the case.

Plaintiff also cannot prevail on the theory that the terms of the employment agreements and PRAs signed by Loughlin and Rhulen constitute a demand as a matter of law.  The employment agreements and PRAs require that certain records be returned to the company upon Loughlin or Rhulen's termination.  *See* Latifullah Decl., Exs. B–C, § 9; *id.*, Exs. E–F, § 2.  In effect, these provisions are akin to a bailment:  Loughlin and Rhulen were permitted possession and enjoyment of property belonging to Plaintiff for a limited time subject to the understanding it would be returned.  *See Ancile Inv. Co. v. Archer Daniels Midland Co.*, 784 F. Supp. 2d 296, 306 (S.D.N.Y. 2011) ("Under New York law, a bailment is defined as 'a delivery of personal property for some particular purpose . . . upon a contract express or implied, and that after such purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions or kept until he reclaims it, as the case may be.'" (quoting *Herrington v. Verrilli*, 151 F. Supp. 2d 449, 457 (S.D.N.Y. 2001))).  So understood, Rhulen and Loughlin's continued possession of emails contrary to the terms of their agreements might give rise to a claim in contract, but it would not, without more, give rise to a tort claim for conversion. As a federal court sitting in diversity, the Court must apply the state's decisional law, and "if there is no direct decision by the highest court of that state, the federal court should determine what it believes that state's highest court would find if the issue were before it."  *Plummer v. Lederle Lab'ys, Div. of Am. Cyanamid Co.*, 819 F.2d 349, 355 (2d Cir. 1987) (citing *Meredith v. Winter Haven*, 320 U.S. 228, 234–37 (1943)).  Given the emphasis of the New York courts on the demand requirement, those courts would likely also apply general common law principles to the question of whether a demand is required at the end of a bailment.  Under those principles, "[a] plaintiff must make a demand for return of property even though the defendant's initially lawful right of possession has expired, as long as the right has merely lapsed, rather than being

terminated as a result of an affirmative act of conversion.  Thus, failure to return property at the end of the agreed-upon term of bailment does not give rise to a conversion claim absent a demand for its return, though it will give rise to a claim for breach of contract." Cause of Action for Conversion by Bailee, 5 Causes of Action 2d 1 (1994).  In other words, when the term of a bailment expires, the bailor may maintain a claim for conversion if either (1) a separate demand is made for return of the property or (2) there has been an affirmative act of conversion.  As every human resources professional knows, it is important to incorporate into the separation process a request for the return of company property.  The agreement establishing the relationship of the parties at the beginning of a term of employment and the term of the bailment does not itself constitute a demand for the return of property at the end of the term of employment.

The employment agreements and PRAs thus do not themselves alone support judgment for Plaintiff for conversion.  They do not serve as a separate demand, and there are disputed facts as to whether there was an affirmative act of conversion.  Plaintiff argues that Loughlin and Rhulen exercised dominion over Rekor's property by removing company emails from Rekor's servers; Plaintiff also argues that Loughlin and Rhulen used the emails for their own benefit and not for the benefit of Rekor.  But Defendants dispute that Loughlin and Rhulen removed the emails from Rekor's servers and claim that they were maintained by them only for Rekor's benefit.  In the absence of undisputed evidence that there existed an affirmative act of conversion or that a demand was made, Rekor is not entitled to summary judgment.

Finally, Plaintiff also appears to contend that a letter communicating concerns about purged emails constitutes a demand, Dkt. No. 244 at 18, but this argument fails too.  The June 25, 2019 letter from counsel stated in relevant part that Defendants' "respective Firestorm e-mail

accounts were purged"; that "[i]t is neither Firestorm's nor Rekor's policy to purge e-mail accounts when employees or officers resign from employment"; and that "[t]his indicates . . . that [Defendants] intentionally emptied [their] e-mail accounts for several improper purposes."  Dkt. No. 247 ¶ 54; Dkt. No. 295-8 ¶ 54.  The letter, however, neither asked for the return of the property nor "convey[ed] the exclusive claim of ownership."  *Polanco*, 132 F. Supp. 3d at 589 (quoting *Feld*, 720 N.Y.S.2d at 37).  In short, by failing to provide evidence of a demand, Plaintiff has not shown liability on its conversion claim.

For these reasons, Plaintiff is denied summary judgment on its claim for conversion.

### C.      Trespass to Chattels (Plaintiff's Fifth Claim)

Plaintiff's fifth claim is for trespass to chattels against Loughlin and Rhulen.[11]  Plaintiff argues that Loughlin and Rhulen are liable for trespass to chattels because they intentionally removed company emails from their company email accounts without Rekor's knowledge or permission.  Dkt. No. 244 at 20.  Defendants argue Plaintiff has failed to show that Loughlin and Rhulen acted with requisite intent; that they physically interfered with Plaintiff's possession of the emails because they simply moved the emails to folders on their company laptops and possessed the emails pursuant to the PRAs and the New Agreement; or that Plaintiff has suffered resulting harm.  Dkt. No. 291 at 20–21.

"The tort of trespass to chattel consists of intentionally disposing another of the chattel or using or intermeddling with a chattel in another's possession."  *Hecht v. Components Int'l, Inc.*, 867 N.Y.S.2d 889, 898 (N.Y. Sup. Ct. 2008) (citing Restatement (Second) of Torts § 217).  "To prevail on a claim of trespass to chattels, plaintiffs must prove the following four elements: (1) defendants acted with intent, (2) to physically interfere with (3) plaintiffs' lawful possession, and

---

[11] The Court dismissed this claim as to Satterfield in its previous summary judgment opinion. Dkt. No. 214 at 25.

(4) harm resulted." *Spa World Corp. v. Lipschik*, 2010 WL 11632681, at *13 (E.D.N.Y. Sept. 9, 2010) (quoting *Biosafe-One, Inc. v. Hawks*, 639 F. Supp. 2d 358, 368 (S.D.N.Y. 2009)). A defendant is liable if it dispossesses the plaintiff of the chattel, including taking the chattel from the possession of another without the other person's consent or destroying the chattel while it is in the other person's possession. *See Hecht*, 867 N.Y.S.2d at 898–99; Restatement (Second) of Torts §§ 218, 221. "Deleting emails destroys computer information and may constitute dispossession of the information if the deletion is without the consent of the possessor of the computer." *Hecht*, 867 N.Y.S.2d at 899.

Plaintiff is not entitled to summary judgment on its trespass to chattels claim because disputed issues of fact remain. Plaintiff argues that it has shown that Loughlin and Rhulen intentionally moved emails onto their laptops without Plaintiff's knowledge or permission. But Defendants point to evidence suggesting that, before Firestorm's acquisition, there was a policy and practice at Firestorm for employees to move emails from their email folders to their hard drives. *See* Loughlin Decl. ¶ 7. Because there are disputed facts, Plaintiff is denied summary judgment on its trespass to chattels claim.

\* \* \*

In summary, Plaintiff's claim for breach of fiduciary duty is dismissed as to Satterfield, and Plaintiff is denied summary judgment on its claims for breach of fiduciary duty, conversion, and trespass to chattels as to Loughlin and Rhulen.[12]

---

[12] Because the Court denies summary judgment on these claims, the Court need not address each of Defendants' general arguments in opposition to Plaintiff's email claims or the extent of the disputed issues that remain for trial on these claims. *See* Dkt. No. 291 at 8–14.

III.    **Libel (Defendants' Sixth Counterclaim)**

Plaintiff also seeks summary judgment on Defendants' sixth counterclaim for libel for the statement in the Form 10-Q filed with the SEC.  Plaintiff argues that the Court should dismiss this claim for the same reasons it dismissed the libel claim in *Loughlin v. Goord*—that a qualified privilege attached to the 10-Q statement and that Defendants failed to allege malice sufficient to defeat that privilege.  Dkt. No. 244 at 22.  Defendants respond that triable issues of fact exist, particularly as to whether Rekor's ill will toward Defendants was the one and only reason for the statement's publication.  Dkt. No. 291 at 24–25.

"Under New York law, to state a claim for defamation, a plaintiff must allege '(1) a written [or spoken] defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability.'"  *Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149, 169–70 (S.D.N.Y. 2021) (alteration in original) (quoting *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019)).  "But New York '[p]ublic policy mandates that certain communications, although defamatory, cannot serve as the basis for the imposition of liability in a defamation action.'"  *Chandok v. Klessig*, 632 F.3d 803, 815 (2d Cir. 2011) (alteration in original) (quoting *Toker v. Pollack*, 376 N.E.2d 163, 166 (N.Y. 1978)).  In New York, "[a] statement is generally 'subject to a qualified privilege when it is fairly made by a person in the discharge of some public or private duty, legal or moral.'"  *Id.* at 814 (quoting *Rosenberg v. MetLife, Inc.*, 866 N.E.2d 439, 442 (N.Y. 2007)).  Relatedly, "a 'qualified[] privilege extends to a communication made by one person to another upon a subject in which both have an interest.'"  *Id.* at 815 (quoting *Liberman v. Gelstein*, 605 N.E.2d 344, 349 (N.Y. 1992)).  "This privilege encompasses a defamatory communication on 'any subject matter in which the party communicating has an interest . . . made to a person having a corresponding interest.'"  *Id.* (quoting *Stukuls v. State*, 366 N.E.2d 829, 833 (N.Y.

1977)).  "Courts recognize a common interest privilege in instances where 'the good that may be accomplished by permitting an individual to make a defamatory statement without fear of liability outweighs the harm that may be done to the reputation of others.'"  *Boehner v. Heise*, 734 F. Supp. 2d 389, 399 (S.D.N.Y. 2010) (quoting *Garson v. Hendlin*, 532 N.Y.S.2d 776, 780 (2d Dep't 1988)).  "As long as the privilege is not abused, the exchange of information between parties who maintain a common interest should not be disrupted."  *Id.*

However, "[a] qualified privilege may be overcome by a showing either of 'actual' malice (*i.e.*, knowledge of the statement's falsity or reckless disregard as to whether it was false) or of common-law malice."  *Chandok*, 632 F.3d at 815.  "Common-law malice 'mean[s] spite or ill will.'"  *Id.* (alteration in original) (quoting *Liberman*, 605 N.E.2d at 349).  "The critical difference between common-law malice and constitutional [*i.e.*, 'actual'] malice . . . is that the former focuses on the defendant's attitude toward the plaintiff, the latter on the defendant's attitude toward the truth."  *Id.* (quoting *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 99 (2d Cir. 2000)).  "In this context, however, spite or ill will refers not to defendant's general feelings about plaintiff, but to the speaker's motivation for making the defamatory statements."  *Liberman*, 605 N.E.2d at 350 (citing, among other authorities, Restatement (Second) of Torts § 603 & cmt. a).  The Restatement (Second) of Torts further explains the relationship between common law malice and the qualified privilege:

> Any conditional privilege is created because the interest of the publisher, the recipient of the defamatory publication or some third person or an interest of the public is actually or apparently involved, and the knowledge by the recipient of the defamatory matter, if it is true, is likely to be of service in the protection of that interest.  If the defamatory matter is not in any part published for its protection, the privilege is abused.  Thus a publication of defamatory matter upon an occasion giving rise to a privilege, if made solely from spite or ill will, is an abuse and not a use of the privilege.  However, if the publication is made for the purpose of protecting the interest in question, the fact that the publication is inspired in part by

> resentment or indignation at the supposed misconduct of the person defamed does
> not constitute an abuse of the privilege. . . .

Restatement (Second) of Torts § 603, comment a.

In other words, "[w]hile either 'actual' malice or common-law malice will suffice to defeat a conditional privilege, common-law malice will defeat such a privilege only if it was the one and only cause for the publication." *Chandok*, 632 F.3d at 815 (internal quotation marks and citations omitted); *see also Conti v. Doe*, 535 F. Supp. 3d 257, 279 (S.D.N.Y. 2021) ("To show common law malice, a plaintiff must prove that the defendant was motived 'only' by 'spite or ill will.'" (quoting *Liberman*, 605 N.E.2d at 349)); *Hodges v. Lutwin*, 2022 WL 974386, at *4 (S.D.N.Y. Mar. 31, 2022) (characterizing the demonstration of malice as the one and only cause for publication as a "high bar"). "If the defendant's statements were made to further the interest protected by the privilege, it matters not that the defendant *also* despised plaintiff." *Liberman*, 605 N.E.2d at 350. "Thus, a triable issue is raised only if a jury could reasonably conclude that 'malice was the one and only cause for the publication.'" *Id.* (quoting *Stukuls*, 366 N.E.2d at 835).

Here, for the same reasons articulated in the Court's opinion in *Loughlin v. Goord* about the same statement in the Form 10-Q filed with the SEC, the Court concludes that the qualified privilege concerning common interest and legal duty applies to the 10-Q statement. *See Loughlin*, 558 F. Supp. 3d at 152–54. Defendants do not dispute that a qualified privilege applies. Instead, they focus their argument on the issue of common law malice sufficient to overcome the qualified privilege. According to Defendants, Plaintiff has not offered evidence as to its motivation for filing the statement save for the declaration of a Rekor executive stating that "[i]n compliance with requirements imposed by the SEC, Plaintiff filed a Form 10-Q on August

14, 2019, in which it disclosed the June 25, 2019 letter it sent to Defendants."[13]  Dkt. No. 291 at 24 (quoting Latifullah Decl. ¶ 10).  By contrast, Defendants argue that they have submitted evidence of a retaliation campaign against Defendants.  *Id.*  However, "it matters not that the [speaker] *also* despised [the party bringing the defamation claim]" so long as the statement was "made to further the interest protected by the privilege."  *Liberman*, 605 N.E.2d at 350.  In other words, even if Plaintiff harbored ill will toward Defendants, that is insufficient.  Defendants instead must point to evidence suggesting that the 10-Q statement was *not* "made to further the interest protected by the privilege."  *Id.*  Defendants argue that, "[a]lthough the Court found that Rekor . . . had an obligation to disclose that Defendants' Warrants might be subject to rescission, Defendants believe that *the necessary disclosure* did not need to be defamatory."  Dkt. No. 291 at 23 (emphasis added).  If Plaintiff made the 10-Q statement as part of a necessary disclosure, Defendants cannot show that common law malice was the one and only cause for the statement. And "a triable issue is raised only if a jury could reasonably conclude that 'malice was the one and only cause for the publication.'"  *Liberman*, 605 N.E.2d at 350 (quoting *Stukuls*, 366 N.E.2d at 835).

For these reasons, the Court dismisses Defendants' sixth counterclaim for libel.

## IV.   Motion to Strike

Plaintiff also moves to strike the declaration of Kevin Struck ("Struck")—a former Firestone employee—along with its supporting exhibits.  Dkt. No. 298 (citing Dkt. Nos. 296, 296-1, 296-2).  According to Plaintiff, Defendants did not identify Struck in their Rule 26(a) disclosures or in their answers to interrogatories, did not supplement their disclosures or

---

[13] Defendants attack this statement as a "legal conclusion," Dkt. No. 291 at 24, but Defendants also concede that the Court previously found that Rekor "had an obligation to disclose that Defendants' Warrants might be subject to rescission," *id.* at 23.

interrogatories to identify Struck, and did not produce the exhibits attached to the declaration prior to the close of discovery.  *Id.* at 1.  Plaintiff argues that Defendants offer no justification for their failure to disclose and that admission of the declaration and exhibits would prejudice Plaintiff because it made its motion for summary judgment on what it thought was the full factual record and because admission would require Plaintiff to conduct additional discovery.  *Id.* at 2–3.

Defendants oppose the motion.  Dkt. No. 302.  Defendants concede that they contacted Struck for the first time after Plaintiff moved for partial summary judgment and after the close of discovery.  *Id.* at 1.  They explain that they did not include Struck in their disclosures because they did not consider him to have information within Rule 26(a)(1)(A)(i) but that they have now served Plaintiff with a formal supplement to their disclosures.  *Id.* at 2.  Defendants also argue that, because Struck's name was mentioned during a deposition taken by Plaintiff's counsel, Plaintiff's counsel knew about Struck and Defendants did not have to supplement their disclosures.  *Id.* at 2–3.  They also argue that any violation of their duty to supplement was inadvertent and arose only after the close of discovery and after Plaintiff moved for summary judgment.  *Id.* at 3.

After Defendants served their supplemental disclosure, which identified Struck as a witness, Plaintiff moved to strike the supplement as untimely.  Dkt. No. 303.  Defendants oppose Plaintiff's request because they assert that disclosure of Struck was made shortly after they learned that his knowledge of past events would be material and not on the eve of trial.  *Id.* at 2.  They also ask that Plaintiff be allowed to depose Struck under such conditions as the Court deems appropriate.  *Id.*

Federal Rule of Civil Procedure 37(c)(1) provides: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Federal Rule of Civil Procedure 26(a)(1)(A) provides that "a party must . . . provide to the other parties: (i) the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A), (A)(i). And Federal Rule of Civil Procedure 26(e)(1) provides that "[a] party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1), (1)(A).

"The purpose of Rule 37(c) is to prevent the practice of 'sandbagging' an adversary with new evidence." *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 156 (S.D.N.Y. 2012). "Courts . . . have 'broad discretion' to determine the nature of any sanction that should be imposed under Rule 37, 'based on all the facts of the case.'" *Id.* (quoting *AAIpharma Inc. v. Kremers Urban Dev. Co.*, 2006 WL 3096026, at *5 (S.D.N.Y. Oct. 31, 2006)). "Further, as preclusion of evidence is a 'harsh remedy,' it 'should be imposed only in rare situations.'" *Id.* (quoting *Izzo v. ING Life Ins. & Annuity Co.*, 235 F.R.D. 177, 186 (E.D.N.Y. 2005)) (collecting cases). "'Before [granting] the extreme sanction of preclusion,' the Court 'should inquire more fully into the actual difficulties which the violation

causes, and must consider less drastic responses.'" *Id.* at 157 (alteration in original) (quoting *Outley v. New York*, 837 F.2d 587, 591 (2d Cir. 1988)).  "In determining whether preclusion or another sanction would be appropriate, courts should consider: '(1) the party's explanation for the failure to comply with the discovery [requirement]; (2) the importance of . . . the precluded [evidence]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.'" *Id.* (quoting *Softel, Inc. v. Dragon Medical & Scientific Communications, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997)). Additionally, "where excusing a party's dilatory conduct would have the effect of causing another party to incur additional costs that it would not have otherwise incurred, it may be appropriate for the court to shift those costs to the party at fault." *Id.* (citing cases in which courts ordered dilatory party to pay costs of depositions).

On Plaintiff's motion for partial summary judgment, the Court strikes the declaration of Struck and related exhibits.[14]  Failure to disclose the facts contained in the deposition and exhibits until opposing a motion to summary judgment is "a clear violation of Rule 26(e)." *White Plains Hous. Auth. v. BP Prod. N. Am. Inc.*, 482 F. Supp. 3d 95, 103 (S.D.N.Y. 2020). Further, "[m]any courts in this Circuit . . . have held that the mere mention of a name in a deposition or interrogatory response is insufficient to satisfy Rule 26(a)(1)(A)(i)." *Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 72 (E.D.N.Y. 2012) (collecting cases).  Defendants do not provide substantial justification for this failure—the content of the Struck declaration and exhibits relate to issues raised prior to Plaintiff's motion for partial summary judgment, and Defendants' counsel do not deny that they were aware of Struck prior to Plaintiff's motion.

---

[14] The Court did not consider the Struck declaration and exhibits in resolving Plaintiff's motion for partial summary judgment.

Further, given the issues raised during fact discovery, Defendants would have known the relevance of Struck's information.  Defendants' failure to disclose also prejudiced Plaintiff in that Plaintiff filed its motion for partial summary judgment based on the discovery record, which had been closed at the time it made its motion.  Based primarily on Defendant's insufficient explanation for its failure to disclose and the prejudiced suffered by Plaintiff on the motion for partial summary judgment, the Court precludes this evidence on Plaintiff's motion for partial summary judgment.

The Court, however, rules differently with respect to Defendant's recent supplemental disclosure identifying Struck as a witness.  The Court will permit Defendants to call Struck as a witness at trial so long as Defendants make Struck available for deposition by Plaintiff and pay for Plaintiff to depose him, including all attorneys' fees and costs.  Preclusion of evidence is a harsh remedy, and the Court determines that this sanction is appropriate under the *Softel* factors. The evidence appears relevant to the email claims, and Plaintiff will not be unduly prejudiced by having to meet the new testimony given the sanction imposed and the amount of time until trial is set to begin.[15]

## V.     Motion to Seal

Lastly, the Court addresses the pending sealing motion.  When Defendants filed their opposition to Plaintiff's motion for partial summary judgment, they filed six exhibits under seal and filed copies of their Rule 56.1 response and Rhulen's declaration in opposition with redactions where those filings discussed the exhibits filed under seal.  Dkt. No. 283; *see also* Dkt. Nos. 284, 295.  Defendants did so because Plaintiff's counsel had requested that they file these documents under seal.  Dkt. No. 283.  Defendants, in fact, object to the confidentiality

---

[15] Upon Defendants' motion and without objection from Plaintiff, the Court recently adjourned the trial date from October 2022 to February 2023.  Dkt. No. 317.

designations, primarily because they assert that the documents are relevant to Plaintiff's motion

for partial summary judgment.  Dkt. Nos. 284, 295.  Plaintiff consents to the public filing of most

of the exhibits at issue but requests that certain portions remain redacted.  Dkt. No. 300; *see also*

Dkt. No. 299.  Plaintiff seeks redactions of material that it says reflects confidential business or

personal information.  Dkt. No. 300 at 2–3.  Plaintiff does not appear to seek to redact any

portion of Dkt. No. 295-5.  *See id.*

There is a presumption of public access to judicial documents under both the common

law and the First Amendment.  *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 126 (2d

Cir. 2006).  Filings in support and in opposition to a motion for summary judgment have been

repeatedly held to be judicial documents.  *See id.* at 121, 124; *Brown v. Maxwell*, 929 F.3d 41, 47

(2d Cir. 2019).  Under the common law right of access, a court may deny access only if there are

"countervailing factors" that weigh against public disclosure such as "'the danger of impairing

law enforcement or judicial efficiency' and 'the privacy interests of those resisting disclosure.'"

*Lugosch*, 435 F.3d at 120 (quoting *United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995)).

Under the First Amendment, similar findings must be made: "continued sealing of [summary

judgment] documents may be justified only with specific, on-the-record findings that sealing is

necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve

that aim."  *Id.*  "In determining the weight to be accorded an assertion of a right of privacy,

courts should first consider the degree to which the subject matter is traditionally considered

private rather than public.  Financial records of a wholly owned business, family affairs,

illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh

more heavily against access than conduct affecting a substantial portion of the public."  *Amodeo*,

71 F.3d at 1051.  However, "[t]he mere fact that information is subject to a confidentiality

agreement between litigants . . . is not a valid basis to overcome the presumption in favor of public access to judicial documents." *In re Gen. Motors LLC Ignition Switch Litig.*, 2015 WL 4750774, at *4 (S.D.N.Y. Aug. 11, 2015).

The Court has reviewed the proposed redactions at Dkt. No. 300 and finds that they are narrowly tailored to protect privacy interests and confidential business information. Defendants therefore are ordered to file public versions of the documents at Dkt. No. 295 with redactions consistent with those proposed by Plaintiff at Dkt. No. 300. Defendant are directed to file Dkt. No. 295-5 without any redactions.

## CONCLUSION

The motion for partial summary judgment is GRANTED IN PART and DENIED IN PART. The motion to strike is GRANTED IN PART and DENIED IN PART. The motion to seal is GRANTED IN PART and DENIED IN PART. Defendants are hereby ordered to file the redacted documents consistent with this Opinion and Order no later than one week from the date of this Opinion and Order.

The Clerk of Court is respectfully directed to close Dkt. Nos. 243, 283, 284, 295, and 298.


SO ORDERED.

Dated: July 29, 2022
New York, New York
_____
LEWIS J. LIMAN
United States District Judge